Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 1 of 99

Hanover 3201 Realty, LLC v. Village Supermarkets, Inc., Not Reported in Fed. Supp....

2016 WL 4541870

2016 WL 4541870
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

HANOVER 3201 REALTY, LLC, Plaintiff,

v.

VILLAGE SUPERMARKETS,

INC., et al., Defendants,

v.

Mack-Cali Realty Corp., et

al., Third-Party Defendants.

Civil Action No. 2:14-cv-1327 (SRC)(CLW)
|
Signed 08/31/2016

**Attorneys and Law Firms**

James E. Cecchi, John Michael Agnello, Michael Cross, Lindsey H. Taylor, Carella Byrne Cecchi Olstein Brody & Agnello, P.C., Roseland, NJ, for Plaintiff/Third-Party Defendants.

Anthony Argiropoulos, Thomas Kane, William Gibson, Epstein Becker Green, PC, Princeton, NJ, David W. Fassett, Arsenault & Fassett, LLP, Chatham, NJ, James M. Hirschhorn, Sills, Cummis, Epstein & Gross, Newark, NJ, for Defendants.

**OPINION & ORDER**

CATHY L. WALDOR, United States Magistrate Judge

*1 **THIS MATTER** comes before the Court upon motion by Defendants', Village Supermarkets, Inc., et al. ("Village"), Motion to Bifurcate Discovery. The Court declined to hear oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure and, for the reasons set forth below, the Court denies Defendants' motion.

On February 28, 2014, Plaintiff filed suit against Defendants in the District of New Jersey under the Sherman Antitrust Act 15 U.S.C. § 2, for monopolizing, attempting to monopolize, and conspiring to monopolize (1) the market for "full-service supermarket[s]" in the "greater Morristown" area; and (2)

the market for "full-service supermarket shopping center[s]" in the "greater Morristown" area. (Amended Complaint, ¶¶ 178-190 and ¶¶ 191-200, ECF No. 11). The Plaintiff, Hanover 3201 Realty, LLC ("Hanover"), is a real estate developer who contracted to construct and lease to Wegmans a supermarket in Hanover, NJ. Defendant, Village Supermarkets, owns and operates ShopRite supermarkets, including one in Hanover. (Brief at 2). Plaintiff alleges that Village tortuously interfered with its Wegmans contract by perpetuating "sham" objections to certain permits and approvals that prevented Hanover from constructing the proposed Wegmans. *id.*

By Opinion and Order (ECF No. 29 and 30), the case was dismissed in its entirety on October 2, 2014 without leave to amend. Judge Chesler granted the Defendants' Motion to Dismiss concluding that Plaintiff lacked standing to pursue either of its Sherman Act claims. The case was appealed.

On November 12, 2015 the Third Circuit affirmed in part, vacated in part, and remanded the case for further proceedings. The Third Circuit ruled that "for attempted monopolization of the market for full-service supermarkets, the District Court took too narrow a view of antitrust injury" and "Hanover Realty can establish that its injury was inextricably intertwined with Defendants' anticompetitive conduct." *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.,* 806 F.3d 162, 166-67 (3d Cir. 2015) (internal quotations omitted). With respect to "the claim for attempted monopolization of the market for rental space" the Third Circuit affirmed the District Court's finding that Hanover "does not compete with Defendants in that market." *id.* The District of New Jersey reinstated the Plaintiff's remaining Sherman Act claim on July 7, 2016. (ECF No. 43).

Defendants filed the instant motion (ECF No. 47), on July 15, 2016 requesting bifurcated discovery. They believe that Village Supermarkets does not have monopoly power and the "lone federal claim is factually and legally baseless." (Brief, at 1) (ECF No. 47-1). Defendants want the Court to "limit the first stage of discovery to Village Supermarkets' lack of monopoly power in the alleged market" followed by dispositive motion practice. (Brief, at 1). According to Village Supermarkets' its ShopRite does not have a monopoly because the Morris Plains Super Stop & Shop is a "full-service supermarket" that competes in the same alleged market. (Brief, at 8).

*2 On July 29, 2016, Plaintiff filed its brief in opposition to Defendants' Motion to Bifurcate (henceforth "Opp. Brief")

Hanover 3201 Realty, LLC v. Village Supermarkets, Inc., Not Reported in Fed. Supp....

2016 WL 4541870

(ECF No. 54). Plaintiff contends that bifurcation will be inefficient and prejudicial because "Village's anticompetitive conduct including ... its practices and policies regarding filing sham petitions to harm market rivals and restrain trade will be a prominent part of the discovery taken." (Opp. Brief, at 6). This discovery will be integral to proving Hanover's monopolization claim, specifically that "the defendant engaged in predatory or anti-competitive conduct" and has "a dangerous probability of achieving monopoly power." (Opp. Brief, at 5). Plaintiff also is concerned that it will have to depose many of the same individuals twice if Village is unsuccessful on summary judgement. (Opp. Brief, at 9).

Pursuant to Federal Rule of Civil Procedure 42(b), "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues." The decision to bifurcate "rests in the Courts [broad] discretion" to resolve discovery disputes as it sees fit. *Weiss v. First Unum Life Ins. Co.*, No. CIV.A.02-4249(GEB), 2008 WL 755958, at *1 (D.N.J. Mar. 19, 2008). Courts have found that bifurcating discovery where one issue "could prove to be dispositive promote judicial economy." *id.*

However, courts "in this district do not routinely grant motions to bifurcate discovery, unless there is some showing on the part of the moving party as to why bifurcation is appropriate." *Cephalon, Inc. v. Sun Pharm. Indus., Ltd.*, No. CIV.A. 11-5474 FLW, 2013 WL 3417416, at *3 (D.N.J. July 8, 2013). In fact the Third Circuit has "condemned the district court's practice of bifurcating [ ] as a general rule." *Barr Lab., Inc. v. Abbott Lab.*, 978 F.2d 98, 115 (3d Cir. 1992). Bifurcation is "the exception" and "the moving party bears the burden of demonstrating that bifurcation" is needed. *Cephalon, Inc.*, No. CIV.A. 11-5474 FLW, 2013 WL 3417416, at *3.

Courts look to balance the extent to which bifurcation "will allow the Court to address a narrow, potentially dispositive issue in a timely and cost effective manner with" any potential prejudice to the opposing party. *Physicians Healthsource, Inc. v. Janssen Pharm., Inc.*, No. CIV.A. 12-2132 FLW, 2014 WL 413534, at *5 (D.N.J. Feb. 4, 2014). "[W]hether the advantages of bifurcation outweigh the disadvantages" is a factual inquiry assessed on a case-by-case basis. *Cephalon, Inc.*, No. CIV.A. 11-5474 FLW, 2013 WL 3417416, at *4. Some factors to consider are if "(a) there will be overlap in testimony and evidence between the two proceedings, (b) the issues to be decided at trial are complex and the

factfinder is likely to become confused, (c) bifurcation will promote settlement, and (d) a single trial will cause unnecessary delay." *Glennon v. Wing Enterprises, Inc.*, No. CIV.A. 10-0324 JAP, 2010 WL 4782773, at *14 (D.N.J. Nov. 17, 2010).

The parties argued extensively in briefing over whether the Morris Plains Stop & Shop is a full-service supermarket, and what impact that has on Village's monopoly power. The merit of Defendants' summary judgement motion on Village's monopoly power is not before the Court. For bifurcation, the Court must consider whether Village's monopoly power alone is a dispositive issue; if so, what discovery is relevant to that issue; and the related interests of the parties in focusing discovery solely on that issue.

Despite Defendants suggestion, Village Supermarkets market share or lack thereof is not the sole consideration for determining its monopoly power. Among experts there is often a "presumption that attempt [of monopoly power] does not occur in the absence of a rather significant market share." *Acme Markets, Inc. v. Wharton Hardware & Supply Corp.*, 890 F. Supp. 1230, 1241 (D.N.J. 1995). But, what "constitutes a market share significant enough to demonstrate a dangerous probability of attaining monopoly power has not been clearly defined in case law." *id.* Simply proving that Morris Plains Super Stop & Shop is a full-service supermarket operating in Hanover may not warrant dismissal of the federal claim. Both parties have acknowledged that percentage of market share is not the only factor to consider in determining Village's serious chance of obtaining monopoly power. (Opp. Brief, at 5) (citing to Defendants' Brief, at 11) (stating, "the defendant's market share is a necessary, though not sufficient, element of the dangerous probability of success").[1]

**\*3** In arguing Village's anticompetitive conduct is irrelevant to the monopoly power inquiry, Defendants compare the alleged sham petitions in this case to the anticompetitive conduct in *Acme Markets*. (Reply Letter, at 5). In *Acme Markets*, Judge Simandle ruled defendant's anticompetitive conduct of enforcing the restrictive covenant would not increase its "market share from its current non-monopoly level" and granted summary judgment on the Sherman Antitrust claim. Village's ShopRite is two miles from the proposed Wegman's location. Unlike in *Acme Markets*, Village could continue to employ the same "sham" objection tactics for future competitors in the relevant geographic region. Discovery regarding these tactics is critical to determining if there is a valid federal claim. If true, Village

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 3 of 99
Hanover 3201 Realty, LLC v. Village Supermarkets, Inc., Not Reported in Fed. Supp....
2016 WL 4541870

Supermarkets' practice of filing sham petitions will go directly to proving Defendants engaged in anticompetitive conduct and may achieve monopoly power in the future, two of the three factors needed to prove attempted monopolization under the Sherman Antitrust Act § 2. (Opp. Brief at 5-6).[2]

Defendants have not met their burden to show there is a significant need for bifurcation. The distinction Defendants wish to draw in discovery is arbitrary given the three factors needed to prove attempted monopolization. Additionally, there has been no showing that bifurcation will promote judicial economy and it may disadvantage Plaintiff.

**ACCORDINGLY, IT IS** on this 31st day of August, 2016,

**ORDERED** that Defendants Village Supermarkets, Inc., et al's motion to bifurcate discovery is **DENIED**; and

**FURTHER ORDERED** that the Clerk shall terminate ECF No. 47.

### All Citations

Not Reported in Fed. Supp., 2016 WL 4541870

Footnotes

1    *Acme Markets, Inc. v. Wharton Hardware & Supply Corp.,* 890 F. Supp. 1230, 1241 (D.N.J. 1995), cited by Defendants' in their Reply Brief indicates that "[c]ourts primarily look to the size of a defendant's market power to determine whether a defendant presents a dangerous probability of gaining monopoly power" but, "other factors considered include the strength of competition, projections on industry development, barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand."

2    Under the Sherman Antitrust Act § 2, "to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993).

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4630852
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Dawn HARTLEY–CULP, individually and on
behalf of all others similarly situated, Plaintiff

v.

CREDIT MANAGEMENT
COMPANY, Defendant.

Civil Action No. 3:CV–14–0282.
|
Signed Sept. 15, 2014.

**Attorneys and Law Firms**

Cynthia Levin, Law Offices of Todd M. Friedman, PC., King
of Prussia, PA, for Plaintiff.

James McNally, Justin M. Tuskan, Metz Lewis Brodman
Must O'Keefe LLC, Pittsburgh, PA, for Defendant.

*MEMORANDUM AND ORDER*

THOMAS M. BLEWITT, United States Magistrate Judge.

**I. BACKGROUND.**

**\*1** This putative class action case was instituted, through
counsel, on February 17, 2014, by Plaintiff Dawn Hartley–
Culp, individually and on behalf of all others similarly
situated. (Doc. 1). Named as sole Defendant is Credit
Management Company ("CMC"). Plaintiff alleges that
Defendant CMC began placing a series of calls to her cellular
telephone ("cell phone") beginning in November of 2013.
Plaintiff alleges that the calls made by Defendant CMC to
her cell phone violated the Telephone Consumer Protection
Act ("TCPA"), 47 U.S.C. §§ 227, *et seq.,* since the calls were
placed by an automated telephone dialing system ("ATDS")
or, by an artificial or recorded voice without her prior
express consent. Plaintiff also alleges that Defendant CMC
left numerous pre-recorded messages on her cell phone.

This Court has jurisdiction over this case pursuant to 28
U.S.C. § 1331.[1]

On April 8, 2014, after being granted an extension of time,
Defendant CMC filed its Answer to the Complaint with
Affirmative Defenses. (Doc. 8). Defendant CMC admitted
that it contacted Plaintiff for the purpose of collecting a debt
which Plaintiff allegedly owed. In its Affirmative Defenses,
Defendant CMC asserted that Plaintiff gave express consent
to CMC's client to whom Plaintiff allegedly owed the debt,
and that the calls made to Plaintiff were not placed via an
ATDS.[2]

Subsequently, the Court issued a scheduling order and set case
deadlines, and then extended the deadlines on two occasions.
(Docs. 19, 22 & 26). The current discovery deadline is
November 28, 2014. Plaintiff's Motion for Class Certification
is due December 12, 2014.

Pursuant to 28 U.S.C. § 636(c), the parties consented to
proceed before the undersigned for all matters. (Doc. 17).

The parties are currently engaged in discovery. Plaintiff
indicates that on July 26, 2014, she served written discovery
on Defendant and scheduled a Rule 30(b)(6) deposition for
August 26, 2014.

On August 12, 2014, Defendant CMC filed a Motion
to Bifurcate Discovery, or in the alternative, to Stay
Proceedings. (Doc. 23). Defendant CMC simultaneously filed
its support brief with Exhibits. (Docs. 24 & 24–1 to 24–4).
Plaintiff filed her opposition brief on August 28, 2014. (Doc.
28). Defendant filed its reply brief on September 9, 2014, with
Exhibits. (Docs. 29, 29–1 & 29–2).

Defendant CMC seeks the Court to bifurcate discovery into
two phases with the first phase limited to the issue of whether
Plaintiff expressly consented to receiving calls on her cell
phone. Defendant CMC maintains that if it proves Plaintiff
provided her express consent, then the calls it placed to her do
not violate the TCPA. Defendant CMC then states that if it can
show the calls placed to Plaintiff did not violate the TCPA,
then Plaintiff will not be able to proceed as the representative
of the purported class.

In the alternative, Defendant CMC moves the Court to
stay all proceedings in this case since it contends that
many of Plaintiff's allegations in her Complaint turn on
issues currently pending before the Federal Communication
Commission ("FCC"). Defendant CMC states that the FCC
has primary jurisdiction to determine the issues raised by
Plaintiff in this case.

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 5 of 99
Hartley-Culp v. Credit Management Co., Not Reported in F.Supp.3d (2014)
2014 WL 4630852

## II. DISCUSSION.

**\*2** Initially, based on the very recent Middle District of Pennsylvania case of *Fenescey v. Diversified Consultants, Inc.,* 2014 WL 2526571 (M.D. Pa. June 4, 2014, J. Conaboy), which is directly on point with our case, as well as *Gager v. Dell Financail Services, LLC,* 727 F.3d 265, 2013 WL 4463305 (3d Cir.2013), and based on the well-reasoned decision of Judge Conaboy, with which we completely concur, we will deny Defendant CMC's alternative Motion to Stay all Proceedings in this case under the primary jurisdiction doctrine. This Court in *Fenescey* largely relied upon the Third Circuit's decision in *Gager v. Dell Financail Services, LLC,* 727 F.3d 265, 2013 WL 4463305 (3d Cir.2013). This Court in *Fenescey* stated that "[g]iven the force and clarity of the [*Gager* ] precedential opinion, we have no need to further evaluate the doctrine of primary jurisdiction on the question of whether the TCPA applies to debt collection calls made to cellular phones." 2014 WL 2526571, \*2. This Court in *Fenescey* also found that based on *Gager,* there was no basis to stay its case on the ATDS issue. *Id.,* \*3.[3]

Since we concur entirely with the Court in *Fenescey,* we do not repeat its decision herein, and shall deny Defendant CMC's alternative Motion to Stay Proceedings in this case.

Next, we turn to Defendant CMC's primary Motion to Bifurcate Discovery.

As mentioned, Plaintiff alleged in her Complaint that Defendant CMC violated the TCPA by placing calls to her cellular telephone number without her prior express consent using an automatic telephone dialing system, and by leaving serval voice mail messages. The TCPA makes it unlawful to "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). Also, as stated, the TCPA applies to debt collection calls made to cellular phones. *Fenescey,* 2014 WL 2526571, \*2 (citing *Gager, supra* ). "Prior express consent is deemed to be granted only if the wireless number is provided by the consumer to the creditor, and the number was provided during the transaction that resulted in the debt owed." *Wattie– Bey v. Step hen and Michaels Assoc., Inc.,* 2014 WL 123597, \*2 (M.D.Pa. Jan.14, 2014) (citation omitted). Also, the burden is on the creditor regarding the issue of whether express

consent was provided and the creditor must show that the required prior express consent was obtained. *Id.* (citation omitted).

There is no question that the Court, in its discretion, can bifurcate discovery under Fed.R.Civ.P. 42. In *Stemrich v. Zabiyaka,* 2014 WL 931069, \*1 (M.D.Pa. March 10, 2014), the Court stated:

> Under Federal Rule of Civil Procedure 42, a trial court may, in its discretion, bifurcate a trial. The rule provides as follows:
>
> > **\*3** For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial.

Fed.R.Civ.P. 42(b). The decision to bifurcate, and the manner in which bifurcation should be ordered, is left to the trial court's informed discretion and must be decided on a case by case basis. *See Idzojtic v. Pennsylvania R.R. Co.,* 456 F.2d 1228, 1230 (3d Cir.1972) ("The district court is given broad discretion in reaching its decision whether to separate the issues of liability and damages."). In exercising its discretion, the court "must weigh the various considerations of convenience, prejudice to the parties, expedition, and economy of resources." *Emerick v. U.S. Suzuki Motor Corp.,* 750 F.2d 19, 22 (3d Cir.1984). The moving party bears the burden of establishing that bifurcation is appropriate. *See Innovative Office Prods., Inc. v. Spaceco, Inc.,* Civ. No. 05–cv–4037, 2006 WL 1340865, \*1 (E.D.Pa. May 15, 2006).

We disagree with Defendant CMC and its contentions in its briefs that discovery at this stage of the case, *i.e.,* before Plaintiff files her Motion for Class Certification, should be limited to the issue of whether its calls to Plaintiff fall within the "prior express consent" exception. As stated, the burden is on the creditor (in this case Defendant CMC) regarding the issue of whether prior express consent was provided. Also, as stated, the burden is on Defendant CMC to demonstrate that it did not use an automated telephone service when it contacted Plaintiff. If Defendant CMC can meet either of its burdens, Defendant CMC will be entitled to summary judgment on Plaintiff's TCPA claim. On the other hand, if genuine disputes of material fact exist as to whether Defendant obtained Plaintiff's prior express consent, then Defendant will not be

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 6 of 99
Hartley-Culp v. Credit Management Co., Not Reported in F.Supp.3d (2014)
2014 WL 4630852

entitled to summary judgment on Plaintiff's TCPA claim. *Wattie–Bey v. Step hen and Michaels Assoc., Inc.,* 2014 WL 123597, *3. Likewise, if disputed issues of fact remain as to whether Defendant CMC used automated telephone services in its contacts with Plaintiff, then summary judgment will not be appropriate. *Id.,* *6(citations omitted). However, we concur with Plaintiff that "whether or not [Defendant] CMC had [prior express consent] to contact Plaintiff is not a threshold question that must be resolved at this stage, before the parties have had an opportunity to conduct class-wide discovery." (Doc. 28–1, p. 6, citing *Grant v. Capital Mgmt. Servs., L.P.,* 449 Fed.Appx. 598, 600 (9th Cir.2011) (" 'express consent' is not an element of a TCPA Plaintiff's prima face case, but rather is an affirmative defense for which the Defendant bears the burden of proof.").

We also agree with Plaintiff that despite Defendant CMC's contention and its Exhibits, that it would not be unduly burdensome on Defendant at this point of the case to respond to Plaintiff's discovery requests, including requests regarding the putative class action. Also, we find prejudice to Plaintiff if discovery was bifurcated as Plaintiff maintains. As Plaintiff points out, she "primarily seeks documents that are ordinarily maintained as business records, and to the extent that CMC will be burdened by having to produce any such documents, CMC can respond with the appropriate objections and substantiate them during the meet and confer process." (Doc. 28–1, p. 5). Defendant CMC will still be able to conduct any discovery it deems necessary to try and meet its burden as to its affirmative defenses, and it will be able to file a dispositive motion at the conclusion of discovery. Moreover, we agree with Plaintiff that she should have the benefit of discovery before she has to file her Motion for Class Certification, especially since Plaintiff has the burden of class certification. *See Hawk Valley, Inc. v. Taylor,* —— F.R.D. ——, 2014 WL1302097 (E.D.Pa. March 31, 2014)

(citation omitted) (court granted Plaintiff's motion for class certification in a TCPA unsolicited-fax case since it found, in part, common issues of law and fact predominated).

**\*4** Finally, we concur with Plaintiff that bifurcation of discovery in this case will increase litigation expenses by protracting the discovery period and by duplicating the discovery process, including the depositions.

### III. CONCLUSION.

Accordingly, the Court will deny entirely Defendant CMC's Motion to Bifurcate Discovery, or in the alternative, to Stay Proceedings (**Doc.23**).[4]

An appropriate Order will be issued.

### ORDER

**AND NOW,** this *15* day of **September, 2014,** based on the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendant CMC's Motion to Bifurcate Discovery, or in the alternative, to Stay Proceedings (**Doc.23**) is **DENIED IN ITS ENTIRETY.**

2. The discovery deadline in this case is extended to **December 29, 2014,** and the deadline for Plaintiff's Motion for Class Certification is extended to **January 12, 2015.**

### All Citations

Not Reported in F.Supp.3d, 2014 WL 4630852

Footnotes

1    Jurisdiction of this Court is properly based on federal question, 28 U.S.C. § 1331, pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227, *et seq. See Fenescey v. Diversified Consultants, Inc.,* 2014 WL 2526571 (M.D.Pa. June 4, 2014).

2    According to Defendant CMC's Doc. 24 brief, p. 3 n. 2, Plaintiff allegedly owed a debt to Defendant CMC's client Extendicare Health Services, Inc. Defendant CMC notes that it is presently pursuing discovery to try and show that Plaintiff voluntarily provided her cell phone number to Extendicare staff during her intake interview upon becoming a patient of Extendicare's rehabilitation division.

3    *See Gager v. Dell Financail Services, LLC,* 727 F.3d 265, 2013 WL 4463305 (3d Cir. Aug.22, 2013) (Third Circuit Court reversed dismissal of case alleging violations of 47 U.S.C. § 227(b) (1)(A)(iii), "the TCPA's provision banning certain automated calls to cellular phones."). In *Gager,* Plaintiff alleged that Defendant was obliged under the TCPA to stop

Hartley-Culp v. Credit Management Co., Not Reported in F.Supp.3d (2014)

2014 WL 4630852

autodialed calls to her cellular phone since she withdrew her prior express consent to be called on said phone via an automatic dialing system. The District Court granted Defendant's Rule 12(b)(6) Motion to Dismiss since it found that Plaintiff could not revoke her prior express consent. *See Gager v. Dell Financail Services, LLC,* 2012 WL 1942079 (M.D.Pa. May 29, 2012). The Third Circuit Court reversed the dismissal and found that "(1) the TCPA affords [Plaintiff] the right to revoke her prior express consent to be contacted on her cellular phone via an autodialing system and (2) there is no temporal limitation on that right." 727 F.3d 265, 2013 WL 4463305, *2.

4      The Court notes that it will, sua sponte, extend the discovery deadline and the deadline for Plaintiff to file her Motion for Class Certification. The discovery deadline will be extended to December 29, 2014, and Plaintiff's Motion for Class Certification will be extended to January 12,2015.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2422617
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Joseph FRIEL, individually and on behalf
of others similarly situated, Plaintiff

v.

LINE 5, LLC and Headstart
Warranty Group, LLC, Defendants

No. 3:24cv1866
|
Signed August 21, 2025

**Attorneys and Law Firms**

Anthony I. Paronich, Pro Hac Vice, Paronich Law, P.C., Hingham, MA, Jeremy C. Jackson, Bower Law Associates, PLLC, State College, PA, Andrew Roman Perrong, Perrong Law LLC, Glenside, PA, for Plaintiff.

Brit J. Suttell, Barron & Newburger, P.C., Media, PA, for Defendant Line 5, LLC.

Andrew Michael Schwartz, Messer Strickler Burnette, Ltd., Downingtown, PA, Barry Guaglardi, Pro Hac Vice, Guaglardi & Meliti, LLP, Rochelle Park, NJ, for Defendant Headstart Warranty Group LLC.

**MEMORANDUM**

JULIA K. MUNLEY, JUDGE

**\*1** This putative class action case involves automated telephone calls allegedly sent by companies selling, guaranteeing, and/or financing vehicle service contracts, otherwise known as extended car warranties. After receiving numerous unsolicited extended-warranty calls over a two-month period, Plaintiff Joseph Friel filed this action pursuant to the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, ("TCPA"), seeking to represent a nationwide class of robocall recipients and a class of recipients on the National Do Not Call Registry ("DNCR"). Before the court is a motion to strike the class allegations from Friel's complaint prior to discovery. Also pending is a motion to bifurcate discovery, which actually requests that discovery be conducted in three separate phases. Both motions are ripe for disposition.

**Background**[1]

Friel's TCPA complaint alleges that former defendant JEA Management Services d/b/a Covered Auto ("JEA") sent prerecorded telemarketing calls on behalf of Defendants Headstart Warranty Group, LLC ("Headstart") and Line 5, LLC ("Line5"), including to recipients on the DNCR without the call recipient's express written consent. (Doc. 1, Compl. ¶ 5).

As for the extended car warranties involved in this TCPA litigation, Friel's complaint details a joint enterprise among the JEA, Headstart, and Line5 entities. Id. ¶ 17. As alleged, JEA and Headstart sell vehicle service contracts with JEA acting as a sales agent and Headstart acting as the guarantor of the contracts. id. ¶¶ 14–15. Line5 handles customer management, payment processing, and provides financing for the contracts sold by JEA and guaranteed by Headstart. Id. ¶ 16. To generate business, JEA places telemarketing calls, some of which are prerecorded, on behalf of Headstart and Line5. Id. ¶ 17.

Friel further alleges that he maintains a personal residential telephone number, which has been on the DNCR since 2011. Id. ¶¶ 18–20. According to the plaintiff, he has never been a customer of JEA, Headstart, or Line5 and never inquired into being a customer of these entities. Id. ¶ 21. Nevertheless, Friel received at least fourteen (14) telemarketing calls from JEA between August 8, 2024 and September 27, 2024. Id. ¶ 22. The caller IDs from these incoming calls reflected different phone numbers from area codes associated with the Philadelphia, Allentown-Bethlehem-Easton, and Scranton-Wilkes-Barre metropolitan areas. Id. ¶¶ 22, 27.

Friel answered the calls. They all began with a prerecorded voice message with fake typing and office background noise. Id. ¶¶ 23, 24. A robotic voice greeted Friel by name, identified that it was calling on behalf of the "vehicle service department," and asked how the plaintiff was doing. Id. ¶ 24. Friel hung up on most of the calls. Id. ¶ 26.

Friel answered one of the calls on September 27, 2024. Id. ¶ 27. Plaintiff heard the above prerecorded message, responded to questions posed by the artificial intelligence agent, and was then transferred to a human representative. Id. ¶¶ 23–32. Next, Friel listened to that representative's sales speech about a vehicle service contract and the financing program offered by Defendant Line5. Id. ¶¶ 32–33. Subsequently, Friel

received various emails and text messages from Line5 and a copy of a vehicle service contract for signature. Id. ¶ 36. From these communications, Friel discerned JEA, Headstart, and Line5's roles in the telephone calls. Id. ¶¶ 37–39.

**\*2** Approximately one month later, on October 29, 2024, Friel initiated this putative class action against JEA, Headstart, and Line5 under 47 U.S.C. § 227(b) and 47 U.S.C. § 227(c)(5) seeking to represent himself and other similarly situated individuals. (Doc. 1, Compl. ¶¶ 90–99). JEA responded by filing three motions: 1) a motion to strike class allegations, (Doc. 29); 2) a motion to dismiss for failure to state a claim, (Doc. 31), and 3) a motion to trifurcate discovery, (Doc. 33). JEA filed briefs in support of each motion. (Docs. 30, 32, 34). Defendant Line5 joined JEA's motion to strike and motion to trifurcate discovery. (Docs. 45–46).

On March 25, 2025, Friel filed a notice of voluntary dismissal regarding JEA. (Doc. 50). JEA's dismissal rendered the motion to dismiss moot. (Doc. 51). The court determined that Line5's joinder to the other motions required oppositional briefing. Id. Friel subsequently filed his briefs in opposition as ordered. (Docs. 52–53). Line5 then filed a reply brief regarding the motion to trifurcate discovery, (Doc. 54), but not the motion to strike. Based on the briefs of JEA and Friel, the motion to strike plaintiff's TCPA class allegations is ripe for disposition. Similarly, the motion seeking phased discovery is ready for a decision based upon the briefs of JEA, Friel, and Line5.

**Jurisdiction**

Because Friel brings suit under a federal statute, the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. See Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 387 (2012) (holding that nothing in the text, structure, or legislative history of the TCPA calls for displacement of federal question jurisdiction).

**Analysis**

**1. The TCPA and the Proposed Classes**

This putative class action concerns alleged violations of the TCPA. "The TCPA protects businesses and consumers from intrusive telemarketing communications." McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp., 606 U.S. 146, 149 (2025). The TCPA "makes it unlawful to use an automatic telephone dialing system or an artificial or prerecorded voice

message, without the prior express consent of the called party, to call any... cellular telephone, or other service for which the receiver is charged for the call." Mims, 565 U.S. at 373 (citing 47 U.S.C. § 227(b)(1)(A)). The TCPA also "forbids using artificial or prerecorded voice messages to call residential telephone lines without prior express consent. Id. (citing 47 U.S.C. § 227(b)(1)(B)). "In plain English, the TCPA prohibited almost all robocalls to cell phones." Barr v. Am. Ass'n of Pol. Consultants, Inc., 591 U.S. 610, 615 (2020) (footnote omitted).

Additionally, Section 227(b) contains a private right of action based on violations of that subsection or the regulations prescribed under that subsection. 47 U.S.C. § 227(b)(3). Under Section 227(b)(3), a person or entity may: 1) obtain injunctive relief; 2) recover actual monetary loss or receive $500 in damages, whichever is greater; or 3) both. See 47 U.S.C. § 227(b)(3)(A)–(C). "The TCPA imposes tough penalties for violating the robocall restriction," including trebling the above damages for willful or knowing violations, "which can add up quickly in a class action." Barr, 591 U.S. at 616.

Section 227(c) concerns further protections of residential telephone subscribers' privacy rights and directs the Federal Communications Commission ("FCC") to prescribe regulations regarding do-not-call systems. See 47 U.S.C. § 227(c)(1)–(4). Section 227(c) "authorizes a private right of action for violation of the FCC's implementing regulations[ ]" related to do-not-call. See 47 U.S.C. § 227(c)(5); Mims, 565 U.S. at 375 & n.5. Section 227(c)(5) permits a civil action by "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations[.]" 47 U.S.C. § 227(c)(5).[2] Under Section 227(c)(5), a person or entity may: 1) obtain injunctive relief; 2) recover actual monetary loss or receive $500 in damages, whichever is greater; or 3) both. See 47 U.S.C. § 227(c)(5)(A)–(C). A plaintiff may also seek treble damages for willful or knowing violations of the do-not-call regulations. Id.

**\*3** These statutory provisions and attendant regulations form the basis of Friel's complaint against the defendants. They also form the basis of his two proposed classes. The proposed Robocall Class stems from the alleged Section 227(b) and related regulatory violations, while the proposed National Do Not Call Registry Class ("DNCR Class") derives from the alleged Section 227(c) and related regulatory violations.

**2. Motion to Strike Class Allegations**

There are two motions presently pending before the court. First, as mentioned above, Line5 joined in JEA's motion to strike the class allegations from Friel's complaint. The motion to strike is partly premised upon Rule 12(f) of the Federal Rules of Civil Procedure. Rule 12(f) provides that the court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). Rule 12(f) motions are designed to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters. Goode v. LexisNexis Risk & Info. Analytics Grp., Inc., 284 F.R.D. 238, 243 (E. D. Pa. 2012) (citations omitted); see also McInerney v. Moyer Lumber and Hardware, Inc., 244 F.Supp.2d 393, 402 (E.D. Pa. 2002). Providing relief under Rule 12(f) is largely disfavored and such motions are typically denied "unless the material bears no possible relation to the matter at issue and may result in prejudice to the moving party." Miller v. Group Voyagers, Inc., 912 F.Supp. 164, 168 (E.D. Pa. 1996). In the class action context, however, it is unlikely that a defendant can show that a plaintiff's class allegations constitute matters usually contemplated by Rule 12(f). See In re Ry. Indus. Emp. No-Poach Antitrust Litig., 395 F. Supp. 3d 464, 496 (W.D. Pa. 2019) (citations omitted).

The motion to strike is also premised upon Federal Rule of Civil Procedure 23, which governs the administration of class actions in federal courts. See Perrigo Institutional Inv. Grp. v. Papa, No. 24-2861, ––– F.4th –––, 2025 WL 2315977, at *4 (3d Cir. Aug. 12, 2025). Although "an ingenious procedural innovationM" Eubank v. Pella Corp., 753 F.3d 718, 719 (7th Cir. 2014), "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' " Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348 (2011) (quoting Califano v. Yamasaki, 442 U.S. 682, 700–701 (1979)). Thus, to ensure that named plaintiffs are appropriate representatives of the class whose claims they wish to litigate, Rule 23(a) contains four requirements: numerosity, commonality, typicality, and adequacy of representation. See id. at 348–49. Additionally, for a class to be certified, the requirements of Rule 23(b)(1), (2), or (3) must also be met. Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 590 (3d Cir. 2012).

Friel brings this putative TCPA class action pursuant to Rule 23(b)(2) and/or Rule 23(b)(3). (Doc. 1, Compl. ¶ 73). Rule 23(b)(2) is used to pursue injunctions in class actions. See In re: Google Inc. Cookie Placement Consumer Priv. Litig., 934 F.3d 316, 323 (3d Cir. 2019). The

complaint requests injunctive relief to prohibit defendants from using prerecorded voices in the future and from making telemarketing calls to telephone numbers on the DNCR. (Doc. 1, Compl. ¶¶ 94, 99). Friel, however, also seeks statutory damages on behalf of himself and the putative classes. Id. ¶¶ 92-93, 98. Rule 23(b)(2) certification is not authorized when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant, or when each class member would be entitled to individualized award of monetary damages. Wal-Mart Stores, Inc., 564 U.S. at 360. Rather, "individualized monetary claims belong in Rule 23(b)(3)." Id. at 362. Under Rule 23(b)(3), a class action may be maintained if the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a) are satisfied and the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[3] FED. R. CIV. P. 23(b)(3).

**\*4** Rule 23(c) further provides that "[a]t an early practicable time after a person sues... as a class representative, the court must determine by order whether to certify the action as a class action." FED. R. CIV. P. 23(c)(1)(A). Additionally, Rule 23(d) permits the court to issue orders that: 1) "determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument[,]" FED. R. CIV. P. 23(d)(1)(A), and/or 2) "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly[,]" FED. R. CIV. P. 23(d)(1)(D). Consequently, where the goal of the motion to strike is to eliminate class allegations prior to discovery, other district courts have concluded that such motions should be considered under the above provisions of Rule 23, not under Rule 12(f). See In re Ry. Indus. Emp. No-Poach Antitrust Litig., 395 F. Supp. 3d at 496; see also Johnson v. Ally Fin. Inc., No. 1:16-CV-1100, 2017 WL 3433689, at *2 (M.D. Pa. Aug. 10, 2017) (Conner, J.) (concluding that a motion to strike class allegations is not an improper procedural device).

To determine whether the requirements of Rule 23 have been satisfied, "a district court must conduct a 'rigorous analysis.' " Landsman & Funk PC v. Skinder-Strauss Assocs., 640 F.3d 72, 93 (3d Cir. 2011) (quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008)).[4] There are "rare few" instances in which "the complaint itself demonstrates that the requirements for maintaining

a class action cannot be met." Id. at 93, n.30. Thus, "delving into the propriety of class certification" can be "the wrong focus" at an early stage of a proceeding where there has been no motion for class certification and no discovery. Id. at 93–94. After all, "[a]n order striking class allegations is functionally equivalent to an order denying class certification[.]" Microsoft Corp. v. Baker, 582 U.S. 23, 34, n.7 (2017).

One of the "rare few" instances where an early motion to strike class allegations may be granted is where the class definitions create impermissible fail-safe classes. See Zarichny v. Complete Payment Recovery Servs., Inc., 80 F. Supp. 3d 610, 624 (E.D. Pa. 2015). "A fail-safe class is 'one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim.' " Id. (quoting Messner v. Northshore University HealthSystem, 669 F.3d 802, 825 (7th Cir .2012)).

Friel's Robocall Class is defined as:

> All persons in the United States who, (1) within four years prior to the commencement of this litigation until the class is certified (2) received one or more calls on their cellular telephone or any other protected telephone service (3) from or on behalf of JEA Management Services d/b/a Covered Auto, Headstart Warranty Group LLC, or Line 5, LLC, (4) sent using the same, or substantially similar, pre-recorded message used to contact the Plaintiff.

(Doc. 1, Compl. ¶ 74).

Friel's DNCR Class is defined as:

> All persons within the United States: (1) whose residential telephone numbers were on the National Do Not Call Registry for at least 31 days; (2) but who received more than one telephone solicitation call from Defendants or a third party acting on Defendants' behalf; (3) within a 12-month period; (4) within the four years prior to the filing of the Complaint.

Id.

The motion to strike asserts that the proposed class definitions are facially uncertifiable. Line5 has adopted JEA's arguments that the proposed class definitions are overbroad, lack commonality, and are defined vaguely. There are no specific arguments that the proposed classes are fail-safe, yet this consideration hangs over the analysis.

#### a. Overbreadth Arguments

**\*5** Defendant Line5 has joined in former defendant JEA's argument that both the proposed Robocall Class and the DNCR Class are overbroad. The Robocall Class definition is challenged as overbroad because it fails to exclude calls to individuals who consented to their receipt.[5] Similarly, the DNCR Class is challenged because this proposed class may include calls made to individuals with an established business relationship ("EBR") with the defendants and may include individuals who did not personally place their number on the DNCR.[6]

After careful consideration, however, Friel appears to be in a situation where he is forced to choose between two vulnerable alternatives in proposing class definitions at the outset of the litigation. On one hand, Friel must define his classes with reference to objective criteria. See Lewis v. Gov't Emps. Ins. Co., 98 F.4th 452, 462 (3d Cir. 2024) (citing Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015)). On the other hand, if Friel uses certain qualifiers, his proposed definitions could be deemed to advance improper fail-safe classes.[7]

As indicated above, "[a] fail-safe class bases its membership upon the validity of putative members' legal claims, meaning that 'a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment.' " Jackson, 2023 WL 2472606, at *3 (quoting Messner, 669 F.3d at 825). More simply stated, fail-safe classes preclude membership in the class unless a putative member would prevail on the merits. See Orduno v. Pietrzak, 932 F.3d 710, 716 (8th Cir. 2019).

**\*6** Fail-safe classes cannot satisfy the ascertainability requirement of some class actions. See Zarichny, 80 F. Supp. 3d at 625 (citation omitted); see also Byrd, 784 F.3d at 163 & n.7 (explaining that a plaintiff seeking certification under Rule 23(b)(3) must prove by a preponderance that the class is ascertainable, but that ascertainability is not a requisite of a Rule 23(b)(2) class). The ascertainability standard requires a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. Byrd, 784 F.3d at 163 (citations omitted).

In Zarichny, the Honorable Stewart R. Dalzell in the Eastern District of Pennsylvania determined that a putative TCPA class was defined in a fail-safe manner and granted a motion

to strike. 80 F.Supp. 3d at 623-26. The proposed TCPA class was comprised of "those people 'who received one or more telephone calls from [d]efendants on the individual's cellular telephone that was initiated using an automatic telephone dialing system' without prior con[s]ent[.]" Id. at 623. Because the class was defined in a manner which only would include those who did not provide the defendant with prior consent, the court determined that "there is no way to provide notice to that putative class without the sort of extensive fact-finding that class actions should avoid," and "at the conclusion of the litigation, should [the defendant] prevail against [the plaintiff], any other putative class recipient would be free to litigate the same claim against [the defendant]." Id. at 625–26. In other words, the TCPA class could not be certified as defined in the initial pleading because the issue of consent was central to the merits of the underlying dispute.

Accordingly, many district courts within the Third Circuit have determined that TCPA class definitions avoid fail-safe concerns by omitting the issue of consent or other merits-based criteria. See Jackson v. Direct Bldg. Supplies LLC, No. 4:23-CV-01569, 2024 WL 184449, at *9 & n.101 (M.D. Pa. Jan. 17, 2024) (Brann, C.J.) (collecting cases); see also Abella v. Student Aid Ctr., Inc., No. CV 15-3067, 2015 WL 6599747, at *4 (E.D. Pa. Oct. 30, 2015) (noting the lack of reference to an automatic telephone dialing system in the proposed class definition since that is a required element of a Section 227(b)(1)(A) claim).[8] Consequently, to avoid fail-safe issues with his proposed Robocall Class in this case, Friel asserts that he intentionally did not include consent language in his class definition. (Doc. 53, Pl. Br. in Opp. at 13).

As indicated above, Line5 has adopted arguments challenging the proposed Robocall Class definition because it fails to exclude calls made with consent. In joining the motion to strike, Line5 also finds fault in the proposed DNCR Class definition because it fails to exclude calls to individuals with an EBR. Adding these qualifiers to the class definitions would incorporate more elements of liability into the definitions. That would then arguably require all putative class members to have winning TCPA claims before being included in the class. Although non-binding, the above cases discussing fail-safe classes would provide defendants with different arguments to strike the class allegations if Friel included reference to a lack of consent or an EBR in his proposed definitions. The court cannot fault Friel for choosing to define his classes around TCPA merits-based criteria.

**\*7** As for authority binding on this court, "in the specific context of claims filed under the TCPA statute, it is difficult to resolve without discovery whether there are factual issues regarding class members' business relationships with defendants or whether they consented to the receipt of [automated phone calls]." Landsman, 640 F.3d at 93–94. Friel's complaint alleges that the proposed classes are identifiable as presently defined through defendants' dialer records, other phone records, and phone number databases. (Doc. 1, Compl. ¶ 79). In the absence of discovery into these records, the court is unwilling to determine whether Friel's classes are defined too broadly or whether they fall short of ascertainability. Line5 thus has not demonstrated a valid reason to strike Friel's class allegations based on the potential breadth of the proposed classes.

### b. Commonality Arguments

Line5 has also adopted JEA's arguments that Friel's proposed classes lack commonality, that is, "the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Wal-Mart Stores, Inc., 564 U.S. at 349 (citing FED. R. CIV. P. 23(a)). Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury, not merely that they have all suffered violation of the same provision of law. See id. (citations omitted). The claims "must depend upon a common contention[,]" which "must be of such a nature that is capable of classwide resolution[,]" meaning that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. As observed, "[t]he commonality requirement is not especially arduous." Johnson, 2017 WL 3433689, at *4.

For his part, Friel's complaint alleges that he received calls related to some extended-warranty sales effort using an artificial or prerecorded voice without his consent in violation of the TCPA. (Doc. 1, Compl. ¶¶ 18–31). Only discovery will reveal whether Friel's proposed classes sustained the same injuries from those sales efforts. Accordingly, the court also rejects arguments that the proposed classes are facially uncertifiable based on a lack of commonality.

### c. Vagueness Arguments

Lastly, Line5 has adopted JEA's arguments that the Robocall Class must be stricken for vagueness because that proposed definition uses the phrase "same, or substantially similar" when describing the prerecorded messages allegedly sent by the defendants. In support, the motion to strike argues

that, as presently defined, there would be no way for defendants to know which putative class members received the exact message that Friel received, and which putative class members received a "substantially similar" message. (Doc. 30, JEA Br. in Supp. at 20–21). Furthermore, per the arguments advanced in the motion to strike, the "substantially similar" definition uses improper subjective criteria and is improperly imprecise for a class action. Id.

Friel counters that such a definition is not vague under the circumstances because it essentially contemplates that defendants could have violated the TCPA as to other putative class members through the same sales efforts, but by using a different robotic voice, for example, or the same voice with a different script. (Doc. 53, Pl. Br. in Opp. at 21). Moreover, Friel explains that, even with this definition, his proposed Robocall Class is limited to calls that presumably had the same factual predicate for being sent, i.e., sales calls. Id. at 22.

Friel's argument signals that he is open to adding more qualifiers to his class definitions as this case moves forward. The court, however, will not strike the definitions or adjust any portion *sua sponte*. Discovery has not yet commenced and no motion to certify the class has been filed. To the extent that there are critical vagueness issues with Friel's proposed Robocall Class definition, those issues would be more easily understood following a period of discovery. Accordingly, the motion to strike Friel's class allegations will be denied.

### 3. Motion to Trifurcate Discovery

**\*8** On the issue of discovery, Defendant Line5 also joined in JEA's motion seeking to conduct discovery in three separate stages, that is, 1) discovery into Friel's individual claims; 2) discovery into the appropriateness of class certification if Friel's claims proceed; and 3) if any class is ultimately certified, merits discovery for the class or classes. (Doc. 34, JEA Br. in Supp.; Doc. 45, Line5 Joinder Notice). Friel opposes, arguing that, if this TCPA action has merit, a trifurcated course of discovery will lead to three rounds of written discovery, three rounds of depositions (with the same witnesses being deposed three times), three rounds of potential discovery disputes, and then three rounds of dispositive motions.[9] (Doc. 52, Pl. Br. in Opp. at 1-3).

Unlike JEA, which has been dismissed, Defendant Line5 filed an answer to Friel's complaint. (Doc. 20). Line5's answer does not raise any defenses unique to Friel's individual claims, only defenses common across the putative TCPA classes. (See Doc. 20, Affirmative and Other Defenses, ¶ 1 ("Line5 did not make or authorize any calls on its behalf."), ¶ 3 ("Upon information and belief, the alleged calls were not selling Line5's services, but rather the calls were made for the purpose of selling an extended car warranty provided by another of the defendants.")). Line5 has not otherwise demonstrated why Friel's specific TCPA claims would be any different from the claims of the putative class members. The court thus sees no reason to bifurcate, trifurcate, or otherwise order that discovery be conducted in phases at this time. Accordingly, the discovery motion will be denied, and this case will be scheduled for a case management conference.

### Conclusion

For the reasons set forth above, JEA's motion to strike class plaintiff's allegations and motion to trifurcate discovery will be denied. An appropriate order follows.

### All Citations

Slip Copy, 2025 WL 2422617

---

Footnotes

1    This background section derives from the facts alleged in plaintiff's complaint. The court makes no determination as to the veracity of these allegations.

2    Pursuant to FCC regulations, "[n]o person or entity shall initiate any telephone solicitation to: ... A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2).

3    At this juncture, it is unknown how Friel will proceed if this matter reaches a motion for class certification. Given the availability of statutory damages of up to $1500 per class member under the TCPA, it may be later determined that this case is more driven by money damages than equitable relief, which would make certification under Rule 23(b)(2) inappropriate. See e.g. Jackson v. Locust Med., LLC, No. 4:22-CV-00424, 2024 WL 2701695, at *5 (M.D. Pa. May 24,

2024) (Brann, C.J.) (denying a plaintiff's motion to certify a class under Rule 23(b)(2) where the complaint included a request for statutory damages under the TCPA).

4    Landsman is an opinion that has been reinstated in part, to the extent it is consistent with Mims. See No. 09-3105, 2012 WL 2052685 (3d Cir. Apr. 17, 2012).

5    To succeed with a cause of action under 47 U.S.C. § 227(b)(1) under the circumstances alleged in the complaint, Friel must show that defendants: 1) made "any call...using any automatic telephone dialing system or an artificial or prerecorded voice[;]' 2) to "any telephone number assigned to a...cellular telephone service[;] 3) without "the prior express consent of the called party[.]" 47 U.S.C. § 227(b)(1)(A)(iii).

6    There are certain regulatory defenses to TCPA actions premised upon 47 U.S.C § 227(c) and the do-not-call regulations. Pursuant to the regulations, a "telephone solicitation" does not include a call to any person with whom the caller has an EBR. 47 C.F.R. § 64.1200(f)(15)(ii). EBR is separately defined in 47 C.F.R. § 64.1200(f)(5). Furthermore, pursuant to the do-not-call regulations, "[n]o person or entity shall initiate any telephone solicitation to...[a] residential subscriber who has registered his or her telephone on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). Defendant Line5 adopts JEA's argument that this requires individuals to personally register their phones on the DNCR. Friel counters that personal registration is not required and would be impossible to prove in any case. (Doc. 53, Pl. Br. in Opp. at 15–17). The court need not reach this issue in disposing of the motion to strike.

7    "Although the United States Court of Appeals for the Third Circuit has not explicitly considered whether fail-safe classes are permissible, it has approvingly cited rulings by other circuits that categorically disallow fail-safe classes." Jackson v. Meadowbrook Fin. Mortg. Bankers Corp., No. 4:22-CV-01659, 2023 WL 2472606, at *3 (M.D. Pa. Mar. 10, 2023) (Brann, C.J.) (citing Byrd, 784 F.3d at 167; In re Nexium Antitrust Litig., 777 F.3d 9, 22 (1st Cir. 2015); Messner, 669 F.3d at 825).

8    On the other hand, the Honorable Christopher C. Conner reached a slightly different result when faced with this issue on a motion to strike in Johnson. 2017 WL 3433689 at *2–*3. Although the proposed TCPA class in Johnson included reference to consent, Judge Conner determined that it was not a facially uncertifiable fail-safe class because the proposed class definition contained reference to business records, which, with discovery, could reveal an ascertainable class. Id. at *1, *4.

9    Defendant Line5 indicates in its reply brief (filed after JEA's dismissal) that it only wishes to *bifurcate*, not *trifurcate* discovery. (Doc. 54). After review of Line5's reply brief, Line5 proposes a course of discovery that has no discernable distinction from the one proposed by JEA in the motion as initially filed.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 15 of 99
Perrong v. Caller Identified as Connor, Not Reported in Fed. Supp. (2023)

2023 WL 113957

2023 WL 113957
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey,
Camden Vicinage.

Andrew R. PERRONG, Plaintiff,

v.

CALLER IDENTIFIED
AS CONNOR, Defendant.

Civil No. 22-4479 (CPO/EAP)
|
Signed January 4, 2023

**Attorneys and Law Firms**

Andrew R. Perrong, Jenkintown, PA, Pro Se.

**MEMORANDUM OPINION AND ORDER**

ELIZABETH A. PASCAL, United States Magistrate Judge

**\*1** This matter comes before the Court by way of *pro se*
Plaintiff Andrew R. Perrong's ("Plaintiff") motion for leave
to conduct expedited discovery. Pl.'s Motion for Discovery
Seeking Leave to Serve a Third-Party Subpoena Prior to a
Rule 26(f) Conference, ECF No. 3 ("Pl.'s Motion"). The
Court has considered the moving papers and decides this
matter pursuant to Federal Rule of Civil Procedure 78(b).
For the reasons set forth herein, Plaintiff's motion to serve
a third-party subpoena prior to a Rule 26(f) conference is
**GRANTED**.

**BACKGROUND**

On July 7, 2022, Plaintiff filed a Complaint against a
party named as Caller Identified as Connor ("Defendant"),
alleging a claim under the Telephone Consumer Protection
Act ("TCPA"), 47 U.S.C. § 227. Complaint, ECF No. 1
("Compl."). The TCPA prohibits the use of an Automated
Telephone Dialing System ("ATDS"), except for emergency
purposes or with the prior express consent of the called
party, to place a telephone call to any service for which the

called party is charged for the call. 47 U.S.C. § 227(b)(1)
(A)(iii). Specifically, Plaintiff alleges that Defendant violated
the TCPA by placing four "nearly identical" calls through an
ATDS to Plaintiff's telephone number in June 2022 without
Plaintiff's prior consent. Compl. ¶¶ 28-33.[1] Also, Plaintiff
alleges that his number is on the national Do-Not-Call
registry, and he claims that Defendant violated the TCPA's
implementing regulations, 47 C.F.R. §§ 64.1200(c) and (d),
by calling a number on the Do-Not-Call registry, failing to
have a written Do-Not-Call policy, and failing to maintain
Plaintiff on its Do-Not-Call list. Compl. ¶¶ 53-54. Third,
Plaintiff claims that Defendant violated the Pennsylvania
Unfair Trade Practices and Consumer Protection Law
("UTPCPL"), 73 Pa. Cons. Stat. § 2246(a), by failing to
register as a telemarketer. Compl. ¶ 48.

The caller allegedly identified himself during each of the
four calls only by the name of "Connor." Compl. ¶¶ 28-33.
Apart from this name and the Defendant's telephone number,
Plaintiff alleges that he is unaware of Defendant's identity.
Compl. ¶ 5.[2] Plaintiff further alleges that the service provider
for Defendant's telephone number is RingCentral, Inc., which
offers its customers the ability to automatically dial numbers.
Compl. ¶¶ 34, 36. On July 11, 2022, Plaintiff filed the
present motion seeking leave to serve a third-party subpoena
upon RingCentral and any downstream telephone providers to
obtain the name, address, contact telephone number, website,
and e-mail address for the subscriber of the telephone number
shown on Plaintiff's caller ID. Pl.'s Motion at 1. In his motion,
Plaintiff argues that serving a subpoena on RingCentral is
his only available means to ascertain Defendant's identity,
effectuate service of process, and pursue his claims under the
TCPA, its implementing regulations, and the UTPCPL. Pl.'s
Motion at 2. Plaintiff further argues that good cause exists
for granting leave to seek discovery prior to a Rule 26(f)
discovery conference. *Id.* at 4.[3]

**APPLICABLE STANDARDS**

**\*2** Pursuant to Federal Rule of Civil Procedure 26(b)(1),
"[p]arties may obtain discovery regarding any nonprivileged
matter that is relevant to any party's claim or defense and
proportional to the needs of the case...." However, "[a] party
may not seek discovery from any source before the parties
have conferred as required by Rule 26(f)," except when
specifically authorized. Fed. R. Civ. P. 26(d)(1).

Perrong v. Caller Identified as Connor, Not Reported in Fed. Supp. (2023)

2023 WL 113957

Until 2015, the Federal Rules authorized the Court, for "good cause," to order discovery of any matter relevant to the subject matter involved in the action. Fed R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment. However, the 2015 amendment to Rule 26 removed the "good cause" language and instituted a proportionality test for discovery. *Id.* Nevertheless, courts in this District typically evaluate similar cases under the "good cause" standard, and the Court finds this analysis instructive. *See, e.g., Modern Woman, LLC v. Does 1-X*, No. 12-4859, 2013 WL 707908, at *2 (D.N.J. Feb. 26, 2013) (noting that courts "often apply the 'good cause' test" when considering motions for leave to serve expedited discovery requests to obtain the identity of unknown defendants); *Malibu Media v. Doe*, No. 15-8940, 2016 WL 614414, at *2 (D.N.J. Feb. 16, 2016) ("Courts in this District have frequently applied the 'good cause' standard to permit early but limited discovery...."); *Manny Film LLC v. Doe Subscriber Assigned IP Address 50.166.88.98*, 98 F. Supp. 3d 693, 694 (D.N.J. 2015) ("A good cause standard governs whether to permit discovery prior to a Rule 26(f) conference."). "Good cause exists where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Malibu Media*, 2016 WL 614414, at *1 (internal quotation omitted).

"Further, a court should consider (1) the timing of the request in light of the formal start to discovery; (2) whether the request is narrowly tailored; (3) the purpose of the requested discovery; (4) whether discovery burdens the defendant; and (5) whether defendant can respond to the request in an expedited manner." *Strike 3 Holdings, LLC v. Doe*, No. 17-12784, 2018 WL 2010422, at *2 (D.N.J. Apr. 24, 2018).

## DISCUSSION

For the reasons that follow, four of the five good cause factors support granting Plaintiff's motion for early discovery, while one factor is mixed.

The first factor, the timing of the request in light of the formal start to discovery, weighs in favor of Plaintiff. While parties typically may not seek discovery before a Rule 26(f) discovery conference, Plaintiff is unable to delay the timing of this motion for leave to serve a third-party subpoena. Plaintiff must first obtain Defendant's name and contact information in order to effectuate service of process on Defendant and name them as a party to the action before a Rule 26(f) discovery

conference may take place. *See also Alston v. Parker*, 363 F.3d 229, 234 n.6 (3d Cir. 2004) ("If discovery is sought by a plaintiff, as it was here, and if it would aid in the identification of responsible defendants or the lack thereof, district courts should strongly consider granting it.").

The second factor also supports Plaintiff's motion because the discovery request is narrowly tailored. Plaintiff is not seeking large volumes of records or information that would be costly for a service provider to procure. Plaintiff only requests the name, address, contact telephone number, website, and e-mail address of the subscriber that made the automated calls. Moreover, the requested information is not unnecessarily sensitive or intrusive into Defendant's privacy. *See also Strike 3 Holdings, LLC v. Doe*, No. 18-12585, 2020 WL 3567282, at *8 (D.N.J. June 30, 2020) (holding that a request for the name and permanent address of IP address subscribers was narrowly tailored because it was "no more than would be required to identify the relevant individual").

**\*3** The third factor, the purpose of the requested discovery, similarly supports granting Plaintiff leave to serve the subpoena. Plaintiff's purpose in requesting early discovery is to identify Defendant in order to litigate his claims. Plaintiff contends that a third-party subpoena "is the only way in which Plaintiff will be able to ascertain the true identity of the caller and effectuate service of process." Pl.'s Motion at 2. Currently, Plaintiff only possesses the telephone number and the purported first name of Defendant, and the automated calls allegedly did not state a company name or any other information about the caller. *Id.* Plaintiff further alleges that he has queried the database of iconectiv, "which is the master database which lists which telephone provider services a particular number," but that the identities of individual subscribers remain solely with the telephone service providers. *Id.; see also Strike 3 Holdings, LLC v. Doe*, 2018 WL 2010422, at *2 (finding good cause for serving an expedited third-party subpoena where the plaintiff's purpose was to obtain the identities of copyright infringers); *Richardson v. Virtuoso Sourcing Grp.*, No. 15-2198, 2016 WL 7468804, at *1 (M.D. Fl. Jan 19, 2016) (finding that "good cause" existed to grant a plaintiff's motion to serve a third-party subpoena on a wireless provider to obtain telephone records necessary to bring a TCPA claim).

The fourth factor, whether discovery burdens Defendant, is mixed. The subpoena will be served on a third-party, RingCentral, and on any downstream telephone providers, and not directly on Defendant. However, there is a risk of

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 17 of 99

Perrong v. Caller Identified as Connor, Not Reported in Fed. Supp. (2023)

2023 WL 113957

incidentally burdening a telephone customer who may not be the truly liable party. In *Manny Film*, a plaintiff sought leave to serve a third-party subpoena on an internet service provider to obtain the identity of the subscriber of an IP address through which a copyrighted movie was illegally distributed. 98 F. Supp. 3d at 694. The court recognized the possibility that the identity of the internet subscriber may not equate to the identity of the infringing party. *Id.* at 695. Since the requested discovery could have led to "false positives" about the defendant's identity, the court "balanced the interests" of the plaintiff against the unknown IP address subscriber. *Id.* at 695-96.

Similarly, the risk of a false positive exists here. Plaintiff recorded the Defendant's purported telephone number on his caller ID. Compl. ¶ 28. However, a caller ID display may not show the caller's true telephone number. For instance, fraudulent actors often use a technique known as "call spoofing" to deliberately falsify the information transmitted to a recipient's caller ID display.[4] As a result, call spoofing may cause a caller ID display to show an entirely unrelated person's telephone number.[5] Therefore, Plaintiff's interests must be balanced against the interests of the unknown telephone customer.

Plaintiff has an interest in obtaining remedies for violations of his rights, and Plaintiff has demonstrated a *prima facie* claim for violations of the TCPA. Again, 47 U.S.C. § 227(b)(1)(A)(iii) prohibits using an Automated Telephone Dialing System (ATDS), except for emergency purposes or with the prior express consent of the called party, to place a call to any service for which the called party is charged for the call, and 47 U.S.C. § 227(b)(3) provides a private cause of action for violations of this subsection. Plaintiff has alleged that the calls were placed by an ATDS due to the nearly identical nature of the calls and because RingCentral offers the ability to automatically dial numbers. *Id.* ¶¶ 31-36. Plaintiff has alleged that he never requested or otherwise gave his consent for the calls. *Id.* ¶¶ 31-36. Additionally, Plaintiff has alleged that he uses a Voice over Internet Protocol (VoIP) telephone service that charges him a fee for each call he receives. *Id.* ¶¶ 22-23. Plaintiff contends that this requested subpoena is his only available means to identify the caller and pursue his claims. Pl.'s Motion at 2.[6]

**\*4** On the other hand, the telephone customer whose number appeared on Plaintiff's caller ID has a privacy interest in his name, address, and other personal information. *See Malibu Media, LLC v. John Does 1-18*, No. 12-7643, 2013 U.S. Dist.

LEXIS 155911 at \*8-9 (D.N.J. Mar. 22, 2013) ("In resolving the pending request for expedited discovery, the Court must balance Plaintiff's need for discovery against the privacy interests of the subscriber."); *Voltage Pictures v. Does 1-60*, No. 12-6885, 2013 WL 12406868, at \*3 (D.N.J. May 31, 2013) ("The recent weight of authority is that a plaintiff may serve a subpoena on an ISP to obtain contact information for a John Doe. Courts, however, impose safeguards to protect the privacy rights of potentially innocent third parties."). Also, an innocent telephone customer has an interest in avoiding the time and expense required to defend against a claim in the event of a "false positive" identification. Therefore, the telephone customer shall have thirty days from receipt of the subpoena to object to or move to quash the subpoena. RingCentral and any downstream telephone providers shall not provide any responsive information to Plaintiff until the latter of the expiration of the thirty-day period or the resolution of any motion to quash or for a protective order. Also, it shall be ordered that Plaintiff may only use the information disclosed in response to the subpoena for the purpose of protecting and enforcing Plaintiff's rights as set forth in his Complaint. *See, e.g., Strike 3 Holdings, LLC v. Doe*, No. 21-17860, 2021 WL 5173473, at \*3 (D.N.J. Oct. 29, 2021) (imposing similar conditions when granting leave to serve a third-party subpoena upon an internet service provider to identify an IP address subscriber).

Lastly, the fifth factor, whether Defendant can respond to the request in an expedited manner, favors Plaintiff. Again, the requested subpoena will be served on RingCentral and any downstream telephone providers—not on Defendant. Regardless, providing the name, address, contact telephone number, website, and e-mail address of the subscriber is unlikely to require extensive research on behalf of RingCentral. *See Strike 3 Holdings, LLC v. Doe*, 2020 WL 3567282, at \*8 (explaining that a third-party subpoena is not served on a defendant, and for this reason, "the fifth good cause factor, whether the defendant can respond to the request in an expedited manner, also serves as no barrier to granting the relief sought.").

In conclusion, four of the five factors weigh in favor of Plaintiff, and one factor is mixed. Plaintiff has demonstrated good cause to obtain leave to serve a third-party subpoena on RingCentral and all downstream telephone providers because the need for expedited discovery outweighs the prejudice to the responding parties. The conditions detailed in the below order balance the interests of Plaintiff and the unknown

Case 1:25-cv-01410-JKM   Document 19-2   Filed 10/30/25   Page 18 of 99

Perrong v. Caller Identified as Connor, Not Reported in Fed. Supp. (2023)

2023 WL 113957

telephone service subscriber. Consequently, for the foregoing reasons, and for good cause shown,

**IT IS** this **4th** day of **January 2023**;

**ORDERED** that Plaintiff's Motion for Leave to Serve a Third-Party Subpoena Prior to a Rule 26(f) Conference, ECF No. 3, is **GRANTED**; and it is further **ORDERED** that:

1. The time within which Plaintiff may serve Defendant with a summons and Complaint in this action is extended to **March 5, 2023.**

2. The Clerk of Court is directed to provide Plaintiff with blank, signed subpoena forms pursuant to Fed. R. Civ. P. 45(a) (3).

3. Plaintiff may serve a Rule 45 subpoena issued to RingCentral, Inc. that is limited to requesting only the name, address, contact telephone number, website, and e-mail address associated with the telephone number listed in the Complaint for the time period between June 10, 2022, and June 21, 2022. No other disclosure may be requested. Plaintiff shall attach a copy of this Order to the subpoena. Plaintiff is advised of the requirements for service of subpoenas under Fed. R. Civ. P. 45, which, when the object of the subpoena is a corporation, requires personal service of a copy of the subpoena upon a corporate officer or agent authorized under Fed. R. Civ. P. 4 to accept service of process. Plaintiff must bear the costs of such service.

4. Plaintiff may also serve a Rule 45 subpoena in the same manner as above on any related downstream carrier that is identified in response to a subpoena as a provider of telephone services to the customer associated with the telephone number identified in the Complaint.

**\*5** 5. RingCentral, Inc. shall have thirty (30) days from the service of this Order and the subpoena to object to or move to quash the subpoena. The customer named as Caller Identified as Connor in this action shall also have thirty (30) days from receipt of this Order and the subpoena to object to or move to quash the subpoena.

6. RingCentral, Inc. or any related downstream carrier shall not respond to any subpoena served in this case until the latter of the expiration of the thirty (30) day periods set forth above or the resolution of a motion to quash or for a protective order.

7. Plaintiff may only use the information disclosed in response to a Rule 45 subpoena served on a telephone provider for the purpose of protecting and enforcing Plaintiff's rights as set forth in his Complaint.

8. Plaintiff shall forward copies of the responsive information to any Defendant who enters an appearance in this case.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 113957

---

Footnotes

1   The four calls were allegedly made on June 10, 2022; June 13, 2022; June 14, 2022; and June 21, 2022. Compl. ¶ 20.

2   Plaintiff further alleges that the calls displayed a generic caller ID name of "CAMDEN NJ." Compl. ¶ 28.

3   Plaintiff also notes that he has prevailed on three similar motions in the Eastern District of Pennsylvania to serve third-party subpoenas upon telephone service providers prior to a Rule 26(f) discovery conference. *See* Order, *Perrong v. Pub. Op. Rsch.*, No. 2:20-cv-5317 (E.D. Pa. Nov. 9, 2020), ECF No. 4 (Pratter, J.); Order, *Perrong v. Does 1–10*, No. 2:20-cv-5980 (E.D. Pa. Apr. 12, 2021), ECF No. 12 (Rufe, J.); Order, *Perrong v. Caller Identified as Jennifer*, No. 2:21-cv-02188 (E.D. Pa. June 4, 2021), ECF No. 4. (Younge, J.).

4   *See Caller ID Spoofing*, Fed. Commc'ns Comm'n (Mar. 7, 2022), https://www.fcc.gov/spoofing (describing caller ID spoofing) (last visited Jan. 4, 2023); *e.g.*, *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 234 (5th Cir. 2012) (providing a factual introduction to caller ID spoofing).

5   *See* Sarah Krouse, *"Stop Robocalling Me!"; "I Didn't"; Robocall Recipients Lash Out, Unaware that Numbers on the Other End May Have Been "Spoofed" by Scammers*, Wall St. J. (Jan. 1, 2019), https://www.wsj.com/articles/stop-robocalling-me-i-didnt-11546261200 (last visited Jan. 4, 2023) (reporting how illegal robocallers use call spoofing to falsify their phone numbers).

**Perrong v. Caller Identified as Connor, Not Reported in Fed. Supp. (2023)**

2023 WL 113957

6    Plaintiff's motion for leave to serve a third-party subpoena does not discuss his Do-Not-Call list and his UTPCPL claims.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S.
                                                                 Government Works.

---

EQT Production Company v. Terra Services, LLC, Not Reported in Fed. Supp. (2014)

2014 WL 12838677

2014 WL 12838677
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

EQT PRODUCTION COMPANY, Plaintiff,

v.

TERRA SERVICES, LLC, Defendant.

Civil Action No. 14-1053
|
Signed 10/21/2014
|
Filed 10/22/2014

**Attorneys and Law Firms**

Patricia L. Dodge, Caleb M. Turner, Nicholas J. Bell, Chad I. Michaelson, Meyer, Unkovic & Scott LLP, Ryan James, Farneth Tomosovich, LLC, Pittsburgh, PA, for Plaintiff.

Daniel Carmeli, John K. Gisleson, Matthew H. Sepp, Morgan, Lewis & Bockius LLP, Pittsburgh, PA, Glen R. Stuart, Morgan, Lewis & Bockius LLP, Philadelphia, PA, Kenneth S. Komoroski, Morgan, Lewis & Bockius LLP, Canonsburg, PA, for Defendant.

**MEMORANDUM ORDER**

Nora Barry Fischer, United States District Judge

**\*1** Pursuant to the Court's rulings at the Initial Case Management Conference, held on September 30, 2014, and the Court's Order of October 1, 2014, (Docket No. 21), Defendant, Terra Services, LLC ("Terra"), filed a Motion to Bifurcate Discovery on October 10, 2014, (Docket No. 25). Plaintiff, EQT Production Co. ("EQT"), filed its Response in Opposition on October 17, 2014. (Docket No. 30). The Motion is now ripe.

"The decision to bifurcate, and the manner in which bifurcation should be ordered, is left to the trial court's informed discretion and must be decided on a case by case basis." *Hartley-Culp v. Credit Mgmt. Co.*, No. 14-282, 2014 WL 4630852, at \*3 (citing *Idzojtic v. Pa. R.R. Co.*, 456 F.2d 1228, 1230 (3d Cir. 1972) ). "Bifurcation "remains the

exception rather than the rule." *Innovative Office Prods., Inc. v. Spaceco, Inc.*, No. 05-4037, 2006 WL 1340865, at \*1 (E.D. Pa. May 15, 2006). "Courts ... do not routinely grant motions to bifurcate discovery, unless there is some showing on the part of the moving party as to why bifurcation is appropriate." *Cephalon, Inc. v. Sun Pharm., Ltd.*, No. 11-5474, 2013 WL 3417416, at \*3 (D.N.J. July 8, 2013). "[T]he moving party bears the burden of demonstrating that bifurcation would serve judicial economy, avoid inconvenience, and not prejudice any of the parties." *Cephalon, Inc.*, 2013 WL 3417416 at \*3.

Though Terra argues that bifurcation would expedite proceedings in this case, its proposed schedule takes discovery in this case through the end of January, 2017. (Docket No. 25-1 at p. 2). EQT points out that this schedule "presumes an immediate decision from the Court on dispositive motions." (Docket No. 30 at p. 4). The Court agrees that this is unrealistic. Adding the several months it will no doubt take this Court to rule on said motions, under Terra's schedule, discovery in this case might remain open until 2018. Cognizant of the availability of witnesses and their diminishing ability to recall the events of 2012, the Court refuses to use its discretion to bifurcate discovery on this ground.

Additionally, as EQT argues, Terra's proposal would likely result in deposing the same witnesses twice–once in the liability phase, and again in the damages phase. This is the definition of inconvenience, and the additional cost of duplicative depositions and document review combine to counsel against bifurcation in this case.

Terra's objections are preserved as is the Court's right to bifurcate the trial of this action.

With the foregoing in mind, IT IS HEREBY ORDERED that Defendant's Motion to Bifurcate Discovery [25] is DENIED.

IT IS FURTHER ORDERED that the parties meet and confer and file a joint proposed case management order by **November 3, 2014**.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12838677

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 21 of 99

**EQT Production Company v. Terra Services, LLC, Not Reported in Fed. Supp. (2014)**

2014 WL 12838677

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Charvat v. Plymouth Rock Energy, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 207677

KeyCite Yellow Flag - Negative Treatment
Distinguished by Harris v. Shore Funding Solutions Inc., E.D.N.Y., April 21, 2023

2016 WL 207677
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Philip J. CHARVAT, individually and on behalf of all others similarly situated, Plaintiff,

v.

PLYMOUTH ROCK ENERGY, LLC, Defendant.

15-CV-4106 (JMA) (SIL)
|
Signed January 12, 2016

**Attorneys and Law Firms**

Kim Richman, The Richman Law Group, Brooklyn, NY, Beth E. Terrell, Jennifer R. Murray, Mary B. Reiten, Terrell Marshall Law Group PLLC, Seattle, WA, Anthony Paronich, Boston, MA, for Plaintiff.

Simon Fleischmann, Locke Lord LLP, Chicago, IL, Samantha Anne Ingram, Locke Lord LLP, Casey Brian Howard, Locke Lord Bissell and Liddell LLP, New York, NY, for Defendant.

*ORDER*

LOCKE, United States Magistrate Judge

**\*1** Presently before the Court in this putative class action brought pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, is Defendant Plymouth Rock Energy, LLC's ("Defendant" or "Plymouth"), motion to bifurcate discovery. *See* Docket Entry ("DE") [25]. For the reasons set forth below, the motion is denied.

**I. Background**

Plaintiff Philip Charvat's ("Plaintiff" or "Charvat") Complaint sets forth the following allegations germane to Defendant's motion. *See* DE [1] ("Compl."). On September 12, 2011, Plaintiff registered for the "National Do–Not–Call Registry" under the TCPA. Compl. ¶ 16. As a result, he was entitled not to be called by entities such as Plymouth more than once every

twelve months. *Id.* ¶ 8. Nevertheless, Charvat received calls from someone marketing Plymouth's services on April 15, 2015 and May 4, 2015. *See id.* ¶¶ 17–22. Moreover, Plaintiff's experience is not unique. According to the Complaint, it appears that at least two other individuals received multiple calls from Plymouth in violation of the TCPA, one receiving seven calls in two days and the other receiving six calls in two days. *See id.* ¶ 26.

Based on these allegations, Plaintiff brings this case for violation of the TCPA as a class action on behalf of:

> All persons in the United States to whom: (a) Defendant and/or any person or entity acting on Defendant's behalf initiated more than one telephone solicitation call; (b) promoting Defendant's goods or services; (c) in a 12–month period; (d) on their cellular telephone line or residential telephone line; (e) whose cellular or telephone line number(s) appear on the National Do–Not–Call registry; and (f) at any time in the period that begins four years before the date of filing of this Complaint to trial.

*Id.* ¶ 31. The class excludes certain entities and individuals not relevant to the present application.

By letter motion dated December 14, 2015, *see* DE [25], Defendant moves to bifurcate discovery so that it can attack Plaintiff's individual claim with a summary judgment motion seeking dismissal of the case prior to engaging in class discovery. According to Plymouth, bifurcation will promote "proportionality, economy and efficiency." Plaintiff opposes the motion. *See* DE [26].

**II. Discussion**

For the reasons set forth below, Defendant's motion to bifurcate is denied. The standards applicable to motions to bifurcate discovery appear to be the same as those addressed under Fed.R.Civ.P. 42(b) governing separate trials, namely, the motion may be granted "[f]or convenience, to avoid prejudice, or to expedite and economize." *See Koch v. Pechota,* No. 10 Civ. 9152, 2012 WL 2402577, at *6 (S.D.N.Y. June 26, 2012) (denying motion to bifurcate and noting that the inquiry is not actually governed by Rule 42(b)); *see also Hartley–Culp v. Credit Mgmt. Co.,* No. CV–14–0282, 2014 WL 4630852, at *2 (M.D.Pa. Sept. 15, 2014) (applying the TCPA) ("There is no question that the Court, in its discretion, can bifurcate discovery under Fed.R.Civ.P. 42."). This standard applies to the issue of whether class-and merits-based discovery should proceed together, including in the TCPA context. *See, e.g., True Health Chiropractic*

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 23 of 99

Charvat v. Plymouth Rock Energy, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 207677

*Inc. v. McKession Corp.,* No. 13–cv–2219–JST, 2015 WL 273188, at *2–3 (N.D.Cal. Jan. 20, 2015) (denying motion to bifurcate in a TCPA case where the court found: (1) a likelihood of overlap between class and individual discovery; (2) that bifurcation would result in a delay in filing motions for certification; and (3) the potential for complication of issues caused by disputes and subsequent motions as to what discovery relates to the class, as opposed to the named plaintiffs); *Hines v. Overstock.com, Inc.,* No. 09–CV–991, 2010 WL 2775921, at *1 (E.D.N.Y. July 13, 2010) ("[W]here discovery relating to class issues overlaps substantially with merits discovery, bifurcation will result in duplication of efforts and needless line-drawing disputes.").

**\*2** Bifurcation may be appropriate however, where the "resolution of a single issue may resolve the case and render trial on the other issue[s] unnecessary." *Tabor v. New York City,* 11–CV–0195, 2012 WL 603561, at *10 (E.D.N.Y. Feb. 23, 2012) (Report and Recommendation), *adopted by,* 2012 WL 869424 (E.D.N.Y. Mar. 14, 2012) (bifurcating discovery in the context of a *Monell* claim). This reasoning applies in the TCPA context as well. *See Leschinsky v. Inter–Continental Hotels Corp.,* No. 8:15–cv–1470–T–30MAP, 2015 WL 6150888, at *1 (M.D.Fla. Oct. 15, 2015) (granting motion to bifurcate and initially limiting discovery to whether the calls the named plaintiff received were dialed manually and how many calls she received); *Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc.,* No. 12–2132, 2014 WL 413534, at *2 (D.N.J. Feb. 4, 2014) (granting motion to bifurcate where "a narrow, potentially dispositive issue exist[ed] concerning whether the faxes sent [were] informational and therefore not actionable under the TCPA," and this issue was "totally distinct from class issues"). The moving party bears the burden of establishing that bifurcation is appropriate, and the decision to bifurcate is left to the Court's discretion. *Hartley–Culp,* 2014 WL 4630852, at *2–3.

Applying these standards, Plymouth has failed to carry its burden of establishing that bifurcation is appropriate. Much of the moving papers are devoted to arguments that Defendant's "potential exposure may be ruinous," and that Plymouth has "strong defenses." DE [25] at 1–2. Although Plymouth claims that the "class discovery contemplated by Mr. Charvat will not impact the Court's ability to fairly and expediently resolve the individual claim," Defendant identifies the discovery it characterizes as class-related only in general terms as including topics such as TCPA compliance, regulatory activity, computer systems and statistics, without referring in any way to Plaintiff's actual discovery requests,

which it attaches. *Id.* at 3. Plymouth then complains about a subpoena to a third-party call center as seeking "extensive documentation and ESI" relating to Plymouth.

Defendant's argument fails for several reasons. Initially, the Court notes that Plaintiff served only 36 document requests and 18 interrogatories, neither of which can be characterized as voluminous. Further, Plymouth submits nothing to demonstrate that the information sought would be unduly burdensome to produce or disproportionate to the needs of the case. *See* Fed.R.Civ.P. 26(a)(1) (setting forth standard). There is also no indication as to which discovery requests Defendant believes would be objectionable as class-based and which requests it is willing to respond to. Accordingly, Defendant has left the Court to either parse its moving papers and attachments to determine the contours of discovery it would be deem permissible, or it simply seeks to leave that issue for future motion practice and resolution by the Court, neither of which promotes judicial efficiency or a prompt resolution of the case. *See True Health* Chiropractic, 2015 WL 273188, at *2 (recognizing the "slew of issues" that would arise from bifurcation regarding what discovery concerns the class as opposed to the named plaintiff).

In fact, bifurcation would have the opposite effect. Much of the discovery sought appears relevant to both the class and individual claims, including documents concerning Plymouth's telemarketing scripts, policies, contracts, practices and procedures, complaints received, investigations of those complaints and audits of third-party providers, as this information is relevant to the issues of both vicarious liability for third-party conduct and willfulness. *Accord* DE [25] (Defendant arguing that it has a "strong defense" because it cannot be held "vicariously liable" for the conduct at issue as it relates to Plaintiff and recognizing the difference in recovery for a "willful" violation of the statute).

**\*3** Moreover, even if the named Plaintiff's claim were defeated, there is no reason to think that this case would likely end. The Complaint identifies complaints by two other individuals involving Plymouth. Both claim to have received more harassing calls than Plaintiff, and either one could replace Plaintiff as a class representative. Accordingly, there is no indication from the motion papers that Defendant's success as to Plaintiff's individual claim would necessarily result in a prompt, efficient resolution of this litigation.

As to the third-party subpoena, regardless of how Plymouth characterizes the information it seeks, the Court notes that

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 24 of 99
Charvat v. Plymouth Rock Energy, LLC, Not Reported in Fed. Supp. (2016)
2016 WL 207677

this third-party has not objected to the subpoena or moved to quash. In any event, it is unclear how such a motion would impact the Court's analysis.

Finally, the Court notes that absent bifurcation, Defendant is still free to seek discovery on the limited issues it believes will result in a prompt resolution of the case and make the appropriate motion at the earliest juncture it chooses.

Based on the foregoing, Defendant's motion to bifurcate discovery is denied.

**III. Conclusion**

For the reasons set forth above, Defendant's motion to bifurcate discovery, DE [25], is denied.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 207677

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF NextGen 1.6.3**
**Eastern Division**

Samuel Katz

                              Plaintiff,

v.                                          Case No.: 1:22–cv–05277
                                            Honorable Robert W. Gettleman

Allied First Bank, SB

                              Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Tuesday, January 3, 2023:

     MINUTE entry before the Honorable Sunil R. Harjani: Status hearing set for 3/14/2023 at 9:15 a.m. By 3/9/2023, parties shall file a joint status report with an update on discovery and any settlement discussions. The Court has reviewed the parties&#039; joint status report [10]. The Court does not see a need to bifurcate discovery in this case. There will be some overlap in discovery here. Discovery as to commonality and typicality under Rule 23 will also apply to the merits of the claim. Moreover, the Supreme Court in Walmart v Dukes has said the district court must conduct a rigorous analysis in determining class certification and that will often require some evaluation about facts that go to the merits of a plaintiff's underlying claims. Thus, bifurcating discovery often does not make sense as the lines between "class discovery" and "merits discovery" are significantly blurred. The Court has reviewed Plaintiff's claims and determined that is the case here. Thus, the Court exercises its substantial discretion in managing discovery under Rule 16 and issues the following discovery schedule: (1) Rule 26(a)(1) disclosures by 1/20/23; (2) written discovery shall issue by 2/3/23; (3) notice of depositions with agreed upon dates shall issue by 5/5/23; and (4) all fact discovery shall be completed by 8/25/23. Whether expert discovery is necessary before a class certification motion is filed is an issue to be discussed at a later time. Mailed notice(lxs, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

2025 WL 596095
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Zoe GRIPPO

v.

SUGARED + BRONZED, LLC

Case No. SA CV 24-01792-AB (DFMx)
|
Filed February 24, 2025

**Attorneys and Law Firms**

Adrian Robert Bacon, Todd M. Friedman, Law Offices of Todd Friedman PC, Woodland Hills, CA, Max S. Morgan, Pro Hac Vice, The Weitz Firm LLC, Philadelphia, PA, for Zoe Grippo.

Joseph R. Ashby, Mark David Johnson, Offitt Kurman P.C., Los Angeles, CA, Jerome P. Doctors, Cozen O'Conner, Los Angeles, CA, Harold M. Walter, Pro Hac Vice, Offit Kurman, Timonium, MD, Nafiz Cekirge, Offit Kurman, Hackensack, NJ, for Sugared + Bronzed, LLC.

**Proceedings: (IN CHAMBERS)** Order re: Defendant's Motion to Bifurcate Discovery (Dkt. 31)

Douglas F. McCormick, United States Magistrate Judge

**\*1** Before the Court is Defendant Sugared + Bronzed's Motion to Bifurcate Discovery. See Dkt. 31. ("Mot."). Plaintiff Zoe Grippo opposed. See Dkt. 38 ("Opp'n"). Defendant replied. See Dkt. 40 ("Reply"). The matter was referred to me. See Dkt. 31.

The Court finds this matter appropriate for resolution without a hearing and therefore VACATES the March 4, 2025 hearing. See Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. For the reasons stated below, the Court DENIES Defendant's Motion.

**I. BACKGROUND**
Plaintiff asserts that Defendant violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq., ("TCPA") by sending telemarketing text messages to Plaintiff and the putative class members without consent. See Dkt. 1 ¶¶ 14, 50-55, 57.

Defendant argues that it did not send marketing text messages during the class period because it outsourced this function to two independent telemarketing companies, Mindbody, Inc. and Klaviyo, Inc. Defendant asks the Court to bifurcate discovery to resolve whether Mindbody and Klaviyo sent the marketing text messages, and if so, whether they did so as Defendant's agents within the meaning of the TCPA. See Mot. at 7. Defendant asserts that if discovery reveals that Mindbody and Klaviyo went rogue, Defendant "will have no direct or vicarious TCPA liability, and this entire case will go away." Id. Defendant represents that bifurcated discovery can be completed in sixty (60) days and that any summary judgment motions can be filed fourteen (14) days after the close of bifurcated discovery. See id. at 7 n.2.

**II. LEGAL STANDARD**
"For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). Under Rule 42(b), courts have the "power to limit discovery to the segregated issues" to "permit deferral of costly and possibly unnecessary discovery proceedings pending resolution of potentially dispositive preliminary issues." Ellingson Timber Co. v. Great N. Ry. Co., 424 F.2d 497, 499 (9th Cir. 1970).

"The decision to bifurcate discovery in putative class actions prior to certification is committed to the discretion of the trial court." True Health Chiropractic Inc. v. McKesson Corp., No. 13-02219, 2015 WL 273188, at *1 (N.D. Cal. Jan. 20, 2015). The court considers four factors in deciding whether to bifurcate: "(1) the overlap between individual and class discovery; (2) whether bifurcation will promote Rule 23's requirement that certification be decided at 'an early practicable time'; (3) judicial economy; and (4) any prejudice reasonably likely to flow from the grant or denial of a stay of class discovery." Id. "The party seeking bifurcation bears the burden of proving that bifurcation is justified given the facts in the case." Kamrava v. Cenlar Capital Corp., No. 20-11465, 2021 WL 10373035, at *2 (C.D. Cal. Oct. 7, 2021) (citation omitted).

**III. DISCUSSION**
Defendant argues bifurcation of discovery is warranted to determine the viability of Plaintiff's claims "before dragging Sugared + Bronzed into disproportionately burdensome class discovery." Mot. at 8. Plaintiff responds that Defendant has

2025 WL 596095

not met its burden to justify bifurcation, and that bifurcation will unnecessarily delay this case. See Opp'n at 6-7. The Court has considered the four factors and finds that bifurcation is unwarranted.

A. Overlap Between Individual and Class Discovery

**\*2** The first factor weighs against bifurcation. The Supreme Court has repeatedly emphasized that class certification requires a "rigorous analysis" of Rule 23, which will "frequently entail overlap with the merits of the plaintiff's underlying claim." Comcast Corp. v. Behrend, 569 U.S. 27, 33-34 (2013). "Thus, the distinction between merits discovery and class discovery is not always clear, and many courts are, for this reason, reluctant to bifurcate class and merits discovery." Blair v. Assurance IQ LLC, No. 23-16, 2023 WL 6622415, at \*6 (W.D. Wash. Oct. 11, 2023) (citation omitted); see also Ahmed v. HSBC Bank USA, Nat'l Ass'n, No. 15-2057, 2018 WL 501413, at \*3 (C.D. Cal. Jan. 5, 2018) ("[T]he distinction between class certification and merits discovery is murky at best and impossible to determine at worst.").

Here, there is overlap between the class determination inquiry and the merits of Plaintiff's underlying claim. This overlap includes whether Defendant contacted Plaintiff and/ or putative class members that were on the National-Do-Not Call Registry or after Defendant received a request to stop. See Dkt. 1 ¶ 75.

Defendant argues there is no overlap between discovery regarding whether Sugared + Bronzed or any of its agents sent the text messages at issue and discovery on class certification issues. See Mot. at 12. "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011). Whether Defendant sent the text messages at issue is a merits issue that will be relevant at the certification stage.

B. Promote Certification at "an Early Practicable Time"

The second factor weighs against bifurcation. Federal Rule of Civil Procedure 23 indicates that class certification should occur "[a]t an early practicable time after a person sues or is sued as a class representative ...." Fed. R. Civ. P. 23(c)(1) (A). Defendant's proposed case schedule without bifurcation would have motions on class certification to be heard by August 1, 2025. See Dkt. 29-2.

Defendant submits that bifurcated discovery can be completed in sixty (60) days and any summary judgment motions can be filed fourteen (14) days after the close of bifurcated discovery. If so, discovery will not be complete until mid or late April 2025 and any motion for summary judgment would not be heard until June 2025. The Court would then have to rule on the motion for summary judgment, and only then could class discovery even begin. And as Plaintiff notes, Defendant's estimate does not include the possibility of any discovery-related disputes or motions. The delay would not promote Rule 23's requirement that certification be decided at an early practicable time.

C. Judicial Economy

The third factor is either neutral or weighs slightly in favor of bifurcation. Defendant argues that the resolution of whether Sugared + Bronzed or its agents sent the text messages is a threshold issue, the resolution of which could resolve this case. See Mot. at 19.

The Court agrees with Defendant that bifurcating discovery could possibly prevent unnecessary discovery if it is correct regarding TPCA liability. However, bifurcation also "has the potential to complicate this litigation," as separating the merits and class discovery raises "a slew of issues as to what discovery relates to the class, as opposed to Plaintiff, thereby causing additional litigation regarding the distinction between the two." Kamrava, 2021 WL 10373035, at \*3 (citation omitted).

**\*3** Furthermore, the Court is concerned that Defendant's "dispositive question"—whether Sugared + Bronzed is vicariously liable under the TCPA for text messages that Mindbody and Klaviyo sent after Plaintiff opted out of receiving such messages—may be informed by class discovery.

A defendant may be held vicariously liable for the TPCA violations of third-party callers "where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and the third-party caller." Henderson v. U. Student Aid Funds, Inc., 918 F.3d 1068, 1072-73 (9th Cir. 2019). One way to establish an agency relationship is "ratification," which can be shown by the principal's "knowing acceptance of the benefit" or "willful ignorance." Id. at 1073-74. A plaintiff can establish willful ignorance if the defendant "knew facts that should led it to investigate [the third party's] work for TCPA violations."

2025 WL 596095

McCurley v. Royal Seas Cruises, Inc., No. 21-55099, 2022 WL 1012471, at *3 (9th Cir. Apr. 5, 2022).

Here, class discovery will likely be useful, and perhaps critical, to resolve TCPA liability. Whether there are other individuals similarly situated to Plaintiff appears relevant to the question of whether Sugared + Bronzed ratified Mindbody and Klaviyo's acts. See id. at *2-3 (considering the number of calls the principal received and the percentage of customers with mismatched data, among other things).

Defendant cites several out-of-circuit cases in which courts have bifurcated discovery in TCPA class actions where dispositive issues could be decided at the outset. Defendant's cases concern discrete issues such as Article III standing or whether an auto dialer was used. In contrast, Defendant's "threshold question" in this case is a wider endeavor that will likely bleed into class discovery. Cf. Pavelka v. Paul Moss Ins. Agency, LLC, No. 22-2226, 2023 WL 3728199 (N.D. Ohio May 30, 2023) (bifurcating discovery to first address individual liability claims); Fania v. Kin Ins., Inc., No. 22-12354, 2024 WL 2607303, at *2 (E.D. Mich. May 24, 2024) (bifurcating discovery to address the "case-dispositive questions" of whether plaintiff received a pre-recorded call and whether defendant was legally responsible for such calls); Newell v. Aliera Healthcare, Inc., No. 19-1489, 2020 WL 13568762, at *3 (N.D. Ga. Apr. 6, 2020) (bifurcating discovery to determine whether plaintiff was called by an ATDS and consent).

### D. Prejudice

The fourth factor is either neutral or weighs slightly against bifurcation. Defendant acknowledges that Plaintiff will be prejudiced, but that any prejudice will be outweighed by "expensive, exhaustive discovery." Mot. at 19-20 (citation omitted). Defendant has not demonstrated significant prejudice by its simple assertion that discovery costs money. See Kamrava, 2021 WL 10373035, at *3 ("[B]esides its simple assertions that having to engage in class-wide discovery is expensive and time consuming, Defendant did not provide any estimates of the expected costs and time to be incurred."). On the flip side, Plaintiff will be prejudiced by delay in this case.

The first two factors weigh against bifurcation. The last two factors are a toss-up. Bifurcation is not warranted here. Defendant's Motion is DENIED.

**All Citations**

Slip Copy, 2025 WL 596095

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6622415
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Seattle.

Douglas Lee BLAIR, Plaintiff,

v.

ASSURANCE IQ LLC, Defendant.

CASE NO. C23-0016-KKE
|
Signed October 11, 2023

**Attorneys and Law Firms**

Avi R. Kaufman, Pro Hac Vice, Kaufman PA, Miami, FL, Eric
R. Draluck, Eric R. Draluck Attorney, Bainbridge Island, WA,
for Plaintiff.

Mark A. Silver, Pro Hac Vice, Nathan L. Garroway, Pro Hac
Vice, Dentons U.S. LLP, Atlanta, GA, John David Du Wors,
Du Wors Law Group, San Francisco, CA, Keith P. Scully,
Nathaniel Eli Durrance, Newman Du Wors LLP, Seattle, WA,
for Defendant.

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS AND DENYING
DEFENDANT'S MOTION TO STAY OR BIFURCATE
DISCOVERY

Kymberly K. Evanson, United States District Judge

**\*1** This matter comes before the Court on Defendant
Assurance IQ, LLC's Motion to Stay Discovery or, in the
Alternative, to Bifurcate Discovery, Dkt. No. 19, and Motion
to Dismiss Amended Complaint, Dkt. No. 20. The Court
GRANTS IN PART and DENIES IN PART the motion to
dismiss with leave to amend. The Court DENIES Assurance
IQ's motion to stay or bifurcate discovery.

**I. BACKGROUND**

In January 2023, Plaintiff Douglas Blair filed this
putative class action under the Telephone Consumer
Protection Act ("TCPA"), 47 U.S.C. § 227, alleging
that he received unlawful prerecorded telemarketing calls

from CarInsurance.net—an entity owned and operated by
Assurance IQ, LLC. *See generally* Dkt. No. 1. Blair filed an
amended complaint (the operative complaint) in late March
2023. Dkt. No. 18. The relevant facts are as follows.

Blair registered his cell phone number on the National Do
Not Call Registry (the "DNC List") on November 19, 2022.
Dkt. No. 18 at 7. Over 31 days later, on December 23rd, he
received six calls from CarInsurance.net. *Id.*; *see also id.* at
8 (image depicting call log). Blair did not answer these calls.
*Id.* at 7. And he ignored two more calls from CarInsurance.net
three days later. *Id.* at 8. On the evening of December 26th,
however, Blair answered one of the calls. *Id.* He claims
that a prerecorded voice message identified the caller as
CarInsurance.net and solicited the sale of car insurance.
*Id.* Blair believes the call was prerecorded "because of the
tone, cadence, and timing of the speaker, which sounded
unnaturally perfect." *Id.* at 9.

He received another call the following day. *Id.* Although Blair
did not answer this call, "a pre-recorded voice message was
left identifying the company name as CarInsurance.net [and]
soliciting the sale of automotive insurance." *Id.* He thereafter
continued to receive unsolicited calls from CarInsurance.net
over the next few days—none of which he answered. *Id.* at
10–11. However, two more allegedly prerecorded voicemails
were left on his phone on December 28th and 30th. *Id.* These
messages again identified the caller as CarInsurance.net and
solicited the sale of car insurance. *Id.* Blair asserts that
the December 27th, 28th, and 30th voice messages are
"identical," a fact he contends suggests that "all three were
pre-recorded." *Id.* at 11.

Blair brings two TCPA claims against Assurance IQ. In Count
1, he alleges that it placed unsolicited prerecorded phone
calls to his residential cell phone without his prior express
consent. *Id.* at 14; *see* 47 U.S.C. § 227(b)(1)(A)(iii), (b)(1)(B).
In Count 2, he accuses the company of initiating telephone
solicitations to his residential cell phone even though he had
registered that number on the DNC List. Dkt. No. 18 at 14–15;
*see* 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). Blair
asks the Court to award statutory damages, treble damages
"[t]o the extent [Assurance IQ]'s misconduct is determined to
be willful and knowing," and further requests injunctive relief
prohibiting Assurance IQ's "unsolicited calling activity[.]"
Dkt. No. 18 at 14–16; *see also id.* at 7 ("Blair brings forward
this case seeking injunctive relief requiring [Assurance IQ] to
cease from violating the TCPA[.]").

**\*2** In addition to his individual TCPA claims, Blair's complaint levels several class allegations. *See id.* at 11–14. He asserts that "[o]ther consumers have ... complained on robocall websites regarding the identical pre-recorded voice message that [he] received, from the same telephone number ..., around the exact ... same time [he] received it[.]" *Id.* at 9; *see also id.* at 4–6. Blair accordingly seeks to represent two nationwide classes. The first proposed class is the "Pre-Recorded No Consent Class." *Id.* at 11. It includes all persons in the United States who, within the preceding four years, received from Assurance IQ a prerecorded voice telemarketing call on their cellular or residential landline number soliciting car insurance quotes on behalf of CarInsurance.net. *Id.* The second proposed class is the "Do Not Call Registry Class." *Id.* at 12. It includes all persons in the United States who, within the preceding four years, received from Assurance IQ more than one telemarketing call during any 12-month period soliciting car insurance quotes on behalf of CarInsurance.net when that person's residential number had been listed on the DNC List for at least 30 days. *Id.*

Assurance IQ moved to dismiss Blair's amended complaint. Dkt. No. 20. It also wants the Court to stay discovery pending resolution of the motion to dismiss or, alternatively, bifurcate discovery into an "individual claims" phase followed by (if necessary) a "class claims" phase. Dkt. No. 19 at 2.

## II. DISCUSSION

The Court addresses the motion to dismiss before turning to the motion to stay or bifurcate discovery.

### A. Motion to Dismiss

Dismissal under *Federal Rule of Civil Procedure 12(b)(6)* may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). At this stage, the Court accepts as true all factual allegations in the complaint and construes them in the light most favorable to the nonmoving party. *Gonzalez v. Google LLC*, 2 F.4th 871, 885 (9th Cir. 2021), *rev'd on other grounds by Gonzalez v. Google LLC*, 143 S. Ct. 1191 (2023) (per curiam). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see* Fed. R. Civ. P. 8(a)(2) (a plaintiff must make a "short and plain statement of the claim showing that the pleader is entitled to relief"). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Assurance IQ moves the Court to dismiss Blair's amended complaint "in its entirety with prejudice" because he (1) fails to sufficiently allege that the calls he received involved prerecorded messages; (2) fails to sufficiently allege that Assurance IQ willfully or knowingly violated the TCPA or its accompanying regulations, which is required for treble damages; and (3) fails to demonstrate the real and immediate threat of future injury necessary to obtain injunctive relief. Dkt. No. 20 at 2. The Court addresses these arguments in turn.

### 1. Sufficiency of TCPA Allegations – Count 1

As relevant here, the TCPA forbids any person from making "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using ... an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii). The statute similarly prohibits any person from initiating "any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party[.]" *Id.* § 227(b)(1)(B). "In plain English, the TCPA prohibit[s] almost all robocalls to cell phones." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2344 (2020).

If a telemarketer violates the TCPA, the recipient of the call may bring an action "to enjoin such violation"; "to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater"; or both. 47 U.S.C. § 227(b)(3); *see Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) ("Congress aimed to curb telemarketing calls to which consumers did not consent by prohibiting such conduct and creating a statutory scheme giving damages if that prohibition was violated."). To plead a TCPA claim under Section 227(b)(1)(A)(iii) and (b)(1)(B), Blair must allege the following three elements: (1) the defendant called his cellular or residential phone number (2) using an artificial or prerecorded voice (3) without his prior express consent. *Rogers v. Assurance IQ, LLC*, No. 2:21-CV-00823-TL, 2023 WL 2646468, at \*3 (W.D. Wash. Mar.

27, 2023) (citing *Meyer v. Portfolio Recovery Assocs., LLC,* 707 F.3d 1036, 1043 (9th Cir. 2012)).

**\*3** Assurance IQ targets the second element, arguing that Blair's amended complaint "does not provide any basis for this Court to reasonably infer that the 'voice' [he] allegedly heard was prerecorded as opposed to live." Dkt. No. 20 at 6. Although the amended complaint contains allegations about the tone, cadence, and timing of the speaker, Assurance IQ argues that Blair fails to specify "*what about* the tone, cadence, and timing indicated that the call was pre-recorded." *Id.* (emphasis original); *see id.* ("Plaintiff has fallen short here by parroting conclusory language."). The Court disagrees.

When, as here, a fact is an element of the claim (i.e., whether the defendant made the call using an artificial or prerecorded voice), it is insufficient for the plaintiff to merely recite that fact verbatim without other supporting details. *Makaron v. GE Sec. Mfg., Inc.,* No. CV-14-1274-GW(AGRX), 2014 WL 12614468, at \*2 (C.D. Cal. July 31, 2014); *Forney v. Hair Club for Men Ltd., Inc.,* No. CV-16-9640-R, 2017 WL 4685549, at \*2 (C.D. Cal. June 26, 2017) (a plaintiff must do more than plead statutory language from the TCPA). District courts in the Ninth Circuit generally require plaintiffs to plead circumstances sufficient to support an inference that the calls were placed with an artificial or prerecorded voice. *Rogers,* 2023 WL 2646468, at \*3 (collecting cases). For example, a plaintiff should be able to allege facts about the "tenor, nature, or circumstances of the alleged calls" or "otherwise demonstrate that a live human was not speaking during the calls." *Id.* at \*4 (internal quotation marks omitted) (quoting *Manopla v. Sansone Jr.'s 66 Automall,* No. 17-16522 (FLW) (LHG), 2020 WL 1975834, at \*2 (D.N.J. Jan. 10, 2020)); *see also, e.g., Greene v. Select Funding, LLC,* No. 2:20-CV-07333-RGK-KS, 2021 WL 4926495, at \*4 (C.D. Cal. Feb. 5, 2021) (finding that plaintiff adequately stated a TCPA claim where he alleged that he knew the caller was a prerecorded message "based on the speaker's content, tone, and inflection; the generic content of the voice message, and the speaker's cadence" (cleaned up)); *Forney,* 2017 WL 4685549, at \*2 ("Successful TCPA complaints allege that the message[s] they received were scripted or impersonal, from an obviously automated number, formatted in code, or similar[ ] factual details."); *Johansen v. Vivant, Inc.,* No. 12-C-7159, 2012 WL 6590551, at \*3 (N.D. Ill. Dec. 8, 2012) ("[A] TCPA plaintiff could describe the robotic sound of the voice on the other line, the lack of human response when he attempted to have a conversation with the 'person' calling him, [or] the generic content of the message he received[.]").

Blair sufficiently alleges that the calls received on December 26, 2022 (7:52 PM), December 27, 2022 (10:02 AM), December 28, 2022 (10:02 AM), and December 30, 2022 (10:02 AM) involved a prerecorded voice message in violation of Section 227(b)(1)(A)(iii) and (b)(1)(B). With respect to the December 26th call, Blair contends the call involved a prerecorded voice "because of the tone, cadence, and timing of the speaker, which sounded unnaturally perfect." Dkt. No. 18 at 9. The voice's "unnaturally perfect" sound is enough at this stage for the Court to infer that it was artificial or prerecorded. The Court similarly concludes that Blair has alleged facts sufficient to infer that the December 27th, 28th, and 30th calls involved artificial or prerecorded voices. Blair received all three calls at the same time (10:02 AM) and resulted in "identical" voicemails delivering a generic sales pitch. *See id.* at 9–11. To be sure, Blair could have expounded more on how these voicemails were identical (e.g., the tone and cadence of the voice). At the dismissal stage, however, the Court views the facts in the light most favorable to Blair. And assuming—as the Court must—the truth of the facts asserted, Blair has alleged suspicious timing (three calls placed at the exact same time on three separate days) and generic content (identical, nonspecific sales pitches) sufficient for the Court to reasonably infer that the speaker on the calls at issue was an artificial or prerecorded voice. Assurance IQ's motion to dismiss is denied with respect to Count 1.[1]

### 2. "Willful" or "Knowing" TCPA Violations: Treble Damages

**\*4** The TCPA vests district courts with discretion to award treble damages for willful or knowing violations of the statute or its regulations. 47 U.S.C. § 227(b)(3), (c)(5); *see Barr,* 140 S. Ct. at 2345. Blair appears to seek treble damages under Count I and Count II of his amended complaint. Dkt. No. 18 at 14–15 (Count I seeks "a minimum of $500 in damages, and up to $1,500 in damage" per violation, whereas Count II expressly demands "treble damages"). Assurance IQ argues that Blair's amended complaint "makes no allegation that [its] alleged conduct was willful and knowing." Dkt. No. 20 at 7 (emphasis omitted). At this juncture, the Court agrees. Nowhere does Blair allege that Assurance IQ's statutory violations were willful or knowing. He instead claims that, "[t]o the extent [Assurance IQ]'s misconduct is determined to be willful and knowing, the Court should ... treble the amount of statutory damages recoverable by the members of the Do Not Call Registry Class." Dkt. No. 18 at 15–16. This

Case 1:25-cv-01410-JKM   Document 19-2   Filed 10/30/25   Page 32 of 99

is insufficient. The Court therefore dismisses Blair's claim for treble damages.

### 3. Standing to Seek Injunctive Relief

The TCPA permits a plaintiff to bring "an action based on a violation of th[e statute] or the regulations prescribed under th[e statute] to enjoin such violation[.]" 47 U.S.C. § 227(b)(3)(A). Assurance IQ's argument under Federal Rule of Civil Procedure 12(b)(1) contends, however, that Blair lacks Article III standing to seek injunctive relief because he "does not allege any threat of future injury[.]" Dkt. No. 20 at 8–9; *see also* Dkt. No. 24 at 5 ("The allegations belie any plausible inference of [future injury] given that the last alleged call was over four months ago."). While Assurance IQ does not specify whether it intends to mount a facial or factual attack, the substance of its motion indicates that it believes Blair's allegations are insufficient to invoke the Court's jurisdiction with respect to injunctive relief, i.e., it brings a facial challenge. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ("In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."). Blair counters that he need not allege a threat of future injury to obtain injunctive relief under the TCPA: "For a statutory injunction, like under the TCPA, if the 'plaintiff sufficiently alleges a claim for a statutory violation, that is all that is required to request injunctive relief in a complaint.' " Dkt. No. 23 at 7 (quoting *Gutierrez v. Fla. Advert. & Mktg. Corp.*, 387 F. Supp. 3d 1410, 1411 (S.D. Fla. 2019)). The Court disagrees.

Standing is a threshold issue central to the Court's subject matter jurisdiction. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc). And the Supreme Court has repeatedly made clear that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (cleaned up). The fact that a statute—here, the TCPA—provides for injunctive relief does not automatically convey standing to seek such relief. *Cf. Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1119–20 (9th Cir. 2020) (assessing whether plaintiffs established standing for injunctive relief under the ECPA, 18 U.S.C. § 2520, even though the statute provides for preliminary and other equitable relief); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) (standing requirements are not automatically met "whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."). Rather, a plaintiff must still show that his injury is concrete and likely to be redressed by the relief he seeks.

*Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1036–37 (9th Cir. 2006).

In terms of injunctive relief, then, Blair "must allege either continuing, present adverse effects" due to his exposure to Assurance IQ's past illegal conduct "or a sufficient likelihood that [he] will again be wronged in a similar way." *Villa v. Maricopa Cnty.*, 865 F.3d 1224, 1229 (9th Cir. 2017) (cleaned up); *accord Rogers*, 2023 WL 2646468, at *7. The threat of injury "must be actual and imminent" rather than merely hypothetical. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (cleaned up). And last, "[a]llegations that a defendant's conduct will subject unnamed class members to the alleged harm is insufficient to establish standing to seek injunctive relief on behalf of the class." *Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 5339806, at *15 (N.D. Cal. Sept. 23, 2016) (citing *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1044–45 (9th Cir. 1999) (en banc)); *see also Villa*, 865 F.3d at 1229 (class representative could not seek injunctive relief on behalf of class because she lacked standing to pursue that relief).

**\*5** A district court resolves a facial jurisdictional attack as it would a Rule 12(b)(6) motion: accepting Blair's allegations as true and drawing all reasonable inferences in his favor, the Court determines whether the allegations are sufficient to invoke its jurisdiction. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). "When evaluating whether the standing elements are present, [the district court] must look at the facts as they exist at the time the complaint was filed." *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014) (cleaned up). Blair filed his amended complaint on March 28, 2023. At that point, it had been three months since the last alleged call. *See* Dkt. No. 18 at 11 (last call occurred December 30, 2022). And Blair does not allege continuing, present adverse effects due to his exposure to Assurance IQ's calls. He instead frames his injury in the past tense: "The unauthorized solicitation telephone calls ... harmed Plaintiff Blair in the form of annoyance, nuisance, and invasion of privacy, occupied his phone line, and disturbed the use of and enjoyment of his phone." *Id.* at 11. Past exposure to unlawful conduct is insufficient to confer standing to seek injunctive relief unless the plaintiff continues to suffer adverse effects. *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010); *see also Davidson*, 889 F.3d at 967 (past harms may bear on whether a real and immediate threat of repeated injury exists, but they are insufficient by themselves to grant standing); *Campbell*, 951 F.3d at 1120 (finding "combination of continuing harm plus likelihood of

future harm" sufficient to confer standing to seek injunctive relief).

Nor does Blair allege a sufficient threat of future harm—let alone "actual and imminent" or "certainly impending" harm. Indeed, he does not even mention the possibility of future calls. And according to the amended complaint, he only received calls over a period of seven days. *See* Dkt. No. 18 at 7–11 (cataloguing calls); *Miller v. Time Warner Cable Inc.*, No. 8:16-CV-00329-CAS (ASX), 2016 WL 7471302, at *4 (C.D. Cal. Dec. 27, 2016) (risk that defendant would continue to make unsolicited calls to plaintiff's phone was "too speculative" to establish a real and immediate threat of injury because plaintiff had not received an unsolicited call in eight months at the time of filing her complaint). Because Blair does not allege ongoing harm from past conduct or establish a sufficient likelihood of future harm, he lacks standing to seek injunctive relief on his or the class's behalf. *See Villa*, 865 F.3d at 1229. The Court accordingly dismisses Blair's claim for injunctive relief.

#### 4. Leave to Amend

The Court will permit Blair leave to file a second amended complaint curing the deficiencies identified above. Federal Rule of Civil Procedure 15(a)(2) directs district courts to "freely give leave when justice so requires." As the language of the rule suggests, the standard for leave to amend is "very liberal," *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006), because "the underlying purpose of Rule 15 [is] to facilitate [a] decision on the merits, rather than on the pleadings or technicalities," *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (cleaned up). A district court should therefore grant leave to amend even when, as here, no request to amend the pleading was made, "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (cleaned up). A court may deny leave to amend "only if there is strong evidence of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment[.]" *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) (cleaned up). Beyond merely requesting dismissal with prejudice, Assurance IQ does not contend any of these factors are present.

### B. Motion to Stay or, Alternatively, Bifurcate Discovery

Assurance IQ next urges the Court to stay discovery pending resolution of its motion to dismiss. Dkt. No. 19 at 3–6. The Court denies this request as moot because it has now ruled on the motion.

Alternatively, Assurance IQ argues that the Court should modify its March 15, 2023 Scheduling Order Regarding Class Certification Motion and bifurcate discovery into two phases: an initial 90-day merits phase limited to Blair's individual claims, followed by a conditional class-based phase (should Blair succeed on his claims). *Id.* at 2, 6–10; *see* Dkt. No. 17 (Mar. 15, 2023 Scheduling Order). Assurance IQ wants the opportunity to move for summary judgment on Blair's individual claims at the close of the merits phase in hopes of avoiding "costly and burdensome [class] discovery that may be moot[.]" *Id.* at 8. The Court declines Assurance IQ's request to bifurcate discovery for the reasons set forth below.

**\*6** "A district court has broad powers of case management, including the power to limit discovery to relevant subject matter and to adjust discovery as appropriate to each phase of litigation." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803–04 (Fed. Cir. 1999); *see also Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988) ("The district court has wide discretion in controlling discovery."); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009) (the district court has broad discretion to control the class certification process, including class-related discovery). As part of this power, the district court also has broad discretion to determine whether to bifurcate discovery prior to certification. *Hunichen v. Atonomi LLC*, No. C19-0615-RAJ-MAT, 2020 WL 5759782, at *1 (W.D. Wash. Sept. 28, 2020); *True Health Chiropractic Inc. v. McKesson Corp.*, No. 13-CV-02219-JST, 2015 WL 273188, at *1 (N.D. Cal. Jan. 20, 2015). The Court may consider the following factors in deciding whether bifurcation is appropriate: (1) the overlap between individual and class discovery; (2) whether bifurcation promotes Rule 23(c)(1) (A)'s requirement that certification be decided "[a]t an early practicable time"; (3) judicial economy; and (4) any prejudice reasonably likely to flow from the grant or denial of a stay of class discovery. *Hunichen*, 2020 WL 5759782, at *1.[2] The Court addresses these factors in turn.

#### 1. Overlap Between Individual and Class Discovery

The first factor weighs against bifurcation. "Generally at the pre-class certification stage, discovery in a putative class

action is limited to certification issues such as the number of class members, the existence of common questions, typicality of claims, and the representative's ability to represent the class." *Gusman v. Comcast Corp.*, 298 F.R.D. 592, 595 (S.D. Cal. 2014). The Supreme Court has, however, repeatedly emphasized that the class certification decision requires "a rigorous analysis" of Rule 23(a)'s prerequisites, and "[s]uch an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013) (cleaned up). This is because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 34 (cleaned up). Thus, the distinction between merits discovery and class discovery "is not always clear," and "[m]any courts are, for this reason, reluctant to bifurcate class and merits discovery." *Hunichen*, 2020 WL 5759782, at *1; *see also, e.g.*, *Ahmed v. HSBC Bank USA, Nat'l Ass'n*, No. ED-CV-15-2057-FMO-(SPX), 2018 WL 501413, at *3 (C.D. Cal. Jan. 5, 2018) ("[T]he distinction between class certification and merits discovery is murky at best and impossible to determine at worst.").

Here, too, there is overlap between the class determination inquiry and the merits of Blair's underlying claims. This overlap includes the existence of common questions of law or fact and predominance under Rule 23(a)(2) and (b) (3). *See Hunichen*, 2020 WL 5759782, at *2. "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (cleaned up). And Blair's two proposed classes track his underlying causes of action verbatim. *Compare* Dkt. No. 18 at 11–12 (proposed classes), *with id.* at 14–15 (individual claims). Assurance IQ appears to concede the presence of at least some overlap in this case, but protests this factor is outweighed by the others. *See* Dkt. No. 19 at 7. As none of the factors favor bifurcation, this argument is irrelevant.

### 2. Promotion of Rule 23(c)(1)(A)

**\*7** The second factor likewise counsels against bifurcation. Federal Rule of Civil Procedure 23(c)(1)(A) directs district courts to determine whether an action should be certified as a class action "[a]t an early practicable time[.]" The Advisory Committee Notes to the 2003 amendment recognize that in some cases the defendant "may prefer to win dismissal or summary judgment as to the individual plaintiffs without certification and without binding the class that might have been certified." However, the Notes also caution against

"forcing an artificial and ultimately wasteful division between 'certification discovery' and 'merits discovery.' "

Assurance IQ initially contends that "any extension owing to bifurcation would not jeopardize class certification motions in this case." Dkt. No. 19 at 8. But it immediately contradicts this representation by admitting that this is precisely what would happen: "Assurance only requests 90 days to complete discovery as to Plaintiff's individual claims.... At most, class certification would be extended only three months from this Court's current deadline[.]" *Id.* Assurance IQ suggests, however, that such a delay is acceptable. Relying on *True Health*, it argues that bifurcation does not offend Rule 23(c) (1)(A)'s directive so long as class certification occurs within two years of a case's filing. *Id.* at 7. And because Blair initiated this suit in January 2023, moving the certification motion deadline (currently set for January 2024) back three months still ensures that will occur within two years. *Id.* at 8.

To the extent Assurance IQ touts *True Health* as establishing a bright-line rule for acceptable delay, the Court disagrees. The district court in *True Health* confronted a delay between the filing of the plaintiff's complaint and the extended certification deadline that was longer than the prospective delay here. But the case does not stand for the proposition that bifurcation is always appropriate so long as certification occurs within two years of the action's commencement. And more importantly, the concerns the court noted in *True Health* are present in this case. There the court rejected the bifurcation request involving an initial 45-day "individual issues" phase (as opposed to a 90-day initial phase) because of the *additional* delay associated with a separate motion for summary judgment:

> If the Court bifurcates discovery and grants Defendants forty-five days to conduct discovery solely as to individual issues, that discovery will likely not be complete until late March. Defendants would then have to prepare and file a motion for summary judgment; assuming this would require approximately a month, the motion would be filed in late April, and heard in early June. The Court would then have to issue an order on summary judgment, and only then —assuming [the proposed class representatives] remained in the case—could class discovery even *begin*. A motion for class certification would not be ready for hearing until class discovery was complete.

*True Health*, 2015 WL 273188, at *2 (emphasis original). This reasoning is equally applicable here. Bifurcation would delay rather than advance the class certification determination

and would not promote Rule 23(c)(1)(A)'s requirement that certification occur "[a]t an early practicable time[.]"

3. Judicial Economy

Nor does the third factor favor bifurcation. The Court acknowledges that initially limiting discovery to Blair's individual claims could facilitate a more efficient resolution of this action and obviate the need for costly class-related discovery. Dkt. No. 19 at 8; *see, e.g.*, *Young v. Mophie, Inc.*, No. SACV-19-827 JVS (DFMX), 2020 WL 1000578, at *3 (C.D. Cal. Jan. 7, 2020); *Deleon v. Time Warner Cable LLC*, No. CV-09-2438-AG (RNBX), 2009 WL 10674767, at *2 (C.D. Cal. Nov. 2, 2009). It concludes, however, that the risks of bifurcation outweigh the potential benefits in this case. Just as the district court observed in *True Health*, bifurcation poses a substantial risk of complicating this litigation with a slew of disputes over whether certain discovery relates to class issues or Blair's individual claims. 2015 WL 273188, at *2; *see also, e.g.*, *Ahmed*, 2018 WL 501413, at *3 ("[B]ifurcation often creates unnecessary gaps in the evidence as a defendant has a strong incentive to withhold evidence[.]"); *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*, No. 8:10-CV-2008-T-33TGW, 2011 WL 486123, at *2 (M.D. Fla. Feb. 7, 2011) (questioning whether, given the "murky" distinction between merits and class issues, parties with an incentive to withhold damaging evidence can properly draw the line between the two categories during phased discovery); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 258 F.R.D. 167, 174 (D.D.C. 2009) ("Bifurcated discovery fails to promote judicial economy when it requires ongoing supervision of discovery. If bifurcated, this Court would likely have to resolve various needless disputes that would arise concerning the classification of each document as 'merits' or 'certification' discovery." (cleaned up)).

*8 Additionally, the Court must weigh the possibility that discovery will validate Blair's claims and, should those claims survive (or win) summary judgment, demonstrate that he is an adequate class representative. If that proves to be the case, the Court and the parties will needlessly duplicate at least two lengthy steps in this litigation: discovery and dispositive motions practice. *True Health*, 2015 WL 273188, at *3; *see also Hartley-Culp v. Credit Mgmt. Co.*, No. 3:CV-14-0282, 2014 WL 4630852, at *4 (M.D. Pa.

Sept. 15, 2014) ("[B]ifurcation of discovery in this case will increase litigation expenses by protracting the discovery period and by duplicating the discovery process, including the depositions."). Dkt. No. 21 at 4 (detailing duplicated efforts).

4. Prejudice

The fourth and final factor is neutral. "The potential for prejudice resulting from granting or denying the motion to bifurcate runs both ways." *True Health*, 2015 WL 273188, at *3. On the one hand, bifurcation would delay production of class-related discovery and therefore temporarily deprive Blair of information necessary to support the proposed classes' claims. On the other, Assurance IQ could needlessly incur serious expenses in responding to Blair's class-related discovery requests should Blair's individual claims prove unsubstantiated or unsuccessful. *Id.*; Dkt. No. 19 at 9 (documenting several class-related interrogatories and requests for production); *but see Hunichen*, 2020 WL 5759782, at *2 (finding prejudice to defendants "minimized by the unavoidable overlap with merits discovery, the ongoing relevance of merits discovery beyond class certification, and the avoidance of disputes over what does and does not constitute solely class-based discovery.").

Three factors weigh against bifurcation while one is neutral. The Court accordingly finds bifurcation inappropriate in this case and denies this aspect of Assurance IQ's motion.

## III. CONCLUSION

The Court DENIES Assurance IQ's Motion to Stay Discovery or, in the Alternative, to Bifurcate Discovery, Dkt. No. 19, and GRANTS IN PART and DENIES IN PART its Motion to Dismiss Amended Complaint, Dkt. No. 20.

Should Blair wish to file an amended complaint curing the deficiencies identified above, he must do so within 14 days of the date of this Order.

## All Citations

Slip Copy, 2023 WL 6622415

---

Footnotes

1    Assurance IQ does not challenge the sufficiency of Count 2. *See generally* Dkt. No. 20.

2023 WL 6622415

2    Assurance IQ's request to bifurcate discovery also implicates Federal Rule of Civil Procedure 16(b)(4). That is, it must demonstrate "good cause" to modify the Court's existing case schedule. For the purposes of this motion, the Court considers this inquiry subsumed by the four-factor bifurcation analysis. Assurance IQ frames its arguments under that test, and it does not otherwise attempt to articulate good cause for amending the case schedule.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Ahmed v. HSBC Bank USA, National Association, Not Reported in Fed. Supp. (2018)

2018 WL 501413

2018 WL 501413
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Saber AHMED, et al.

v.

HSBC BANK USA, NATIONAL
ASSOCIATION, et al.

Case No. ED CV 15–2057 FMO (SPx)
|
Filed 01/05/2018

**Attorneys and Law Firms**

Alexander H. Burke, Pro Hac Vice, Burke Law Offices LLC, Chicago, IL, Joshua B. Swigart, Hyde and Swigart APC, San Diego, CA, Meghan Elisabeth George, Thomas Edward Wheeler, Todd M. Friedman, Adrian Robert Bacon, Law Offices of Todd M. Friedman PC, Woodland Hills, CA, Seyed Abbas Kazerounian, Jason A. Ibey, Matthew M. Loker, Kazerouni Law Group APC, Costa Mesa, CA, Adrienne D. McEntee, Pro Hac Vice, Beth E. Terrell, Jennifer Rust Murray, Pro Hac Vice, Terrell Marshall Law Group PLLC, Seattle, WA, Suren N. Weerasuriya, Burkhalter Kessler Clement and George LLP, Irvine, CA, for Saber Ahmed, et al.

Julia B. Strickland, Shannon Elizabeth Dudic, Arjun P. Rao, Bryan J. Weintrop, Stroock and Stroock and Lavan LLP, Kay Fitz–Patrick, Scott M. Pearson, Taylor Steinbacher, Ballard Spahr LLP, Los Angeles, CA, Daniel J. T McKenna, Pro Hac Vice, Ballard Spahr LLP, Philadelphia, PA, Matthew A. Morr, Pro Hac Vice, Ballard Spahr LLP, Denver, CO, for HSBC Bank USA, National Association, et al.

**Proceedings: (In Chambers) Order Re: Motion for Reconsideration**

Fernando M. Olguin, United States District Judge

**\*1** Having reviewed and considered all the briefing filed with respect to defendants' Motion for Reconsideration Pursuant to Federal Rule of Civil Procedure 54(b) (Dkt. 121, "Motion"), the court concludes that oral argument is not necessary to resolve the motion. See Fed. R. Civ. P. 78; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001).

**INTRODUCTION**

On October 6, 2015, plaintiff Saber Ahmed ("Ahmed") filed a Complaint, individually and on behalf of all others similarly situated, against defendant HSBC Mortgage Corporation (USA) ("HSBC") alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, et seq. (See Dkt. 1, Complaint at ¶¶ 23–30). On March 15, 2017, Ahmed and plaintiff John Monteleone (collectively, "plaintiffs") filed a First Amended Complaint ("FAC") against HSBC and defendant PHH Mortgage Corporation ("PHH" and collectively, "defendants"), for negligent and willful violations of the TCPA. (See Dkt. 27, FAC at ¶¶ 65–73).

Defendants filed a Motion to Strike Class Allegations. (See Dkt. 76). Plaintiffs subsequently filed Motions to Compel Responses to Discovery (Dkts. 85–86), which defendants opposed. On September 25, 2017, the Magistrate Judge granted the Motions to Compel in part and denied them in part. (See Dkt. 101, Magistrate Judge's Order of September 25, 2017, at 14–15). At the time the Magistrate Judge issued her ruling, the court had yet to rule on defendants' Motion to Strike Class Allegations. Following the Magistrate Judge's ruling, defendants filed an Ex Parte Application to Stay Rulings (Dkt. 104, "Ex Parte Application"), a Motion to Modify Scheduling Order (Dkt. 105), and a Motion for Reconsideration re: Order on Motion to Compel (Dkt. 106, "Motion for Review") (collectively, "Discovery Motions"). On November 6, 2017, the court denied defendants' Motion to Strike Class Allegations and denied the Discovery Motions as moot. (See Dkt. 118, Court's Order of November 6, 2017, at 4). On November 13, 2017, defendants filed the instant Motion seeking reconsideration of the court's denial of the Discovery Motions and alternatively, requesting "that the Court facilitate an application for interlocutory appeal" pursuant to 28 U.S.C. § 1292(b).[1] (See Dkt. 121, Motion at 3–5).

**DISCUSSION**

"In this district, motions for reconsideration are governed by Local Rule 7–18," Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc., 568 F.Supp.2d 1152, 1162 (C.D. Cal. 2008), which provides that such a motion

Ahmed v. HSBC Bank USA, National Association, Not Reported in Fed. Supp. (2018)

2018 WL 501413

may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.

**\*2** Local Rule 7–18. The Local Rule also admonishes that "[n]o motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion." Id.

Defendants assert that the court erred in denying their Discovery Motions because the Motions were not mooted by the court's denial of defendants' Motion to Strike Class Allegations. (See Dkt. 121, Motion at 3). According to defendants, the Discovery Motions "were based on completely separate and independent grounds" and "had nothing to do with the Motion to Strike[.]" (Id.). Defendants' assertions are unpersuasive.

As the Magistrate Judge noted, "[t]he parties' discovery disputes largely stem from one overarching dispute regarding whether plaintiffs are entitled to class-wide discovery beyond what pertains to the named plaintiffs." (See Dkt. 101, Magistrate Judge's Order of September 25, 2017, at 4). With respect to the Discovery Motions, they, too, "largely stem" from defendant's contention that plaintiffs are not entitled to class-wide discovery.[2] (See Dkt. 104, Ex Parte Application at 5–6 (raising three arguments: (1) the magistrate judge's order should be reversed because defendants' Motion to Strike "is meritorious[;]" (2) plaintiffs lack standing; and (3) the magistrate judge's order was "clearly erroneous because it improperly compelled class-wide merits discovery before a class has been certified"); Dkt. 106, Motion for Review at 1–2 (raising same arguments as Ex Parte Application);[3] Dkt. 105, Motion to Modify Scheduling Order at 1–2 (arguing that modification of the Scheduling Order is warranted because class wide discovery is not appropriate as a matter of law and because "there are dispositive issues that can be determined now")). However, the court's Scheduling Order, filed on May 22, 2017, advised and cautioned the parties that the court would not "bifurcate discovery." (Dkt. 65, Court's Order of May 22, 2017, at 2). The parties were advised "that absent exceptional circumstances, discovery shall not be stayed

while any motion is pending, including any motion to dismiss or motion for protective order." (Id.).

Defendants' claim that discovery should be bifurcated in class actions is largely based on a case that is more than 40 years old and involved securities fraud and a parallel state proceeding that had already resulted in a settlement. (See Dkt. 105, Motion to Modify Scheduling Order, at 9–10, relying on Kamm v. California City Dev. Co., 509 F.2d 205 (9th Cir. 1975)); Kamm, 509 F.2d at 210–11; Schwartz v. Lights of Am., Inc., 2012 WL 12883222, *10 (C.D. Cal. 2012) ("Unlike Kamm, in which remedies had 'already been instituted' and the purchasers obtained meaningful relief, here, remedies have not been determined .... Further unlike Kamm, no settlement has been reached .... Because the distribution of relief in Kamm was the primary factor in finding that the state action was superior, this case is fundamentally distinguishable.") (citing Cartwright v. Viking Indus., 2009 U.S. Dist. LEXIS 83286, *47 (E.D. Cal. 2009) (finding that the most important distinction between that case and Kamm was that in the latter relief had been accorded and in the former it had not)); Moore v. Walter Coke, Inc., 294 F.R.D. 620, 629 (N.D. Ala. 2013) ("Kamm v. Cal. City Dev. Co., 509 F.2d 205 (9th Cir.1975), in which the court dismissed class claims 'without discovery where it was clear from the complaint and associated public records that the class could not satisfy Rule 23(b).' ... adds nothing new. It is distinguishable both as a securities fraud case and as a case in which well-underway parallel proceedings brought by state officials were clearly superior to the class action proposed.")).[4] Defendants' argument ignores the realities of class action litigation today, which are governed by the Supreme Court's landmark decision in Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). In Dukes, the Supreme Court indicated that class certification requires a trial court to engage in a "rigorous analysis[ ] that the prerequisites of Rule 23(a) have been satisfied[.]" Id. at 351, 131 S.Ct. at 2551–52. This analysis usually frequently "entail[s] some overlap with the merits of the plaintiff's underlying claim" because the "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." Id.; see Gusman v. Comcast Corp., 298 F.R.D. 592, 595 (S.D. Cal. 2014) ("Facts that are relevant to the class determination frequently will overlap with those relevant to the merits of the case."); McEwan v. OSP Grp., L.P., 2016 WL 1241530, *3 (S.D. Cal. 2016) ("In this regard, the Supreme Court had directed courts considering class certification motions to engage in a 'rigorous analysis' to determine whether Rule

Ahmed v. HSBC Bank USA, National Association, Not Reported in Fed. Supp. (2018)

2018 WL 501413

23's prerequisites have been satisfied, an analysis that will frequently [ ]overlap with the merits of plaintiff's underlying claim.").

 **\*3** In light of Dukes and the "rigorous analysis" requirement for class certification, many courts "are reluctant to bifurcate class-related discovery from discovery on the merits."[5] Chen–Oster v. Goldman, Sachs & Co., 285 F.R.D. 294, 299–300 (S.D.N.Y. 2012) (collecting cases). This is because the distinction between class certification and merits discovery is murky at best and impossible to determine at worst. See Munoz v. PHH Corp., 2016 WL 10077139, \*4 (E.D. Cal. 2016) ("Courts have repeatedly acknowledged that there is no clear-cut division between discovery that relates to class certification and discovery that relates to the merits."); In re: Riddell Concussion Reduction Litig., 2016 WL 4119807, \*2 (D.N.J. 2016) (explaining that the court had previously declined to bifurcate discovery because "more often than not there is no 'bright line' between class certification and merits issues."); Lakeland Regional Medical Center, Inc. v. Astellas US, LLC, 2011 WL 486123, \*2 (M.D. Fla. 2011) ("Simply stated, if district courts as neutral arbiters of the law find the distinction between merits and class issues to be murky at best, and impossible to discern at worst, the Court cannot imagine how parties with an incentive to hold back damaging evidence, can properly draw the line between these categories of evidence during 'phased' discovery."). Separating merits and class discovery "raise[s] a slew of issues as to what discovery relates to the class, as opposed to the named plaintiffs, thereby causing additional litigation regarding the distinction between the two." True Health Chiropractic Inc. v. McKesson Corp., 2015 WL 273188, \*3 (N.D. Cal. 2015); see Quinn v. Specialized Loan Servs., LLC, 321 F.R.D. 324, 327–28 (N.D. Ill. 2017) (observing that bifurcation "may give rise to disputes over whether a particular discovery request relates to the merits or to class certification"); Burges v. BancorpSouth, Inc., 2015 WL 13628132, \*4 (M.D. Tenn. 2015) (same); City of Pontiac General Employees' Retirement System v. Wal–Mart Stores, Inc., 2015 WL 11120408, \*1–2 (W.D. Ark. 2015) (bifurcation may force the court to resolve "endless discovery disputes"). For example, bifurcation often creates unnecessary gaps in the evidence as a defendant has a strong incentive to withhold evidence even if such evidence "overlap[s] with the merits of the plaintiff's underlying claim" or "involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."[6] See Dukes, 564 U.S. at 351, 131 S.Ct. at 2551–52; see, e.g., Tyus v. Wendy's of Las Vegas, Inc., 2017 WL 3026403, \*5 (D. Nev. 2017)

("Plaintiffs do not have the benefit of discovery into the merits of a case at the class certification stage and defendants frequently have withheld exactly the information needed to prove plaintiffs' case because it is common in putative class actions for defendants to seek 'bifurcated discovery' between class certification and merits issues, and this bifurcation results in a limited record at the class certification stage."); Tait v. BSH Home Appliances Corp., 289 F.R.D. 466, 488 (C.D. Cal. 2012) ("Indeed, it is often easy for a defendant to paint a dismal picture of plaintiffs' prospects because, at the class certification stage, plaintiffs do not have the benefit of discovery into the merits of a case and defendants frequently have withheld exactly the information needed to prove plaintiffs' case.").

In addition to "rais[ing] a slew of issues," True Health Chiropractic Inc., 2015 WL 273188, at \*3, "[a]rbitrary insistence on the merits/class discovery distinction sometimes thwarts the informed judicial assessment that current class certification practice emphasizes." Mbazomo v. ETourandTravel, Inc., 2017 WL 2346981, \*1–2 (E.D. Cal. 2017). For example, even if the class is not certified, the case will still continue and the discovery produced during the course of the case will be relevant and useful for the remainder of the case. See, e.g., In re Semgroup Energy Partners, L.P., Sec. Litig., 2010 WL 5376262, \*2–3 (N.D. Okla. 2010) ("because of the number of investors and the enormity of losses they allege to have incurred, this case is likely to continue even if Lead Plaintiff is not found to be an adequate class representative or class certification is otherwise denied"); City of Pontiac, 2015 WL 11120408, at \*1 ("Contrary to Defendant's assertions, there is no reason to believe that denial of class certification will terminate this litigation."); cf. Kelleher v. Fred Meyer Stores Inc., 302 F.R.D. 596, 599 (E.D. Wash. 2014) (granting motion to compel that sought personnel files of allegedly similarly situated employees, the identities of employees who requested leave or disability accommodation so that plaintiff could "attempt to demonstrate inconsistent treatment"); Lyoch v. Anheuser–Busch Companies, Inc., 164 F.R.D. 62, 70 (E.D. Mo. 1995) ("evidence of a pattern and practice of discrimination is relevant to an individual claim of discrimination").

 **\*4** In short, "[t]he decision to bifurcate discovery in putative class actions prior to certification is committed to the discretion of the trial court." True Health Chiropractic Inc., 2015 WL 273188, at \*1; Mbazomo, 2017 WL 2346981, at \*2 ("the Court is fully within its discretion to set either bifurcated

or non-bifurcated discovery schedules in class action cases"). The court does not believe that bifurcation of discovery is warranted in this case. See, e.g., True Health Chiropractic Inc., 2015 WL 273188, at *3 (declining to bifurcate discovery in TCPA class action); Charvat v. Plymouth Rock Energy, LLC, 2016 WL 207677, *2–3 (E.D. N.Y. 2016) (same). Finally, the court has again reviewed the Magistrate Judge's Order of September 25, 2017, (Dkt. 101), and finds that it is neither clearly erroneous nor contrary to law, see Fed. R. Civ. P. 72, and, therefore, the court did not err in denying the Discovery Motions.

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT Defendants' Motion for Reconsideration (**Document No. 121**) is **denied**.

## All Citations

Not Reported in Fed. Supp., 2018 WL 501413

Footnotes

1    In their reply brief, defendants indicate they are withdrawing the request for certification. (See Dkt. 127, Reply in Support of Defendant's Motion [ ] at 5). Therefore, the court only addresses defendants' arguments with respect to reconsideration.

2    Indeed, one of the Discovery Motions, defendants' Motion for Review (Dkt. 106) directly challenged the Magistrate Judge's discovery order.

3    In denying the Motion to Strike Class Allegations, the court noted that defendants had failed to explain the basis for their standing argument and that such an argument was not properly raised in a Rule 12(f) motion. (See Dkt. 118, Court's Order of November 6, 2017, at 3–4).

4    Similarly, defendants' reliance on Harris v. comScore, Inc., 2012 WL 686709, *3 (N.D. Ill. 2012) is misplaced. First, this is non-binding authority. More importantly, the concerns that led the Harris court to bifurcate discovery are not present here. For example, in Harris, the court found that "it is possible to draw general lines in this case" severing class certification issues from merits issues. See Harris, 2012 WL 686709, at *4. Here, merits issues and class certification issues are "enmeshed" with one another. See Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351, 131 S.Ct. 2541, 2552, 180 L.Ed.2d 374 (2011). Whether plaintiff is an adequate class representative, whether there is an agent/principal relationship, or other relationship giving rise to liability between HSBC and PHH, whether HSBC had knowledge of PHH's actions, and whether defendant HSBC and/or PHH used automatic telephone dialing systems to place calls, are all factual and legal issues that must be considered in determining whether Rule 23's requirements have been satisfied, i.e., it is very difficult in this case to draw a line between class certification and merits issues. (See Dkt. 27, FAC at ¶¶ 8–22, 53–54, 58–73); see also Meyer v. Portfolio Recovery Assocs., LLC, 707 F.3d 1036, 1043 (9th Cir. 2012) ("The three elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent.").

5    The Federal Judicial Center's "Manual for Complex Litigation cautions that '[d]iscovery relevant only to the merits delays the certification decision and may ultimately be unnecessary.' " In re Groupon, Inc. Securities Litig., 2014 WL 12746902, *2 (N.D. Ill. 2014); see Manual for Complex Litigation, Fourth § 21.14 (2004).

6    Bifurcation of discovery also enables a defendant to challenge the adequacy of plaintiff's counsel during the class certification proceedings. For example, in Moore v. Ulta Salon, Cosmetics & Fragrance, Inc., 311 F.R.D. 590 (C.D. Cal. 2015), a wage and hour class action, defense counsel challenged the adequacy of plaintiff's counsel, asserting that plaintiff's counsel had "done little to investigate the claims in this action—while they seek to certify a class of over 8,000 members, their motion is supported by 6 declarations covering 3 stores in one county." Id. at 607. Although plaintiff's counsel sought classwide discovery, defendant objected on a number of grounds, stating that plaintiff's discovery "seeks to elicit information that is beyond the scope of issues pertaining to class certification" and that "plaintiff should not be allowed to engage in class-wide merits discovery because discovery is limited to those issues necessary to establish class certification." Id. (internal quotation marks omitted). The Magistrate Judge limited the discovery plaintiff could receive, and required defendant to provide discovery responses only with respect to the stores where the named plaintiffs worked. This court rejected defendant's adequacy of counsel challenge, stating that "defendant's assertion that plaintiff's counsel

2018 WL 501413

is inadequate because of their inability to obtain the very discovery defense counsel refused to provide—because it was supposedly irrelevant to class certification—is utterly meritless, disingenuous, and not well-taken." Id.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 100894
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Robert NOCK, on behalf of himself
and others similarly situated, Plaintiff,

v.

PALMCO ADMINISTRATION,
LLC, et al., Defendants.

Civil Case No. 24-cv-00662-RDB
|
Signed January 15, 2025

**Attorneys and Law Firms**

Jacob U. Ginsburg, Pro Hac Vice, Kimmel & Silverman,
Ambler, PA, Ethan Preston, Dallas, TX, for Plaintiff.

Charles A. Zdebski, Eckert Seamans Cherin & Mellott LLC,
Washington, DC, for Defendants.

### MEMORANDUM OPINION AND ORDER

J. Mark Coulson, United States Magistrate Judge

**\*1** Plaintiff, Robert Nock, individually and on behalf of
all others similarly situated, alleges that Defendants, PalmCo
Administration, LLC d/b/a Indra Energy, and PalmCo Power
MD, LLC d/b/a Indra Energy, and PalmCo Energy MD, LLC
d/b/a Indra Energy (collectively, "Indra" or "Defendants")
violated the Telephone Consumer Protection Act, 47 U.S.C.
§ 227, et seq. as well as the Maryland Telephone Consumer
Protection Act, Md. Com. Law § 14-3201, et seq. (ECF No.
28). Specifically, Plaintiff contends Defendants contacted him
and others similarly situated in violation of these statutes, and
that Defendants' agents attempted to mask these violations
by disguising them as in-person solicitations rather than
telephone contacts so as to avoid liability. *Id.* at 15-16.[1]
Presently before the Court is Defendants' Motion to Bifurcate
Discovery. (ECF Nos. 54, 68).[2] The issues have been fully
briefed, (ECF Nos. 68, 70), and no hearing is necessary. *See*
Loc. R. 105.6 (D. Md. 2023). For the reasons set forth below,
the Court shall DENY Defendants' motion.

### I. BACKGROUND

This matter was referred to the undersigned for discovery
and all related scheduling by U.S. District Judge Richard
Bennett on November 7, 2024. (ECF No. 49). On November
13, 2024, the parties filed a joint letter with the Court
identifying several discovery disputes, (ECF No. 50), and
filed their respective position letters regarding the disputes
on November 18, 2024. (ECF Nos. 54, 56). These disputes
included: (1) the completeness of Defendants' production as
to certain emails and document types; (2) Defense counsel's
instruction to a fact witness not to answer certain questions
during a deposition; and (3) bifurcation of individual and
class discovery. *Id.* The Court held a telephonic discovery
conference with the parties on November 26, 2024, and
issued a written Memorandum Opinion and Order addressing
the disputes the following day. (ECF No. 60). In the
November 27, 2024 Memorandum Opinion, the undersigned
ordered additional briefing on the limited issue of bifurcation,
directing Defendants to file their brief by December 16, 2024,
and Plaintiff to file his Opposition by January 6, 2025. *Id.*
The parties' briefing deadlines were thereafter extended by
seven days, to December 23, 2024, and January 13, 2025,
respectively. (ECF No. 67).

Also relevant to the current dispute is Judge Bennett's
July 26, 2024 Order addressing a previous discovery issue
raised by the parties. (ECF No. 36). Judge Bennett directed
Defendants to produce "communications with Neil St. Lous/
NSL Marketing, LLC and any other Indra sales agents who
enrolled Maryland consumers with Defendants between April
1, 2021, and July 1, 2021." *Id.* Further, Judge Bennett
ordered that Defendants produce a fact witness, Jonathan
Cleckley, for a two-hour deposition. *Id.* As noted in the Court's
November 27, 2024 Memorandum Opinion, based on the
allegations of the Amended Complaint, it appears Judge
Bennett concluded this information was relevant to the issue
of whether Defendants knew or had notice of the alleged
practice of Defendants' sales agents of substituting telephone
solicitations for in-person solicitations.

### II. LEGAL STANDARD

**\*2** "Whether to order bifurcation, during discovery or at
trial, is an issue squarely within the broad discretion of the
district court." *Singh v. Lenovo,* No. CCB-20-1082, 2021 WL
1516032, at \*1 (D. Md. Apr. 16, 2021) (citing Fed. R. Civ. P.
42(b)). Courts consider four factors in determining whether
bifurcation of liability and class discovery is appropriate:

(1) [T]he overlap between individual and class discovery,
(2) whether bifurcation will promote Federal Rule of Civil

Procedure 23's requirement that certification be decided at "an early practicable time," (3) judicial economy, and (4) any prejudice reasonably likely to flow from the grant or denial of a stay of class discovery.

*Id.* at *2 (citing 1 McLaughlin on Class Actions § 3:10 (17th ed. 2020)); *see also Akselrod v. MarketPro Homebuyers LLC*, CCB-20-2966, 2021 WL 100666, at *2 (D. Md. Jan. 11, 2021). Bifurcation of discovery is generally the exception rather than the rule. *Id.* at *1 (citing *Cardenas v. Resort Sales by Spinnaker, Inc.*, No. 9:20-cv-00376-RMG, 2021 WL 733393, at *1 (D.S.C. Feb. 24, 2021)).

In *Singh*, Judge Blake of this Court explained that following the United States Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, district courts have been "reluctant to bifurcate class-related discovery from discovery on the merits." *Id.* at *1 (first citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), then citing *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 300 (S.D.N.Y. 2012); *Cardenas*, 2021 WL 733393 at *2 (citation omitted); *Hunichen v. Atonomi LLC*, No. C19-0615-RAJ-MAT, 2020 WL 5759782, at *1 (W.D. Wash. Sept. 28, 2020)). This reluctance stems from *Dukes*' directive that district courts engage in a "rigorous analysis" to determine class certification requirements, an analysis which often overlaps with the merits of the individual plaintiff's underlying claims. *Id.*(quoting *Dukes*, 564 U.S. at 350-51) (citation omitted). Because the distinction between class certification and merits discovery is "murky at best and impossible to determine at worst," distinguishing between the two may raise "a slew of issues as to what discovery relates to the class, as opposed to the named plaintiffs," resulting in further litigation. *Id.* (quoting *Cardenas*, 2021 WL 733393 at *2 (citation omitted)).

## III. ANALYSIS

Indra argues that good cause exists to bifurcate discovery because Plaintiff lacks factual support for his individual claims, and because Nock is the only named Plaintiff in this matter, whether he received calls from Indra or its agents "is a discrete, dispositive issue that will determine whether this action will proceed." (ECF No. 68 at 6). Indra further contends that there is little to no overlap between the discovery necessary to prove Plaintiff's claim and class discovery because "Plaintiff's claims lack any form of record support," and that bifurcation will still permit class certification to be determined "at an early practicable time" as required by the Federal Rules, given that Indra has proposed an "expeditious and streamlined five-month period to complete individual discovery and submit summary

judgment briefs." *Id.* at 14. Finally, Indra submits that judicial economy is best served by bifurcation, as the parties will not be required to engage in class discovery unless Nock's individual claims survive dispositive motions, and that any prejudice resulting from the denial of bifurcation "will be substantially and exclusively experienced by Defendants, who have already gone to great lengths to attempt to satisfy Plaintiff's discovery demands." *Id.* Defendants additionally attach an order in a TCPA case brought by Nock and his counsel in the United States District Court for the Southern District of New York case (*Nock v. Spring Energy*, Case No. 1:23-cv-1042) where discovery was bifurcated. (ECF No. 68-1 at 2).

**\*3** Plaintiff counters that he has produced call recordings reflecting calls to Nock and others, and, as Defendants concede, one of these calls purportedly made to Nock mentions Indra. (ECF No. 70 at 6). Plaintiff additionally provides recordings of calls made to other consumers, ostensibly on behalf of Indra, and alleges these calls correspond to records of consumers enrolled with Indra. *Id.* Plaintiff further argues that bifurcation at this late stage in the litigation would compound prejudice to Nock from Indra's already-belated discovery responses and would thwart judicial economy. *Id.* at 14. Finally, Plaintiff asserts that it is impracticable to separate class and merits discovery in this matter because evidence of Indra's knowledge of the alleged scheme to disguise telemarketing as in-person solicitation is relevant to both Nock's individual claims and the claims of prospective class members. *Id.* at 14-15. Regarding the *Nock v. Spring Energy* order, Plaintiff responds that although the Southern District of New York initially bifurcated discovery, the parties jointly moved to terminate bifurcation two months later because "bifurcation [was] no longer tenable." *Id.* at 6; ECF No. 70-2 at 5.

Having considered the parties' arguments and the four factors identified in *Singh*, the Court concludes that bifurcation is not appropriate in this matter. Starting with the first factor, the undersigned agrees that evidence of notice to Indra of the alleged scheme to mask telemarketing enrollments as in-person solicitations could be relevant to Nock's individual claims and the claims of prospective class members.[3] Because individual and class discovery overlaps, the difficulty of drawing the line between the two is likely to cause further discovery disputes and place greater demands on the Court's time. This result also implicates the third factor, judicial economy, and weighs against bifurcation. *See Singh*, 2021 WL 1516032 at *3 ("The parties in this action have different

ideas about what constitutes merits discovery and what constitutes class discovery. This confirms...that the line between the two is murky and that the court would be required to expend resources drawing those lines for the parties as disputes arise.").

With respect to the second factor, although Indra proposes a five-month schedule for individual discovery and dispositive motions briefing, this does not account for the time it takes the Court to decide those motions. Even if dispositive motions were decided within six months of this Order, well over one year would have passed from the date that this action was initiated in March 2024. (ECF No. 1). Permitting class and individual discovery to proceed simultaneously will best allow the Court to comply with Federal Rule of Civil Procedure 23's mandate that certification be decided at "an early practicable time" and is in the interests of judicial economy.

Turning to the final factor, prejudice, while the Court acknowledges that Indra may expend more resources in responding to discovery if bifurcation is denied, the undersigned is also concerned that Plaintiff's case will be prejudiced by further delay in this matter.[4] Further, as noted in Defendants' Memorandum of Law, Indra has already produced documents that it deems relevant primarily to class discovery, pursuant to Judge Bennett's July 26, 2024 Order. (ECF Nos. 36, 68 at 13). It seems the parties have engaged in concurrent individual and class discovery for close to eight months,[5] and it makes little sense to change course now. Accordingly, the Court will deny Defendants' Motion to Bifurcate Discovery.

## IV. CONCLUSION

**\*4** For the reasons stated, Defendants' Motion to Bifurcate Discovery (ECF No. 54) is DENIED. Accordingly, it is hereby ORDERED that:

1) Pursuant to the Court's November 27, 2024 Order, (ECF No. 60), Defendants shall produce all TPV.com data for all attempted and successful enrollments between April and July of 2021 within thirty (30) days of the entry of this Order; and

2) Pursuant to the Court's November 27, 2024 Order, (ECF No. 60), Defendants shall, within thirty (30) days of the entry of this Order, produce either (1) all recordings for quality assurance calls for door to door enrollment between April and July of 2021 or (2) recordings for quality assurance calls for door to door enrollment where the consumer indicated that the sales agents telephoned them rather than visited them in person between April and July of 2021;[6] and

3) Pursuant to Rule 26(g) of the Federal Rules of Civil Procedure, at least one attorney of record shall sign the production to certify that the production is complete to the best of the attorney's knowledge, information and belief formed after a reasonable inquiry.

IT IS SO ORDERED.

## All Citations

Slip Copy, 2025 WL 100894

## Footnotes

1    When the Court cites to a particular page number or range, the Court is referring to the page numbers located in the electronic filing stamps provided at the top of each electronically filed document.

2    ECF No. 54 is Defendants' position letter regarding the parties' discovery disputes, but is docketed as a Motion to Bifurcate Individual and Class Discovery, and does include an overview of Defendants' arguments for bifurcation. Defendants' arguments are fully briefed at ECF No. 68.

3    As before, the undersigned is guided by Judge Bennett's July 26, 2024 decision, in that Judge Bennett already found that "communications" between Defendants' sales agents and Defendants regarding Maryland consumers who were enrolled with Indra is within the scope of discovery. (ECF No. 36).

4    Defendants cite *Akselrod v. MarketPro Homebuyers LLC*, a TCPA case from this District in which Judge Blake bifurcated liability and class discovery and limited discovery to potentially dispositive issues. 2021 WL 100666 at *2. Judge Blake explained that bifurcation in *Akselrod* was appropriate because "[l]imited discovery ha[d] the potential to simplify the case and to save both parties the time and expense of class discovery, which can be particularly resource intensive." *Id.* However, the facts of *Akselrod* are distinguishable from the instant case, largely because of the different timelines

2025 WL 100894

between the two. The *Akselrod* defendant moved for bifurcation less than 20 days after filing its Answer, whereas Indra filed its Motion to Bifurcate Discovery four days before the discovery deadline. (ECF Nos. 36, 54). Additionally, Judge Blake noted that class certification could not be determined in *Axselrod* until a relevant Supreme Court case was decided. 2021 WL 100666 at *2.

5    Plaintiff states he served discovery requests on Indra in May 2024. (ECF No. 70 at 14).

6    As explained in the Court's November 27, 2024 Memorandum Opinion, it may be logistically easier for Defendants to produce all calls, rather than review them and identify which are responsive to Plaintiff's request. (ECF No. 60 at 4). Defendants may choose either option.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1506378

KeyCite Yellow Flag

Distinguished by Cunningham v. CBC Conglomerate LLC, E.D.Tex., December 4, 2019

2019 WL 1506378
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

James E. SHELTON
v.
NATIONAL GAS & ELECTRIC, LLC

CIVIL ACTION NO. 17-4063
|
Filed 04/05/2019

**Attorneys and Law Firms**

Clayton S. Morrow, Morrow & Artim, P.C., Pittsburgh, PA, Anthony Paronich, Broderick & Paronich, P.C., Boston, MA, for James E. Shelton.

Ezra Dodd Church, Andrew W. Katz, Morgan Lewis & Bockius, LLP, Philadelphia, PA, Michelle Pector, Morgan Lewis & Bockius LLP, Houston, TX, for National Gas & Electric, LLC.


**MEMORANDUM**

R. BARCLAY SURRICK, District Judge

**\*1** Plaintiff brought suit against Defendant alleging violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA"). Presently before the Court is Defendant's Motion to Dismiss Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). (ECF No. 5.) For the reasons that follow, we will deny Defendant's Motion.


**I. BACKGROUND**

**A. Factual Background**
Plaintiff's Complaint alleges that he has a permanent residence in Pennsylvania, but attends school at Case Western University in Ohio, where he has lived while attending school since August 25, 2017. (Compl. ¶ 7, ECF No. 1; Affidavit of Pl. ¶¶ 11-12, Pl.'s Resp. to MTD Ex. 2, ECF No. 8.) Plaintiff also owns a cell phone with a 484 area code. (Compl. ¶ 24.)

The 484 area code represents a Pennsylvania phone service region. Plaintiff's phone number is also registered on the National Do Not Call Registry, which alerts telemarketers that Plaintiff does not want to receive solicitations at that number. (Id. ¶¶ 14, 24.) Plaintiff alleges that this cell phone is the only phone that he owns, but that he also uses it for business purposes. (Affidavit of Pl. ¶¶ 2, 5.) Specifically, Plaintiff owns a business called Final Verdict Solutions, which "is in the judgment collection business." (Id. ¶¶ 5, 7.) Plaintiff does not purchase or use telephones "for the sole purpose of bringing lawsuits under the TCPA." (Id. ¶ 4.) However, his business website states that telemarketers are not welcome to call his cell number. (Id. ¶ 9.)

Plaintiff alleges that, on August 18, 2017, just before he went to Ohio to attend school, he received a telemarketing call on his cell phone from Defendant, National Gas & Energy, LLC. (Compl. ¶ 23.) Defendant is an energy company that is incorporated and headquartered in Texas. (Id. ¶¶ 8, 20.) Plaintiff has never done any business with Defendant, provided Defendant with his phone number, or consented to receive telemarketing calls from Defendant. (Id. ¶ 30-31.) When Plaintiff received Defendant's call, he allowed it to go to voicemail. (Id. ¶ 25.) The voicemail was comprised of a "distinctive click and pause, followed by Defendant's telemarketing representative saying 'hello.' " (Id. ¶ 26.) Plaintiff called Defendant back and "received a scripted pitch from Victor Melendez about National Gas's services." (Id. ¶ 28.) Plaintiff described the call as "a nuisance" and "annoying and harassing," and stated that it "occupied Plaintiff's telephone line from legitimate communication." (Id. ¶ 38.) He also alleges that at least nine other callers have reported that they have received calls from the same number and the calls were telemarketing calls. (Id. ¶ 37.)


**B. Procedural Background**
On September 11, 2017, Plaintiff filed a Complaint against Defendant for violating the TCPA, which prohibits automated telemarketing calls made to cell phone numbers. 47 U.S.C. § 227(b)(1)(A)(iii). Plaintiff seeks to represent a class of individuals who have experienced the same harm caused by Defendant. On November 13, 2017, Defendant filed the instant Motion to Dismiss Plaintiff's Complaint, asserting that Plaintiff lacks standing to assert the claim and that this Court cannot exercise personal jurisdiction over Defendant. (MTD, ECF No. 5.) In addition, Defendant requested a stay of the proceedings pending a decision by the Court of Appeals for the D.C. Circuit in a case that may have shed light on whether Plaintiff stated a claim. On November 21, 2017,

2019 WL 1506378

Plaintiff filed a Response in opposition to Defendant's Motion to Dismiss and request to stay. On March 16, 2018, the D.C. Circuit issued an opinion in the aforementioned case, *ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018). On April 3 and 5, 2018, by letters to the Court, counsel for Plaintiff and Defendant supplemented their briefs with analyses of the effect of *ACA International* on Defendant's Motion to Dismiss the Complaint pursuant to Rule 12(b)(6).

## II. DISCUSSION

**\*2** The section of the TCPA at issue here prohibits "any person within the United States" from "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1). The statute defines "automatic telephone dialing system" ("ATDS")[1] as "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." *Id.* § 227(a)(1). The statute provides that a person may bring a private right of action based on violation of subsection (b) to enjoin the person in violation and/or "to recover for actual monetary loss from such a violation, or to receive $ 500 in damages for each such violation, whichever is greater." *Id.* § 227(b)(3).

In its Motion, Defendant seeks to dismiss the Complaint because, it argues, Plaintiff's judgment recovery business precludes him from asserting an injury-in-fact or that his damages fall within the "zone of interests" necessary to establish standing. Defendant also argues that Defendant's connections to Pennsylvania are too tenuous for this Court to exercise personal jurisdiction. Finally, Defendant argues that *ACA International* changed the definition of ATDS such that Plaintiff has failed to adequately allege that such a service was used in this case. (Def.'s Letter re *ACA Int'l*, on file with the Court.)

In his Response, Plaintiff argues that his judgment recovery business does not preclude him from asserting either an injury-in-fact or that he is within the zone of interests of the TCPA. He also asserts that Defendant's connections to Pennsylvania support specific personal jurisdiction, and that the D.C. Circuit's decision in *ACA International* does not have any effect on the case at this stage of litigation and will only serve to streamline discovery with respect to the technology

that was used in making the call to Plaintiff. (Pl.'s Letter re *ACA Int'l*, on file with the Court.)

We will address each of Defendant's arguments.

### A. 12(b)(1) Motion to Dismiss for Lack of Standing

"The doctrine of standing incorporates both a constitutional element and a non-constitutional, 'prudential' element." *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 174-75 (3d Cir. 2001) (citation omitted). Each of these elements has a separate test, and the plaintiff has the burden of showing that they have standing sufficient to confer subject matter jurisdiction under both tests. *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). Defendant argues that Plaintiff cannot establish either constitutional or prudential standing. We will address constitutional standing before turning to prudential standing.

A challenge to standing under Rule 12(b)(1) can take two forms: a facial challenge or a factual challenge. When a facial challenge is made, the court is restricted to a review of the allegations in the pleadings and any documents referenced therein. *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 177 (3d Cir. 2000). When a factual challenge is made, a party challenges the facts alleged in the pleadings by presenting contrary evidence. *Id.* In a factual challenge to standing, "no presumptive truthfulness attaches to the plaintiff's allegations" and the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Davis*, 824 F.3d at 346 (citation and alterations omitted). Defendant's challenge appears to be factual, given that it primarily criticizes Plaintiff's expressed motives in bringing this action and attaches additional evidence, such as Plaintiff's business webpage and evidence of other lawsuits. Therefore, we will consider all the evidence in the record to assess Defendant's constitutional and prudential challenges to Plaintiff's standing.

### 1. Constitutional Standing

**\*3** A plaintiff must demonstrate their constitutional standing by showing: "(1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272 (3d Cir. 2016) (citation and internal quotation marks omitted). Defendant only challenges the injury-in-fact prong of this test. To establish an injury-in-

Case 1:25-cv-01410-JKM   Document 19-2   Filed 10/30/25   Page 48 of 99

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1506378

fact, Plaintiff must show that he has suffered "an invasion of a legally protected interest" that is both "actual or imminent, not conjectural or hypothetical" and "concrete and particularized." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citation omitted). The Third Circuit Court of Appeals has held that "the actual or threatened injury required by Art[icle] III may exist *solely by virtue of statutes creating legal rights*, the invasion of which creates standing." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 636 (3d. Cir. 2017) (citation and internal quotation marks omitted) (emphasis in original).[2] A concrete injury has been pled when one sues under a statute alleging "the very injury [the statute] is intended to prevent." *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (citation and internal quotation marks omitted).

Plaintiff has sufficiently alleged an injury-in-fact. When enacting the TCPA, Congress stated that it was motivated by "outrage[ ] over the proliferation of intrusive, nuisance calls to their homes from telemarketers" to "[b]an[ ] such automated or prerecorded telephone calls to the home." TCPA, Pub. Law No. 102-243, § 2(6), (12), 105 Stat. 2394 (1991). Plaintiff has alleged that he received an automated telemarketing call from Defendant that was a nuisance and was annoying and harassing. This is the very injury the statute was intended to prevent. *See Susinno*, 862 F.3d at 351-52 ("[I]n asserting 'nuisance and invasion of privacy' resulting from a single prerecorded telephone call, [plaintiff's] complaint asserts 'the very harm that Congress sought to prevent,' arising from prototypical conduct proscribed by the TCPA."); *Abramson v. CWS Apt. Homes, LLC*, No. 16-426, 2016 U.S. Dist. LEXIS 146627, at *6, 2016 WL 6236370 (W.D. Pa. Oct. 24, 2016) (finding that plaintiff adequately alleged injury-in-fact under TCPA because he received automated calls in violation of TCPA).

**\*4** Defendant argues that Plaintiff cannot demonstrate an injury-in-fact because he operates a professional judgment recovery business and "a TCPA litigation operation" in which he files TCPA lawsuits either to generate profit or punish telemarketers. (MTD 6, 7.) Defendant contends that Plaintiff's claim is "based on calls to a business number *that the plaintiff used specifically to drum up TCPA litigation.*" (MTD 5 (emphasis in original).) To support its argument, Defendant attaches a screenshot of Plaintiff's business webpage, in which Plaintiff states:

If you are reading this website, you are most likely a telemarketer that has illegally called my phone. You are going to be sued. I played along with your telemarketer script in order to find out who you really are.... Put [Plaintiff's cell number] on your do not call list.... [H]ire a really good lawyer."

(MTD 6-7.) The page also has a tab for "James' TCPA Cases," and Defendant notes that Plaintiff filed seven TCPA lawsuits in 2017. (*Id.*) Defendant asserts that, under the circumstances, the calls are neither intrusive nor a nuisance, but rather something that Plaintiff "hopes for and encourages." (*Id.* at 1, 6-7.)

Defendant cites the case of *Stoops v. Wells Fargo Bank, N.A.*, 197 F.Supp.3d 782 (W.D. Pa. 2016), in support of its position. In *Stoops*, the court granted summary judgment in favor of the defendant in a TCPA action because the plaintiff could not prove that it had sustained an injury-in-fact. Specifically, the plaintiff, a Pennsylvania resident, had purchased more than 35 cell phones, registered them in Florida in order to draw telemarketers targeting "economically depressed" consumers, recorded all telemarketing calls she received in order to file TCPA lawsuits, and admitted at deposition that the phones were used solely for that purpose. *Id.* at 788. The court held that, "[b]ecause Plaintiff has admitted that her only purpose in using her cell phones is to file TCPA lawsuits, the calls are not 'a nuisance and an invasion of privacy.' " *Id.* at 800.

Even if this Court were bound by the decision in *Stoops*, neither the facts nor the procedural posture of this case mirror it. First, the court in *Stoops* was deciding a motion for summary judgment and, thus, had the benefit of discovery to support its decision. Here, we are dealing with a Motion to Dismiss in which we have a limited amount of evidence to consider. Most importantly, Defendant has not introduced any evidence that Plaintiff's phone is used solely for business purposes or "specifically to drum up litigation." Although Plaintiff's website lists his cell phone number as his business number, and Plaintiff himself admitted in an affidavit that he uses his cell phone number for his judgment recovery business, it would be premature to conclude that Plaintiff's *only* purpose in using his cell phone is to file lawsuits. Indeed, we can infer from Plaintiff's affidavit, in which he states that his cell phone is his only phone, that the phone is also used for non-business purposes. With the benefit of discovery, Defendant may ultimately be able to establish its position, but dismissal would be improper at this stage given the lack of evidence to substantiate Defendant's claims. *See Cunningham*

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 49 of 99

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1506378

*v. Capital Advance Sols., LLC*, Civil Action No. 17-13050, 736 Fed.Appx. 875, 2018 U.S. Dist. LEXIS 197590, at \*8-12, 2018 WL 6061405 (D.N.J. Nov. 20, 2018) (denying motion to dismiss pursuant to *Stoops* even though plaintiff had filed more than 85 TCPA lawsuits because plaintiff identified "various non-business purposes for which he utilizes his cell phone" and discovery would reveal whether plaintiff was more similar to plaintiff in *Stoops* ); *Abramson v. Oasis Power LLC*, No. 18-479, 2018 U.S. Dist. LEXIS 129090, at \*17, 2018 WL 4101857 (W.D. Pa. July 31, 2018) (denying motion to dismiss TCPA claim pursuant to *Stoops* because only evidence in record did not indicate that cell phone's sole purpose was to bring TCPA lawsuits).

**\*5** In addition, the fact that Plaintiff warns telemarketers on his website that he will sue them if they violate the TCPA does not raise an inference that he "hopes for and encourages" potential defendants, acquires phones to increase his chances of receiving calls, or is doing anything other than exercising his rights. The fact that he "play[s] along" with telemarketing scripts to "find out who [they] really are" is not as devious as Defendant suggests. A plaintiff must know the name of the telemarketer that violated the TCPA in order to bring suit against it, and the content of the message can help prove that it was a solicitation. Defendant also focuses on the fact that it was only after Plaintiff called Defendant back that he received any sort of marketing message. Defendant argues that, before Plaintiff made that call, Plaintiff's only "injury" was a single missed call and a voicemail comprised only of a "hello." Therefore, Defendant argues, any telemarketing was essentially sought out, such that Plaintiff cannot allege he was injured. However, the plain language of the TCPA requires only that a person have "ma[d]e a call ... using any [ATDS] ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1). The statute does not require that the plaintiff have answered the call, received any message, or spoken to any person, and Defendant has not cited to any case law interpreting the TCPA to require such involvement. Plaintiff's injury was the receipt of a call in violation of the TCPA.

*2. Prudential Standing*

The requirement of prudential standing is a judicial self-management tool used "to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." *Joint Stock Soc'y*, 266

F.3d at 179 (citation omitted). In the Third Circuit, prudential standing requires that:

1. a litigant assert his [or her] own legal interests rather than those of third parties,

2. courts refrain from adjudicating abstract questions of wide public significance which amount to generalized grievances, and

3. a litigant demonstrate that her interests are arguably within the zone of interests intended to be protected by the statute, rule, or constitutional provision on which the claim is based.

*Freeman v. Corzine*, 629 F.3d 146, 154 (3d Cir. 2010) (citation omitted). In this case, Defendant challenges only the third requirement, that Plaintiff's interests fall within the zone of interests intended to be protected by the statute.

Plaintiff has demonstrated that his interests fall within the zone of interests intended to be protected by the TCPA. As stated above, Congress was clear when it enacted the TCPA that its purpose is to protect consumers from intrusive, nuisance automated telemarketing calls. *See also Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 325 (3d Cir. 2015) ("[The] primary concern in enacting § 227(b)(1)(B) was to protect [the called] party from unwanted robocalls. This necessarily means that the 'called party' is within the zone of interests protected by the Act."). Again, Plaintiff has alleged that he received an automated marketing call from a company with whom he had no relationship, and it was an annoying, harassing nuisance.

Defendant argues that, because Plaintiff operates a business that includes filing TCPA lawsuits for profit, his interests do not fall within the zone of interests intended to be protected by the statute. Defendant again cites to *Stoops*. On the issue of prudential standing, the court in *Stoops* held that the plaintiff did not have prudential standing because "Plaintiff's interests, which include purchasing cell phones with the hope of receiving calls from creditors for the sole purpose of collecting statutory damages, are not 'among the sorts of interests [the TCPA was] specifically designed to protect.' " *Stoops*, 197 F.Supp.3d at 805.

In this case, Defendant has not offered any evidence that Plaintiff purchased his cell phone with the hope of receiving calls for the sole purpose of collecting statutory damages. Again, we note that *Stoops* was a decision on a motion for summary judgment and had the benefit of complete

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1506378

discovery, including a deposition in which the plaintiff admitted her motives. The only evidence before the Court at this stage demonstrates that Plaintiff has requested in multiple forms that he not be targeted for solicitation—by registering his number on the Do Not Call Registry and stating on his website that he does not wish to receive such calls—and that he derives a profit when companies simultaneously ignore his requests and violate the TCPA. The fact that Plaintiff derives a profit from these lawsuits is exactly what Congress intended. *See* 47 U.S.C. § 227(b)(3), (c)(5) (providing statutory damages to plaintiffs in private actions pursuant to TCPA); *see also Bais Yaakov of Spring Valley v. Educ. Testing Serv.*, No. 13-4577, 2019 U.S. Dist. LEXIS 43985, at \*44, 2019 WL 1244949 (S.D.N.Y. Mar. 18, 2019) ("In the absence of authority to the contrary, the Court concludes that Plaintiff's filing of other TCPA lawsuits does not remove it from the zone of interests that the TCPA was intended to protect."); *Cunningham v. Rapid Response Monitoring Servs.*, 251 F.Supp.3d 1187, 1197 (M.D. Tenn. 2017) (finding that "professional plaintiff" had prudential standing despite using TCPA for profit because "[t]he TCPA does not merely contemplate self-interested plaintiffs—it encourages them." (citing TCPA's statutory damages provision for private actions) ). Moreover, there is no evidence that Plaintiff hopes he will receive such calls or that he has taken any action to increase his chances of receiving the calls. As stated above, Plaintiff's only intentional engagement with Defendant was calling it back to "find out who [it] really [was]," which is a prerequisite to filing a lawsuit. At this stage, there is no evidence that Plaintiff is doing anything other than "pursu[ing] his rights." *CWS Apt. Homes*, 2016 U.S. Dist. LEXIS 146627, at \*7, 2016 WL 6236370 (finding prudential standing even though plaintiff had filed sixteen other TCPA lawsuits); *see also Hossfeld v. Compass Bank*, No. 16-2017, 2017 U.S. Dist. LEXIS 182571, at \*39, 2017 WL 5068752 (N.D. Ala. Nov. 3, 2017) (declining to follow *Stoops'* reasoning on prudential standing until factual record more developed).

**\*6** Therefore, at this juncture, Plaintiff has adequately demonstrated that he has suffered an injury-in-fact and that his interests are within the zone of interests the TCPA was intended to protect.

### B. 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

Next, Defendant asserts that this Court lacks personal jurisdiction over it. A district court "typically exercises personal jurisdiction according to the law of the state where

it sits." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007); Fed. R. Civ. P. 4(k)(1)(A) (stating that service of summons "establishes personal jurisdiction over a defendant: (A) who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located"). Pennsylvania's long-arm statute authorizes courts to exercise personal jurisdiction "to the fullest extent allowed under the Constitution of the United States...." 42 Pa. Cons. Stat. Ann. § 5322(b). Due process requires that the nonresident defendant have "minimum contacts" with the forum state, and "that the exercise of jurisdiction comport with 'traditional notions of fair play and substantial justice.' " *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ).

Two types of personal jurisdiction have evolved from these due process principles: general jurisdiction and specific jurisdiction. General personal jurisdiction is satisfied when a defendant's "affiliations with the State are so continuous and systematic as to render them essentially at home in the forum state." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011) (citation and internal quotation omitted); *see also Chavez v. Dole Food Co., Inc.*, 836 F.3d 205, 223 (3d Cir. 2016). Specific personal jurisdiction exists when "the plaintiff's cause of action arises out of a defendant's forum-related activities, such that the defendant should reasonably anticipate being haled into court in that forum." *Remick*, 238 F.3d at 255 (citation and internal quotation marks omitted). In order to assert specific personal jurisdiction, Plaintiff must show that his claim arises out of or relates specifically to activities that Defendant purposefully directed at Pennsylvania. *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (citations omitted).

When faced with a Rule 12(b)(2) motion to dismiss based on lack of personal jurisdiction, the court must accept the plaintiff's allegations as true and resolve disputed facts in favor of the plaintiff. *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). If a defendant contends that the Court lacks personal jurisdiction over it, then the plaintiff must "prove by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (quoting *Dayhoff Inc. v. H. J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996) ). As is the case here, if the district court does not hold an evidentiary hearing, a plaintiff "need only establish a prima facie case of personal jurisdiction." *Id.* (citation omitted).

2019 WL 1506378

## 1. Parties' Arguments

Defendant is a Texas corporation with its principal place of business in Texas. Plaintiff does not contend that general personal jurisdiction exists here. Instead, Plaintiff contends that the Court can exercise specific personal jurisdiction over Defendant. Defendant argues that Plaintiff cannot establish that specific personal jurisdiction exists because Plaintiff was not a resident of Pennsylvania, or was not in Pennsylvania, when Defendant called him. In support of this argument, Defendant cites to another TCPA lawsuit that Plaintiff filed in Ohio, *Shelton v. LIG International, LLC*, No. 17-1868, ECF No. 1 (N.D. Ohio, filed Sept. 6, 2017) (*"Shelton v. LIG"*). In that complaint, filed the same month as the Complaint here, Plaintiff alleges that he is an Ohio resident and that, as an Ohio resident, he received calls to his private cell number during the summer of 2017, including on August 1, 3, 4, 8, 9, 21, 22, 23, and 29, 2017. *Shelton v. LIG* Compl. ¶¶ 5-6, 24-48. Defendant notes that the call in this case allegedly took place on August 18, 2017, and that Plaintiff alleges he was a Pennsylvania resident at that time. Defendant adds that, because Plaintiff was neither a resident of Pennsylvania nor in Pennsylvania at the time of the call, the fact that Plaintiff has a Pennsylvania area code, alone, is not enough to support jurisdiction.

**\*7** As mentioned above, Plaintiff rebuts Defendant's argument with an affidavit in which he states that he attends school in Ohio and has lived there while attending school since August 25, 2017, but that he maintains a permanent residence in Pennsylvania. Moreover, he alleges that he was in Pennsylvania when he received the call in this case, despite having stated in *Shelton v. LIG* that he received calls on August 1, 3, 4, 8, 9, 21, 22, 23, and 29, 2017, as an Ohio resident. Plaintiff also attached a credit card statement from August of 2017 showing that he made purchases in Pennsylvania until August 24, 2017. (Credit Statement, Pl.'s Resp. Ex. 2) Finally, Plaintiff argues that the state with which a plaintiff's area code is associated is generally dispositive evidence that a defendant targeted that forum and subjected itself to personal jurisdiction there.

## 2. Analysis

Plaintiff has satisfied his burden of demonstrating that specific personal jurisdiction exists. In TCPA cases, courts generally find that specific personal jurisdiction exists when

a defendant sends a message into the forum state by targeting a phone number in that forum. However, courts do not consistently define whether and when a phone number is "in" a particular forum. Some courts find the location of the area code to be dispositive, while others find the residency of the plaintiff or the location where the call was received to be dispositive. *See, e.g., Abramson v. Agentra, LLC*, No. 18-615, 2018 WL 6617819, at \*4, 2018 U.S. Dist. LEXIS 212285, at \*12 (W.D. Pa. Dec. 18, 2018) ("At this juncture it is reasonable to infer from the allegations in the amended complaint that Agentra purposefully aimed its conduct at Pennsylvania by contacting directly Abramson's Pennsylvania mobile and residential telephone numbers."); *Hicks v. Health Ins. Innovations, Inc.*, No. 17-3344, 2017 WL 6764054, at \*3, 2017 U.S. Dist. LEXIS 214098, at \*4 (D.N.J. Dec. 20, 2017) (finding that New Jersey court lacked personal jurisdiction over TCPA defendant because plaintiff "merely maintains a cell phone with a New Jersey area code" and was not citizen of New Jersey, did not receive the calls in question in New Jersey, and did not allege that she suffered any harm in New Jersey); *CWS Apt. Homes*, 2016 U.S. Dist. LEXIS 146627, at \*10, 2016 WL 6236370 (finding area code dispositive of personal jurisdiction in TCPA case and listing cases that have held same); *Michaels v. Micamp Merch. Servs.*, No. 13-191, 2013 U.S. Dist. LEXIS 159782, 2013 WL 5970340 (W.D. Pa. Nov. 8, 2013) (finding Pennsylvania lacked personal jurisdiction over TCPA defendant because plaintiff was merely present in Pennsylvania when she received call in question, but was not Pennsylvania resident, did not have Pennsylvania phone number, and did not allege that defendant knew she was in Pennsylvania).

Here, we need not decide which factors are dispositive because Plaintiff has demonstrated that he was a Pennsylvania resident when he received the call, was physically present in Pennsylvania, and has a Pennsylvania phone number. Although Plaintiff's explanation of his dual residency is not a model of jurisdictional clarity, he has asserted in an affidavit, as he is required, that he was in fact a Pennsylvania resident at the time he received the call from Defendant. A credit card statement from August of 2017 supports Plaintiff's assertions that he was in Pennsylvania at the time he received the call and was still a Pennsylvania resident at the time. It is common for students to maintain two residences. The date of the move, August 25th, is consistent with a move in preparation for a new school year. Therefore, the statements in Plaintiff's affidavit are not as implausible as Defendant suggests. Moreover, Plaintiff allegedly moved to Ohio after

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 52 of 99

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1506378

the call in this case was made, but before the calls from the defendant in *Shelton v. LIG* ceased, so it is not unreasonable for Plaintiff to file his *LIG* lawsuit in Ohio and assert that he is an Ohio resident for the purposes of that action. Given Plaintiff's affidavit, credit card statement, and Pennsylvania area code, we need not engage in any further analysis.

**\*8**  Plaintiff has also adequately demonstrated the remaining elements of a personal jurisdiction analysis. The call in question was clearly related to Defendant's contacts with Pennsylvania, which included targeting a phone number in Pennsylvania. Moreover, exercising personal jurisdiction over Defendant would not offend the traditional notions of fair play and substantial justice. These traditional notions include analysis of five factors: "the burden on the defendant, the interests of the forum State, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Grand Entm't Grp. v. Star Media Sales*, 988 F.2d 476, 483 (3d Cir. 1993) (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) ). Defendant has not argued that it would be burdened by being called into Pennsylvania for litigation of this case, although we can assume some hardship given that it is based in Texas. However, "when minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi*, 480 U.S. at 114, 107 S.Ct. 1026. With regard to the next two factors, Plaintiff clearly has an interest in obtaining relief under the TCPA, and Pennsylvania has an interest in protecting its residents from TCPA violations. *Id.* And with regard to the last two factors, Defendant has not argued that jurisdiction would be unreasonable based on the interstate judicial system's interest in obtaining the most efficient resolution of controversies or the shared interest of the several States in furthering fundamental substantive social policies. We may properly assert personal jurisdiction over Defendant.

## C. 12(b)(6) Motion to Dismiss for Failure to State a Claim

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. A motion under Rule 12(b)(6) tests the sufficiency of the complaint against the pleading requirements of Rule 8(a). Under Rule 8(a)(2), "[a] pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). Courts need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. This " 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955).

### 1. Relevant Law

As stated above, the section of the TCPA at issue here prohibits "any person within the United States" from "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any [ATDS] ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1). The statute defines ATDS as "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." *Id.* § 227(a)(1). Therefore, to state a cause of action under the TCPA, "a plaintiff must allege that (1) a call was made; (2) the caller used an [ATDS] ...; (3) the telephone number called was assigned to a cellular telephone service; and (4) the caller did not have prior express written consent of the recipient. *Richardson v. Verde Energy USA, Inc.*, No. 15-6325, 2016 U.S. Dist. LEXIS 175642, at \*5, 2016 WL 7375028 (E.D. Pa. Dec. 19, 2016) (citing 47 U.S.C. § 227(b)(1)(A)(iii) ).

Defendant challenges only the second of the above requirements, that it used an ATDS. Defendant argues that the D.C. Circuit's recent decision in *ACA International* confirms that Plaintiff cannot prevail on his TCPA claim because the court in that case narrowed the definition of an ATDS such that Plaintiff's allegations that Defendant used such a system no longer state a claim. Plaintiff counters that his allegations are broad enough to encompass Defendant's use of an ATDS that still qualifies as such even after *ACA International*, and that only discovery will reveal whether Defendant used an ATDS within the meaning of the TCPA.

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1506378

*2. Regulatory and Case Law Background*

**\*9** Pursuant to authority granted to the Federal Communication Commission ("FCC") in the TCPA,[3] the FCC has issued declaratory orders that, among other things, have expanded the kinds of devices that they consider to have the "capacity" to function as autodialers, including a device called a "predictive dialer." In an order issued in 2003, the FCC explained that:

> A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. ... *In some instances, a consumer answers the phone only to hear "dead air" because no telemarketer is free to take the call.*

*In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Red. 14014, 13 ¶ 8 n. 31 (2003) ("2003 Order") (emphasis added). The FCC went on to find that such dialers are autodialers because "[t]he hardware, *when paired with certain software*, has the *capacity* to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers," even though, "in most cases, telemarketers program the numbers to be called into the equipment." *Id.* at 205 ¶ 131 (emphasis added). In 2008, the FCC addressed a challenge to, and reaffirmed, its finding that predictive dialers are autodialers. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Red. 559, 566 ¶¶ 12-14 (2008) ("2008 Order"). The FCC again reaffirmed its finding that predictive dialers are considered autodialers in an order issued in 2015. *In re Rules & Regulations Implementing the Tel. Consumer Protection Act of 1991*, 30 FCC Red. 7991, 7974 ¶ 10 (2015) ("2015 Order"). In the 2015 Order, the FCC clarified that "the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities." *Id.* at 7974 ¶ 16. Thus, even if a device does not have the current capacity to generate and dial phone numbers, if the device can be paired with software to do so in the future, it qualifies as an ATDS whether or not the software has in fact been installed—as the FCC has described predictive dialers since 2003. The FCC also declined to adopt a rule that would "clarify[ ] that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention," *id.* at 7976 ¶ 17, thus implying that a device

could still be considered an ATDS even if it required some level of human intervention to generate and dial numbers.

*3. Recent Statutory Interpretation*

In *ACA International v. FCC*, the D.C. Circuit upheld certain challenges to the FCC's 2015 Order. First, the court struck down the portions of the 2015 Order stating that a device is considered an ATDS even if it cannot presently generate or dial phone numbers without human intervention, but has the capacity to do so with additional software. *ACA Int'l*, 885 F.3d at 700.[4] Next, the court struck down the portions of the 2015 Order stating that a device could qualify as an ATDS even if it requires some human intervention to generate or dial phone numbers. *Id.* at 703. Notably, the court "did not specify that a particular ATDS definition was wrong or what types of devices would qualify as an ATDS." *Wilson v. Quest Diagnostics Inc.*, No. 18-11960, 2018 U.S. Dist. LEXIS 212023, at *6 (D.N.J. Dec. 10, 2018).

**\*10** The Third Circuit adopted *ACA International* in *Dominguez v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018), and stated that, "[i]n light of the D.C. Circuit's holding, we interpret the statutory definition of an autodialer as we did prior to the issuance of 2015 Declaratory Ruling." *Id.* at 119. The court then stated that a device is an ATDS if it has "the present capacity to function as an autodialer." *Id.* at 119, 121. Thus, predictive dialers are still autodialers so long as they have the present capacity—rather than a hypothetical future capacity, with the addition of software—to generate and dial phone numbers. *See, e.g., Might v. Capital One Bank United States, N.A.*, No. 18-716, 2019 WL 544955, at *3, 2019 U.S. Dist. LEXIS 21379, at *8-9 (W.D. Okla. Feb. 11, 2019) (holding that, after *ACA Int'l*'s treatment of predictive dialers, "the issue is whether the calls about which Plaintiff complains were the product of a machine that was capable at that time of generating random and sequential numbers, not whether the call to him was the result of such."); *Collins v. Nat'l Student Loan Program*, No. 17-5345, 2018 U.S. Dist. LEXIS 214251, at *14, 2018 WL 6696168 (D.N.J. Dec. 20, 2018) (holding that device with predictive capabilities was not an ATDS because plaintiff failed to prove on summary judgment that device "has the 'present capacity' to initiate autodialed calls to cell phone numbers without modifications to the system"); *Richardson v. Verde Energy USA, Inc.*, 354 F.Supp.3d 639, 650 (E.D. Pa. 2018) ("[T]he Court concludes that a predictive dialing device that merely dials numbers from a stored list of

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 54 of 99

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1506378

numbers—rather than having generated those numbers either randomly or sequentially—is not an ATDS."); *Gonzalez v. Ocwen Loan Servicing, LLC*, No. 18-340, 2018 U.S. Dist. LEXIS 153480, at *15, (M.D. Fla. Sep. 5, 2018) ("Having considered the statute [after *ACA Int'l*], this Court concludes that the definition of an ATDS *would not include* a predictive dialer that lacks the capacity to generate random or sequential telephone numbers and dial them; but it *would include* a predictive dialer that has that capacity." (emphasis in original) ).

In the context of a motion to dismiss, a plaintiff must allege facts that make it plausible that the defendant used a device that had the present capacity to generate and dial phone numbers.[5] In *Wilson v. Quest Diagnostics Inc.*, the court analyzed *ACA International* and *Dominguez* and found that the plaintiff had properly pleaded that the defendant used an ATDS. 2018 U.S. Dist. LEXIS 212023 at *8-9. She alleged that the defendant used a predictive dialer, as evidenced by "a momentary pause before someone started speaking to her," and that the defendant was attempting to collect a debt owed by someone other than her. *Id.* at *8. The court found that these allegations raised a plausible inference that the defendant used a predictive dialer that had the present capacity to function as an autodialer. *Id.* at *8-9; *see also Maes v. Charter Commc'n.*, 345 F.Supp.3d 1064, 1070 (W.D. Wis. 2018) (finding plaintiff adequately pleaded use of ATDS when complaint stated that plaintiff heard dead air after answering, because predictive dialers can still be autodialers after *ACA Int'l* ); *Whitehead v. Ocwen Loan Servicing, LLC*, No. 18-470, 2018 U.S. Dist. LEXIS 182386, at *11, 2018 WL 5279155 (M.D. Fla. Oct. 24, 2018) ("Whitehead's allegations—hearing a pause when she answered before hearing a voice plus her allegations that Ocwen used an ATDS—satisfy her burden at this stage in the proceedings." (citation omitted) ); *Sieleman v. Freedom Mortg. Corp.*, No. 17-13110, 741 Fed.Appx. 631, 2018 U.S. Dist. LEXIS 129698, at *12-14, 2018 WL 3656159 (D.N.J. Aug. 2, 2018) (finding that plaintiff adequately alleged use of ATDS, post-*ACA Int'l* and -*Dominguez*, when he alleged that there was pause after he picked up and that he did not actually qualify for service being offered).

*4. Application to Plaintiff's Complaint*

**\*11** Here, Plaintiff's allegations raise a plausible inference that Defendant used a predictive dialer with the present capacity to generate and dial phone numbers. First, Plaintiff

has alleged that Defendant used an ATDS. (Compl. ¶ 27.) He further alleged that "the call to the Plaintiff was transmitted using technology capable of *generating* thousands of similar calls per day." (*Id.* ¶ 5 (emphasis added).) He supports this assertion with allegations that he argues are indicative of an ATDS: he had no prior relationship with Defendant; the geographic distance between the parties; the "distinctive click and pause, followed by the Defendant's telemarketing representative saying 'hello' " in the voicemail Defendant left him; and at least nine other callers have identified calls from the same number as "spam." (*Id.* ¶¶ 26-28, 30, 36-37.)

Defendant argues that these allegations only support the inference that it used a device with the "potential, theoretical capability" to function as an autodialer. (Def.'s Letter re *ACA Int'l*.) Defendant adds that Plaintiff should have alleged that Defendant "placed a call to Plaintiff using a device that could make calls without human intervention." (Def's Letter re *ACA Int'l*.) However, Plaintiff's allegations are similar to those in *Wilson* and the other cases cited above that denied motions to dismiss on the same grounds. Moreover, we cannot require a plaintiff to make allegations regarding the technical aspects of a device, including the precise level of human intervention needed to place a call, when he or she has no way of knowing those details prior to discovery. *See Battaglia v. Quicken Loans, Inc.*, No. 18-1104, 2019 U.S. Dist. LEXIS 17782, at *6, 2019 WL 430042 (W.D.N.Y. Feb. 4, 2019) (refusing to require plaintiff to allege details regarding defendants' calling technology at pleading stage because "it would be virtually impossible" and "would make callers virtually immune to TCPA claims" (citation and internal quotation marks omitted) ); *Wilson*, 2018 U.S. Dist. LEXIS 212023, at *8-9 (denying motion to dismiss based on allegation of dead air after answering because, "[d]uring discovery, the parties can explore the actual configuration of the dialing equipment used to call Plaintiff, as such evidence could shed light on whether Quest used a device capable of making autodialed calls" (citation omitted) ); *Whitehead*, 2018 U.S. Dist. LEXIS 182386, at *11, 2018 WL 5279155 (holding that allegations regarding dead air and use of ATDS are sufficient to state claim because "[t]here is no way for Plaintiff to know the technological capabilities of the device(s) used to place the calls at issue in this case short of Plaintiff learning that information in discovery.").

Defendant adds that an ATDS was not used to place the call at issue because informal discovery has shown that Plaintiff "was called only after a National Gas representative selected a specific number to call and physically clicked on a 'connect'

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 55 of 99

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1506378

button in order to initiate the call." (Def's Letter re *ACA Int'l.*) Even if we were to accept Defendant's interpretation of *ACA International*—that a device cannot be considered an ATDS if it requires any human intervention to function— there is no evidence in the record regarding the device used in this case. Discovery may in fact reveal that the device at issue here required some amount of human intervention to function. However, this is not the time to address the existence or ramifications of such intervention. Plaintiff's limited allegations regarding use of an ATDS are sufficient to survive dismissal.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion will be denied. An appropriate Order follows.

## All Citations

Not Reported in Fed. Supp., 2019 WL 1506378

## Footnotes

1    Courts discussing the TCPA use the terms "ATDS" and "autodialer" interchangeably to refer to automatic telephone dialing systems.

2    We note that *Horizon* was decided after *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016), and *Doe v. National Board of Medical Examiners*, 199 F.3d 146 (3d Cir. 1999). Defendant relied on *Spokeo* and *Doe* for the proposition that "[m]erely invoking a federal statute is insufficient, on its own, to confer standing." (MTD 5.) However, the court in *Horizon* acknowledged *Doe* as being "not ... entirely consistent" and stated that cases subsequent to *Doe* "have been decidedly in favor of allowing individuals to sue to remedy violations of their statutory rights, even without additional injury." *Horizon*, 199 F.3d at 635-36. The court in *Horizon* also interpreted *Spokeo* to mean that "there are some circumstances where the mere technical violation of a procedural requirement of a statute cannot, in and of itself, constitute an injury in fact." *Id.* at 638. In this case, we are not dealing with a "mere technical violation of a procedural requirement of a statute," but rather a violation of the substantive rights conferred in the TCPA. Importantly, the *Horizon* court stated that, "[a]lthough it is possible to read the Supreme Court's decision in *Spokeo* as creating a requirement that a plaintiff show a statutory violation has caused a 'material risk of harm' before he can bring suit, we do not believe that the Court so intended to change the traditional standard for the establishment of standing." *Id.* at 637-38 (internal citation omitted). Accordingly, we believe that the rule in *Horizon*—that a substantive statutory violation, alone, creates an injury —is the most appropriate to apply in this situation.

3    The TCPA explicitly confers upon the FCC "the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution." TCPA, Pub. Law No. 102-243, § 2(13).

4    The court's primary concern was that smartphones—the cellular devices used by "a significant majority of American adults"—would fall into this category, such that "an uninvited call or message from a smartphone violates the statute even if autodialer features were not used to make the call or send the message." *Id.* at 697.

5    We note that some courts do not require any factual allegations with regard to autodialers other than that the defendant used one. *See, e.g., Abella v. Student Aid Ctr., Inc.*, No. 15-3067, 2015 U.S. Dist. LEXIS 147299, at *6, 2015 WL 6599748 (E.D. Pa. Oct. 30, 2015) (denying motion to dismiss because plaintiff alleged that defendant used ATDS); *Gross v. Weinstein, Weinburg & Fox, LLC*, 123 F.Supp.3d 575, 580 (D. Del. 2015) ("Plaintiffs have adequately alleged a claim on which relief may be granted.... Plaintiffs allege that WWF 'used, controlled, and/or operated automatic telephone dialing systems' in violation of the [TCPA]."). We need not decide whether a plaintiff is required to make additional factual allegations because, as discussed below, Plaintiff here has already done so.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 7560932

KeyCite Yellow Flag

Distinguished by Holton v. Finley, M.D.Pa., April 14, 2022

2019 WL 7560932
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Judy WILSON, on behalf of herself and
all others similarly situated, Plaintiff,

v.

QUEST DIAGNOSTICS,
INCORPORATED, Defendant.

Civil Action No. 18-11960 (WJM)
|
Signed 08/22/2019

**Attorneys and Law Firms**

Andrew Joseph Obergfell, Bursor & Fisher PA, New York, NY, for Plaintiff.

Michael T. Hensley, Jorkeell Echeverria, Bressler Amery & Ross, PC, Florham Park, NJ, for Defendant.

**ORDER**

MARK FALK, Chief U.S. Magistrate Judge

**\*1** **THIS MATTER** having come before the Court by way of Defendant's motion to stay the case, or in the alternative, bifurcate discovery [ECF No. 23]; and the Court having considered the papers in support of and in opposition to the motion; and for the reasons stated below, Defendant's motion is **DENIED**.

**IT APPEARING THAT:**

**1.** On July 23, 2018, Plaintiff, Judy Wilson, filed a putative class action complaint alleging violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"). Plaintiff claims that Defendant called on her cellular telephone, using an automatic telephone dialing system ("ATDS"), about a debt. However, Plaintiff alleges that she does not owe a debt to Defendant, is not a customer of Defendant, and has never provided Defendant with consent to call her. Plaintiff's Complaint seeks to certify a nationwide

class, alleging that Defendant has a pattern and practice of autodialing consumers who have not provided consent.

**2.** On August 14, 2018, Defendant filed a pre-answer motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6).

**3.** On August 31, 2018, Plaintiff filed an Amended Complaint. In response, Defendant filed a motion to dismiss the amended complaint on September 10, 2018. The crux of Defendant's motion was that Plaintiff's Amended Complaint failed to state a claim because Plaintiff had not sufficiently pleaded facts alleging that Quest called her cellphone using an ATDS.

**4.** On December 17, 2018, the Honorable William J. Martini, U.S.D.J., denied Defendant's motion to dismiss. Judge Martini expressly found that Plaintiff had sufficiently pleaded the use of an ATDS. (Opinion at 5; ECF No. 14.) Judge Martini also commented on the need for discovery to proceed in this case, noting that "[d]uring discovery, the parties can explore the actual configuration of the dialing equipment used to call Plaintiff," and that "[w]ith the benefit of discovery as to the type of equipment Quest used and the nature and extent of Quest's contacts with Plaintiff, the case will be well postured to assess Quest's conduct under the TCPA." Judge Martini concluded the Opinion stating "[t]he Court will thus unlock the doors of discovery." (*Id.*; quotations omitted).

**5.** On January 29, 2019, the Undersigned issued an Order scheduling an initial conference.

**6.** On February 8, 2019, Defendant filed a formal motion seeking to stay the case. As an alternative to a stay, Defendant seeks to bifurcate discovery and focus on the issue of Plaintiff's "consent." (ECF No. 23.) Defendant contends that the FCC is engaged in notice and comment rulemaking on the issue of whether certain equipment qualifies as an ATDS – equipment they claim is at issue in this case – and thus, could impact Plaintiff's ability to bring a claim. In the alternative, Defendant wants to bifurcate discovery to focus solely on the issue of Plaintiff's consent. Defendant contends that Plaintiff's husband provided the phone number that was called in this case, and that he is a "customary" user of the phone, which it claims equates to consent under the TCPA.

**\*2** **7.** Plaintiff opposes the motion to stay and/or bifurcate. She contends that the FCC process is lengthy and could drag on for months or years without resolution. Moreover, Plaintiff contends that, since there has been no discovery

2019 WL 7560932

on the subject of what dialing equipment Defendant used, the equipment might constitute an ATDS regardless of the FCC's interpretation. Finally, Plaintiff opposes bifurcation on the grounds that whether her husband used her cell phone or not, consent is not implied and she is the only person with the authority to consent, which she did not do. She also contends that bifurcation will delay the case, cause discovery inefficiency and disputes, and result in duplication, such as deposing Plaintiff twice.

**8.** On July 3, 2019, while the motion to stay and/or bifurcate was pending, Defendant filed a motion for reconsideration of Judge Martini's decision on the motion to dismiss. Plaintiff opposes reconsideration as both untimely and substantively deficient.

**9.** Defendant seeks a stay of the case pursuant to (1) the Court's inherent authority; and (2) the primary jurisdiction doctrine.

A stay pursuant to the Court's inherent authority is completely discretionary. *See, e.g., Bechtel Corp. v. Local 215 Laborers' Int'l Union of N.A.*, 544 F. 2d 1207, 1215 (3d Cir. 1976). Deciding whether to stay a case requires "an exercise in judgment, which must weigh competing interests and maintain an even balance." *Landis v. North Am. Co.*, 299 U.S. 248, 255-56 (1936). Considerations generally include: the hardship to the moving party should the case proceed; the potential prejudice to the non-moving party; the length of the requested stay; the similarity of issues; and judicial economy. *See, e.g., Ford Motor Credit v. Chiorazzo*, 529 F. Supp. 2d 535, 542 (D.N.J. 2008).

With respect to the primary jurisdiction doctrine, courts in the Third Circuit consider the following factors when determining whether the doctrine applies: (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made. *See Baykeeper v. NL Indus., Inc.*, 660 F.3d 686, 691 (3d Cir. 2011).

**10.** Requests to bifurcate discovery are controlled by Rule 42(b). *See, e.g., Cephalon, Inc. v. Sun Pharm., Indus., Ltd.*, 2013 WL 3417416, at *2 (D.N.J. Aug. 31, 2016). "Bifurcation is the exception and the moving party bears the burden of

demonstrating that bifurcation is needed." *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 2016 WL 4541870, at *2 (D.N.J. Aug. 31, 2016). "Whether the advantages of bifurcation outweigh the disadvantages is a factual inquiry assessed on a case by case basis." *Id*. As a practical matter, bifurcation of discovery in this District, which is in a serious judicial emergency, is extremely rare, since bifurcation often delays cases and leads to serial motion practice.

**11.** Defendant's motion to stay is **denied**. At the outset, the parties' briefs read like briefs on the merits of the case. However, Defendant already had an opportunity to make a pre-answer motion to dismiss and it did not prevail. Indeed, Judge Martini's decision expressly states that the Court is "unlock[ing] the doors of discovery." We are now at the discovery stage; disagreement with a pre-answer decision is no basis to seek to stay the case and hope that intervening events from the FCC change its course. Putting that aside, consideration of the traditional factors do not support a stay in this case.

**\*3 12.** There is no basis for a stay under the primary jurisdiction doctrine.

First, determining what constitutes an ATDS is something that courts routinely consider and decide, and is well within the "conventional" role of judges. Case law supporting this view is expansive. *See, e.g., Baum v. ADT, LLC*, 2018 WL 5255219, at *3 (W.D. Pa. Oct. 22, 2018); *Grogan v. Aaron's Inc.*, 2018 WL 6040195, at *7 (N.D. Ga. Oct. 26, 2018); *Pieterson v. Wells Fargo Bank, N.A.*, 2018 WL 3241069, at *3 (N.D. Cal. July 2, 2018); *Bieler v. GC Servs. L.P.*, 2014 WL 5531169, at *3 (M.D.N.C. Nov. 3, 2014). Thus, the first primary jurisdiction factor does not support a stay.

Second, while the parties agree that what constitutes an ATDS is within the FCC's discretion, that does not mean that this case is a ripe for a stay. As cited with respect to factor one, judges are routinely called upon to, and do, decide what constitutes an ATDS. *See, e.g., Grogan*, 2018 WL 6040195, at *7 ("While it is beyond cavil that the issues implicated in this case ... fall within the FCC's purview, that does not lead to the inexorable conclusion that they are beyond ... this Court to analyze and adjudicate, even in the absence of binding regulatory guidance from the FCC."). Nothing about this case suggests that this is an exceptional case that warrants abstention on primary jurisdiction grounds.

Wilson v. Quest Diagnostics, Incorporated, Not Reported in Fed. Supp. (2019)

2019 WL 7560932

Third, the risk of inconsistent rulings does not require a stay. The case is already more than a year old and no discovery has taken place. There is no certainty with respect to when the FCC will issue anything, and even if something was issued soon, it would still be subject to further appeals and proceedings. Thus, while some risk of inconsistent determinations is theoretically conceivable, it is not definite enough as to warrant halting TCPA litigation and waiting an undetermined period of time for the FCC to issue guidance and then for that guidance to be further challenged. *See, e.g.*, *Grogan*, 2018 WL 6040195, at *8 ("While the Court is mindful that a concrete pronouncement from the FCC would prove beneficial in navigating the turbulent waters that lie ahead, neither is the Court willing to stay this matter for what could end up being years."). Moreover, as Plaintiff notes, it's "wholly possible" that Defendant's system could constitute an ATDS regardless of any future FCC guidance.

Finally, Defendant has not itself made an application to the FCC, which the majority of Courts generally deem necessary for the final factor to weigh in favor of a stay. *See, e.g.*, *Demmick v. Cellco Partnership*, 2011 WL 1253733, at *6 (D.N.J. Mar. 29, 2011).

**13.** The Court also declines to stay this case pursuant to its inherent authority. First, Defendant has not established any prejudice that will result from proceeding with the case. Defendant had the benefit of a stay of discovery while its motion to dismiss was pending - and the case is now more than year old. Judge Martini denied the motion to dismiss and directed discovery to proceed. It is time to proceed with the case. To the extent Defendant claims that Plaintiff's discovery demands themselves are burdensome or disproportionate or expensive, that can be addressed pursuant to the discovery rules, *see* Fed. R. Civ. P. 26; it is not, however, a basis to avoid discovery altogether. Nor does engaging in balanced and appropriate discovery constitute any prejudice.

 **\*4** Second, there is likely prejudice to the non-moving party. The case has been pending for a fairly lengthy period of time with no discovery. The longer the case sits dormant, the longer the wait for the case to be decided on the merits.

Third and Fourth, the length of the stay and judicial economy are addressed together – and neither supports a stay. The period of stay sought here could be lengthy. No one knows when the FCC may act. It could be many months, and with no certainty whatsoever that what the FCC does will affect

this case. It certainly may not be binding. At the same time, Plaintiff will be precluded from discovery, and the case will potentially be years away from trial.

**14.** Bifurcation would be inefficient and contrary to judicial economy. Bifurcation of discovery is a discretionary matter that is considered on a case-by-case basis. Here, no special basis for bifurcation has been shown. Defendant contends that the issue of consent could be dispositive of the case and thus should proceed first. However, that position is untenable and unfair. The Court should not allow one side to pick one defense of its choosing, limit discovery to that issue, and then presumably try a summary judgment motion. Both sides have a right to discovery. Further, if the ensuing summary judgment motion was denied, the case would just be starting and there would likely be subsequent rounds of dispositive motion practice – a completely impractical approach. Also, Defendant's argument that considering its chosen issue first would dispose of the case could be (and often is) made in every case. However, allowing that approach to case management would not only be unfair to plaintiff, it would wreak havoc on the docket, extending resolution of cases for years. For example, following a motion on the consent issue, one would assume Defendant (and perhaps Plaintiff) would seek to make additional, merits-based summary judgment motions after the close of fact discovery. Generally, one round of summary judgment motions following the close of discovery is the Court's practice. And nothing in this case suggests that it is unique or different such that it should be permitted two different dispositive motions before any discovery is taken. For that reason, bifurcation will only delay the disposition of the entire case, and therefore, is contrary to judicial economy.

**FOR THE REASONS STATED ABOVE**,

**IT IS on this 22nd day of August 2019,**

**ORDERED** that, Defendant's motion to stay, or in the alternative to bifurcate discovery [ECF No. 23] is **DENIED**. The parties are directed to confer and submit a joint discovery plan within 14 days.

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 7560932

**Wilson v. Quest Diagnostics, Incorporated, Not Reported in Fed. Supp. (2019)**

2019 WL 7560932

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

2025 WL 863469
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

Joseph BOND, on behalf of himself and
all others similarly situated, Plaintiff,

v.

FOLSOM INSURANCE AGENCY
LLC and Cody Folsom, Defendants.

No. 3:24-cv-2551-L-BN
|
Signed March 19, 2025

**Attorneys and Law Firms**

Anthony I. Paronich, Paronich Law PC, Hingham, MA,
Andrew Roman Perrong, Perrong Law LLC, Glenside, PA,
Sharon K. Campbell, Law Office of Sharon K. Campbell,
Dallas, TX, for Plaintiff.

Jason Ray Jobe, Yesha Prakashcha Patel, Thompson Coe
Cousins & Irons LLP, Dallas, TX, Haley S. Grissom, Dentons
U.S. LLP, Dallas, TX, for Defendants.

**MEMORANDUM OPINION AND ORDER**

DAVID L. HORAN, UNITED STATES MAGISTRATE
JUDGE

 **\*1** Defendants Folsom Insurance Agency, LLC and Cody
Folsom (collectively, "Folsom") have filed a Motion to
Bifurcate Discovery. *See* Dkt. No. 30.

Plaintiff Joseph Bond filed a response. *See* Dkt. No. 31.

This case has been referred to the undersigned United States
magistrate judge for pretrial management under 28 U.S.C. §
636(b) and an order of reference from United States District
Judge Sam A. Lindsay. *See* Dkt. No. 32.

For the reasons explained below, the Court denies Folsom's
Motion to Bifurcate Discovery [Dkt. No. 30].

**Background**

This case concerns a class action lawsuit alleging violations of
the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C.
§ 227.

Plaintiff Joseph Bond alleges that Defendants placed at least
one prerecorded telemarketing call to his cellular phone
without his prior express written consent in violation of the
TCPA. *See* Dkt. No. 6.

Bond alleges the following putative class:

> **Robocall Class:** All persons within the United States:
> (1) to whose cellular telephone number or other number
> for which they are charged for the call (2) Defendants
> (or an agent acting on behalf of Defendants) placed
> a telemarketing call (3) within the four years prior to
> the filing of the Complaint (4) using an identical or
> substantially similar pre-recorded message used to place
> telephone calls to Plaintiff (5) from four years prior to the
> filing of the Complaint through trial.
>
> *Id.* at 9 (emphasis in original).

Folsom denies TCPA liability and contends that Bond cannot
maintain his lawsuit as a class action because it fails to meet
the requirements of Federal Rule of Civil Procedure 23.

The Parties have begun discovery and filed a joint status
report to assist the Court in entering a scheduling order under
Federal Rule of Civil Procedure 16(b). *See* Dkt. No. 29.

In the joint status report and this subsequent motion, Folsom
asks the Court to bifurcate and limit discovery into two phases
– individual and class-based discovery – and allow for class-
based discovery only if Bond's individual claims survive
dispositive motions. *See* Dkt. No.29 at 4-5; Dkt. 30 at 1.

**Legal Standards & Analysis**

"Under [Federal Rule of Civil Procedure] 42(b), district
courts have discretion to bifurcate trials '[f]or convenience, to
avoid prejudice, or to expedite and economize.' " *Pharmerica
Corp. v. Advanced HCA LLC*, No. 2:17-cv-00180-JRG, 2018
WL 3326822, at *1 (E.D. Tex. May 1, 2018) (quoting Fed. R.
Civ. P. 42(b)). "The decision to bifurcate 'is a matter within
the sole discretion of the trial court.' " *Id.* (quoting *First Tex.
Sav. Ass'n v. Reliance Ins. Co.*, 950 F.2d 1171, 1174 n.2 (5th
Cir. 1992)).

And Federal Rule of Civil Procedure "26 affords trial courts ample authority to control the sequence and timing of discovery." *E.E.O.C. v. Lawler Foods, Inc.*, 128 F. Supp. 3d 972 (S.D. Tex. 2015).

The issue before the Court is whether it should birfucate and limit discovery into two phases – individual and class-based discovery,

Folsom contends that discovery should be bifurcated because rulings on Bond's individual claims will determine the validity of his class-based claims. *See* Dkt. No. 1 at 1. And it asserts that "bifurcation will be expedient and economical because it will help determine whether [Bond] is a proper class representative before broader discovery is taken." *Id.*

**\*2**  Bond contends that Folsom's bifurcation proposal is an "end-run" around the Court's Order granting in part Bond's motion to compel, which involved classwide discovery. *See* Dkt. No. 31 at 2-3; Dkt. No. 28.

In the order that Bond references, the Court stated:

> As to Interrogatory Nos. 6 and 7, "[t]he Court will not engage in a preemptive merits analysis to determine whether [Bond] is entitled to discovery on the claim that [he] has pleaded and is pursuing. *Firebirds Intl, LLC v. Firebird Rest. Grp., LLC*, No. 3:17-cv-2719-B, 2018 WL 3655574, at \*16 (N.D. Tex. July 16, 2018). "The Court will not prematurely assess the balance of the evidence on the merits of [Bond's] claim[s] against [Folsom Insurance] and will not credit [Folsom Insurance's] assessment to cut off [Bond] from seeking relevant evidence from this named party before discovery has closed and any summary judgment motion has been filed." *Velazquez v. El Pollo Regio LP, LLC*, No. 3:15-cv-3170-M, 2017 WL 2289185, at \*6 (N.D. Tex. May 25, 2017). On the Court's reading, Bond has pleaded "call" broadly enough to include ringless voicemails, and, although the Court need not now determine whether a ringless voicemail can support liability as a matter of law under the statute, Folsom Insurance's answer is incomplete as to what Bond is asking based on what he has pleaded and is pursuing. And Folsom Insurance has not supported its other boilerplate objections and may not avoid appropriate classwide discovery that is – as Bond persuasively argues – necessary for a future class certification motion.
> Dkt. No. 28.

Bond also asserts that there is "significant overlap" between discovery relevant to the merits of his individual claims and issues of class certification Dkt. No. 31 at 6. And, so, Bond argues that bifurcation would lead to duplication of discovery and may result in further discovery disputes regarding the distinction between merits and class discovery. *See id.* at 6-7. In Bond's view, bifurcation of discovery in this case would lead to the "opposite of judicial economy." *Id.* at 6.

As to class certification under Rule 23, the Supreme Court has instructed that "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.' " *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-351 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

And "[f]requently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim" because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 351 (cleaned up).

Considering *Dukes* and the "rigorous analysis" requirement for class certification, district courts have been reluctant to bifurcate class-related discovery from discovery on the merits. *See Ahmed v. HSBC Bank USA, Nat'l Ass'n*, No. EDCV152057FMOSPX, 2018 WL 501413 (C.D. Cal. Jan. 5, 2018) (declining to bifurcate discovery in TCPA case and stating that "the distinction between class certification and merits discovery is murky at best and impossible to determine at worst"); *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 300 (S.D.N.Y. 2012) (collecting cases).

**\*3**  In another TCPA case, *Cardenas v. Resort Sales by Spinnaker, Inc.*, No. 9:20-cv-00376-RMG, 2021 WL 733393 (D.S.C. Feb. 24, 2021), the Court found that bifurcation would not serve the interests of judicial economy given the plaintiff's "persuasive argument that the evidence needed to determine whether [they] have a claim substantially overlaps with [their] ability to represent a class under [Rule] 23." *Cardenas*, 2021 WL 733393, at \*3.

Similarly, here, the undersigned already found that Folsom "may not avoid appropriate classwide discovery that is – as Bond persuasively argues – necessary for a future class certification motion." Dkt. No. 28. And, so, the Court agrees with Bond that bifurcation would not promote efficiency because there is considerable overlap between discovery

relevant to the merits of his individual claims and issues of class certification. *Accord True Health Chiropractic Inc. v. McKesson Corp.*, 2015 WL 273188, *2-3 (N.D. Cal. 2015) (declining to bifurcate a TCPA class action and noting that individual and class discovery claims typically overlap).

And, in light of the bulk of authority discussing the lack of a "bright line" distinction between merits and class discovery, bifurcation could lead to avoidable, future disputes over whether a particular discovery request relates to the merits or to class certification. *See Quinn v. Specialized Loan Servs., LLC*, 321 F.R.D. 324, 327–28 (N.D. Ill. 2017); *see also City of Pontiac General Employees' Retirement System v. Wal–Mart Stores, Inc.*, 2015 WL 1112040B, *1–2 (W.D. Ark. 2015) (bifurcation may force the court to resolve "endless discovery disputes"); *True Health*, 2015 WL 273188, at *3 (finding that bifurcation "raise[s] a slew of issues as to what discovery relates to the class, as opposed to the named plaintiffs, thereby causing additional litigation regarding the distinction between the two.").

And, so, considering the binding law from *Dukes* and persuasive authority from other district courts, the Court declines to bifurcate discovery in this case.

**Conclusion**

For the reasons explained above, the Court denies Folsom's Motion to Bifurcate Discovery [Dkt. No. 30]. The Court will separately enter a scheduling order under Federal Rule of Civil Procedure 16(b) in accordance with this Memorandum Opinion and Order.

SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 863469

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

In re Plastics Additives Antitrust Litigation, Not Reported in F.Supp.2d (2004)

2004 WL 2743591, 2004-2 Trade Cases P 74,620

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re Special Grand Jury 89-2, 10th Cir.(Colo.), June 15, 2006

2004 WL 2743591

United States District Court,

E.D. Pennsylvania.

In re PLASTICS ADDITIVES
ANTITRUST LITIGATION

No. Civ.A. 03–2038.
|
Nov. 29, 2004.

*MEMORANDUM ORDER*

DAVIS, J.

**\*1** Presently before the Court are Defendants' Joint Motion for Bifurcation of Discovery and Entry of a Scheduling Order (Doc. No. 88) filed on September 14, 2004; Plaintiffs' Opposition to Motion for Bifurcation (Doc. No. 92) filed on October 1, 2004; Defendants' Joint Memorandum in Further Support of Defendants' Motion for Bifurcation of Discovery and Entry of a Scheduling Order (Doc. No. 98) filed on October 21, 2004; Plaintiffs' Motion for Entry of Proposed Discovery Scheduling Order (Doc. No. 93) filed on October 1, 2004; Defendants' Opposition to Plaintiffs' Motion for Entry of Proposed Scheduling Order (Doc. No. 96) filed on October 15, 2004; and Plaintiffs' Reply Memorandum in Support of Motion for Entry of Proposed Discovery Scheduling Order (Doc. No. 103) filed on November 10, 2004.

For the following reasons, Defendants' motion to bifurcate will be DENIED and Plaintiffs' Motion for Entry of Proposed Discovery Scheduling Order will be GRANTED in part and DENIED in part.

I. Factual and Procedural History

This case is a class action antitrust case concerning the plastics additives industry. Defendants are alleged manufacturers and/or sellers of plastic additives. (Am. Compl. at ¶¶ 19–29). Plaintiffs are allegedly purchasers of "plastics additives," what the plaintiffs define as "heat stabilizers, impact modifiers, and processing aids used to process plastics." (Am. Compl. at ¶ 7). Plaintiffs seek to represent a nationwide class

of purchasers of plastics additives for the time period of January 1, 1990 through December 31, 2003. (*Id.* at ¶ 1).

In February 2003, the United States Department of Justice Antitrust Division ("DOJ") commenced an investigation into the plastics additives industry. (Def. Mot. to Bifurcate, at 4). Two grand juries were convened in the Northern District of California. (*Id.*). Both grand juries are currently proceeding in secret. One grand jury is focusing on heat stabilizers and the other grand jury involves heat impact modifiers and processing aids. (*Id.*). All defendants have been subpoenaed as part of one or both of the investigations. (*Id.*).

On March 28, 2003, plaintiff Gitto/Global Corporation filed a complaint on behalf of themselves and the putative class, alleging that defendants engaged in a price-fixing scheme for the sale of plastic additives in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. (Doc. No. 1). Subsequently, six separate complaints were filed against defendants based upon alleged antitrust violations. On August 14, 2003, this Count entered a pretrial order consolidating the seven related actions under a master file, directing plaintiffs to file a consolidated complaint, and holding discovery in abeyance pending the resolution of motions filed in response to the complaint. (Doc. No. 23).[1]

Plaintiffs filed an amended complaint on September 3, 2003. (Doc. No. 28). Plaintiffs contend that defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in a conspiracy in restraint of trade to artificially raise, fix, and/or stabilize priecs for plastic additives in the United states. (*Id.* at ¶¶ 49–50). Plaintiffs contend that defendants agreed to charge prices at higher levels and to allocate prices in order to artificially manipulate the price of plastic additives. (Id. at ¶ 50). Plaintiffs further allege that they had no knowledge of the conspiracy because defendants fraudulently concealed it. (*Id.* at ¶ 52). As a result, plaintiffs allege that they and other members of the class were required to pay more for plastic additives than they would have in a competitive marketplace. (Id. at ¶ 11).

**\*2** On December 1, 2003, defendants moved for dismissal and partial dismissal. (Doc. No. 54, 56). This Court denied defendants' motions on May 26, 2004, prompting the parties to meet to discuss an ongoing plan for discovery. (Doc. No. 72). The parties failed to reach an agreement on a discovery schedule, and, on September 14, 2004, defendants moved for bifurcation of discovery and for a stay of merits-based discovery. (Doc. No. 88). On October 1, plaintiffs filed a

motion for entry of plaintiff's proposed scheduling order. (Doc. No. 92). After an array of briefs and response briefs, the final brief in support of the parties' respective positions was filed on November 10, 2004. (Doc. No. 103).

II. Motion to Bifurcate

Defendants have moved this Court to bifurcate discovery into class certification issues and merit-based issues. Defendants present three major reasons for bifurcation. First, defendants claim that bifurcation will promote the early and efficient resolution of class issues contemplated by Federal Rule of Civil Procedure 23©)(1). (Def. Mot. To Bifurcate, at 7–13). Second, defendants claim that bifurcation is necessary due to pending grand jury proceedings in California. (*Id.,* at 13–17). Third, defendants claim that bifurcation will save the parties time and expense because resolution of the class certification issue will influence further proceedings. (*Id.,* at 11). This Court rejects defendants' arguments in favor of bifurcation.

Class certification must be made "as soon as practicable after commencement of an action." Fed.R.Civ.P. 23(c)(1) & (3). This mandate recognizes that "class certification or its denial will have a substantial impact on further proceedings, including the scope of discovery, the definition of issues, the length and complexity of trial, and the opportunities for settlement." Federal Judicial Center, Manual For Complex Litigation § 11.213, at 40 (4th ed.2004). To ensure that the mandate of Federal Rule of Civil Procedure 23(c)(1) is followed, courts have the discretion to "allow classwide discovery on the certification issue and postpone discovery on the merits." *Washington v. Brown & Williamson Tobacco,* 959 F.2d 1566, 1570–1571 (11th Cir.1992).

The Third Circuit has not set a bright line test as to when a court should bifurcate discovery in class action litigation. Generally, however, courts allow classwide discovery on the certification issue and postpone classwide discovery on the merits of the claims when bifurcation serves the interests of "fairness and efficiency." *See* Manual for Complex Litigation § 11.213, at 40 ("discovery may proceed concurrently if bifurcating class discovery from merits discovery would result in significant duplication of effort and expense to the parties"); *see also Williamson Tobacco Corp.,* 959 F.2d at 1570–71 ("[t]o make early class determination practicable and to best serve the interests of fairness and efficiency, courts may allow classwide discovery on the certification issue and postpone classwide discovery on the merits").

**\*3** Both parties rely upon the Manual for Complex Litigation (the "Manual") as an authoritative source to determine when bifurcation is fair and efficient. (Def. Mot. to Bifurcate, at 5; Pl. Opp'n to Mot. to Bifurcate, at 9). According to the Manual, "courts often bifurcate discovery between certification issues and those related to the merits of the allegation." *Id.* § 21.14, at 256. Nonetheless, the Manual voices several concerns with bifurcation. The Manual notes that the distinction between merits-based discovery and class-related discovery if often blurry, if not spurious. *See id.* § 21.14, at 255 ("generally, application of the Rule 23 criteria requires the judge to examine the elements of the parties' substantive claims and defenses in order to analyze commonality, typicality, and adequacy of representation under Rule 23(a)"). The Manual further notes that "some merits discovery during the precertification period is generally more appropriate for cases that are large and likely to continue even if not certified." *Id.; see also Gray v. First Winthrop,* 133 F.R.D. 39, 41 (N.D.Cal.1990) (denying order to stay merits-based discovery until resolution of class certification motion would be "unworkable," "impracticable," and "inefficient" and would deny plaintiffs ability to develop facts in support of motion). Accordingly, the Manual suggests that the prime considerations in whether bifurcation is efficient and fair include whether merits-based discovery is sufficiently intermingled with class-based discovery and whether the litigation is likely to continue absent class certification.

Bifurcation would be inefficient, unfair, and duplicative in this case for several reasons. First, bifurcation would further delay the resolution of the litigation in derogation of Rule 1 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 1 (procedural rules must be administered to secure "the just, speedy, and inexpensive determination of every action"). This case has already been on the docket for over 18 months without a decision on class certification. Failure to permit simultaneous discovery of merits-related and class-related issues will further delay the length of the overall discovery period, thereby inhibiting plaintiffs from receiving an expeditious resolution of their claims.[2] *See, e.g., In re Sulfuric Acid Antitrust Litigation,* MDL No. 1561, No. 03 C 4576 (N.D.Ill.2003) (refusing to bifurcate discovery in antitrust litigation in part because of delays created by bifurcation). Bifurcation would also belie principles of judicial economy, as the Court may be forced to spend time and resources resolving discovery disputes over what is "merit" discovery as compared to "class" discovery. *See, e .g., In re Hamilton Bancorp, Inc. Securities Litigation,* 2002 WL 463314, at \*1 (S.D.Fla. Jan.14, 2002) (noting

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 65 of 99

In re Plastics Additives Antitrust Litigation, Not Reported in F.Supp.2d (2004)
2004 WL 2743591, 2004-2 Trade Cases P 74,620

that "bifurcation of discovery may well-increase litigation expenses by protracting the completion of discovery, coupled with endless disputes over what is 'merit' versus 'class' discovery").

**\*4** Second, class certification discovery in this litigation is not "easily" differentiated from "merits" discovery. *See, e.g., Gray,* 133 F.R.D. at 41 (noting that "discovery relating to class certification is closely enmeshed with merits discovery" and "cannot be meaningfully developed without inquiry into basic issues of the litigation"). There will be a substantial overlap between what is needed to prove plaintiff's price-fixing claims, as well as the information needed to establish class-wide defenses, and what is needed to determine whether the elements of class certification are met. For example, according to the defendants' proposed scheduling order, determination of whether the elements of class certification are met[3] would require discovery into whether the agreements between the parties for the sale of plastic additives, competitor contracts, defendants' business plans and strategies for marketing and selling plastic additives, the impact of the defendants' conduct on plaintiffs, and services provided by defendants to plaintiffs in connection with the sale of plastic additives. (Def. Proposed Scheduling Order, attached as Exhibit A). Discovery on these issues will also be necessary to prove the merit of plaintiffs' claim, namely whether defendants' engaged in a nation-wide price-fixing scheme for the sale of plastic additives and whether, as a result, the plaintiffs suffered damages. *See, e.g., In re Linerboard Antitrust Litigation,* 305 F.3d 145, 151 (3d Cir.2002) (damages in antitrust litigation can be proved by establishing that free market prices would be lower than prices paid and that plaintiffs made purchases at higher prices). Due to the intermingling of the facts necessary to evaluate class certification and the merits of plaintiffs' claims, separating the two would duplicate discovery efforts, which, in turn, would force both parties to incur unnecessary expenses and would further protract the litigation.

Third, contrary to defendants' assertions, there is no reason to believe that denial of class certification will terminate this litigation. *See* Manual for Complex Litigation § 21.14, at 256 (bifurcation not appropriate if litigation likely to proceed without certification). Seven individual lawsuits were filed against the defendants and then consolidated under this master file. The six additional lawsuits have not been terminated, but, instead, have been stayed pending class certification in this litigation. If class certification is denied, it is reasonable to assume that the individual plaintiffs will

pursue their claims through the cases that are currently stayed. (Pl. Opp'n to Def. Mot. to Bifurcate, at 10). This is particularly true because one of the defendants, Crompton Corporation ("Crompton"), has been accepted into the Department of Justice's corporation leniency program, and has agreed to assist plaintiffs' counsel in the prosecution of claims against non-settling defendants. (*Id.,* at 10–11). The likelihood of the continuation of individual claims, regardless of class certification, belies whatever time and expense may be saved in the future through the narrowing of discovery pursuant to the resolution of class certification motions.

**\*5** Because bifurcation of discovery would be inefficient, unfair, and duplicative, this Court denies defendants' motion to bifurcate discovery into a class-based stage and a merits-based stage.[4]

### III. Motion to Stay Merits–Based Discovery

In addition to the request for straightforward bifurcation, defendants expressly ask this Court to issue a stay of all merits-based discovery pending a determination of class certification. (Def. Mot. to Bifurcate, at 12–13). Defendants support their argument by reference to the standard for determining whether to stay civil proceedings pending the resolution of related criminal proceedings. (*Id.,* at 12–13). In so doing, defendants implicitly ask this court to stay merits-based discovery until the outcome of ongoing grand jury proceedings in California. (*Id.,* at 15) ("If, however, the grand jury has not concluded by the time the class certification motion has been decided, the Court can re-evaluate at that time whether to permit merits discovery to go forward and with what limitations").

It is well-settled that defendants in a criminal prosecution do not have a due process right to stay proceedings in a parallel civil case. *United States v. Kordel,* 397 U.S. 1, 9–10, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970). However, it is equally well-settled that the Court has the inherent authority to control the disposition of cases on its dockets. *See, e.g., Landis v. North Am. Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936). This includes the power to stay civil discovery until termination of related criminal proceedings. *See Texaco, Inc. v. Borda,* 383 F.2d 607, 608 (3d Cir.1967).

The "stay" of a civil case is an "extraordinary remedy." *Weil v. Markowitz,* 829 F.2d 166, 174 n. 17 (D.C.Cir.1987). In determining whether the "extraordinary" remedy of a stay is appropriate, this Court looks at five competing interests:

(1) interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay;

(2) burden which any particular aspect of the proceedings may impose on defendants;

(3) convenience of the court in the management of its cases, and the efficient use of judicial resources;

(4) interests of persons not parties to the civil litigation; and

(5) interest of the public in the pending civil and criminal litigation.

*See, e.g., Golden Quality Ice Cream Co. v. Deerfield Specialty,* 87 F.R.D. 53, 56 (E.D.Pa.1980) (promulgating factors). Ultimately, the decision whether to grant a stay must be made on a case-by-case basis. *See Shirsat v. Mutual Pharmaceutical Co.,* 1995 WL 695109, at *1 (E.D.Pa. Nov.21, 1995).

This Court refuses to bifurcate discovery on the basis of concurrent grand jury proceedings that may extend indefinitely. To the extent that defendants are asking for an official stay on merits-based discovery pending the resolution of grand jury proceedings, and perhaps even criminal prosecutions, this Court also denies the defendants' request based upon a balancing of all relevant factors. *See Sterling Nat'l Bank v. A–1 Hotels Int'l, Inc.,* 175 F.Supp.2d 573, 579 (S.D.N.Y.2001) (treating request for stay of depositions for six months as request for stay of case pending resolution of ongoing grand jury proceedings and criminal investigations because "the argument for a further stay [six months later] will be at least as potent as it is now").

A. Plaintiffs' Interest and Potential Prejudice

**\*6** Staying merits-based discovery would prejudice plaintiffs by preventing the expeditious resolution of the lawsuit. *See, e.g ., Sterling Nat'l Bank,* 175 F.Supp.2d at 575 (concluding that "it would be perverse if plaintiffs who claim to be the victims of criminal activity were to receive slower justice than other plaintiffs because the behavior they allege is sufficiently egregious to have attracted the attention of the criminal authorities"). It is "only through the discovery procedure that a plaintiff can determine the merit (or lack of merit) in his [or her] case and develop the strategy which will guide him [or her] throughout the litigation." *Golden Quality Ice Cream Co.,* 87 F.R.D. at 56. While the initiation and resolution of the California grand jury

proceedings against defendants may narrow the scope of this litigation, this possibility is too remote to be considered at this stage. Furthermore, staying discovery on this rationale would result in an indefinite stay, as there is no way to predict when grand jury proceedings will end, whether an indictment will be delivered, and whether criminal proceedings will ensue. *See In re Residential Doors Antitrust Litigation,* 900 F.Supp. 749, 756 (E.D.Pa.1995) (rejecting argument that discovery can be stayed without prejudice to plaintiffs until completion of government's criminal investigation of unspecified others at unknown future date).

B. Burden on Defendants

Defendants have not established that they would suffer actual prejudice if merits-based discovery proceeds. As corporations, defendants will not be able to invoke the privilege against self-incrimination. *United States v. Kordel,* 397 U.S. 1, 9, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970) (right against self-incrimination not available to corporations). However, if defendants' employees invoke their Fifth Amendment right against self-incrimination during the discovery process, such as by refusing to refusing to answer deposition questions or interrogatories, the defendants' chances of success at trial may diminish. Indeed, a court may impose "reasonable" discovery sanctions in such a situation, such as preventing the witness from testifying on behalf of the defendant concerning the factual matters that were concealed by the invocation of the Fifth Amendment. *See, e.g., Securities & Exch. Comm'n v. Graystone Nash, Inc.,* 25 F.3d 187, 190 (3d Cir.1994) (reliance on Fifth Amendment right against self-incrimination in civil cases may give rise to adverse inference against party claiming benefits).

This Court recognizes the seriousness of defendants' concerns. However, the weight to be attached to these fears is minimized by the layers of speculation upon which they are built. *See Sterling Nat'l Bank,* 175 F.Supp.2d at 578 (denying motion to stay pending resolution of grand jury proceedings because "there is no way of measuring with any precision what questions defendants may refuse to answer, or what damage may be done to their position in the civil case by any assertions of privilege they choose to make"). Defendants presume that employees, who have yet to be indicted, will need to, and will actually invoke, their Fifth Amendment privilege during discovery. *Id.* Defendants then presume that this Court will impose discovery sanctions for the exercise of this right. *Id.* These presumptions render the actual prejudice to defendants "inherently unclear" at this pre-indictment phase. *Id* . at 577–578.

2004 WL 2743591, 2004-2 Trade Cases P 74,620

**\*7** This Court also finds defendants' fears concerning discovery sanctions incommensurate with defendants' request for a stay of merits-based discovery. Because merits-based discovery and class-based discovery overlap, the progression of class-based discovery, to which defendants have agreed, may require the defendants' employees to exercise their Fifth Amendment rights during discovery events. Paradoxically, this would lead to the very result that defendants' request for a stay seeks to prevent. Accordingly, defendants' failure to request a blanket stay of all discovery pending the resolution of criminal grand jury proceedings in California undermines their argument that a stay of merits-based discovery will avoid actual prejudice.

Finally, this Court notes that defendants have not argued that merits-based discovery will divert resources that may be necessary for defense of a possible criminal action. Nor have defendants argued that the expense of defending the civil litigation and the grand jury proceedings in California would be unreasonable. Accordingly, although the defendants may experience some future prejudice if this Court refuses to grant a stay of merits-based discovery, particularly with respect to negative inferences to be drawn from the exercise of Fifth Amendment rights by individual witnesses, this prejudice is both remote and uncertain. *See State Farm Mutual Automobile Ins. Co. v. Beckham–Easley,* 2002 WL 31111766, at \*2 (E.D.Pa. Sept.18, 2002) (pre-indictment requests for stay are typically denied because risks are more remote than for indicted defendant).[5]

C. Burden on the Court

Staying merits-based discovery in the litigation hinders the Court's responsibility to keep its docket moving to provide litigants with a timely and effective resolution of their claims. *See, e.g., Dawson v. Dodd,* 1999 WL 410366, at \*3 (E.D.Pa. June 17, 1999) ("The Court has a responsibility to control the disposition of the cases on its docket with economy of time and effort for all actors including itself."). To delay merits-based discovery pending the resolution of grand jury proceedings at some unforeseeable date in the future would hinder the Court from performing its responsibility. This duty is particularly important when, as in the instant matter, the complaint that is the subject of the motion to stay has been lingering on the docket for more than 18 months.

The Court realizes that, in some instances, staying discovery until the resolution of parallel criminal proceedings may

minimize the Court's burden. A stay may avoid duplicative judicial efforts, eliminating the need for parties to claim the Fifth Amendment right against self-incrimination or removing the burden upon plaintiffs to prove antitrust liability. *See, e.g., White v. Mapco Gas Products, Inc.,* 116 F.R.D. 498, 502 (E.D.Ark.1987). In this case, however, these possibilities are too remote to be given significant consideration. *See, e.g., Anthony v. City of Philadelphia,* 2001 WL 118964, at \*2 (E.D.Pa. Feb.9, 2001) (rejecting argument as too speculative that plaintiff and court will benefit from stay because resolution of criminal case may reduce or simplify issues). There has been no indictment handed down in either of the grand jury proceedings. *See Sterling Nat'l Bank,* 175 F.Supp.2d at 580 (refusing to grant stay of parallel civil proceedings when no indication that grand jury's investigation reached critical stage or that indictment is imminent because stay would "substantially halt the civil litigation indefinitely, without any predictability as to when the case would return to the Court's active docket"). As such, no criminal charges have been filed, nor has a date been set for trial. It is therefore uncertain how long the requested stay will last, and whether future criminal proceedings will alleviate the evidentiary and analytical burdens on the parties and on the court. *See Beckham–Easley,* 2002 WL 3111176, at \*3 (denying motion to stay discovery despite defendants' contentions that indictment would be issued within 120 days from filing motion to stay). Accordingly, the interests of immediate judicial economy trump the defendants' speculations that waiting until the completion of grand jury proceedings would lessen the Court's burden.

D. Burden on Non-parties

**\*8** Corporations speak and function only through their officers and employees. *See Upjohn,* 449 U.S. at 389–392. As the defendants note, the DOJ frequently requires current and former employees from companies under investigation to testify before the grand jury. (Def. Mot. To Bifurcate, at 14–15). These employees are not parties to this litigation. However, if faced with a discovery request, whether in the form of depositions, written interrogatories, or document production, these witnesses may have to invoke their Fifth Amendment right against self-incrimination to avoid disclosing information that may lead to a future criminal conviction. The pressure of whether to invoke this right during civil discovery can be severe. *See Golden Quality Ice Cream,* 87 F.R.D. at 58; *see also White,* 116 F.R.D. at 503 (noting that corporations' officers and managers may have Fifth Amendment privileges by virtue of grand jury probe and

that interest of non-parties against self-incrimination favors staying discovery).

While the dilemma of whether a non-party should invoke her Fifth Amendment right against self-incrimination may be severe, the personal consequences that attach to this decision are not as grave. This Court may not impose discovery sanctions on non-parties who invoke their Fifth Amendment rights during civil discovery. Nor can the exercise of this right be used against such witnesses in future criminal prosecutions. *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (no adverse inference may be drawn nor penalty imposed on criminal defendant who chooses not to testify by exercising Fifth Amendment right against self-incrimination). Furthermore, to lessen the burden on non-party witnesses in deciding to invoke the privilege, defendants may seek the entry of a protective order, which forbids the dissemination of information gathered through civil discovery to outside parties. Finally, to this Court's knowledge, no indictments have been handed down against defendants or their employees, thereby further weakening the degree of risk to non-parties if merits-based discovery progresses. *See Sterling Nat'l Bank,* 175 F.Supp.2d at 578 (noting that burden is greater to indicted party because risk of liberty, importance of safeguarding constitutional rights, and strain on resources and attention make defending parallel civil litigation particularly difficult). Consequently, the burden on non-parties in this instance is marginal.

E. Public Interest
Public interest considerations weigh against granting a stay of merit-based discovery. The public's interest in vigorously enforcing national anti-trust laws through the expeditious resolution of a private antitrust litigation is particularly great. *See Golden Quality Ice Cream,* 87 F.R.D. at 58; *In re Residential Doors,* 900 F.Supp. at 756 (public interest prejudiced by delay in discovery proceedings in class action antitrust litigation). This interest is even greater when the nature of the litigation is a class action lawsuit, filed on behalf of nationwide consumers of a particular product over the course of more than a decade. Furthermore, the public also has a significant interest in ensuring the flow of this Court's judicial docket so that justice may be administered to the instant litigants, as well as all other litigants before this Court, in a timely fashion. These interests are not rendered less acute by the federal government's decision to spend resources on behalf of the public investigating potential antitrust violations by defendants and convening grand jury proceedings, particularly when no indictments have been

delivered and when the federal government has not intervened to request a stay of discovery on the basis of ensuring the secrecy, integrity, and timeliness of such proceedings. *See, e.g., Kaiser v. Steward,* 1997 WL 66186, at *5 (E.D.Pa.1997) (refusing blanket stay of civil proceedings pending outcome of criminal trial, even when government prosecuting parallel criminal case requests stay to prevent defendants from using civil discovery as vehicle to gain information on possible future criminal prosecutions); *Golden Quality Ice Cream,* 87 F.R.D. at 58 (public interest in quick and diligent resolution of antitrust violations through private litigation only weakened when federal government receives indictment and chooses to prosecute criminal antitrust case).

**\*9**  The defendants ask the Court to weigh these significant interests against the public interest in maintaining the secrecy of grand jury proceedings, as embodied in Rule 6(e) of the Federal Rules of Criminal Procedure. Defendants note that witnesses may be asked to provide testimony and documents that reveal information provided to the grand jury, thereby helping the litigants in this matter to identify other witnesses who have been called to testify before one or both grand juries. (Def. Mot. To Bifurcate, at 17.) As stated more fully in Section III.A.1 of this opinion, Rule 6(e) neither applies to witnesses nor to documents created independent of grand jury proceedings. *See* Fed. R.Crim. Pro. 6(e). Accordingly, defendants' argument that permitting civil merits discovery will violate the grand jury secrecy provisions of Rule 6(e) is unfounded.

F. Conclusion
A careful weighing of the factors indicates that discovery should not be bifurcated. Nor should merits-based discovery be stayed pending the resolution of class certification, ongoing grand jury proceedings, or subsequent criminal prosecutions. This Court recognizes the legitimacy of defendants' concerns about possible prejudice from employees asserting their right against self-incrimination during the discovery process. Nonetheless, rather than delaying this litigation to allay defendants' speculative concerns, such as by staying merits-based discovery or preventing the taking of depositions of defendants' employees prior to class certification, this Court will progress with discovery and will attempt to accommodate defendants' concerns if and when the situations triggering these concerns actually arise.

IV. Plaintiffs' Motion for Entry of a Scheduling Order

Plaintiffs argue that the Court should enter the proposed scheduling order, which does not bifurcate discovery. Plaintiffs' scheduling order allocates sixty days for the completion of discovery concerning class certification issues. (Pl. Proposed Order, at ¶ 2(d)). It imposes the following obligations on the parties. First, it requires defendants to produce within forty-five days of the order all documents relating to plastics additives "that were produced to the Department of Justice, any grand jury, and any investigatory authority, foreign or domestic (including but not limited to the European Union, Canada, or Japan), on a rolling basis...." (*Id.* at ¶ 2(a)). Second, it requires defendants to produce within sixty days of the order "in electronic format, all transactional data relating to their sales of Plastics Additives, as defined in the Complaint, in the United States during the period January 1, 1990 through to December 31, 2003" and to make available defendants' documentation and computer personnel to help understand and use the data. (*Id.* at ¶ 2(b)). Third, it requires plaintiffs to produce within 45 days "all documents relating to their purchases of plastics additives ... from the defendants." (*Id.* at ¶ 2(c)).

**\*10** Defendants object to this proposed scheduling order on several grounds. First, defendants contend that the production of all documents produced to the DOJ, any grand jury, or any domestic investigatory authority violates Rule 6(e) of the Federal Rules of Criminal Procedure. (Def. Opp'n to Pl. Mot., at 8–12). Second, defendants contend that the production of all documents produced to any foreign investigatory authority is excessively burdensome and not geared towards the acquisition of relevant evidence. (*Id.* at 11–13). Third, defendants contend that sixty days is insufficient to conduct class-related discovery and allows for inadequate time for factual development on class issues. (*Id.,* at 15). Fourth, defendants contend that the discovery plan imposes no reciprocal burden upon plaintiffs to produce data in electronic format and to provide technical assistance to defendants in understanding the use of that data. (*Id.*). Finally, defendants contend that they should be expressly allowed to take discovery from plaintiffs related to plaintiffs' sales of plastics products to their customers. (*Id.*).

A. Documents related to plastic additives that were submitted to the Department of Justice, any grand jury, and any domestic investigatory body

Defendants claim that defendants should not have to produce documents related to plastic additives that were submitted as part of a domestic government investigation because Rule 6(e)(2) of the Federal Rules of Criminal Procedure bars

disclosure and because case law does not dictate such a result. (Def. Mem. In Opp'n to Pl. Mot., at 8).

1. Rule 6(e)(2) is inapplicable.

Defendants claim that Federal Rule of Criminal Procedure 6(e)(2) prevents plaintiffs from receiving documents that defendants produced to the DOJ in connection with California grand jury investigations. (Def. Mem. in Opp'n to Pl. Mot., at 8). Defendants' arguments lack legal support.

Federal Rule of Criminal Procedure 6(e)(2)(A) states that "no obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B)." Fed.R.Crim.P. 6(e)(2) (A). Rule 6(e)(2)(B) prohibits certain people from disclosing "a matter occurring before the grand jury." Fed.R.Crim.P. 6(e)(2)(B). This list of persons includes the following: a grand juror; an interpreter; a court reporter; an operator of a recording device; a person who transcribes recorded testimony; an attorney for the government; or any person to whom disclosure is made. *Id.* Conspicuously absent from this list are witnesses, whether witnesses that testify at grand jury proceedings or witnesses that provide documents to grand juries during the course of their proceedings. *See* Susan W. Brenner, Gregory G. Lockhart, Federal Grand Jury: A Guide to Law and Practice § 8.3.1 (2004); *see also* Andrea M. Nervi, FRCP 6(E) And the Disclosure of Documents Reviewed by a Grand Jury, 57 U. Chi. L.Rev. 221, 224–225 (1990). This omission was not unintentional, as the Advisory Committee Note to Rule 6(e) specifies that the rule "does not impose any obligation of secrecy on witnesses." *Id.*

**\*11** Despite its express language, courts disagree as to whether Rule 6(e)(2) applies to witnesses and other private parties not listed in the rule. *Compare Illinois v. Sarbaugh,* 552 F.2d 768, 777–78 (7th Cir.1977) (private corporations indicted through grand jury proceedings subject to secrecy obligations of Rule 6(e), although state demonstrated particularized need within meaning of Rule 6(e) to force corporate employer of grand jury witness to turn over transcripts of grand jury testimony concerning highway construction fraud) *and Cumberland Farms, Inc. v. Browning–Ferris Ind., Inc. .,* 1989 WL 90884, at \*1 (E.D.Pa. April 18, 1989) (applying Rule 6(e) without discussion to private party defendants and requiring showing of particularized need for documents created by or for grand jury) *with In re Grand Jury Subpoena Duces Tecum,* 575 F.Supp. 1219, 1221 (E.D.Pa.1983) (Rule 6(e) does not impose obligation of secrecy on witnesses, nor does the court retain a general supervisory authority to impose restraints on

witnesses who seek to disclose testimony given before grand jury). Although the Third Circuit has not squarely addressed this issue, this Court agrees with those courts holding that Rule 6(e)(2) does not impose secrecy obligations on a witness who supplies documents to a grand jury proceeding. *See, e.g., In re Wirebound Boxes Antitrust Litigation,* 126 F.R.D. 554, 555–556 (D.Minn.1989) (defendants in antitrust litigation are not among the parties enumerated in Rule 6(e)(2) and are required to release documents which were produced independent of the grand jury); *Golden Quality Ice Cream Co., Inc.,* 87 F.R.D. at 59 (disclosure of documents produced by defendants in class action to grand jury not prohibited by Federal Rule of Criminal Procedure 6(e)). This analysis comports with the text of the rule and with the advisory comment explaining the purpose and genealogy of the rule. *See* Fed.R.Crim.P. 6(e) (no obligation of secrecy on any person except those listed in Rule 6(e)(2)(B)).

Furthermore, even if Rule 6(e)(2) was applicable to private parties not listed in the rule, documents generated for purposes independent of the grand jury investigation, such as during the ordinary course of a defendant's business, are not "matters occurring before the grand jury." *See, e.g., In re Grand Jury Matter* (Catania), 682 F.2d 61, 64 (3d Cir.1982) (information developed by the FBI during course of investigation and presented to federal grand jury was not subject to Rule 6(e) because information exists apart from and was developed independently of grand jury, even though developed with an eye towards ultimate use in grand jury proceeding); *In re Grand Jury Matter,* 640 F.Supp. 63, 65 (E.D.Pa.1986) (Rule 6(e) does not apply to materials created for purposes independent of the grand jury investigation and, thus, business records subpoenaed by grand jury could be disclosed to Inspector General as part of a separate investigation). The Third Circuit has expressly declared that "information does not become a matter occurring before the grand jury simply by being presented to the grand jury, particularly where it was developed independently of the grand jury." *U.S. v. Chang,* 2002 WL 31108904, at *2 (3d Cir. Sept.20, 2002) (unpublished opinion); *In re Grand Jury Matter* (Catania), 682 F.2d at 64. Nonetheless, materials created at a grand jury's request, such as subpoenas, transcripts, and document lists, constitute matters "occurring before the grand jury" within the meaning of Rule 6(e), thereby requiring parties to demonstrated particularized need to acquire these materials. *See, e.g., United States v. Procter & Gamble Co.,* 356 U.S. 677, 683, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958) (requiring party seeking grand jury transcript to demonstrate "particularized" need for disclosure).

**\*12** Because defendants are not one of the enumerated parties in Rule 6(e), and because the defendants have not asserted that the documents were created at the request of grand jury proceedings in California rather than during the ordinary course of defendants' business operations, the obligation of secrecy does not apply.[6] *See* Manual for Complex Litigation § 11.49 ("The production to a grand jury of otherwise discoverable material does not, however, entitle it to Federal Rule of [Criminal] Procedure 6 protection. Copies of material produced to a grand jury are subject to discovery ."). Indeed, this Court does not believe that the production of documents submitted during the California grand jury proceedings is likely to disclose the "essence" of those proceedings. *See, e.g., In re Grand Jury Investigation,* 630 F.2d 996, 1000 (3d Cir.1980) (holding that Rule 6(e)'s policy of secrecy "designed to protect from disclosure only the essence of what takes place in the grand jury room" and recognizing that mere fact that particular document was reviewed by grand jury does not subject document to Rule 6(e) protections). Consequently, defendants' objection to plaintiffs' proposed order on the ground of Rule 6(e)(2) lacks merit.

2. Plaintiffs' request for all documents submitted to the DOJ, any grand jury, and any domestic investigatory body is supported by case law.

Rejecting the defendants' defense to plaintiffs' discovery request is not the same as endorsing the content of plaintiffs' proposed order. It appears, however, that defendants in antitrust litigation regularly agree through joint discovery schedules to produce documents submitted to the DOJ, grand juries, and other investigatory authorities concerning the basis for the antitrust civil suit. *See, e.g., In re Acrylonitrile Butadiene Rubber (NBR) Antitrust Litigation,* 03–cv–1898 (W.D. Pa. June 14, 2004) (parties agreeing in proposed discovery schedule to produce documents submitted to grand jury or DOJ); *In re Rubber Chemicals Antitrust Litigation,* 03–CV–1496 (N.D.Cal. Jan. 26, 2004) (documents produced to grand jury or DOJ subpoenas in related criminal investigation included within Rule 26 initial disclosures); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation,* 03–MD–1542 (PCD) (D.Conn. Oct. 31, 2003) (parties agreeing in proposed discovery schedule to produce all documents submitted to DOJ or grand jury). This willingness to produce such documents at the outset of litigation signals the appropriateness and relevance of such a discovery request.

Plaintiffs also cite several cases in which defendants have been compelled to produce documents relating to government investigations. *See, e.g., In re Wirebound Boxes Antitrust Litigation,* 126 F.R.D. at 556 (requiring defendants to product "documents which they submitted to the government in response to an investigation of the wirebound box industry and which they created independently from any such investigation); *Golden Quality Ice Cream,* 87 F.R.D. at 59. These cases recognize the relevance of these documents to antitrust litigation. *See In re Wirebound Boxes Antitrust Litigation,* 126 F.R.D. at 556. They also recognize that the production of these documents will impose only a minimum burden on the defendants, "since the documents in question have already been identified and sorted." *See, e.g., Golden Quality Ice Cream,* 87 F.R.D. at 59. In fact, ordering production of these documents "seems to accord with prevailing practice." *Id.*[7]

**\*13** This Court agrees with the logic of *In re Wirebound Boxes AntiTrust Litigation* and *Golden Quality Ice Cream.*[8] Applying this logic, defendants shall be required to produce all documents that were produced to the DOJ, any grand jury, and any domestic investigatory authority in connection with an investigation of the plastics additives industry. *See* Grand Jury Law and Practice § 5:6 (2d ed.2004) (evidence obtained independently of the grand jury proceeding does not ordinarily constitute a "matter occurring before the grand jury," even if same witness or similar evidence has been or will be presented to grand jury).

B. Documents related to plastics additives that were submitted to foreign investigatory bodies

Defendants present two major objections to the proposal that defendants produce all documents turned over to foreign investigatory bodies in conjunction with the investigation of the plastics additives industry. First, defendants claim that documents produced to foreign investigative authorities are irrelevant to this lawsuit. (Def. Opp'n To Pl. Mot., at 12). Specifically, defendants claim that plaintiffs have alleged only that defendants engaged in a price-fixing conspiracy "in the United States," rather than a foreign price-fixing conspiracy; that foreign investigators focus on domestic markets over which they have control and jurisdiction; and that foreign investigators generally conduct wholesale seizures of files, thereby collecting documents irrelevant to the antitrust issues in this litigation. (*Id.*)

Second, defendants claim that this request, at such an early stage in the litigation, would impose an unnecessary burden on the parties. (*Id.* at 13). Defendants stress that foreign investigators may object to the production of documents, as the United States often does, and that production may disclose information about ongoing investigations. (*Id.*). Defendants further claim that foreign criminal investigations into alleged antitrust violations involve a different process than domestic criminal investigations into alleged antitrust violations. (*Id.*). Accordingly, because of this methodological difference, defendants claim that they would need to conduct a thorough review of the documents to determine the applicability of evidentiary privileges, that this review would be complicated by the fact that many of the documents are not likely to be in English, and that companies in defendants' position are not likely to have copies of documents that were seized pursuant to a foreign investigation into the plastic additives industry. (*Id.*).

Plaintiffs respond to defendants' objections by arguing that documents produced to foreign investigative bodies are as relevant as those produced to grand juries in the United States. (Pl. Reply Mem., at 8). Plaintiffs cite a recent order from *In re: Automotive Refinishing Paint Antitrust Litigation,* MDL Docket No. 1426 (E.D.Pa. October 29, 2004) (J. Surrick), in which the court affirmed its previous order requiring antitrust defendants, in response to document requests and interrogatories, to produce documents submitted to foreign investigative bodies relating to the production, pricing, marketing, sale, or distribution of automotive refinishing paint. *Id.* at \*5–6. The court reasoned that such information was relevant because foreign-price fixing activities would impact the domestic market for automotive refinishing paint, because evidence of foreign price-fixing among defendants would establish the existence of an illegal conspiracy in restraint of trade within the meaning of section 1 of the Sherman Act, and because evidence of foreign price-fixing would be material "to prove that they had the opportunity and ability to engage in domestic price-fixing for automotive refinishing paint." *Id.* at \*8. The court further reasoned that the burden of producing these documents would not be significant because defendants had already agreed to produce all documents and information related to the United States; thus, requiring blanket production was easier than compelling defendants to sift through documents submitted to foreign investigative bodies for materials relevant to the United States. *Id.* at \*10–11.

2004 WL 2743591, 2004-2 Trade Cases P 74,620

**\*14**  It is well-settled that courts presiding over antitrust cases generally take a liberal view of relevance in determining the scope of discovery. *See, e.g., New Park Entm't, LLC v. Elec. Factory Concerts, Inc.,* 2000 WL 62315, at \*3 (E.D.Pa. Jan.13, 2000) (internal quotations omitted). Applying this expansive view of relevance, this Court agrees that documents produced to foreign investigative bodies are relevant to determine whether defendants have engaged in price-fixing that affects American commerce. Regardless of whether plaintiffs have alleged a global conspiracy, materials produced to international government authorities may cover transactions involving the sale or marketing of plastic additives in the United States. They may also cover transactions and decision-making outside the United States that influence the sale or marketing of plastic additives in the United States. Accordingly, these documents may lead to evidence that illuminates defendants' motive and opportunity for the alleged conspiracy within the United States, the breadth of the conspiracy, and the manner by which defendants fraudulently concealed the conspiracy from plaintiffs. *See, e.g., In re Vitamins Antitrust Litigation,* 2001 WL 1049433, at \*11–12 (D.D.C. June 20, 2001) (refusing to place geographic limitation on merits-based discovery in global price-fixing case because, although acts or communications outside the United States may be admissible to establish existence of conspiracy). In addition, such materials may help plaintiffs to discover the identity and location of potential witnesses and to impeach defendants' trial witnesses. *Id.*

This Court also rejects defendants' position that production of all documents submitted to international investigative authorities concerning plastic additives at this juncture in the litigation would pose a substantial burden on defendants. The scope of document production in antitrust litigation is often quite expansive. *See, e.g., In re Fine Paper Antitrust Litigation,* 685 F.2d 810, 818 (3d Cir.1982) (no abuse of discretion where trial court permitted taking of 270 depositions and production of nearly two million documents in complex, nationwide antitrust claim); *In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 614 (7th Cir.1997) (pretrial discovery involved more than 1,000 depositions and over fifty million pages of documents); *In re Linerboard Antitrust Litigation,* 296 F.Supp.2d 568, 577 (E.D.Pa.2003) (pretrial discovery required production of millions of pages of documents). Furthermore, although foreign antitrust investigations generally may be conducted in a distinct manner from domestic antitrust investigations, defendants have not provided this Court with specific,

individualized reasons why the production of documents that defendants supplied to foreign investigative bodies would be burdensome in this particular litigation. Defendants fail to present evidence, such as affidavits from employees or written documentation, indicating that wholesale files were seized from defendants' international offices, that the documents produced to foreign investigative authorities are in languages other than English, or that defendants would need to review each and every document to determine whether it invokes applicable privileges. Nonetheless, this Court gives serious consideration to the defendants' generic contention that companies subject to foreign seizures of corporate records are not likely to have either lists of the documents seized or records indicating what was taken. Accordingly, defendants shall be required to provide documents related to plastic additives that were produced to foreign investigatory authorities, to the extent that defendants have knowledge of the identity of these documents and/or can reasonably obtain knowledge of the identity of these documents.

### C. Time Period

**\*15**  Defendants contend that the proposed discovery schedule of 60 days for class-related discovery is unrealistic. (Def. Opp'n to Pl. Mot., at 15). Defendants claim that this period allows inadequate time for factual development on class issues. (*Id.*).

This Court has refused to bifurcate discovery. This decision may require the parties to spend substantial time in responding simultaneously to merits-based discovery and class-based discovery. Because merits-based discovery may deflect attention and resources from establishing a record for class certification, this Court agrees that sixty days for class-based discovery is inadequate, particularly when both party may employ expert witnesses in support of their respective positions on class certification. *See, e.g ., Larson v. Burlington Northern and Santa Fe Railway Co.,* 210 F.R.D. 663, 667 (D.Minn.2002) (granting bifurcation but supplying only ninety days to create record for class certification). Instead, this Court will give the parties 120 days to conduct fact-based discovery on the class certification issue.

### D. Production of Data in Electronic Format and Technical Assistance

Defendants also object to the obligation that defendants provide data in electronic format to plaintiffs and that defendants provide technical assistance to plaintiffs in understanding this data. (Def. Opp'n to Pl. Mot., at 15).

2004 WL 2743591, 2004-2 Trade Cases P 74,620

Defendants do not question the relevance of these obligations, only the fact that no similar burden is imposed upon plaintiffs. (*Id.*).

This Court agrees with defendants' objections. Both parties must provide all transactional data in electronic format, to the extent reasonably feasible. *See, e.g., In re: Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation,* 03–MD–1542 (D.Conn. October 31, 2003) (parties agree to produce transactional data in electronic format, but only to extent "reasonably feasible"). However, defendants shall not be required to make available "documentation and computer personnel" to help plaintiffs understand that data. Requiring this condition as a matter of right in contested litigation undermines the adversarial nature of antitrust litigation. Unless otherwise agreed upon, interpretations of data produced through discovery should be obtained through traditional discovery outlets and through the hiring of expert witnesses. Although the parties may privately agree to provide technical assistance to one another, this Court will not impose such an obligation on either party as a matter of course.

   E. Discovery of Downstream Data
Defendants further object to the plaintiffs' proposed discovery order on the basis that the discovery order does not require plaintiffs to produce information about "demand conditions on the end markets for defendants' products and the varying types of pricing terms to the proposed class members that have resulted from those conditions." (Def. Mem. In Opp'n to Pl. Mot., at 3). Defendants claim that this information must be provided at the outset of the discovery period because it is relevant to whether plaintiffs meet the elements necessary for class certification. (*Id.* at 15).

 **\*16**  Plaintiffs note that their proposal does not prohibit defendants from requesting this information, as both parties are free to serve discovery requests seeking any information they require. (Pl. Reply Mem., at 9). However, in an effort to preempt future discovery disputes, plaintiffs note that case law prevents discovery of events occurring in the chain of distribution after the initial sales of the price-fixed product, information otherwise known as "downstream data." (*Id.* at 15; Pl. Mem. In Opp'n to Def. Mot., at 19–25).

This Court agrees that plaintiffs' proposed schedule does not prohibit defendants from seeking downstream data, to the extent relevant, through discovery. This Court also agrees that defendants have not established the relevance of plaintiffs'

downstream data to the merits of plaintiffs' claims or to class certification issues. Defendants provide no case law in support of their argument. In fact, the case law brought to the Court's attention holds that downstream data is irrelevant to determine whether defendants are liable for price-fixing under the Sherman Act. *See, e.g., Illinois Brick Co. v. Illinois,* 431 U.S. 720, 724–725, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (holding that the overcharged direct purchaser, and not other indirect purchasers who receive the passed-on price of the illegal overcharge, may sue to recover the illegal overcharge and that antitrust defendants may not introduce evidence that indirect purchasers were injured by illegal overcharge) (citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)). As such, courts have refused to require production of downstream data in antitrust price-fixing cases. *See, e.g., In re Vitamins Antitrust Litigation,* 198 F.R.D. 296, 301 (D.D.C.2000) (noting that "no court has even allowed production of individualized downstream data" in antitrust case and refusing to grand defendants' motion to compel documents that relate to plaintiffs' use, manufacture, sale, marketing, distribution, or supply of vitamin products); *In re Wirebound Boxes Antitrust Litigation,* 131 F.R.D. 578 (D.Minn.1990) (denying motion to compel document requests for materials concerning plaintiffs' financial information in price-fixing antitrust litigation because plaintiffs do not seek to recover lost profits); *In re Carbon Dioxide Antitrust Litigation,* MDL 940, slip op. at 4 (M.D.Fl. Nov. 19, 1993) (refusing to permit discovery in antitrust litigation of plaintiffs' sales, profits, and costs of products for which liquid carbon dioxide and nitrogen are used because plaintiffs seek to recover overcharges from defendants' antitrust violations). Consequently, although this Court will not *per se* preclude defendants at this time from requesting downstream data through discovery, this Court will certainly not require plaintiffs to produce downstream data at the outset of the discovery period through the entry of a scheduling order.

V. Conclusion
For the following reasons, defendants' motion to bifurcate discovery is denied and plaintiffs' motion for entry of a discovery schedule is granted in part and denied in part. An order and scheduling order consistent with this opinion follow.

*ORDER*

**\*17**  AND NOW, this _____ day of November 2004, upon consideration of Defendants' Join Motion for Bifurcation of Discovery and Entry of a Scheduling Order (Doc. No. 88) filed on September 14, 2004, Plaintiffs' Opposition to Motion for Bifurcation (Doc. No. 92) filed on October 1, 2004, Defendants' Joint Memorandum in Further Support of Defendants' Motion for Bifurcation of Discovery and Entry of a Scheduling Order (Doc. No. 98) filed on October 21, 2004, Plaintiffs' Motion for Entry of Proposed Discovery Scheduling Order (Doc. No. 93) filed on October 1, 2004, Defendants' Opposition to Plaintiffs' Motion for Entry of Proposed Scheduling Order (Doc. No. 96) filed on October 15, 2004, and Plaintiffs' Reply Memorandum in Support of Motion for Entry of Proposed Discovery Scheduling Order

(Doc. No. 103) filed on November 10, 2004, it is hereby ORDERED as follows:

1. Defendants' Motion for Bifurcation is DENIED.

2. Plaintiffs' Motion for Entry of a Proposed Scheduling Order is GRANTED in part and DENIED in part.

3. Discovery shall be completed according to the Scheduling Order that accompanies this Order.[*]

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 2743591, 2004-2 Trade Cases P 74,620

Footnotes

1    By order dated September 15, 2004, the other six cases against defendants were placed in deferred status pending the outcome of class certification in this litigation.

2    This delay is evident from the defendants' proposed order bifurcating discovery, which would not resolve the issue of class certification until (at a minimum) March 2006 and which, throughout this period, would not permit plaintiffs to engage in merits-based discovery. (Def. Mot. to Bifurcate, at 20). Defendants' proposed scheduling order delays both the class certification issue and the ultimate resolution of this litigation, whether through a trial on the merits, settlement, or dispositive motions. (*Id.*). Defendants' proposed scheduling order therefore violates the rationale of efficiency upon which the theory of discovery bifurcation is based.

3    Class action certification is appropriate only if the following four elements are met: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representatives will fairly and adequately protect the interests of the class ("adequacy of representation"). *See* Fed.R.Civ.P. 23(a).

4    This Court also disagrees with defendants' assertions that bifurcation is appropriate because other state courts, which are adjudicating state antitrust claims concerning plastics additives against the same defendants, have chosen to bifurcate discovery. Defendants cite two orders from parallel state litigation in Ohio and California for this proposition. However, these cases are not relevant to this Court's analysis. First, in *Competition Collision Center LLC v. Crompton Corp., et al.,* Case No. CGC–04–431278 (Cal.Super.Ct. May 18, 2004), the California Superior Court only stated that the discovery period *"may* be bifurcated into class certification and other issues" [emphasis added]. Second, in *Heritage Plastics, Inc. v. Rohm and Haas Company, et al.,* Case No. 03–CV–0113 (Ohio CCP July 26, 2004), the Court of Common Pleas for Belmont County, Ohio bifurcated discovery, but implied that bifurcation was appropriate primarily because of the congestion in the Court's docket and because federal antitrust litigation against the same defendants was proceeding in this Court.

5    Defendants claim that no general rule exists disfavoring pre-indictment requests for a stay of parallel civil proceedings. (Def. Mem. In Further Support of Mot. to Bifurcate, at 8 n. 7). Defendants also claim, that, if such a rule exists, it is inapplicable in this situation because defendants have not asked for a blanket stay of all civil proceeding, only merits-based discovery. (*Id.*). Although this Court agrees that there is no *per se* rule against pre-indictment stays of parallel civil proceedings, there is certainly a strong judicial preference against such stays. *See, e.g.,* Sterling Nat'l Bank, 175 F.Supp.2d at 576–77 (courts generally grant the extraordinary remedy of stay only after defendant seeking stay has been indicted). Furthermore, the logic behind rejecting a blanket stay of parallel civil proceedings prior to a defendant's indictment applies with equal force to a determination of whether merits-based discovery should be stayed pending

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 75 of 99

In re Plastics Additives Antitrust Litigation, Not Reported in F.Supp.2d (2004)
2004 WL 2743591, 2004-2 Trade Cases P 74,620

ongoing grand jury proceedings. In fact, the argument in favor of a stay of merits-based discovery at the pre-indictment phase may be weaker than the argument in favor of a blanket stay because, in the former situation, defendants and their employees may be forced into the Fifth Amendment dilemma through the progression of class-based discovery even if the stay is granted.

**6**   Defendants have not asked this Court to exercise its supervisory powers over grand jury proceedings as a basis to prevent disclosure of the documents at issue. Accordingly, this Court need not address whether a federal court has the authority to supplement the text of Rule 6(e)(2) by imposing the obligation of secrecy on witnesses or other private parties not mentioned in the rule. *See* Brenner, Federal Grand Jury § 8.3.1 (noting that "it is unclear whether courts have the authority to supplement" Rule 6(e)'s provisions to impose secrecy obligation on parties not enumerated).

**7**   In *In re Wirebound Boxes AntiTrust Litigation,* defendants were not required to produce all documents related to government investigations into the wirebound box industry 136 F.R.D. at 556. Instead, the court struck a compromise between the need of civil litigants to discover relevant materials and the need to preserve the secrecy of the grand jury process, regardless of the literal text of Rule 6(e). *Id.* The court achieved this balance by requiring defendants to produce all documents created independently from any government investigation, while requiring plaintiffs to show particularized need prior to disclosing documents created by a grand jury or at a grand jury's request, such as subpoenas, transcripts, and lists of documents. *Id.* Although this Court agrees with the general principles of *In re Wirebound Boxes AntiTrust Litigation,* it will not adopt a judicially created discovery limitation in contravention of the literal text of Rule 6(e), which imposes no secrecy obligation on witnesses or private parties who supply documents to grand jury proceedings.

**8**   The case cited in support of defendant's position, *In re Sulfuric Acid Antitrust Litigation,* 2004 WL 769376, at *3–5 (N.D.Ill. April 9, 2004), which prevented discovery in antitrust litigation of all documents related to sulfuric acid that were provided to a grand jury in connection with a related criminal investigation, is inapplicable. The court in *In re Sulfuric Acid Antitrust Litigation* was compelled to follow the Seventh Circuit's interpretation of Rule 6(e) as covering documents supplied to a grand jury, although created for purposes other than or independent of grand jury investigations. *Id.* at *3. It was also forced to follow the Seventh Circuit's interpretation of Rule 6(e)(2)(B) as covering civil defendants who have supplied documents to a grand jury in a related criminal investigation. *Id.* at *2.

\*   Editor's Note: Scheduling Order is not included in this publication.

---

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 863601
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

MARGO SIMMONS, individually and on
behalf of all others similarly situated, Plaintiff,

v.

AUTHOR REPUTATION
PRESS LLC, Defendant.

Civil Action No. 24-12330-BEM
|
Filed 03/18/2025

### MEMORANDUM AND ORDER

Brian E. Murphy Judge, United States District Court

**\*1** For the reasons stated herein, the Court DENIES
Defendant Author Reputation Press LLC's request to
bifurcate and ADOPTS Plaintiff Margo Simmons's proposed
case schedule.

### I. Introduction

Plaintiff Margo Simmons alleges that Defendant Author
Reputation Press LLC violated the Telephone Consumer
Protection Act of 1991 ("TCPA") by telemarketing to phone
numbers on the National Do Not Call Registry. Dkt. 1 ¶ 3.
Plaintiff makes these allegations individually and on behalf
of a putative class of other individuals similarly situated. *Id.*
¶¶ 31–38.

Defendant asks the Court to bifurcate the issues in this case so
that it can "address the viability of Plaintiff's individual TCPA
claim before engaging in costly and time-consuming class
discovery." Dkt. 15 at 5–6. In its briefing, Defendant identifies
a non-exhaustive list of seven defense-related "issues" to
be explored during the first phase of litigation. *See id.*
at 6. Defendant's proposed schedule contemplates that this
phase will take approximately four months, with motions for
summary judgment and trial to follow on the individual claim.
*Id.* at 9–10.

### II. Legal Standard

Federal Rule of Civil Procedure 26 affords district courts
"broad discretion" in managing the timing and sequencing of
discovery. *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998);
*see also* Local Rule 16.3(a)(3)(B) (providing for courts'
ability to "sequence discovery into two or more stages").
Likewise, the decision to segregate certain claims for separate
disposition under Federal Rule of Civil Procedure 42 "is a
matter peculiarly within the discretion of the trial court."
*Gonzalez-Marin v. Equitable Life Assur. Soc. of U.S.*, 845 F.2d
1140, 1145 (1st Cir. 1988).[1]

Notwithstanding this authority, "[b]ifurcation is ordinarily the
exception and not the rule." *Hewlett-Packard Co. v. Genrad,
Inc.*, 882 F. Supp. 1141, 1158 (D. Mass. 1995); *see also
Wilson v. Quest Diagnostics, Inc.*, 2019 WL 7560932, at \*4
(D.N.J. Aug. 22, 2019) (highlighting potential unfairness and
inefficiency of bifurcation).

**\*2** Faced with similar requests, "[c]ourts in this district
have bifurcated individual merits and class discovery where
doing so served the interests of justice given the allegations
and circumstances of particular cases." *Katz v. Liberty Power
Corp., LLC*, 2019 WL 957129, at \*2 (D. Mass. Feb. 27, 2019)
(granting bifurcation in TCPA case); *Osidi v. Assurance IQ,
LLC*, 2022 WL 623733, at \*1 (D. Mass. Mar. 3, 2022) (same).

### III. Discussion

Defendant has not shown here that bifurcation would "serve[ ]
the interests of justice." *Katz*, 2019 WL 957129, at \*2; *Osidi*,
2022 WL 623733, at \*1. *Katz* and *Osidi*—two cases wherein
the court granted bifurcation of individual TCPA claims—
are both distinguishable. In each of those cases, the court
was presented with a clear, documented deficiency in the
plaintiff's individual claim.[2] *See* Defendants' Memorandum
in Support of Motion to Bifurcate Individual and Class
Discovery at 5–7, *Katz*, Civ. No. 18-10506 (demonstrating,
with record evidence, reasonable suspicion that the plaintiff's
phone number would not qualify for TCPA protection);
Local Rule 16.1(d) Joint Statement at 6–7, *Osidi*, Civ. No.
21-11320 (highlighting "pure legal" issue of TCPA consent,
made salient and relevant by the defendant's record evidence,
requiring "minimal, if any, additional discovery" before
summary judgment).

Here, by contrast, Defendant has provided the Court no
specific basis on which to conclude that Plaintiff's individual
claims are particularly vulnerable to early defeasance. Rather,
Defendant has merely pointed out that individual claims are

2025 WL 863601

subject to individual defenses, but that is true for all putative class-action plaintiffs.

**IV. Conclusion**

For these reasons, Defendant's request for bifurcation is DENIED. The Court ADOPTS Plaintiff's proposed pretrial schedule. *See* Dkt. 15 at 7–8.

**So Ordered.**

**All Citations**

Slip Copy, 2025 WL 863601

Footnotes

1    Defendant frames its proposal as a plan for discovery, Dkt. 15 at 5–6, but that plan also contemplates separate summary judgment briefings and trials on the individual claims, Dkt. 15 at 9–10, implicating Rule 42. *See Wilson v. Quest Diagnostics, Inc.,* 2019 WL 7560932, at *2 (D.N.J. Aug. 22, 2019) (framing a similar dispute under Rule 42); *cf. DeRubeis v. Witten Techs., Inc.,* 244 F.R.D. 676, 678–82 (N.D. Ga. 2007) (ordering pure sequencing of discovery in a trade secret case). At bottom, both rules place the decision squarely within the discretion of the trial court. *See Crawford-El,* 523 U.S. at 598; *Gonzalez-Marin,* 845 F.2d at 1145. However, courts have expressed particular concern against "routine[ ] order[ing]" of separate trials. *Abbott Biotechnology Ltd. v. Centocor Ortho Biotech, Inc.,* 55 F. Supp. 3d 221, 222 (D. Mass. 2014) (quoting *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 795 F. Supp. 501, 503 (D. Mass. 1992), *aff'd,* 36 F.3d 1147 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154 (2010)); *see also Chapman ex rel. Est. of Chapman v. Bernard's Inc.,* 167 F. Supp. 2d 406, 417 (D. Mass. 2001) (placing burden on party seeking bifurcation under Rule 42).

2    The Court does not intend to suggest that a "clear, documented deficiency" is either a necessary or sufficient condition for bifurcation, only that the circumstances here are unlike those in *Katz* or *Osidi.*

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 78 of 99

Saleh v. Crunch, LLC, Not Reported in Fed. Supp. (2018)

2018 WL 11264884

2018 WL 11264884
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Bilal SALEH, individually and on behalf of
a class of others similarly situated, Plaintiff,

v.

CRUNCH, LLC, a Delaware limited
liability company, Crunch Franchising,
LLC, a Delaware limited liability company
and DeLiu, LLC, a Delaware limited
liability company doing business as
Crunch Fitness Oakland Park, Defendants.

Case No. 17-62416-Civ-COOKE/HUNT
|
Signed 02/28/2018

**Attorneys and Law Firms**

Jibrael Jarallah Said Hindi, The Law Offices of Jibrael S. Hindi, Fort Lauderdale, FL, Bret Leon Lusskin, Jr., Bret Lusskin, P.A., Aventura, FL, Sean Martin Holas, Scott David Owens, Scott D. Owens, P.A., Hollywood, FL, for Plaintiff.

Ian C. Ballon, Pro Hac Vice, Lori Chang, Pro Hac Vice, Valerie W. Ho, Pro Hac Vice, Greenberg Traurig LLP, Los Angeles, CA, Ian M. Ross, Stumphauzer Foslid Sloman Ross & Kolaya, PLLC, Miami, FL, Paul K. Silverberg, Silverberg & Weiss, P.A., Weston, FL, for Defendants Crunch, LLC, Crunch Franchising, LLC.

David K. Markarian, Markarian & Hayes, Palm Beach Gardens, FL, Paul K. Silverberg, Silverberg & Weiss, P.A., Weston, FL, for Defendant DeLiu, LLC c/o Marc Delisle, Managing Member 4801 Peregrine Point Circle West Sarasota, FL 34231.

## ORDER DENYING MOTION TO STAY PROCEEDINGS

MARCIA G. COOKE, United States District Judge

**\*1** THIS CAUSE came before the Court on Defendants Crunch, LLC's and Crunch Franchising, LLC's Motion to Stay Proceedings Pending a Decision by the Ninth Circuit

Court of Appeals (ECF No. 35), which Defendant DeLiu, LLC has since joined. *See* Notice of Adoption/Joinder, ECF No. 40. Plaintiff filed a Response in Opposition (ECF No. 43), and Defendants subsequently filed a Reply (ECF No. 45). I have reviewed the pertinent portions of the record, and am otherwise fully advised in the premises. For the reasons stated below, Defendants Motion to Stay is denied.

Defendants move to stay the instant proceedings pending a decision by the Ninth Circuit Court of Appeals in *Marks v. Crunch San Diego, LLC*, Appeal No. 14-56834 (9th Cir.). According to Defendants, the Ninth Circuit in *Marks* is set to rule on whether the Texmunication platform is an automatic telephone dialing system ("ATDS") within the meaning of the Telephone Consumer Protection Act ("TCPA"),[1] an appeal from a district court ruling in *Marks v. Crunch San Diego, LLC*, 55 F. Supp. 3d 1288, 1292 (S.D. Cal. 2014) which found that Textmunication did not constitute an ATDS. In Plaintiff's Complaint (ECF No. 1), Plaintiff alleges Defendants sent texts through the Textmunication platform; Defendants therefore argue this case should be stayed pending the Ninth Circuit's decision because "an affirmance of that case would be authoritative of Crunch's liability in this case." Motion, 2.

A district court has broad discretion in determining whether a stay is appropriate. *Clinton v. Jones*, 520 U.S. 681, 706 (1997). A stay is "based on a balancing test in which the movant bears the burden of showing either 'a clear case of hardship or inequity' if the case proceeds, or little possibility the stay will harm others." *Dunn v. Air Line Pilots Ass'n*, 836 F. Supp. 1574, 1584 (S.D. Fla. 1993), *aff'd*, 193 F.3d 1185 (11th Cir. 1999) (citing *Landis v. North American Co.*, 299 U.S. 248, 254–55 (1936)). "The proponent of a stay bears the burden of establishing its need." *Clinton*, 520 U.S. at 708. I find that a stay in this matter is not appropriate at this time.

First, a decision in *Marks v. Crunch San Diego, LLC*, Appeal No. 14-56834 (9th Cir.) would not necessarily be authoritative. The ruling on appeal in *Marks* was made on a motion for summary judgment, after the parties had developed a factual record. While the texting platform at issue may be the same in both cases, it is possible that the Plaintiff in the instant case may discover or present different facts than the parties in *Marks*. "Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). Further, a decision in *Marks* will not define the

2018 WL 11264884

rights of both parties nor will it automatically moot this case. While the Ninth Circuit's affirmance or rejection of the district court's finding might be persuasive in the instant matter, it is not binding on this Court. *See McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) ("A circuit court's decision binds the district courts sitting within its jurisdiction...."). Nor would there be a preclusive effect, as "[Plaintiff] was not a party to the [California] action, [his] interests were not adequately represented, and [he] did not have the opportunity to litigate the issues presented in the [California] action." *Int'l Ship Repair & Marine Servs., Inc. v. N. Assur. Co. of Am.*, 503 F. App'x 681, 683 (11th Cir. 2013). After a ruling by the Ninth Circuit, the parties would still need to litigate the applicability of the *Marks* decision to the facts of the instant case. As such, Plaintiff should be allowed to litigate this matter and develop his own factual record. Defendants can argue the correctness and applicability of the Ninth Circuit's ruling once it has been made.

**\*2** Second, if the D.C. Circuit's and Ninth Circuit's decisions are imminent, as Defendants argue, then there is a good chance the decisions will be issued in time to shape the parties' discovery and/or any motions for summary judgment. Third, and last, Defendants have not shown that a denial of the stay will result in any undue prejudice to them other than that they *may* have more favorable caselaw to bolster their position at a later date. These are not sufficient reasons to warrant a stay of this matter, especially where a stay would prolong this matter on the Court's docket and could conceivably prejudice Plaintiff by the fading memory of any witnesses. *See Yong v. Peraza*, 2015 WL 4639736, *2 (S.D. Fla. Aug. 4, 2015).

For the foregoing reasons, it is hereby **ORDERED and ADJUDGED** that Defendant's Motion to Stay Proceedings (ECF No. 35) is **DENIED**.

**DONE and ORDERED** in chambers, at Miami, Florida, this 28th day of February 2018.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 11264884

---

Footnotes

1    The Ninth Circuit is, in turn, awaiting a ruling from the D.C. Circuit in *ACA Int'l v. F.C.C.*, Appeal No. 15-1211 (D.C. Cir.) on the validity of the Federal Communication Commission's 2015 Regulations, which, the petitioners in the case argue, expanded the statutory definition of an ATDS impermissibly. *See Marks v. Crunch San Diego, LLC*, No. 14-56834 (9th Cir.) ECF No. 62.

---

**End of Document**                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 80 of 99

Lathrop v. Uber Technologies, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 97511

KeyCite Yellow Flag - Negative Treatment
Distinguished by Allen v. Protective Life Insurance Company, E.D.Cal.,
December 12, 2023

2016 WL 97511
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

James LATHROP, et al., Plaintiffs,

v.

UBER TECHNOLOGIES, INC., Defendant.

Case No. 14-cv-05678-JST
|
Signed 01/08/2016

**Attorneys and Law Firms**

Hassan Ali Zavareei, Andrea R. Gold, Andrew J. Silver, Tycko & Zavareei LLP, Washington, DC, Evan Matthew Meyers, Myles P. McGuire, Mcguire Law, P.C. Chicago, IL, Kristen Law Sagafi, Tycko & Zavareei LLP, Oakland, CA, for Plaintiff.

James G. Snell Perkins Coie LLP, Palo Alto, CA, Debra Rae Bernard, Perkins Coie LLP, Martin Wojslaw Jaszczuk, Nick James Digiovanni, Locke Lord LLP, Chicago, IL, Nicola Carah Menaldo, Perkins Coie LLP, Seattle, WA, Sarah J. Crooks, Perkins Coie LLP, Portland, OR, Susan Jane Welde, Locke Lord LLP, Los Angeles, CA, for Defendant.

**ORDER DENYING DEFENDANT'S MOTION TO STAY PROCEEDINGS**

Re: ECF No. 71

JON S. TIGAR, United States District Judge

**\*1** Before the Court is Defendant Uber Technologies, Inc.'s ("Uber") Motion to Stay. ECF No. 71. For the reasons set forth below, the Court will deny the motion.

**I. BACKGROUND**

**A. Procedural History**
On December 31, 2014, Plaintiffs filed this putative class action against Uber for alleged violations of the Telephone

Consumer Protection Act ("TCPA"). Second Amended Complaint, ECF No. 54 ("SAC"). Uber "is a nationwide passenger transportation service that connects riders and drivers through a cellular telephone application." Id. ¶ 5. According to Plaintiffs, "Uber's recruiting tactics include sending prolific text messages to prospective Uber drivers." Id. ¶ 10. Plaintiffs allege that they received recruiting texts from Uber without providing prior express consent. Id. ¶¶ 32, 48, 61, 75, 88, 98. Plaintiffs Justin Bartolet, Sandeep Pal, Jonathan Grindell, and Jennifer Reilly further allege that they continued to receive texts after asking Uber to stop. Id. ¶¶ 53, 70, 82, 93. Plaintiffs allege that in making these texts, Uber used a device that qualifies as an "automatic telephone dialing system" as defined by 47 U.S.C. § 227(a)(1). Id. ¶¶ 30, 46, 59, 73, 86, 96.

On November 13, 2015, Uber filed a Motion to Stay Proceedings in light of two pending appeals.[1] ECF No. 71 at 1–2. Uber argues that both the D.C. Circuit's review of the FCC's 2015 Omnibus Order of the TCPA in ACA International, et al. v. Federal Communications Commission, No. 15-1211 (D.C. Cir. filed July 10, 2015), and the Supreme Court's upcoming decision in Spokeo, Inc. v. Robins, 135 S.Ct. 1892 (2015), could fundamentally alter the outcome of this case. Id.

**B. The FCC's 2015 Order and the D.C. Circuit Appeal in ACA International**
On July 10, 2015, the FCC issued a Declaratory Ruling and Order, addressing a number of petitions related to the TCPA. See In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 30 F.C.C. Rcd. 7961 (July 10, 2015) ("2015 FCC Order"). Uber specifically highlights the FCC's rulings on "automatic telephone dialing system," "called party," and revocation of consent.[2] ECF No. 71 at 12–15. Uber contends that the definitions of these terms are at issue in this case and request a stay while the definitions of these terms are contested. Id. at 15–17.

**\*2** To qualify as an automatic telephone dialing system, equipment must have "the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1)(A). In its July 2015 order, the FCC clarified that the TCPA's use of the term "capacity" in the definition of "automatic telephone dialing system" does not exempt equipment that lacks the "present ability" to dial randomly or sequentially.[3] 2015 FCC Order ¶ 15. "In other words,

Lathrop v. Uber Technologies, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 97511

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 81 of 99

the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities." Id. ¶ 16.

The FCC also concluded that the term "called party" should be defined as "the subscriber, i.e., the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan." Id. ¶ 73. The FCC created a very limited safe harbor for "callers who make calls without knowledge of reassignment and with a reasonable basis to believe they have valid consent to make the call." Id. at ¶ 72. Subject to this exception, "calls to reassigned wireless numbers violate the TCPA when a previous subscriber, not the current subscriber or customary user, provided the prior express consent on which the call is based." Id. at ¶ 73.

Although the TCPA does not explicitly discuss revocation of consent, the FCC determined that "the most reasonable interpretation of consent is to allow consumers to revoke consent if they decide they no longer wish to receive voice calls or texts." Id. ¶ 56.

After the FCC issued its ruling, nine companies, trade associations, and other entities filed petitions with the U.S. Court of Appeals for the District of Columbia Circuit seeking review of the 2015 FCC Order. The petitions were subsequently consolidated into a single case, ACA International, et al. v. Federal Communications Commission, No. 15-1211. The petitions request that the D.C. Circuit vacate the FCC's ruling with regard to the potential liability for calls to reassigned cell phone numbers and the definition of an "automatic telephone dialing system." The D.C. Circuit set a briefing schedule requiring all briefs to be filed by February 24, 2016. It is unknown when the D.C. Circuit will schedule oral argument or issue a decision.

## C. The Supreme Court's Pending Decision in Spokeo

In Robins v. Spokeo, Inc., 742 F.3d 409 (9th Cir. 2014) cert. granted, 135 S. Ct. 1892 (2015), the plaintiff alleged violations of the Fair Credit Reporting Act ("FCRA"), based on a website's publication of inaccurate consumer information regarding the plaintiff. 742 F.3d at 410. The district court ruled that the plaintiff had not alleged any actual or imminent harm because plaintiff only alleged the misinformation harmed his employment prospects. Id. The Ninth Circuit reversed and held that the alleged violation of the plaintiff's statutory rights under the FCRA, in itself, was sufficient to satisfy the injury-in-fact requirement. Id. at 413–14. The Ninth

Circuit held that the relevant interests protected by the FCRA were "sufficiently concrete and particularized" to satisfy the requirements of Article III. Id. Because the panel determined that the plaintiff had standing based on the alleged violations of his statutory rights, the panel did not decide whether harm to the plaintiff's "employment prospects or related anxiety could be sufficient injuries in fact." Id. at 414 n.3.

**\*3** On April 27, 2015, the United States Supreme Court granted the defendant's petition for a writ of certiorari, Spokeo, Inc. v. Robins, 135 S. Ct. 1892 (2015). The question presented was, "[w]hether Congress may confer Article III standing upon a plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of a federal statute," Pet. Writ of Cert. at i, Spokeo, Inc. v. Robins, No. 13-1339 (U.S. May 1, 2014); Br. of Pet'r at i, Spokeo, Inc. v. Robins, No. 13–1339 (U.S. July 2, 2015). The Supreme Court heard oral argument on November 2, 2015 and a decision is expected by June 2016.

Uber contends that the result in Spokeo is important because Plaintiffs have only alleged statutory damages without identifying concrete harm. ECF No. 71 at 20–21.

## II. LEGAL STANDARD

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936). Whether to stay proceedings is entrusted to the discretion of the district court. See id. 254–55 ("How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.").

In deciding whether to stay proceedings pending resolution of an appeal in another action, a district court must weigh various competing interests, including the possible damage which may result from granting a stay, the hardship a party may suffer if the case is allowed to go forward, and "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." Lockyer v. Mirant Corp., 398 F.3d 1098, 1110 (9th Cir. 2005). The burden is on the movant to show that a stay is appropriate. See Clinton v. Jones, 520 U.S. 681, 708 (1997).

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 82 of 99
Lathrop v. Uber Technologies, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 97511

## III. DISCUSSION

Uber contends that the possibility that the 2015 FCC Order will be vacated by the D.C. Circuit "is far from speculative." Id. at 16. Uber particularly stresses that two of the five FCC Commissioners issued strong dissents to the Order, arguing that the Order deviated from the plain language of the TCPA. Uber also brings two cases to the Court's attention in which the district courts granted stays pursuant to the D.C. Circuit's decision in ACA International: Gensel v. Performant Techs., Inc, No. 13-C-1196, 2015 WL 6158072 (E.D. Wisc. Oct. 20, 2015) and Fontes v. Time Warner Cable, Inc., No. CV14-2060-CAS(CWx), 2015 WL 9272790 (C.D. Cal. Dec. 17, 2015).

In Gensel v. Performant Techs., Inc, the court concluded that it appeared that the FCC's definition of "capacity" contradicted the plain language of the statute. 2015 WL 6158072, at *2 (E.D. Wis. Oct. 20, 2015). As such, the agency's interpretation would not be entitled deference on appeal. The court stayed the case pending ACA International and a Seventh Circuit appeal. The court noted that "most importantly, if the Seventh Circuit were to rule that 'capacity' means 'present capacity' in accordance with the plain language of the statute, such a ruling would be dispositive of the instant case because it is undisputed that [the defendant's] telephony system did not and does not have the capacity to randomly or sequentially call phone numbers." Id. Fontes v. Time Warner Cable, Inc. similarly discussed the FCC's broadened definition of "capacity." See 2015 WL 9272790, at *4 (C.D. Cal. Dec. 17, 2015) ("[T]he FCC adopted a broader definition of 'automatic telephone dialing system' that focuses on a device's *potential* capabilities, as opposed to a narrow definition based on a device's *present* capabilities." (emphasis in original)).

 **\*4** Uber argues that should the D.C. Circuit vacate the FCC's "potential capacity" definition, the focus and scope of discovery would constrict. ECF No. 77 at 15. "For example, if the D.C. Circuit vacates the FCC's expanded definition of 'ATDS,' Plaintiffs will not be able to argue that they are entitled to discovery on the 'potential ability' of Uber's systems, significantly reducing discovery." Id. Uber asserts that it did not send text messages using an automatic telephone dialing system. See ECF No. 56 (Answer) at 17. Uber similarly contends that its discovery obligations may narrow should the D.C. Circuit address the definition of "called party" or the means a party may use to revoke consent. ECF No. 77 at 16.

Plaintiffs counter that the FCC Order's definitions are not new, are likely to be upheld due to their long-standing history, and have been adopted by numerous courts over the years. Id. at 15–18. Plaintiffs also point out that regardless of the D.C. Circuit's decision, the parties would "still need to obtain the relevant facts in discovery, as well as the expert opinions necessary, for the Court to apply the law to the undisputed facts." ECF No. 74 at 25. Thus, for example, even if the D.C. Circuit invalidated the FCC's interpretation of an ATDS, "[d]iscovery is still necessary and this Court must still determine whether the calling equipment that Uber actually used qualifies as an ATDS under the TCPA...." Id.

The Court finds that a stay in favor of the D.C. Circuit's decision in ACA International is not appropriate. First, while the briefing schedule is set in the case, oral argument has not yet been scheduled and neither the parties and nor the Court can forecast when the D.C. Circuit will ultimately issue a decision. Plaintiffs argue persuasively that they would suffer prejudice from a stay because the case would extend for an indeterminate length of time, increase the difficulty of reaching class members, and increase the risk that evidence will dissipate. ECF No. 74 at 26–27. Moreover, as counsel for Uber acknowledged at the hearing on this motion, the D.C. Circuit is unlikely to be the final step in the litigation over the FCC's 2015 Omnibus Order. Whichever party is unsuccessful in that court is almost certain to appeal to the Supreme Court. Thus, even the most optimistic estimate of the time required for a decision from the D.C. Circuit significantly understates both the delay a stay might engender and the concomitant prejudice to Plaintiff.

Second, although the decision in ACA International may vacate portions of the 2015 FCC Order, discovery in this case will be required regardless of the outcome in that one. See 28 U.S.C. § 2342(1) (stating that court of appeals, including the D.C. Circuit, may "enjoin, set aside, suspend (in whole or in part) or [ ]determine the validity" of final FCC orders). Even if the D.C. Circuit were to modify or vacate the 2015 FCC Order, factual disputes, such as whether an ATDS was used and whether text recipients provided their consent, will remain here. Although Uber may suffer hardship, in the form of additional discovery, the Court concludes that this potential hardship does not merit a stay in this case. Uber has not persuaded the Court that the potential changes in the playing field of this case—the size of which are currently unknowable—are so substantial or work such a hardship on Uber that a stay is necessary or appropriate.

Case 1:25-cv-01410-JKM Document 19-2 Filed 10/30/25 Page 83 of 99

Lathrop v. Uber Technologies, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 97511

The Court also declines to grant the stay based on the pendency of Spokeo. In the case at bar, Plaintiffs have articulated concrete harm to them, and are not simply relying on a bare violation of the statute. ECF No. 54 ¶¶ 114–116. In addition to claiming statutory and punitive damages, Plaintiffs allege they and members of the class "suffered damages in the form of text message, data, and other charges to their cellular telephone plans." Id. ¶ 116. Based on the allegations in the Second Amended Complaint, the Court concludes that Plaintiffs have sufficiently stated an injury in fact. See, e.g., Johnson v. Navient Sols., Inc., No. 115CV00716LJMMJD, 2015 WL 8784150, at *2 (S.D. Ind. Dec. 15, 2015) (denying motion to stay in TCPA action pursuant to Spokeo because plaintiff's intrusion of privacy allegation stated a claim for actual harm); Doe v. Selection.com, No. 15-cv-02338-WHO, 2015 WL 5853700 at *5 (N.D. Cal. Oct. 8, 2015) (denying motion to stay in FCRA action because plaintiff adequately alleged actual injury and because balance of hardships did not warrant a stay). As Uber concedes, it may seek discovery on "whether it can mount a *factual* attack" to Plaintiffs' claims of injury as well as class certification issues. ECF No. 77 at 21. But neither Uber's description of the proceedings in Spokeo nor the Court's

independent review persuade the Court that Spokeo is likely to render this case moot.

 **\*5** In sum, Uber may face additional discovery obligations but has not established that this hardship justifies staying the case, which would otherwise be delayed with no identifiable end to the stay. Decisions in ACA International and Spokeo may have a beneficial impact on the case by clarifying questions of law. Nonetheless, Uber has not shown this is one of the "rare circumstances" in which a stay pending the resolution of an appeal in another case is appropriate. See Landis, 299 U.S. at 255.

**CONCLUSION**

For the foregoing reasons, the Court denies Uber's Motion to Stay.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 97511

Footnotes

1    Three additional TCPA cases against Uber are pending: (1) Kolloukian v. Uber Technologies, Inc., Case No. 2:15-cv-02856-PSG-JEM filed in the Central District of California on April 17, 2015; (2) Vergara v. Uber Technologies, Inc., Case No. 1:15-cv-06942 filed in the Northern District of Illinois on August 7, 2015; and (3) Kafatos v. Uber Technologies, Inc., Case No. 3:15- cv-03727 filed in the Northern District of California on August 14, 2015. Uber filed motions to stay in each case. In Kolloukian, the plaintiff did not oppose the motion, and the court granted the motion to stay. See ECF No. 84, Ex. A. In Vergara, the court denied the motion to stay but encouraged the parties to limit discovery. See ECF No. 85, Exs. A and B. The motion to stay in Kafatos is currently pending before this Court.

2    Uber also flagged the FCC's interpretation of "call." See ECF No. 71 at 14. However, because petitioners did not brief this issue on appeal, Uber no longer relies on the challenge as a basis for granting the stay. ECF No. 77 at 8 n.2.

3    The FCC has previously interpreted an ATDS as "cover[ing] any equipment that has the specified capacity to generate numbers and dial them without human intervention, regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." In re the Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014, 14017 (2003) ("2003 FCC Order"). The FCC has also ruled that "predictive dialers" fall "within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." Id. Predictive dialers have hardware that, "when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, from a database of numbers." Id. The 2015 FCC Order justified its "potential capacity" interpretation based on the 2003 FCC Order: "By finding that, even when the equipment presently lacked the necessary software, it nevertheless had the requisite capacity to be an autodialer, the Commission implicitly rejected any 'present use' or 'current capacity' test." 2015 FCC Order ¶ 16.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disagreed With by A Fast Sign Co., Inc. v. American Home Services, Inc.,
Ga., November 5, 2012

2007 WL 3169078
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Bruce LEVITT, et al.

v.

FAX.COM, et al.

Civil No. WMN–05–949.
|
May 25, 2007.

**Attorneys and Law Firms**

Michael Craig Worsham, Law Office of Michael Craig
Worsham, Forest Hill, MD, Stephen Howard Ring, Stephen
H. Ring PC, Germantown, MD, for Bruce Levitt, et al.

Rodney E. Gould, Rubin Hay and Gould PC, Framingham,
MA, Thomas S. Hood, Hood and Scholnick PA, Towson, MD,
for Fax.Com, et al.

*MEMORANDUM*

WILLIAM M. NICKERSON, United States Senior District
Judge.

 **\*1**  This suit arises out of three facsimile transmissions sent
to Plaintiff Bruce Levitt in January and February of 2001.
These transmissions advertised vacation packages offered
by Defendant JD & T Enterprises, Inc. d/b/a Travel to Go
(JD & T) and it is alleged that identical transmissions were
sent, unsolicited, to thousands of Maryland residents. It is
undisputed that the fax transmissions were actually sent by
Defendant Fax.com. Furthermore, it is also undisputed that
Fax.com was hired to send the faxes, not by JD & T directly,
but by Creative Marketing Concepts (CMC), an independent
marketing company hired by Defendant JD & T to market its
vacation packages.

Plaintiff filed this action in the Circuit Court for Baltimore
City on May 7, 2001, alleging violations of the Telephone
Consumer Protection Act, 47 U.S.C. § 227 (TCPA). The
TCPA makes it generally unlawful "to use any telephone

facsimile machine, computer, or other device to send an
unsolicited advertisement to a telephone facsimile machine."
42 U.S.C. § 227(b)(1)(C). Plaintiff initially named only
Fax.com and JD & T as defendants.

On December 24, 2002, Judge Marcella Holland of the
Baltimore City Circuit Court certified this suit as a class
action. The class of plaintiffs was defined as:

> All persons, including business entities of any form,
> in Maryland, who received unsolicited advertisements
> transmitted by Fax .com, Inc, via facsimile promoting
> products and services offered for sale by or through JD &
> T Enterprises, Inc.

Order dated Dec. 24, 2002. Shortly thereafter, the Baltimore
City Circuit Court granted a motion for summary judgment in
favor of all defendants and dismissed the case. This dismissal
was subsequently reversed by the Maryland Court of Appeals.
*Levitt v. Fax.com, Inc .,* 857 A.2d 1089 (Md.2004). After
the case was remanded to the Circuit Court, Plaintiff filed
a "Second Amended Class Action Complaint" on February
23, 2005. This pleading added new defendants, including
Creative Marketing Concepts, LLC and several individuals.

Two of the newly added individual defendants,[1] Matthew
Buecler and Jeanette Bunn, removed the action to this Court
on April 7, 2005, pursuant to provisions of the then recently
enacted "Class Action Fairness Act of 2005," 28 U.S.C.
1332(d) (CAFA). On October 12, 2005, this Court denied
Plaintiff's motion to remand and on December 1, 2005, this
Court granted a motion to dismiss Buecler and Bunn.

During the period of time between the certification of the class
action and the denial of Plaintiff's motion to remand, *Fax.com*
apparently went out of business and ceased its participation
in this litigation. Thus, the only remaining active defendant
is Defendant JD & T. On January 12, 2007, Defendant JD &
T filed a motion to decertify the class action. Paper No. 40.
That motion is now ripe.

"Even after a certification order is entered, the judge remains
free to modify it in the light of subsequent developments in
the litigation." *General Tel. Co. of the Southwest v. Falcon,*
457 U .S. 147, 160 (1982). In fact, a court "is duty bound to
monitor [the] class decision and, where certification proves
improvident, to decertify, subclassify, alter, or otherwise
amend its class certification." *Chisolm v. TranSouth Financial
Corp.* 194 F.R.D. 538, 544 (E.D.Va.2000). Like the decision
to initially certify a class, a decision to decertify a class is

left to the court's discretion. *Doe v. Lally,* 467 F.Supp. 1339 (D.Md.1979).

**\*2** Defendant JD & T raises three arguments as to why this Court should decertify the class. First, it argues that, now that the case is in a federal court, certification must be re-evaluated under the federal class certification rule. Although Maryland's class certification rule, Md. R. 2–231, is patterned after federal rule, Fed.R.Civ.P. 23, Defendant contends that the presumptions and burdens applied in interpreting the two rules are not identical. Second, Defendant contends that changes in the posture of the case, specifically, the fact that Fax.com is no longer actively participating in the litigation, have rendered continued treatment of this case as a class action unmanageable. Fax.com, according to JD & T, was the only source of critical information regarding the identity of those who received the facsimile transmissions, as well as those that may have consented to the transmissions. Finally, JD & T argues that the state court's certification decision was simply wrong.

For the reasons explained below, the Court finds JD & T's second argument compelling. Under the current posture of this litigation, class certification is no longer appropriate under Rule 23. Thus, the Court need not reach the issue of whether the state court's certification decision was flawed or whether it would have been different under the federal rule.

Rule 23(a) sets out four threshold requirements that must be satisfied by the putative class before a class action can be certified. The class representative must establish that

1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These four prerequisites are frequently referred to as "numerosity," "commonality," "typicality," and "adequacy of representation," respectively.

Once these four prerequisites are established, the plaintiff must still satisfy one of the three criteria of section (b) of Rule 23 before a class can be certified. Under 23(b) the potential class representative must show either that: 1) separate actions would result in inconsistent adjudications or the interests of non-parties would be substantially impaired; 2) final injunctive or declaratory relief is appropriate to the class as a whole; or 3) common questions of law or fact predominate

over any questions affected only individual members and a class action is the superior method of fairly and efficiently adjudicating the controversy. Here, Plaintiff asserted, and the state court found, that class certification was appropriate under the state rule equivalent of the third subparagraph of Rule 23(b). *See* Second Amend. Compl. ¶ 21 (citing Md. Rule 2–231(b)(3)). Defendant argues, and this Court agrees, that Plaintiff simply cannot establish the prerequisites of commonality or typicality, nor can he demonstrate that common questions predominate over questions affecting the individual class members.

**\*3** Commonality, by definition, requires that there are questions of law or fact that are "common" to the class. "A common question is one that can be resolved for each class member in a single hearing, such as the question of whether an employer engaged in a pattern and practice of unlawful discrimination against a class of its employees. A question is not common, by contrast, if its resolution turns on a consideration of the individual circumstances of each class member." *Thorn v. Jefferson–Pilot Life Ins. Co.,* 445 F.3d 311, 319 (4th Cir.2006) (internal quotations and citations omitted). The need for a case-by-case determination of a material issue for each class member's claim also denotes that the claims of the class representative are not "typical" of the claims of the individual class members. *See Stott v. Haworth,* 916 F.2d 134, 145 (4th Cir.1990).

In order to establish a claim under the TCPA, a plaintiff must have received a facsimile transmission that was "unsolicited." Under the statute, "unsolicited" means transmitted without the recipient's "prior express invitation or permission." 47 U.S.C. § 227(a)(5). The recipient's prior invitation or permission could have been given orally or in writing. *Id.* (stating that invitation or permission can be given "in writing or otherwise"); *see also Carnett's Inc. v. Hammond,* 610 S.E.2d 529, 531 (Ga.2005).

Under the Federal Communications Commission's (FCC's) TCPA implementing regulations in effect at the time Plaintiff received the fax transmissions from JD & T, "express permission [was] also deemed given by those recipients having an 'established business relationship' " with the sender of the fax transmission.[2] *Carnett,* 610 S.E.2d at 531. An "established business relationship" is defined as "a prior or existing relationship formed by a voluntary two-way communication ... with or without an exchange of consideration...." 47 C.F.R. § 64.1200(f)(3). "The FCC has opined that the established business relationship exemption is

broad and that you have an established business relationship with a person or entity if you have made an inquiry, application, purchase, or transaction regarding products of services offered by such person or entity." *Carnett,* 610 S.E.2d at 531–32 (internal citations omitted).[3]

It is this need to make a determination for each class member as to whether the facsimile transmission was unsolicited, both by the lack of express permission and by the absence of a prior business relationship, that makes class treatment of this action inappropriate and unmanageable. This determination of whether invitation or permission was given is, of necessity, highly individualized and would require a separate inquiry for each individual class member in light of their particular relationship or lack of relationship with each of the defendants. Under the current posture of this case, there is simply no available method for class-wide determination of this issue.

**\*4** Numerous courts, citing the lack of commonality, typicality and predominance of common issues, have determined that TCPA claims cannot be brought as a class action. *See, e.g., Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 403–04 (E.D.Pa.1995)(observing that "the essential question of fact that each potential plaintiff must prove is whether a specific transmission to its machine was without express invitation or permission on its part."); *Kenro, Inc. v. Fax Daily, Inc.,* 962 F.Supp. 1162, 1169–70 (S.D.Ind.1997) (noting that it would be required "to conduct individual inquiries with regard to each potential class member in order to determine whether each potential class member had invited or given permission for transmission of the challenged fax advertisements."); *Blitz v.. Xpress Image, Inc.,* Civ. No. 05–679, 2006 WL 2425573 (N.C.Super.Aug.23, 2006) (denying class certification upon the conclusion that "there is no avoiding an individualized inquiry into the facts and circumstances of each recipient's 'invitation and permission' should this matter proceed as a class action," as well as need for individualized determination of applicability of "established business relationship"); *Carnett's Inc. v. Hammond,* 610 S.E.2d 529, 532 (Ga.2005) (noting that while the predominate *question* of whether facsimiles were unsolicited was common to all class members, "a common question is not enough when the *answer* may vary with each class member and is determinative of whether the member is properly part of the class."); *Rondos v. Lincoln Prop. Co.,* 110 S.W.3d 716, 721–22 (Tex.Ct.App.2003) (reversing certification of class upon concluding that the predominant issue for litigation would be whether individual fax owners

gave permission to receive advertisements); *Livingston v. U .S. Bank, N.A.,* 58 P.3d 1088, 1091 (Colo.App.2002) (upholding trial court's determination that "the question whether any particular fax recipient gave 'prior express invitation or permission' would have to be decided on an individual basis and therefore would overwhelm, let alone predominate over, the common issues").

It is conceivable, while the actual transmitter of the facsimiles in question, Fax.com, was available to actively participate in this litigation, that these issues could have been resolved in some more global fashion. In moving to certify the class in the state court and in his pleadings opposing this motion to decertify, Plaintiff averred that Fax.com had a database and log of the transmissions at issue in this matter. *See* Aug. 7, 2002, Mem. in Support of Class Cert.;[4] Opp. at 14. Information that Fax.com might have as to the source of its databases might be instructive as to issues of consent: was the database constructed from customer lists provided by CMC, lists purchased from some third party, numbers generated by Fax.com computers randomly dialing and hunting for fax machines, or some combination thereof? Regardless of what insight *Fax.com* might have been able to provide, however, there is no evidence in the record that JD & T has, or ever had, any information regarding the content or construction of the databases used by Fax.com.

**\*5** This absence of available information about the database renders this case, in its present posture, readily distinguishable from at least some of the cases relied upon by Plaintiff where class certification of TCPA claims was found appropriate. For example, in *Kavu, Inc. v. Omnipak Corp.,* Civ. No. 06–109, 2007 WL 201093, (W .D.Wash. Jan. 23, 2007), the record before the certifying court included the identity of the specific third party supplier of the database that was used to send the offending faxes as well as an explanation of the particular method used by that third party to construct the database. The defendant, in fact, asserted in the litigation that the recipients' inclusion in that database demonstrated consent to receive facsimiles. *Id.* at \*3. Because the validity of that assertion could be tested on a class-wide basis, the Court distinguished the case before it from the more typical TCPA case: "whether the facsimile was 'unsolicited' appears to be more of a common issue in this case than in the cases that denied class certification .... [where] the issue of whether each potential class member gave permission to receive the facsimiles was key." *Id.; see also, Gene & Gene, LLC v. Biopay, LLC,* Civ. No. 05–121, 2006 WL 3933312 at \*2 (M.D.La. Dec. 20, 2006) (record before the court contained

database with names and contact information for the alleged unlawful facsimile transmissions).[5]

Implicitly acknowledging the importance of some means by which to identify those who received the offending facsimiles and those who may have consented to that receipt, Plaintiff devotes much of his opposition to an attempt to show that JD & T has or had possession of this information, or at least should have had possession of this information. In this attempt, however, Plaintiff seriously misconstrues the record. For example, Plaintiff declares that Jeannette Bunn, JD & T's president, "selected the geographic areas to be targeted" by the facsimile advertisements. Opp. at 6. This statement is presumably based upon a series of emails from JD & T to individuals associated with Fax.com and CMC. While Bunn makes geographic suggestions in these emails as to the *content* of the facsimile advertisements, *i.e.,* recommending the addition of particular vacation destinations,[6] there is nothing in these emails or elsewhere in the record to suggest that she had any input into the geographic areas to which those advertisement were to be sent.

Similarly, Plaintiff cites to a series of emails where complaints about the receipt of facsimiles are forwarded to Bunn and Bunn contacts the marketing company to have the telephone numbers removed from the call list. Plaintiff argues that these emails show that "JD & T thus helped 'maintain' the fax list" and "Bunn thus carelessly and recklessly proceeded to help in the deletion process, without taking the extra step of ascertaining whether prior consents were being obtained, and without implementing a policy to be sure they were obtained where needed." Opp. at 8, 9. While these emails might have relevance to issues of liability, they do not shed light on the propriety of class certification. If anything, they reinforce the fact that JD & T did not have immediate access to the database and thus had to relay the complaints elsewhere.

**\*6** In his opposition, Plaintiff asserts that he is attaching what he claims to be "3 representative pages" of "[t]he Fax.com database [which he] obtained through a former employee." Opp. at 8. Given the undisputed significance of this database, it is remarkable that Plaintiff mentions that it has come into his possession almost in passing. The Court surmises that Plaintiff's nonchalance with regard to this "evidence" is explained by Plaintiff's apparent inability to render it admissible. As JD & T observes, Plaintiff makes no effort, whatsoever, to authenticate this evidence. Furthermore, from the dates on the "representative pages," it appears this list is from a time period three years after the time relevant

to this action. Finally, there is nothing about these pages indicating that they contain telephone numbers to which JD & T advertisements were sent. As evidence in this action, these pages as presented are essentially worthless and the Court suspects from the offhanded way that they were introduced that Plaintiff's counsel realizes as much.

Plaintiff also cites a January 28, 2003, letter from counsel for JD & T to Plaintiff's counsel in which it is stated that 36,877 transmissions of the specific advertisement at issue in this action were sent to Maryland fax numbers during the relevant time period. Pl.'s Ex. 7. This letter, Plaintiff claims, demonstrates that JD & T "had a method to determine Maryland recipients of the specific unsolicited travel faxes at issue." Opp. at 12. The value of this letter as evidence relevant to issues of class certification, however, is also highly suspect. First, the letter clearly states that it is a "***CONFIDENTIAL SETTLEMENT COMMUNICATION PER JUDGE HOLLAND—NOT TO BE USED IN LITIGATION.***" That aside, the letter also clearly relates that the information is coming from Fax.com, not JD & T.[7] Furthermore, the letter explains that, because of the way that the database was encrypted to protect its contents from theft, there is no way to obtain the individual numbers that comprise the database.

Unable to provide any evidence that JD & T actually had access to the database used by Fax.com to send the advertisement, Plaintiff argues, in the alternative, that JD & T *should* have had that access. Plaintiff opines that "[i]f Fax.com represented that it had obtained prior consents, one would expect that JD & T would want to confirm this fact, and see some kind of evidence in support." Opp. at 16. Plaintiff argues that, based upon JD & T's inability to prove that consent was given, a finding of lack of consent "should apply uniformly, across the board, as to all class members." *Id.* at 15.

This argument is based upon an interpretation of the statute not supported by the language of the statute itself or by the case law. Plaintiff contends, without citation, that "[e]ven if a member of the class had given permission to Fax.com to send faxes ... any such permission would not extend to JD & T." Opp. at 17. If, hypothetically, a consumer requested that Fax.com send information about travel packages and Fax.com then sent that consumer a facsimile about travel packages offered by JD & T, it is hard to imagine how that transmission could be deemed "unsolicited." Under the statute, the term " 'unsolicited advertisement' means any material advertising the commercial availability or quality

of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a) (5). The statute does not designate to whom the permission must be given. If permission is given to the transmitter of the facsimile, the marketing company, or the provider of the advertized product or services, the statute would not be violated.

**\*7** Once all the smoke is blown away, it appears that Plaintiff's true position is that this action is amenable to class treatment because the class members do not actually need to prove that the facsimiles in question were "unsolicited" in order to make out a claim under the TCPA. In Plaintiff's "common sense" view, "[i]t is unfathomable that anyone would actually give consent to receive via facsimile a barrage of ads like those at issue in this action." Opp. at 15 n. 7.[8] Thus, it can simply be presumed, according to Plaintiff, that the transmissions were unsolicited.

The Court has no doubt that this assumption would hold true for a majority of consumers. Most consumers do not wish for their facsimile machines to be tied up or their toner and paper wasted receiving and printing faxed advertisements. Just because that is true of most, however, does not permit the Court to adopt a presumption that it is true of all. Again, if Fax.com had remained involved in this litigation, information regarding the sources of telephone numbers in its database might have allowed some global determinations of consent. But without Fax.com's participation, that is simply not possible.[9]

Plaintiff raises one additional argument that warrants brief mention. Plaintiff argues that CAFA, the Class Action Fairness Act, somehow "weighs in favor of certification." Opp. at 2. Plaintiff correctly observes that this Court has already held that, because CAFA allows for the aggregating of class member claims, " 'there is no dispute that the instant suit satisfies' " CAFA's jurisdictional criteria. Opp. at 17 (quoting Oct. 12, 2005 Mem. at 2). Because Plaintiff's individual damages would be below the requisite amount in controversy for diversity jurisdiction, Plaintiff opines that decertification

would divest this Court of subject matter jurisdiction of his claims. *Id.* at 18.

In the context of post-removal reduction of the amount in controversy under the general diversity jurisdiction statute, courts have uniformly held that "diversity jurisdiction is determined at the time the action commences, and a federal court is not divested of jurisdiction ... if the amount in controversy subsequently drops below the minimum jurisdictional level." *Hill v. Blind Indus. & Serv. of Md.,* 179 F.3d 754, 757 (9th Cir.1991). Because of the recentness of CAFA's enactment, few courts have considered the effect of post-removal certification or decertification decisions on continued federal jurisdiction. In the one decision of which this Court is aware that reached the issue, *Davis v. Homecomings Financial,* Civ. No. 05–1466, 2007 WL 905939 (W.D.Wash. March 22, 2007), the court held that a similar "time of removal" principle would apply.

In *Davis,* the plaintiff proposed a nation-wide class. After removal to federal court, the class was certified as state-wide class only which brought the amount in controversy under CAFA's requisite $5 million threshold. Nonetheless, following the principle that the amount in controversy is determined as of the time of the removal, the court concluded that it could retain jurisdiction over the now diminished class action. The court reasoned that Congress is presumed to be aware of the legal context in which it is legislating and, despite this presumed knowledge, "there is no indication that Congress intended to alter the established authority regarding subsequent changes to the amount in controversy." *Id.* at * 1. This Court agrees with that reasoning and concludes that decertification of the class will not divest this Court of jurisdiction over Plaintiff's now lone claim.

**\*8** For the above stated reasons, the Court concludes that the class should be decertified. A separate order will issue.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 3169078

---

Footnotes

1    There is no indication in the record that any of the other defendants added in the Second Amended Complaint were ever served with process.

2007 WL 3169078

2    Congress subsequently amended the TCPA to codify the "established business relationship" exception to TCPA liability in the facsimile context. 47 U.S.C. § 227(b)(1)(C)(i).

3    When Congress codified the "established business relationship" exception, it adopted by reference the FCC's definition of the term. 47 U.S.C. 227(a)(2) ("[t]he term 'established business relationship' for the purposes only of [47 U.S .C. § 227(b)(1)(C)(i) ] shall have the meaning given the term in [47 C.F.R. 64.1200]").

4    Defendant included quoted text from this memorandum in its motion, Mot. at 9, but the memorandum itself is not a part of record in this Court and Defendant did not supply it with its motion. As Plaintiff did not challenge Defendant's citation, the Court assumes its accuracy.

5    The court in *Gene & Gene,* did not base its decision on the availability of that database. Instead, after acknowledging that "federal courts have consistently denied class certification," 240 F.R.D. at 242, the court proceeded to examine "Fifth Circuit precedent in order to ascertain how a federal court within the Fifth Circuit should decide this matter." *Id.* Under its view of Fifth Circuit precedent, the court opined that the requirements of commonality and typically are "not demanding." *Id.* at 244. In contrast, the Fourth Circuit has held that, "in class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(b)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over' other questions." *Lienhart v. Dryvit Systems, Inc.,* 255 F.3d 138, 147 n. 4 (4th Cir.2001) (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 609 (1997)). Thus, in the Fourth Circuit, "[t]he common questions must be dispositive and overshadow other issues." *Lienhart,* 255 F.3d at 146.

     In addition to distinguishable facts and law, all three of the cases relied upon by Plaintiff—*Kavu, Gene & Gene; and Lampkin v. GGH,* 146 P.3d 847 (Okla.Civ.App.2006), a recent decision from the intermediate appellate court of Oklahoma —endorsed what this Court views as a flawed class definition. The class definitions in all three actions, like the class definition approved by the state court in the instant action, required a determination of the merits in that all the definitions limit class membership to those who received "unsolicited" facsimiles. *Kavu,* 2007 WL 201093 at * 2 (defining class as "[a]ll persons who received an unsolicited advertisement ..."); *Gene & Gene,* 240 F.R.D. at 241 (defining class as "all recipients of unsolicited telefacsimile messages and/or advertisements ..."); *Lampkin,* 146 P.3d at 851 (defining class as "[h]imself and all entities and persons ... who received unsolicited fax advertisements ..."); Dec. 24, 2002, Order (defining class as "[a]ll persons, including business entities of any form, in Maryland, who received unsolicited advertisements transmitted by Fax.com, Inc...."). Deciding the merits of individuals' claims in order to determine the members of the class is not appropriate. *See Eisen v. Carlisle v. Jacquelin,* 417 U.S. 156, 177 (1974); *See also, Forman,* 164 F .R .D. at 403; *Intratex Gas Co. v. Beeson,* 22 S.W.3d 398, 404–06 (Tex.2000) (collecting cases and explaining why a "fail-safe class," *i.e.,* a class whose definition includes a determination of the merits, is untenable).

6    *See, e.g.,* Opp. at 10 (" '... regarding adding some areas to the fax piece? I asked if you could add Sun Valley, ID as it is a popular destination for skiing and we have inventory there that is not moving at all.' ") (quoting Oct. 6, 2001 email from Bunn to Robin Posser).

7    For a brief period of time, early in this litigation, counsel for Fax.com also represented JD & T. At the time this letter was sent, Fax.com was clearly the main target of this litigation as evidenced by the fact that JD & T is mentioned nowhere in the letter.

8    Annoying as unsolicited facsimiles might be, the Court questions if three facsimiles can be fairly deemed "a barrage."

9    In an effort to compensate for Fax.com's absence from this litigation, Plaintiff submitted materials from other proceedings related to Fax.com. For example, Plaintiff submitted a portion of the testimony of Thomas Roth, one of Fax.com's officers, given in a January 31, 2003, hearing before the Securities and Exchange Commission. In his testimony, Mr. Roth states that some of the numbers in Fax.com's database were obtained by having computers randomly dial phone numbers fishing for facsimile machines. Faxes to these numbers, Roth acknowledged, would be unsolicited. But Roth also testified that *Fax.com* would purchase some numbers from list brokers. He made no representation in the testimony provided by Plaintiff that faxes sent to numbers on those purchased lists would be unsolicited. There is no testimony regarding the source of the database used to fax the JD & T material. Furthermore, as JD & T had no opportunity to cross examine Roth, this testimony is likely inadmissible in this action.

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 90 of 99
**Levitt v. Fax.com, Not Reported in F.Supp.2d (2007)**
2007 WL 3169078

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S.
                                                        Government Works.

2009 WL 980383
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

Emmanuel SANAAH, Plaintiff,

v.

Nurse Debb HOWELL, Warden Arellano,
Major Scott Grover, Life Safety Coordinator
and Maintenance Supervisor, and
Maintenance Worker Lt. Bosley, Defendants.

Civil Action No. 08–cv–02117–REB–KLM.
|
April 9, 2009.

**Attorneys and Law Firms**

Emmanuel Sanaah, Crowley, CO, pro se.

**ORDER**

KRISTEN L. MIX, United States Magistrate Judge.

 *1 This matter is before the Court on Defendants' **Motion to Stay Discovery** [Docket No. 33; Filed April 8, 2009] (the "Motion"). The Court has reviewed the Motion, the entire case file and applicable case law and is sufficiently advised in the premises.

Defendants request that the above-captioned case be stayed until resolution of their pending Motion to Dismiss [Docket No. 32; Filed April 8, 2009]. *Motion* [# 33] at 1. As grounds, Defendants argue that they have raised the defense of qualified immunity in their Motion to Dismiss, and that all discovery should be stayed until the Court makes a legal determination on Defendants' entitlement to qualified immunity. *Id.*

IT IS HEREBY **ORDERED** that the Motion is **DENIED** for the reasons set forth below.

Stays are generally disfavored in this District. *See Wason Ranch Corp. v. Hecla* (unpublished decision). However, a stay may be appropriate in certain circumstances, and the Court weighs several factors in making a determination regarding

the propriety of a stay. *See String Cheese Incident, LLC v. Stylus Show, Inc.,* No. 02–cv–01934, 2006 WL 894955, at *2 (D.Colo. Mar. 30, 2006)* (unpublished decision) (denoting a five-part test). The Court considers (1) the interest of Plaintiff; (2) the burden on Defendants in going forward; (3) the Court's convenience; (4) the interest of nonparties, and (5) the public interest in general. *Id.* Here, those factors weigh against entry of a stay.

Although Plaintiff's position on this issue is not known, the Court has generally found that with the passage of time, the memories of the parties and other witnesses may fade, witnesses may relocate or become unavailable, or documents may become lost or inadvertently destroyed. As such, delay may diminish Plaintiff's ability to proceed. By contrast, Defendants do not suggest any undue burden in proceeding with the case, other than the ordinary burdens associated with defending a case. While Defendants do contend that their assertion of a qualified immunity defense entitles them to a stay, a review of the Motion to Dismiss reveals that success on the merits of such a defense is not assured.[1] On balance, the Court finds that the consideration of these two factors weighs against the imposition of a stay in this case.

The Court also considers its own convenience, the interest of nonparties, and the public interest in general. None of these factors prompts the Court to reach a different result. The Court is inconvenienced by an ill-advised stay because the delay in prosecuting the case which results from imposition of a stay makes the Court's docket less predictable and, hence, less manageable. This is particularly true where there is a pending Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), for which ultimate success is not guaranteed. While the Court identifies no particular interest of persons not parties to the litigation, the Court identifies a strong interest held by the public in general regarding the prompt and efficient handling of all litigation. Under these circumstances, the Court finds that a stay of the case is not warranted.

 *2 The parties are reminded of their obligation to comply with my Order of February 11, 2009 [Docket No. 24] setting a Preliminary Scheduling Conference in this matter for **April 21, 2009 at 10:30 a .m.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 980383

2009 WL 980383

Footnotes

1    The Court expresses no opinion about the merits of the Motions to Dismiss, but merely notes that Defendants' qualified
     immunity defense is not particularly well developed or compelling on its face.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S.
                                                                              Government Works.

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 93 of 99

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 4382204

⚑ KeyCite Yellow Flag - Negative Treatment

Disagreed With by Wiggins v. Bank of America, North America, S.D.Ohio, September 22, 2020

2019 WL 4382204
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Caroline SIMON, individually and on behalf of all others similarly situated, Plaintiff,

v.

ULTIMATE FITNESS GROUP, LLC d/b/ a Orangetheory Fitness, and Does 1 Through 10, inclusive, and each of them, Defendants.

No. 19 Civ. 890 (CM)
|
Signed 08/19/2019

**Attorneys and Law Firms**

Todd Friedman, Law Offices of Todd M. Friedman, Woodland Hills, CA, for Plaintiff.

Cary Brian Samowitz, Rachael C. Kessler, Cassandra Beckman Widay, DLA Piper US LLP, New York, NY, Edward Dean Totino, Baker & McKenzie LLP, Los Angeles, CA, for Defendants.

**MEMORANDUM DECISION AND ORDER DENYING MOTIONS TO DISMISS OR STAY**

McMahon, C.J.:

 **\*1** Plaintiff Caroline Simon brings this class action against Ultimate Fitness Group, LLC d/b/a Orangetheory Fitness ("Defendant" or "Orangetheory") and ten unnamed employees or agents of Orangetheory, alleging violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA"). The TCPA prohibits the making and sending of telemarketing calls and texts through an automated telephone dialing system ("ATDS" or "autodialer") without the consent of the recipient.

Orangetheory now moves to dismiss the Class Action Complaint (hereinafter referred to as the "Complaint") for lack of personal jurisdiction and for failure to state a claim.

In the event that the motion to dismiss is denied, Defendant also moves to stay the proceedings while awaiting the Federal Communications Commission's ("FCC's") release of the revised definition of an ATDS.

For the reasons set forth below, all of Orangetheory's motions are denied.

**I. Factual Background**

The following facts are drawn from the allegations in the Complaint, which are presumed true for the purposes of these motions.

Plaintiff Caroline Simon ("Plaintiff" or "Simon") is a resident of New York. (Compl. dated Jan. 31, 2019, Dkt. No. 11 ("Compl.") ¶ 4.)

The Complaint originally stated in error that Orangetheory had its principal place of business in New York City. (Compl. ¶ 5.) However, Plaintiff now agrees that Orangetheory is a Delaware corporation with its principal place of business and headquarters in Florida. (See Pl.'s Mem. of Law in Opp. Mot. to Dismiss, Dkt. No. 36 ("PL MTD Opp.") at 4 n.2; Def.'s Mem. of Law in Supp. of Mot. to Dismiss, Dkt. No. 32 ("Def. MTD Br.") at 1; see also Decl. of Charlene Barone in Supp. of Def.'s Mot. to Dismiss, Dkt. No. 33 ("Barone Decl.") ¶¶ 2–3.)

In or about May 2018, Simon received an unsolicited text message from Defendant on her cell phone. (Compl. ¶ 8.) The last four digits of the sender's number were "5443." (Id.) In or about June 2018, Simon continued to receive unsolicited text messages from Defendant, sent from Defendant's "text number" 797-979. (Id. ¶ 9.) Defendant allegedly contacted or attempted to contact Simon from telephone numbers confirmed to belong to Defendant, including but not limited to 797-979. (Id. ¶ 11.)

Although Simon does not allege what the text messages said, she alleges Defendant sent her "spam advertisements and/or promotional offers." (Id. ¶ 9.) She alleges the text messages were sent via Defendant's "SMS blasting platform," which she alleges is classified as a prohibited "automatic telephone dialing system" (ATDS) under the Telephone Consumer Protection Act ("TCPA"). (Id. ¶ 10.)

Simon was never a customer of Orangetheory, and never provided her cellular telephone number to it. (Id. ¶ 14.) Defendant and its agents never received Simon's prior express consent to receive unsolicited text messages, pursuant to 47

Case 1:25-cv-01410-JKM     Document 19-2     Filed 10/30/25     Page 94 of 99

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 4382204

U.S.C. § 227(b)(1)(A). (*Id.*) Defendant's texts were not for emergency purposes, as defined by 47 U.S.C. § 227(b)(1)(A). (*Id.* ¶ 12.)

**\*2** Simon now brings this action on behalf of a putative class of individuals within the United States who also received unsolicited text messages from Defendant within four years of the date of Simon's filing of her Complaint. (*Id.* ¶ 16.) While Simon is not sure exactly how large the putative class is, she believes the class could contain hundreds of thousands of people. (*Id.* ¶ 18.)

With respect to injury, Simon alleges that she and members of the putative class were harmed by Defendant's acts because the unsolicited text messages caused the class members to "incur certain telephone charges or reduce cellular telephone time for which Plaintiff and the Class members previously paid, and invad[ed] the privacy of said Plaintiff and the Class members." (*Id.* ¶ 19.)

## II. Procedural History

In her Complaint filed on January 31, 2019, Simon asserts two causes of action on behalf of herself and the class: first, for negligent violations of the TCPA (Count 1), and, second, for knowing and/or willful violations of the TCPA (Count 2). (*Id.* ¶¶ 28–37.) The Complaint seeks $500 in statutory damages for each of Defendant's negligent violations of the TCPA (*Id.* ¶¶ 28–31), and up to $1,500 in statutory damages for each of Defendant's knowing and/or willful violations of the TCPA. (*Id.* at 6.)

Orangetheory now moves to dismiss the Complaint against it for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), and for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (Dkt. No. 31.) Should those motions fail, Orangetheory asks the Court to stay Simon's action pending new FCC rules that might affect the definition of an autodialer under the TCPA. (Dkt. No. 34.)

## III. Discussion

### A. Defendant's Motion to Dismiss Under Rule 12(b)(2) for Lack of Personal Jurisdiction Is Denied

#### 1. Applicable Legal Standard

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that

the court has jurisdiction over the defendants. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003); *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). The plaintiff's burden of proof "depends upon the procedural context in which the jurisdictional challenge is raised." *Navaera Scis., LLC v. Acuity Forensic Inc.*, 667 F. Supp. 2d 369, 373 (S.D.N.Y. 2009). Where, as here, no evidentiary hearing has been held, plaintiffs "need only make a *prima facie* showing of personal jurisdiction." *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (citation omitted). "This showing may be made through the plaintiff's own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *Id.* The pleadings, affidavits, and other supporting materials are construed in a light most favorable to plaintiffs, and all doubts are resolved in their favor. *Id.*

Because Simon's claim is based on the TCPA, which is silent about service of process, state law informs whether the court has personal jurisdiction over Orangetheory. *Sea Tow Servs. Int'l, Inc. v. Pontin*, 472 F. Supp. 2d 349, 358 (E.D.N.Y. 2007) (quoting *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990)).

To determine whether personal jurisdiction exists over a non-domiciliary, the court engages in a two-step inquiry. *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007)). The court first applies the long-arm statute of the forum state, to see whether it permits the exercise of personal jurisdiction over the defendants. If the laws of the forum state permit jurisdiction, the court then considers whether the exercise of such jurisdiction comports with constitutional due process. *See Best Van Lines*, 490 F.3d at 244.

**\*3** Because the Court is located in New York, the Court applies New York law. *See Chloe*, 616 F.3d at 163. Under New York's long-arm statute, there are two ways to establish personal jurisdiction over a defendant: (1) "general jurisdiction" under N.Y. C.P.L.R. § 301; and (2) "specific jurisdiction" under N.Y. C.P.L.R. § 302. As will be discussed, only the latter constitutes a possible basis for asserting personal jurisdiction over Orangetheory in this case.

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 95 of 99

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 4382204

## 2. The Court Has Specific Jurisdiction over Orangetheory with Respect to Simon's Claim

Simon originally plead in error that Defendant's principal place of business was in New York City. (Compl. ¶ 5.) If that were true, there would be no question that Defendant is "at home" in New York and is thus subject to the general jurisdiction of this Court. *Daimler AG v. Bauman*, 571 U.S. 117, 136–37 (2014). However, because Orangetheory is actually a Delaware corporation with its principal place of business in Florida, the Court can only exercise specific jurisdiction over it—that is, jurisdiction that arises out Simon's and the putative class members' claims with respect to Defendant's conduct alleged in the suit. (Pl. MTD Opp. at 4); *see Daimler*, 571 U.S. at 137.

Defendant does not challenge that this Court has specific jurisdiction over Defendant with respect to Simon's claim and the claims of any New York residents who may be in the putative class. (Def. MFD Br. at 4 ("... the Court presumably has specific jurisdiction over [Plaintiff's] claim against Defendant....").) Defendant argues, however, that Supreme Court's recent decision in *Bristol-Myers Squibb v. Superior Court of California*, 137 S. Ct. 1773 (2017), prevents the Court from exercising personal jurisdiction over Defendant with respect to the claims of putative class members who are not New York residents.

## 3. The *Bristol-Myers Squibb* Decision

Defendant argues that *Bristol-Myers Squibb v. Superior Court of California*, 137 S. Ct. 1773 (2017), requires this Court to dismiss the claims of absent, non-New York class members, because the Court lacks specific jurisdiction over Orangetheory with respect to those claims. (Def. MTD Br. at 4.)

In *Bristol-Myers Squibb*, a group of 678 plaintiffs filed a mass action, under eight nearly identical complaints, against Bristol-Myers Squibb in California state court, for injuries caused by one of Bristol-Myers Squibb's drugs, Plavix. *Bristol-Myers Squibb*, 137 S. Ct. at 1778. Only 86 of the plaintiffs were California residents. *Id.* The other 592 plaintiffs were residents of other States, and so had not suffered their injuries within California. *Id.* The California Supreme Court found that the lower courts had personal jurisdiction over Bristol-Myers Squibb, given the company's extensive contacts with

California and the similarities between the claims of the California plaintiffs and the non-California plaintiffs. *Id.* at 1779. The Supreme Court reversed: without an actual connection between the out-of-state plaintiffs' claims and the defendant's activities in California, California state courts' exercise of personal jurisdiction over Bristol-Myers Squibb with respect to the non-California plaintiffs' claims would violate the Due Process Clause of the Fourteenth Amendment. *Id.* at 1781, 1783.

The Supreme Court explicitly "[left] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1784. The Supreme Court therefore left it to the lower courts to determine whether *Bristol-Myers Squibb*'s holding applies to nationwide class actions brought pursuant to Fed. R. Civ. P. 23. In practice, this question has fallen to the district courts; as far as this Court is aware, no circuit court has yet to weigh in on the matter. *See Suarez v. Cal. Nat. Living, Inc.*, 17-cv-9847, 2019 WL 1046662, at *6 (S.D.N.Y. Mar. 5, 2019).

**\*4** District courts generally take one of three approaches.

First, many courts hold that *Bristol-Myers Squibb* does not apply outside of the context of mass tort cases. *See, e.g.*, *Sanchez v. Launch Tech. Workforce Solutions, LLC*, 297 F. Supp. 3d 1360, 1365 (N.D. Ga. 2018); *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 126 (D.D.C. 2018); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. 09-md-2047, 2017 WL 5971622, at *12–*14 (E.D. La. Nov. 30, 2017); *Cabrera v. Bayer Healthcare, LLC*, LA 17-cv-8525, 2019 WL 1146828, at *8 (C.D. Cal. Mar. 6, 2019); *Gress v. Freedom Mortg. Corp.*, No. 1:19-cv-375, 2019 WL 2612733, at *6–*7 (M.D. Pa. June, 26, 2019); *Hicks v. Rous. Baptist Univ.*, 17-cv-629, 2019 WL 96219, at *5–*6 (E.D.N.C. Jan. 3, 2019). Under this view, there is no constitutional unfairness in subjecting a defendant to the class claims of out-of-state plaintiffs in Rule 23 class actions, as long as a court has jurisdiction over the class representative's claims. *Sanchez*, 297 F. Supp. 3d at 1366. The due process issue is avoided because Rule 23 class certification already protects a defendant's due process rights. *Id.* at 1365–66 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)).

Another set of district courts holds the opposite: the same due process concerns that animated *Bristol-Myers Squibb* necessarily apply to nationwide class actions in federal courts. They hold there is no principled way to distinguish between the strictures of the Fourteenth Amendment Due Process

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 4382204

Clause and the Fifth Amendment Due Process Clause. *See, e.g., Gazzillo v. Ply Gem Indus., Inc.*, 17-cv-1077, 2018 WL 5253050, at *7 (N.D.N.Y. Oct. 22, 2018); *DeBernardis v. NBTY, Inc.*, No. 17 C 6125, 2018 WL 461228, at *2 (N.D. Ill. Jan. 18, 2018); *Greene v. Mizuho Bank, Ltd.*, 289 F. Supp. 3d 870, 874–75 (N.D. Ill. 2017); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 850–51 (N.D. Ohio 2018).

A third set of district courts opts to defer this issue until class certification: since unnamed plaintiffs are merely *potential* class members who may never actually be joined to this action, it would be premature for a court to decide whether there is specific jurisdiction over the defendant(s) with respect to their claims. *See Suarez*, 2019 WL 1046662, at *6 (citing *Gonzalez v. Costco Wholesale Corp.*, 16-cv-2590, 2018 WL 4783962, at *8 (E.D.N.Y. Sept. 29, 2018)); *Chernus v. Logitech, Inc.*, No. 17-cv-673, 2018 WL 1981481, at *7–*8 (D.N.J. Apr. 27, 2018); *see also Campbell v. Freshbev LLC*, 322 F. Supp. 3d 330, 337 (E.D.N.Y. 2018) (citing the "unsettled nature of the law following *Bristol-Myers*" as another reason to defer on personal jurisdiction).

### 4. The Court Defers This Question Until Class Certification

Orangetheory "believes that it would be preferable to make this argument at the time that Plaintiff moves to certify a class." (Def. MTD Br. at 4 n.2.) Orangetheory represents that it made its motion now only to preserve the issue of personal jurisdiction, which is waived if not raised in a responsive pleading or motion to dismiss. (*Id.; see also* Reply in Supp. of Def.'s Mot. to Dismiss Pl.'s Class Action Compl., Dkt. No. 38 ("Def. MTD Reply") at 2.)

**\*5** The Court agrees that it is appropriate to defer questions regarding the class claims until class certification. *See Campbell*, 322 F. Supp. 3d at 337; *Gonzalez*, 2018 WL 4783962, at *8. "[I]n contrast to *Bristol-Meyers*, there are no actual 'non-forum state plaintiffs' or putative class members to speak of yet in this case, making Defendants' motion to dismiss or strike patently premature." *Bank v. CreditGuard of Am.*, No. 18-cv-1311, 2019 WL 1316966, at *12 (E.D.N.Y. Mar. 22, 2019). The Court will consider this issue when and if Plaintiff moves for class certification. The Court notes that the issue is preserved.

### B. Defendant's Motion to Dismiss Count 1 (Negligent Violation of the TCPA) and Count 2 (Knowing or Willful Violation of the TCPA) for Failure to State a Claim under Rule 12(b)(6) Is Denied

#### 1. Applicable Legal Standard

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), the Court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor. *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (internal citation omitted), The claims will survive the motion to dismiss as long as they contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The plaintiff must do more, however, than merely attach "labels and conclusions" to bald factual assertions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

#### 2. The Telephone Consumer Protection Act (TCPA)

Congress enacted the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, ("TCPA") to hold telemarketers accountable for spamming customers with intrusive nuisance calls. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370–71 (2012). The TCPA makes it unlawful to "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any *automatic telephone dialing system* ... to any telephone number assigned to a ... cellular telephone service ... unless such call is made solely to collect a debt owed to or guaranteed by the United States[.]" 47 U.S.C. § 227(b)(1)(a)(iii) (emphasis added).

The TCPA defines an "automatic telephone dialing system," or "ATDS," as "equipment which has the *capacity*—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added).

The definition of an "automatic telephone dialing system"—and the attendant concept of "capacity"—are central to the statute.

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 4382204

"The FCC has the authority to promulgate regulations implementing the TCPA." *King v. Time Warner Cable Inc.*, 894 F.3d 473, 474 (2d Cir. 2018) (citing 47 U.S.C. § 227(b)(2)). "In 2015, the FCC issued a Declaratory Ruling and Order that, among other things, attempted to clarify the TCPA's requirement that, to qualify as an autodialer under the statute, a device must have the 'capacity' to dial random and sequential numbers." *Id.* (citing *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7973–74 (2015) (the "2015 Ruling")). "The Commission asserted that an expansive interpretation of the term 'capacity' was consistent with both Congress's intent that the TCPA have a broad protective reach, and with the Commission's previous orders. Accordingly, the FCC 'declined to define a device's "capacity" in a manner confined to its "present capacity." Instead, the agency construed a device's "capacity" to encompass its "potential functionalities" with modifications such as software changes.' " *Id.* (quoting *ACA Int'l v. FCC*, 885 F.3d 687, 693–94 (D.C. Cir. 2018) (in turn quoting 2015 Ruling)).

**\*6** In 2018, the 2015 Ruling was struck down by the D.C. Circuit in *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018). The D.C. Circuit held that, per the text of the statute, the ATDS' *present* functions must include the ability to generate random or sequential numbers, even if that function was turned off when the system sent the offending calls or text messages in question. *Id.* at 699.

After the D.C. Circuit vacated the 2015 Ruling, the FCC sought public comment on the meaning of "capacity" under the TCPA's definition of an autodialer. *See Consumer and Governmental Affairs Bureau Seeks Comment on Interpretation of the Telephone Consumer Protection Act in Light of the D.C. Circuit's ACA International* Decision, 83 Fed. Reg. 26,284 (June 6, 2018). The notice stated that the agency would take comments until October 24, 2018. The FCC has taken no further action.

In the meantime, on June 29, 2018, the Second Circuit published a decision adopting the definition of "capacity" articulated by the D.C. Circuit in *ACA International*:

> In sum, we conclude that the term "capacity" in the TCPA's definition of a qualifying autodialer should be interpreted to refer to a device's current functions, absent any modifications to the device's hardware or software. That definition does not include every smartphone or computer that might be turned into an autodialer if

properly reprogrammed, but does include devices whose auto dialing features can be activated, as the D.C. Circuit suggested, by the equivalent of "the simple flipping of a switch."

*King*, 894 F.3d at 481 (citing *ACA Int'l*, 885 F.3d at 696).

At present—in the absence of any valid agency rule interpreting "capacity"—the Second Circuit's decision in *King* is binding on this Court.

### 3. Simon Has Plausibly Plead that Orangetheory Used an ATDS

To state either a negligent violation or willful violation claim under the TCPA, a plaintiff must allege the following basic elements: "(1) [a defendant] called her on her cell phone; (2) using an automated dialing system or pre-recorded voice; (3) without her consent." *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 725 (S.D.N.Y. 2015), *rev'd on other grounds*, 894 F.3d 473 (2d Cir. 2018); *see also Rotberg v. Jos. A. Bank Clothiers, Inc.*, 345 F. Supp. 3d 466, 474 (S.D.N.Y. 2018).

The parties agree that Simon has pleaded the first and third elements. Simon alleges that she received text messages from Defendant on multiple occasions between May and June 2018. (Compl. ¶ 9.) Since a text message is the same as a "call" under the TCPA, Simon has shown the first element of her claim. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 666–67 (2016). In addition, Simon also alleges that she has never been a customer of Defendant's and that she has never given Defendant her cell phone number. (Compl. ¶ 14.) This allows the Court to draw a direct inference that Defendant never received Simon's "prior express consent." 47 U.S.C. § 227(b)(1)(A)(iii).

Defendant instead moves to dismiss both TCPA claims (Counts 1 and 2) on the ground that Simon has not plausibly plead enough facts suggesting the use of an ATDS.

I find that she has.

Courts find that the use of a "short code telephone number" plausibly indicates that the Defendant used an ATDS. *Rotberg*, 345 F. Supp. 3d at 476–77; *see also Krady v. Eleven Salon Spa*, No. 16-cv-5999, 2017 WL 6541443, at \*4 (E.D.N.Y. July 28, 2017), *report and recommendation adopted*, 2017 WL 6542462 (E.D.N.Y. Dec. 21, 2017) (collecting cases on short codes and other indicia of ATDS).

2019 WL 4382204

In addition, courts have found that if the texts are of an "impersonal, generic nature," they plausibly indicate the use of an ATDS. See *Krady*, 2017 WL 6541443, at \*4; *see also Unchageri v. YuppTV USA, Inc.*, No. 17-CV-3862, 2018 WL 1184737, at \*3 (N.D. Ill. Mar. 7, 2018).

**\*7** Here, Simon asserts that she received the text message via "Defendant's SMS blasting platform," which plausibly alleges that the text messages were sent widely and to multiple numbers. (Compl. ¶ 10.) Although Simon does not allege the specific contents of the text messages, she alleges Defendant sent her "spam advertisements and/or promotional offers"—which plausibly suggest impersonal, generic messages. Most persuasively, Simon claims to have received several unsolicited text messages over a period of two months from a variety of numbers, including the short code text number "797-979," which, as other courts have held, is plausible indicia of an ATDS. (*Id.* ¶ 9.) At this stage, Plaintiff has done all she must to plead this element of her claim.

Defendant's motion to dismiss Counts 1 and 2 of the Complaint for failure to state a claim under Rule 12(b)(6) is, therefore, DENIED.

### C. Defendant's Motion to Stay Is Denied

Defendant has filed a separate motion asking the Court stay the case until the FCC promulgates a new final rule, or issues a new declaratory ruling, defining "autodialer" and "capacity." Defendant identifies two grounds for such a stay: *first*, the Court's inherent power to issue stays to control its docket, and, *second*, the Court's authority to issue a stay under the doctrine of primary jurisdiction.

For the following reasons, Orangetheory's motion is denied without prejudice to renewal at a later stage of the litigation.

### 1. Defendant Has Not Shown It Is Entitled to a Stay

In deciding whether to grant a stay under its inherent powers, the Court must consider: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007).

Defendant fails to make the required showing on any of these factors. Orangetheory has not made *any* showing—let alone a strong one—that any ruling by the FCC would likely exclude the device used by Orangetheory to spam Simon, so as to enable it to succeed on the merits. In addition, Orangetheory has not demonstrated irreparable injury; it notes only that it is potentially on the hook for substantial damages, given the putative nationwide class. Monetary damages, of course, do not by themselves constitute irreparable injury.

Simon, on the other hand, persuasively argues that she would be injured by a stay, particularly because discovery has yet to commence, and evidence is at risk of being lost. This injury, which is both likely and irreparable, far outweighs the injury posed by a potential future judgment for money damages.

Finally, Orangetheory argues that the public interest favors issuing a stay, because of the "risk of disparate interpretations of the TCPA in the absence of clear guidance from the FCC." (Mem. of Law in Supp. of Def.'s Mot. to Stay, Dkt. No. 35 ("Def. Stay Br.") at 15.) However, the Second Circuit's interpretation of "capacity" in *King*, according to Orangetheory, is in line with nearly all other circuits that have reached the issue. (*See id.* at 12–14.) The risk seems small. If and when the FCC rules, we will deal with it.

### 2. The Primary Jurisdiction Doctrine Does Not Mandate a Stay

Defendant also argues that the abstention doctrine of primary jurisdiction requires staying the case.

"The doctrine of primary jurisdiction allows a federal court to refer" or stay "a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222–23 (2d Cir. 1995). In the Second Circuit, the "inquiry has generally focused on four factors:

**\*8** (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

Case 1:25-cv-01410-JKM    Document 19-2    Filed 10/30/25    Page 99 of 99

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 4382204

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether a prior application to the agency has been made.

*Ellis v. Tribune Television Co.*, 443 F.3d 71, 82–83 (2d Cir. 2006). Courts "must also balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *Id.* at 83 (internal quotation omitted).

Defendant argues that "the FCC is currently considering the precise questions at issue here," because, in its June 2018 request for comments, it asked the following questions: "What constitutes an [ATDS]? How "automatic" must dialing be for equipment to qualify as an [ATDS]? Must such a system dial numbers without human intervention? If equipment cannot itself dial random or sequential numbers, can that equipment be an [ATDS]?" (Def. Stay Br. at 3.)

Putting aside for the moment that agency requests for comment are often broader than the scope of the final rule, the takeaway from Defendant's brief is that degree of human interaction with the purported autodialer lies at the heart of this lawsuit. But neither Simon nor this Court knows anything about the system that was allegedly used to send text messages on behalf of Orangetheory. The Court certainly does not know if "human intervention" is what will tip the scales in favor of either plaintiff or defendant, and therefore whether this case is susceptible of resolution by the FCC's rulemaking —if that is even what the FCC intends to do. *See Gould v. Farmers Ins. Exch.*, 326 F.R.D. 530, 531 (E.D. Mo. 2018) ("[T]he FCC has not indicated whether it will pursue a formal rulemaking or some other proceeding following the collection of comments on this issue" of what constitutes "capacity."). Put differently, "a stay is not prudent at this time because, at a minimum, discovery of the nature of [Defendant's] calling system and [Defendant's] contacts with Plaintiffs is required before any definitive legal standard under the TCPA can be applied to [Defendant's] conduct herein." *Somogyi v. Freedom*

*Mortg. Corp.*, No. 17-cv-6546, 2018 WL 3656158, at *1 (D.N.J. Aug. 2, 2018).

Finally, even if Orangetheory had identified the specific question at issue and the Court were convinced that the FCC was taking action would resolve it—I am not—delay and prejudice would still justify denying the motion. It is well known that, "If the FCC does proceed with a formal rulemaking, such a process will likely take years[.]" *Gould*, 326 F.R.D. at 532. Further, any final rule promulgated by the FCC would almost certainly be subject to a pre-enforcement challenge—and would likely be stayed pending the resolution of that challenge, which could also take years. In the meantime, it is clear that critical evidence, including records from any third parties that Orangetheory may have contracted with for its telephone marketing, may be lost or destroyed.

That said, it is possible that the regulatory landscape will have changed significantly once discovery concludes. Therefore, while the Court denies Orangetheory's motion to stay the case now, that ruling is without prejudice to Orangetheory's renewal of its motion, if and when: (1) the issues for trial are narrowed; (2) the scope and timeline of the FCC's action becomes clearer; and (3) a stay would not pose irreparable harm to Plaintiff and the putative class.

### IV. Conclusion

**\*9**  For the aforementioned reasons, Defendant's motion to dismiss for lack of personal jurisdiction is denied; the motion to dismiss for failure to state a claim is denied; and the motion to stay is denied.

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 31 and 34.

This constitutes the written decision and order of the Court.

### All Citations

Not Reported in Fed. Supp., 2019 WL 4382204

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.