Babare v. Sigue Corporation, Not Reported in Fed. Supp. (2020)

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 1 of 121

2020 WL 8617424
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Seattle.

Daniel BABARE, individually and on behalf
of all others similarly situated, Plaintiff,
v.
SIGUE CORPORATION, Defendant.

CASE NO. C20-0894-JCC
|
Signed 09/30/2020

**Attorneys and Law Firms**

Manuel Hiraldo, Pro Hac Vice, Hiraldo PA, Michael Eisenband, Pro Hac Vice, Eisenband Law, P.A., Fort Lauderdale, FL, Kira M. Rubel, The Harbor Law Group, Gig Harbor, WA, for Plaintiff.

Evelyn Crystal Lopez, Pro Hac Vice, Joshua Briones, Pro Hac Vice, Mintz Levin Cohn Ferris Glovsky & Popeo PC, Los Angeles, CA, Rogelio Omar Riojas, Goldfarb & Huck Roth Riojas, PLLC, Seattle, WA, for Defendant.

ORDER

John C. Coughenour, UNITED STATES DISTRICT JUDGE

**\*1** This matter comes before the Court on Defendant Babare Corporation's motion to stay (Dkt. No. 19). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

**I. BACKGROUND**

In June, Plaintiff Daniel Babare filed a complaint alleging that Defendant Sigue Corporation used an automatic telephone dialing system ("ATDS") to send Mr. Babare six text messages without his written consent in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b). (*See* Dkt. No. 1 at 5–7, 10.) Mr. Babare seeks a declaration that Sigue Corporation used an ATDS to send the messages, statutory damages of at least $500 for each violation, and a permanent injunction prohibiting Sigue Corporation from violating the TCPA in the future. (*See id.* at 10.)

Sigue Corporation denies that it used an ATDS to send the messages, (*see* Dkt. No. 17 at 4–5, 7–8), and moves to stay this action until the United States Supreme Court decides *Facebook, Inc. v. Duguid*, No. 19-511, a case in which the Court will resolve a circuit split about what constitutes an ATDS under the TCPA, (*see generally* Dkt. No. 19). Sigue Corporation argues that staying the case will conserve judicial resources and spare the parties the expense of engaging in costly discovery and motions practice that could be mooted by the Supreme Court's decision. (*See* Dkt. No. 19 at 1, 16.) Specifically, Sigue Corporation argues that the device it used to send the text messages does not qualify as an ATDS under the narrower definition adopted by the Third, Seventh, and Eleventh Circuits, so if the Supreme Court were to adopt that definition, this case could be resolved by an early summary judgment motion. (*See* Dkt. Nos. 19 at 9, 23 at 10.)

Mr. Babare argues that the Court should not stay the case because "the same discovery and briefing will have to take place" regardless of how the Supreme Court rules, (Dkt. No. 21 at 11), Sigue Corporation's proposed stay is "indefinite," and "a prolonged stay could result in the irretrievable loss of critical evidence," (*id.* at 13–14). Alternatively, Mr. Babare argues that if the Court does grant a stay, the stay should be limited to whether Sigue Corporation used an ATDS to send the messages and discovery and briefing regarding class certification should proceed. (*See id.* at 16–17.)

**II. DISCUSSION**

The Court has inherent authority to manage its docket "in a manner which will promote economy of time and effort for itself, for counsel, and for litigants." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). This includes the power to stay an action "pending resolution of independent proceedings which bear upon the case." *Levya v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979). When considering whether to stay an action, the Court must weigh "the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX*, 300 F.2d at 268.

Case 1:25-cv-01410-JKM   Document 23-4   Filed 11/21/25   Page 2 of 121

Babare v. Sigue Corporation, Not Reported in Fed. Supp. (2020)

**\*2**  The Court concludes that the *CMAX* factors weigh in favor of a stay. First, a stay will promote the orderly course of justice because it will allow the Supreme Court to settle a question of law that is central to this litigation. The text messages Sigue Corporation sent to Mr. Babare are covered by the TCPA only if Sigue Corporation sent them using an ATDS. *See* 47 U.S.C. § 227(b). Thus, whether Sigue Corporation used an ATDS to send the messages is one of the key issues to be decided in this case. The parties appear to disagree about the proper definition of an ATDS, (*see* Dkt. Nos. 19 at 10–12, 21 at 6, 9–10), and it makes little sense for the parties to spend more time and effort briefing that issue (and for the Court to spend time and effort resolving it) when the Supreme Court is likely to provide a conclusive answer in a few months. Thus, entering a stay will promote the orderly course of justice by allowing the Supreme Court to resolve a question of law that is central to this case.

Next, Mr. Babare is likely to suffer little, if any, harm from a stay. Mr. Babare does not allege that the text messages have continued or that he is suffering any ongoing harm, and a delay in collecting potential damages is not a particularly severe hardship. *See CMAX*, 300 F.2d at 268–69. Indeed, in that regard, Mr. Babare is likely to suffer even less harm than the plaintiff in *CMAX*. In *CMAX*, the plaintiff sought to recover nearly $13,000 it was allegedly owed for services rendered. *See* 300 F.2d at 266. Here, by contrast, Mr. Babare seeks to recover only statutory damages. (*See* Dkt. 1 at 10.) Therefore, delaying resolution of the lawsuit, standing alone, will not significantly harm Mr. Babare.

Mr. Babare next argues that a stay could result in "the irretrievable loss of critical evidence" because "[m]emories fade with the passage of time, documents and data can be lost," and "Defendant has offered no guarantees that" it has preserved evidence. (*See* Dkt. No. 21 at 14–15.) But, contrary to Mr. Babare's argument, Sigue Corporation *has* confirmed that it has implemented a litigation hold, (*see* Dkt. No. 19 at 15), and Mr. Babare can address any alleged spoliation by resorting to the ordinary remedies that are available to any litigant, *see, e.g.,* *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) ("[A] trial court also has the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation [of evidence].").

Finally, Mr. Babare argues that the Court should deny the stay because it is "indefinite." (*See* Dkt. No. 21 at 13). This argument is not well taken. *Duguid* is scheduled for oral argument on December 8, 2020, and absent unusual circumstances the Supreme Court generally decides the cases it schedules for argument by the end of its term (in June or July).

While a stay is likely to impose minimal costs on Mr. Babare, proceeding is likely to impose significant costs on Sigue Corporation. It is well-recognized that discovery in class actions is expensive and asymmetric, with defendants bearing most of the burdens. *See, e.g., Am. Bank v. City of Menasha*, 627 F.3d 261, 266 (7th Cir. 2010) (observing that class action plaintiffs sometimes "us[e] discovery to impose asymmetric costs on defendants in order to force a settlement advantageous to the plaintiff regardless of the merits of his suit"). Mr. Babare argues that "the same discovery and briefing will have to take place" regardless of how the Supreme Court rules, (Dkt. No. 21 at 11), but that is not necessarily true. If the Supreme Court adopts the narrower definition of ATDS and Sigue Corporation is correct that it did not use an ATDS under the narrower definition, Sigue Corporation could choose to bring an early summary judgment motion thereby avoiding the need to "expend resources on extensive discovery or class certification briefing." (Dkt. No. 23 at 10); *see also Cowen v. Bank United of Tex., FSB*, 70 F.3d 937, 941 (7th Cir. 1995) ("Class actions are expensive to defend. One way to try to knock one off at low cost is to seek summary judgment before the suit is certified as a class action."). The hardship Sigue Corporation would endure by proceeding is not just the need to defend the case; it is the burden of engaging in costly discovery and motions practice that could be unnecessary if the Supreme Court adopts the narrower definition of ATDS. *Cf. Morgan Hill Concerned Parents Ass'n v. Cal. Dep't of Educ.*, 781 F. App'x 666, 667 (9th Cir. 2019) (holding stay was justified because proceeding would expose the defendant to "extensive and likely redundant discovery demands"). Thus, Mr. Babare's suggestion that the parties proceed with discovery and briefing related to class certification until *Duguid* is decided does little to remedy the problem. That discovery and briefing is the very burden Sigue Corporation seeks to avoid.

**\*3**  In addition to the burdens on the parties, it is not an efficient use of the Court's time and effort to police discovery and address a class certification motion that could turn out to be unnecessary.

Babare v. Sigue Corporation, Not Reported in Fed. Supp. (2020)

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 3 of 121

In sum, the balance of the hardships tilts strongly in favor of a stay here. If the Court were to enter a stay and the Supreme Court were to affirm the Ninth Circuit's opinion in *Duguid*, Mr. Babare will have been delayed by a few months in pursuing his claim. If the case were to proceed and the Supreme Court were to adopt the narrower definition of ATDS, Sigue Corporation will have been required to participate in unnecessary yet costly and burdensome discovery and class certification briefing.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant Sigue Corporation's motion to stay (Dkt. No. 19). The Court STAYS this case pending the Supreme Court's opinion in *Facebook, Inc. v. Duguid*, No. 19-511, and ORDERS the parties to file a joint status report that proposes a new case schedule within 14 days of the date the Supreme Court issues its opinion in *Duguid*.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 8617424

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 863469
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

Joseph BOND, on behalf of himself and
all others similarly situated, Plaintiff,
v.
FOLSOM INSURANCE AGENCY
LLC and Cody Folsom, Defendants.

No. 3:24-cv-2551-L-BN
|
Signed March 19, 2025

**Attorneys and Law Firms**

Anthony I. Paronich, Paronich Law PC, Hingham, MA,
Andrew Roman Perrong, Perrong Law LLC, Glenside, PA,
Sharon K. Campbell, Law Office of Sharon K. Campbell,
Dallas, TX, for Plaintiff.

Jason Ray Jobe, Yesha Prakashcha Patel, Thompson Coe
Cousins & Irons LLP, Dallas, TX, Haley S. Grissom, Dentons
U.S. LLP, Dallas, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

DAVID L. HORAN, UNITED STATES MAGISTRATE
JUDGE

**\*1** Defendants Folsom Insurance Agency, LLC and Cody
Folsom (collectively, "Folsom") have filed a Motion to
Bifurcate Discovery. *See* Dkt. No. 30.

Plaintiff Joseph Bond filed a response. *See* Dkt. No. 31.

This case has been referred to the undersigned United States
magistrate judge for pretrial management under 28 U.S.C.
§ 636(b) and an order of reference from United States District
Judge Sam A. Lindsay. *See* Dkt. No. 32.

For the reasons explained below, the Court denies Folsom's
Motion to Bifurcate Discovery [Dkt. No. 30].

**Background**

This case concerns a class action lawsuit alleging violations
of the Telephone Consumer Protection Act ("TCPA"), 47
U.S.C. § 227.

Plaintiff Joseph Bond alleges that Defendants placed at least
one prerecorded telemarketing call to his cellular phone
without his prior express written consent in violation of the
TCPA. *See* Dkt. No. 6.

Bond alleges the following putative class:

> **Robocall Class:** All persons within
> the United States: (1) to whose cellular
> telephone number or other number
> for which they are charged for the
> call (2) Defendants (or an agent
> acting on behalf of Defendants) placed
> a telemarketing call (3) within the
> four years prior to the filing of
> the Complaint (4) using an identical
> or substantially similar pre-recorded
> message used to place telephone calls
> to Plaintiff (5) from four years prior
> to the filing of the Complaint through
> trial.

*Id.* at 9 (emphasis in original).

Folsom denies TCPA liability and contends that Bond cannot
maintain his lawsuit as a class action because it fails to meet
the requirements of Federal Rule of Civil Procedure 23.

The Parties have begun discovery and filed a joint status
report to assist the Court in entering a scheduling order under
Federal Rule of Civil Procedure 16(b). *See* Dkt. No. 29.

In the joint status report and this subsequent motion, Folsom
asks the Court to bifurcate and limit discovery into two phases
– individual and class-based discovery – and allow for class-
based discovery only if Bond's individual claims survive
dispositive motions. *See* Dkt. No.29 at 4-5; Dkt. 30 at 1.

**Legal Standards & Analysis**

"Under [Federal Rule of Civil Procedure] 42(b), district courts have discretion to bifurcate trials '[f]or convenience, to avoid prejudice, or to expedite and economize.' " *Pharmerica Corp. v. Advanced HCA LLC*, No. 2:17-cv-00180-JRG, 2018 WL 3326822, at *1 (E.D. Tex. May 1, 2018) (quoting Fed. R. Civ. P. 42(b)). "The decision to bifurcate 'is a matter within the sole discretion of the trial court.' " *Id.* (quoting *First Tex. Sav. Ass'n v. Reliance Ins. Co.*, 950 F.2d 1171, 1174 n.2 (5th Cir. 1992)).

And Federal Rule of Civil Procedure "26 affords trial courts ample authority to control the sequence and timing of discovery." *E.E.O.C. v. Lawler Foods, Inc.*, 128 F. Supp. 3d 972 (S.D. Tex. 2015).

The issue before the Court is whether it should birfucate and limit discovery into two phases – individual and class-based discovery,

Folsom contends that discovery should be bifurcated because rulings on Bond's individual claims will determine the validity of his class-based claims. *See* Dkt. No. 1 at 1. And it asserts that "bifurcation will be expedient and economical because it will help determine whether [Bond] is a proper class representative before broader discovery is taken." *Id.*

**\*2**  Bond contends that Folsom's bifurcation proposal is an "end-run" around the Court's Order granting in part Bond's motion to compel, which involved classwide discovery. *See* Dkt. No. 31 at 2-3; Dkt. No. 28.

In the order that Bond references, the Court stated:

As to Interrogatory Nos. 6 and 7, "[t]he Court will not engage in a preemptive merits analysis to determine whether [Bond] is entitled to discovery on the claim that [he] has pleaded and is pursuing. *Firebirds Intl, LLC v. Firebird Rest. Grp., LLC*, No. 3:17-cv-2719-B, 2018 WL 3655574, at *16 (N.D. Tex. July 16, 2018). "The Court will not prematurely assess the balance of the evidence on the merits of [Bond's] claim[s] against [Folsom Insurance] and will not credit [Folsom Insurance's] assessment to cut off [Bond] from seeking relevant evidence from this named party before discovery has closed and any summary judgment motion has been filed." *Velazquez v. El Pollo Regio LP, LLC*, No. 3:15-cv-3170-M, 2017 WL 2289185, at *6 (N.D. Tex. May 25, 2017). On the Court's reading, Bond has pleaded "call" broadly enough to include ringless voicemails, and, although the Court

need not now determine whether a ringless voicemail can support liability as a matter of law under the statute, Folsom Insurance's answer is incomplete as to what Bond is asking based on what he has pleaded and is pursuing. And Folsom Insurance has not supported its other boilerplate objections and may not avoid appropriate classwide discovery that is – as Bond persuasively argues – necessary for a future class certification motion.

Dkt. No. 28.

Bond also asserts that there is "significant overlap" between discovery relevant to the merits of his individual claims and issues of class certification Dkt. No. 31 at 6. And, so, Bond argues that bifurcation would lead to duplication of discovery and may result in further discovery disputes regarding the distinction between merits and class discovery. *See id.* at 6-7. In Bond's view, bifurcation of discovery in this case would lead to the "opposite of judicial economy." *Id.* at 6.

As to class certification under Rule 23, the Supreme Court has instructed that "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.' " *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-351 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

And "[f]requently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim" because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 351 (cleaned up).

Considering *Dukes* and the "rigorous analysis" requirement for class certification, district courts have been reluctant to bifurcate class-related discovery from discovery on the merits. *See Ahmed v. HSBC Bank USA, Nat'l Ass'n*, No. EDCV152057FMOSPX, 2018 WL 501413 (C.D. Cal. Jan. 5, 2018) (declining to bifurcate discovery in TCPA case and stating that "the distinction between class certification and merits discovery is murky at best and impossible to determine at worst"); *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 300 (S.D.N.Y. 2012) (collecting cases).

**\*3**  In another TCPA case, *Cardenas v. Resort Sales by Spinnaker, Inc.*, No. 9:20-cv-00376-RMG, 2021 WL 733393 (D.S.C. Feb. 24, 2021), the Court found that bifurcation would not serve the interests of judicial economy given the plaintiff's "persuasive argument that the evidence needed to determine whether [they] have a claim substantially overlaps with [their] ability to represent a class under [🚩Rule] 23." *Cardenas*, 2021 WL 733393, at \*3.

Similarly, here, the undersigned already found that Folsom "may not avoid appropriate classwide discovery that is – as Bond persuasively argues – necessary for a future class certification motion." Dkt. No. 28. And, so, the Court agrees with Bond that bifurcation would not promote efficiency because there is considerable overlap between discovery relevant to the merits of his individual claims and issues of class certification. *Accord True Health Chiropractic Inc. v. McKesson Corp.*, 2015 WL 273188, \*2-3 (N.D. Cal. 2015) (declining to bifurcate a TCPA class action and noting that individual and class discovery claims typically overlap).

And, in light of the bulk of authority discussing the lack of a "bright line" distinction between merits and class discovery, bifurcation could lead to avoidable, future disputes over whether a particular discovery request relates to the merits or to class certification. *See Quinn v. Specialized Loan Servs., LLC*, 321 F.R.D. 324, 327–28 (N.D. Ill. 2017); *see also City*

*of Pontiac General Employees' Retirement System v. Wal–Mart Stores, Inc.*, 2015 WL 11120408, \*1–2 (W.D. Ark. 2015) (bifurcation may force the court to resolve "endless discovery disputes"); *True Health*, 2015 WL 273188, at \*3 (finding that bifurcation "raise[s] a slew of issues as to what discovery relates to the class, as opposed to the named plaintiffs, thereby causing additional litigation regarding the distinction between the two.").

And, so, considering the binding law from *Dukes* and persuasive authority from other district courts, the Court declines to bifurcate discovery in this case.

### Conclusion

For the reasons explained above, the Court denies Folsom's Motion to Bifurcate Discovery [Dkt. No. 30]. The Court will separately enter a scheduling order under Federal Rule of Civil Procedure 16(b) in accordance with this Memorandum Opinion and Order.

SO ORDERED.

### All Citations

Slip Copy, 2025 WL 863469

---

2025 WL 2336513
Only the Westlaw citation is currently available.
United States District Court, D. Utah.

Jordan CAMERON, on behalf of himself
and others similarly situated, Plaintiff,

v.

CHW GROUP, INC. a New Jersey corporation doing
business as Choice Home Warranty, Defendant.

Case No. 2:23-cv-00320-HCN-DBP
|
Filed 08/13/2025

District Judge Howard C. Nielson, Jr

MEMORANDUM DECISION AND ORDER

Dustin B. Pead United States Magistrate Judge

*1 Before the court are two related motions. First the parties move the court for a scheduling conference because the parties have been unable to reach agreement on all the issues discussed in their Fed. R. Civ. P. 26(f) conference. [1] Second, Defendant moves the court for an order bifurcating discovery between the individual claim of Plaintiff Jordan Cameron and the putative class members' claims. [2] Bifurcation of discovery is one issue upon which the parties could not agree during the Rule 26(f) conference. Having carefully considered the parties' written memoranda and proposed scheduling orders, along with relevant case law, the court orders as follows. [3]

BACKGROUND

In their scheduling conference the parties could not reach agreement on the following issues:

1. Defendant requests discovery be bifurcated. Plaintiff opposes these requests.

2. Defendant wants to limit each side to 5 depositions each. Plaintiff wants to limit each side to 10 depositions each.

3. Defendant does not want to limit the number of requests for admissions. Plaintiff wants to limit each side to 50 requests.

4. Defendant does not want to limit the number of requests for production. Plaintiff wants to limit each side to 50 requests.

5. Plaintiff is requesting that the deadline to file a motion for class certification occur approximately one month after the fact discovery deadline. Defendant requests this court set the deadline for class certification to occur after the close of expert discovery. [4]

The court resolves these issues in the scheduling order that is entered contemporaneously with this order. Therefore, the parties' request for a scheduling conference to consider these issues is GRANTED. The court further addresses the Motion to Bifurcate in this order. [5]

This is a putative class action. Plaintiff alleges Defendant violated the Telephone Consumer Protection Act, 🚩47 U.S.C. § 227, et seq. (TCPA) by calling Plaintiff and putative class members with solicitations despite having their phone numbers registered on the National Do-Not-Call Registry. Plaintiff alleges Defendant utilized a campaign to "market its home warranty services through the use of unsolicited calls, pre-recorded text messages, and other deceptive practice in plain violation" of the TCPA. [6] This case was before District Judge Bruce Jenkins before he passed away. Defendant sought to dismiss this case and following the denial of that motion, and the denial of a Motion to Reconsider Interlocutory Order, the parties held their Rule 26(f) scheduling conference earlier this year. As noted above the parties failed to reach agreement on all discovery issues and the present motion followed.

DISCUSSION

*2 In considering whether to bifurcate discovery in a putative class action, courts look to both 📁Federal Rules of Civil Procedure 23 and 42(b). [7] Rule 42(b) provides a trial court with wide discretion to bifurcate proceedings for "convenience, to avoid prejudice, or to expedite and economize." [8] When considering whether to bifurcate class discovery and a plaintiff's individual claims, courts consider

" '(1) [the] overlap between individual and class discovery, (2) whether bifurcation will promote [⚐ Fed. R. Civ. P. 23's] requirement that certification be decided at 'an early practicable time,'(3) judicial economy, and (4) any prejudice likely to flow from the grant or denial of a stay of class discovery.' " [9] As this court has noted, "[b]ifurcation under Rule 42 is not the norm or even a common occurrence." [10] However, in the context of TCPA putative class actions, courts have bifurcated discovery, and Defendant cites to a number of cases from other circuits, [11] where courts have recognized the efficiencies of bifurcated discovery in TCPA class actions. [12] Courts granting such motions have acknowledged the well-recognized fact that "discovery in class actions is expensive and asymmetric, with defendants bearing most of the burdens." [13] And Federal Rule 1's guiding directive "to secure the just, speedy, and inexpensive determination of every action and proceeding." [14]

**\*3** "The decision to bifurcate discovery in putative class actions prior to certification is committed to the discretion of the trial court." [15] Class certification requires the court to be "satisfied, after a rigorous analysis, that the pre-requisites of ⚐ Rule 23(a) have been satisfied." [16] To certify a class, a plaintiff must establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." [17] As noted by this court, often, "the class determination 'involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " [18] Courts are therefore "reluctant to bifurcate class-related discovery from discovery on the merits." [19] "This is because the distinction between class certification and merits discovery is murky at best and impossible to determine at worst" [20] and can result in "petty [ ] fights over what constitutes merits discovery versus class discovery." [21] Turning to the factors outlined in *Klassen* [22] and applied by this court in *Dillard* [23] , the court finds that bifurcation is warranted here.

Defendant argues that while bifurcated discovery may not be appropriate in all cases, it is appropriate here because this is not a routine merits versus class bifurcation request. Instead, Defendant's focus is on "narrow issues that are unique to Plaintiff's individual TCPA claim (e.g., whether he

consented, is a "residential telephone subscriber," received a "telephone solicitation") for which no class discovery would be necessary for a short period before proceeding to broader discovery." [24]

First, in contrast to *Dillard*, there is enough separation between class discovery and individual discovery to warrant bifurcation. This includes discovery concerning whether Plaintiff consented to the calls, whether his particular number is registered on the National DNC Registry, whether Plaintiff is a "residential telephone subscriber", and whether Plaintiff received telephone solicitations that fall within the TCPA. As noted by other courts, these narrow, potentially dispositive, issues can be decided at the outset of a case prior to costly class discovery. TCPA cases, in the court's view, present a unique opportunity that warrants bifurcated discovery due to those cost savings.

In closely related fashion, the court agrees with Defendant that ⚐ Rule 23 requires certification be decided at "an early practicable time" not for "the earliest practicable class certification" as advanced by Plaintiff. ⚐ Rule 23 must be balanced with Rule 1's requirements and limited discovery that may ultimately preclude costly class discovery serves Rule 1's purposes. There is nothing in limited individual focused discovery that prevents class certification at "an early practicable time."

As to the third factor, the court is persuaded that counsel here are of a sophisticated enough nature to not disintegrate into childish "petty discovery fights over what constitutes merits discovery versus class discovery." [25] Counsel in the authority relied on by Defendant were able to manage this divide and the court is confident counsel can do so here. The court finds judicial economy is promoted by an efficient narrow focus on Plaintiff before proceeding to class discovery. If the case can be resolved on those narrow dispositive issues relevant to Plaintiff and his individual claims, the limited resources of the court will be preserved. And, if Plaintiff moves forward past such discovery, he will be better positioned to represent the needs of the class.

**\*4** The prejudice identified by Defendant does not appear to be unique and mostly cost based. However, in taking all the factors together, along with the reasoning found in the authority cited to by Defendant that is persuasive, discovery should be bifurcated in this case. Plaintiff's allegations of prejudice focus on alleged discovery disputes and additional

delays and costs. As noted above, there is the potential for cost savings for all parties and the court is persuaded that some discovery that focuses on Plaintiff will be utilized in making a class certification decision later. For example, the typicality requirement will benefit from discovery into Plaintiff.

Finally, the court is not persuaded by Plaintiff's arguments to the contrary. There is no request to stay discovery such as in *Dillard*, and Defendant's discovery requests that appear to be class-related do not amount to waiver. Moreover, the "more than two years later" [26] request to bifurcate discovery does not preclude such a request given what happened procedurally in this case and with the unfortunate passing of Judge Jenkins.

## ORDER

For the foregoing reasons, Defendant's Motion to Bifurcate Discovery is GRANTED. Defendant may conduct discovery focusing on Plaintiff's individual TCPA claims, and this will be followed by class discovery.

DATED this 13 August 2025.

## All Citations

Slip Copy, 2025 WL 2336513

---

## Footnotes

1    ECF No. 51.

2    ECF No. 52.

3    District Judge Howard Nilson referred this case to the undersigned pursuant to 🚩28 U.S.C. § 636(b)(1)(A). Under DUCivR 7-1(g), the court concludes that oral argument is not necessary and, therefore, decides the motion on the written memoranda.

4    Joint Motion for Scheduling Conference at 2, ECF No. 51.

5    Plaintiff filed a Motion to Strike the Motion to Bifurcate. The court denied this motion. ECF No. 56.

6    Complaint at ¶ 2, ECF No. 1.

7    *Klassen v. SolidQuote LLC*, No. 23-cv-00318-GPG-NRN, 2023 WL 5497865, at *2 (D. Colo. Aug. 23, 2023).

8    Fed. R. Civ. P. 42(b).

9    🚩*Dillard v. Maverik, Inc.*, No. 2:24-CV-00285-TS-JCB, 2024 WL 4145162, at *2 (D. Utah Sept. 11, 2024), objections overruled, No. 2:24-CV-285-TS-JCB, 2024 WL 4534694 (D. Utah Oct. 21, 2024) (quoting *Klassen*, 2023 WL 5497865, at *2.

10    *Gadd v. S. Jordan City*, No. 2:15-CV-00667, 2018 WL 6441763, at *1 (D. Utah Dec. 7, 2018) (citation and quotations omitted).

11    *See Sapan v. Fin. of Am. Reverse LLC*, No. 8:24-CV-01213-FWS-KES, 2025 WL 1932935, at *3 (C.D. Cal. July 14, 2025) (bifurcating discovery between the plaintiff's individual claim and class discovery); *Moore v. Demand Science Grp, LLC*, 2024 WL 175743, at *1 (N.D. Ill. Jan. 4, 2024) ("The Court is concerned about wholly unnecessary discovery, so it grants the motion for bifurcation ... because it is more efficient to proceed with the limited and targeted discovery as proposed by Defendant given that the overlap between the proposed initial discovery and merits discovery is minimal"); *Pavelka v. Paul Moss Ins. Agency, LLC*,

2023 WL 3728199, at *3 (N.D. Ohio May 30, 2023) ("In cases asserting both individual liability and potential 'class action' claims under the TCPA, courts have often approved bifurcating discovery in such cases where narrow, potentially dispositive, issues can be decided at the outset of a case prior to costly class discovery.") (collecting cases); *Osidi v. Assurance IQ*, LLC, 2022 WL 623733, at *2 (D. Mass. Mar. 3, 2022) (bifurcating discovery in TCPA case, finding "the need for class discovery may be eliminated if [d]efendant is able to demonstrate that the [n]amed [p]laintiff lacks viable individual claims"); *Akselrod v. MarketPro Homebuyers LLC*, 2021 WL 100666, at *2 (D. Md. Jan. 12, 2021) (granting defendant's motion to bifurcate discovery in TCPA case and finding "[l]imited discovery has the potential to simplify the case and to save both parties the time and expense of class discovery, which can be particularly resource intensive"); *Newell v. Aliera Healthcare, Inc.*, 2020 WL 13568762, at *3 (N.D. Ga. Apr. 6, 2020) (reasoning that the limited discovery into the individual plaintiff "has the potential to save the parties and the Court from the substantial costs and burdens associated with whole scale class action discovery") (quotation and citation omitted); *Katz v. Liberty Power Corp., LLC*, 2019 WL 957129, at *2 (D. Mass. Feb. 27, 2019) ("[C]lass discovery is not necessary to address certain issues that may be dispositive of Plaintiffs' individual claims or ability to bring the asserted class claims, including whether the phone numbers at issue are within the TCPA, whether named [p]laintiffs' are within the classes they purport to represent, and whether any named [p]laintiffs with a viable claim can demonstrate the Court's jurisdiction to resolve that claim."); *Leschinsky v. Inter-Continental Hotels Corp.*, 2015 WL 6150888, at *2 (M.D. Fla. Oct. 15, 2015) (granting bifurcated discovery in a TCPA case).

12   *See, e.g., Fania v. Kin Ins., Inc.*, No. 22-12354, 2024 WL 2607303, at *2 (E.D. Mich. May 24, 2024) ("In the Court's view, bifurcating discovery into plaintiff specific and class wide phases is the most efficient way to proceed with this litigation. In cases asserting both individual liability and potential class action claims under the TCPA, courts have bifurcated discovery 'where narrow, potentially dispositive, issues can be decided at the outset of a case prior to costly class discovery.') (quoting *Pavelka v. Paul Moss Ins. Agency, LLC*, No. 1:22 CV 02226, 2023 WL 3728199, at *2 (N.D. Ohio May 30, 2023) (collecting cases).

13   *Babare v. Sigue Corp.*, 2020 WL 8617424, at *2 (W.D. Wash. Sept. 30, 2020).

14   Fed. R. Civ. P. 1.

15   *True Health Chiropractic Inc. v. McKesson Corp.*, No. 13-cv-02219-JST, 2015 WL 273188, at *1 (N.D. Cal. Jan. 20, 2015); *see also* 🚩*Crawford-El v. Britton*, 523 U.S. 574, 598–99 (1998) (noting district courts have broad discretion to control discovery and to dictate the sequence of discovery)

16   🚩*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (citation omitted).

17   🚩Fed. R. Civ. P. 23(b)(3).

18   🚩*Dillard*, 2024 WL 4145162, at *3 (quoting 🚩*Wal-Mart Stores, Inc.*, 564 U.S. at 351 (quotation and citation omitted)).

19   *Klassen*, 2023 WL 5497865, at *2 (quotation and citation omitted).

20   *Id.*

21   *Id.* at 3.

22   2023 WL 5497865.

23   🚩2024 WL 4145162.

24    Motion at 11.

25    *Klassen*, 2023 WL 5497865, at *3.

26    Plaintiff's Opposition Memorandum at 2.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 12 of 121

Chenault v. Beiersdorf, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 5016795
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Western Division.

Travis CHENAULT, Plaintiff,

v.

BEIERSDORF, INC., Defendant.

Case No. 1:20-cv-174
|
Signed 08/24/2020

**Attorneys and Law Firms**

Robb S. Stokar, Christian A. Jenkins, Minnillo & Jenkins Co.,
LPA, Cincinnati, OH, for Plaintiff.

David Kirsten Montgomery, Jamie Marie Goetz-Anderson,
Jackson Lewis LLP, Cincinnati, OH, for Defendant.

**ORDER GRANTING DEFENDANT'S
MOTION TO BIFURCATE DISCOVERY**

Timothy S. Black, United States District Judge

 **\*1**  This civil action is before the Court on Defendant
Beiersdorf, Inc.'s motion to bifurcate discovery (Doc. 9), and
the parties' responsive memoranda (Docs. 10, 11).

## I. BACKGROUND

On February 28, 2020, Plaintiff filed this proposed class
action lawsuit on behalf of himself and others similarly
situated alleging that Defendant violated the Fair Labor
Standards Act ("FLSA") and Ohio law. (Doc. 1). Plaintiff
alleges that he and other Beiersdorf employees worked in
excess of 40 hours per workweek and were not paid overtime
pay. (*Id.* at ¶ 29). Defendant filed its answer on May 26, 2020.
(Doc. 5).

The Court held a Preliminary Pretrial Conference ("PPTC")
by telephone with the parties on June 23, 2020. During
the PPTC, the parties informed the Court that they dispute
whether bifurcated discovery is appropriate, and the Court set
an expedited briefing schedule. (June 23, 2020 Minute Entry
and Notation Order).

On July 6, 2020, Defendant filed the present motion
to bifurcate discovery. (Doc. 9). Defendant proposes that
discovery be conducted in two phases. The first proposed
phase of discovery would be focused on class/collective
action issues under the FLSA and/or Rule 23. Defendant
proposes limiting the first phase of discovery to 25
interrogatories, 25 requests for production, 25 requests for
admission, and up to five depositions for each party. (*Id.*
at 1). Under Defendant's proposed plan, expert witness
disclosures and discovery would be deferred until the second
phase of discovery, unless either party requires expert
witness testimony in connection to certification issues. If
either party requires expert testimony related to certification
issues, Defendant proposes an October 1, 2020 deadline
for primary expert designations and a November 15, 2020
deadline for any rebuttal expert designations. (*Id.* at 2).
Defendant's proposed deadline for the first phase of discovery
is December 15, 2020, one month before Plaintiff's deadline
to file a motion for conditional certification and/or motion for
class action. (*Id.* at 1).

Defendant proposes that the second phase of discovery
—which would occur after the Court's decision on any
motion for class and/or conditional certification—would
focus on merits-based discovery and final certification and
decertification issues. (*Id.* at 1–2). After the Court rules on any
motion for class and/or conditional certification, Defendant
suggests holding a status conference to establish a calendar
for the second phase of discovery. (*Id.* at 2).

Plaintiff opposes Defendant's proposed discovery plan and
contends he needs discovery beyond what is proposed in
Defendant's bifurcation plan in order to support his motion
for conditional certification. (Doc. 10 at 2). Alternatively, if
the Court grant's Defendant's motion to bifurcate, Plaintiff
requests that Defendant be required to produce materials
"reasonably necessary for plaintiff to seek conditional
certification." (*Id.* at 5–6).

 **\*2**  Defendant's motion to bifurcate discovery is ripe for
review.

## II. STANDARD OF REVIEW

"Whether to bifurcate class certification and merits discovery
is within the discretion of the court." *McCluskey v. Belford
High School*, 2011 WL 13225278, at *3 (E.D. Mich. Mar. 10,

Chenault v. Beiersdorf, Inc., Not Reported in Fed. Supp. (2020)

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 13 of 121

2011); *In re Copper Tubing Litig.*, 2006 WL 8434911, at \*5 (W.D. Tenn. Oct. 3, 2006).

To determine whether bifurcating discovery is appropriate, courts consider "the benefits and detriments to each party's interest," as well as "the Court's interest in reaching a just, speedy and efficient resolution of the issues raised by the pleadings." *Woods v. State Farm Fire & Casu. Co.*, 2010 WL 1032018, at \*3 (S.D. Ohio Mar. 16, 2010); *see Johnson v. Gulfport Energy Corp.*, 2020 WL 4528824, at \*5 (S.D. Ohio Aug. 5, 2020). Courts may bifurcate discovery "if it serves judicial economy and does not unfairly prejudice any party." *Galloway v. Nationwide Mut. Fire Ins. Co.*, No. 3:09-CV-491-JDM, 2010 WL 3927815, at \*1 (W.D. Ky. Oct. 5, 2010) (citing *Hines v. Joy Mfg. Co.*, 850 F.2d 1146, 1153 (6th Cir. 1988)).

### III. ANALYSIS

Defendant's motion requests that the Court bifurcate discovery into two phases: discovery related to class-certification and discovery on the merits. Defendant contends that bifurcated discovery "will allow Plaintiff and Defendant to discovery any evidence needed to support their respective positions regarding class and/or conditional certification, while preserving the parties' time and resources by delaying class-wide discovery unless and until a class or collective is certified." (Doc. 9 at 2).

Plaintiff opposes bifurcation because he contends that he would be denied the opportunity to obtain the materials necessary to prosecute his case. (Doc. 10 at 5). Moreover, Plaintiff argues that the information he seeks will not be burdensome or costly for Defendant to produce. (*Id.* at 4–5).

Although there is not a well-delineated test to determine whether to bifurcate class certification and merit-based issues, courts have looked to three factors in considering whether bifurcation is appropriate:

> (1) expediency, meaning whether bifurcated discovery will aid the court in making a timely determination on the class certification motion; (2) economy, meaning "the potential impact a grant or denial of certification would have upon the pending litigation," and whether the definition of the class would "help determine the limits of discovery on the merits;" and (3) severability, meaning whether class certification and merits issues are closely enmeshed.

*Ballard v. Kenan Advantage Grp., Inc.*, 2020 WL 4187815, at \*1 (N.D. Ohio July 20, 2020) (quoting 3 Newberg on Class Actions § 7:17 (5th ed.) (citing *Harris v. comScore, Inc.*, 2012 WL 686709, \*3 (N.D. Ill. March 2, 2012))).

Here, the Court finds that bifurcation of discovery is appropriate.

The first and second factors favor bifurcation. First, prioritizing certification related discovery before addressing merits discovery will help this Court issue a timely ruling on any motion for class and/or conditional certification. Second, bifurcation should promote judicial economy because defining any potential class may limit or focus discovery on the merits and prevent potentially unnecessary discovery costs.

**\*3** The third factor is thornier. The Court recognizes that courts within the Sixth Circuit have denied motions to bifurcate discovery where there would be considerable amount of overlap between class certification and merits-based discovery. *Johnson*, 2020 WL 4528824, at \*5 (finding that bifurcation would not promote judicial economy because class certification and merits-based discovery overlapped); *Shah v. Metro. Life Ins. Co.*, 2017 WL 4772870, at \*3 (S.D. Ohio Oct. 19, 2017) (denying bifurcated discovery because it would not promote judicial economy); *McCluskey v. Belford High Sch.*, 2011 WL 13225278, at \*3 (E.D. Mich. Mar. 10, 2011) (finding that bifurcating discovery would "likely lead to disputes over what is 'merit' discovery as opposed to 'class' discovery, resulting in needless motion practice" and noting that "the discovery relative to class issues and merits discovery will significantly overlap, thereby creating inefficiencies were the Court to bifurcate discovery"). But the fact that class and merits-based discovery will be inevitably be intertwined to some extent does not necessitate denying a motion to bifurcate. Here, the Court finds that—while class issues and merit-based discovery may be somewhat enmeshed—there should not be considerable overlap.

Because efficiency and judicial economy favor bifurcation, Defendant's motion is well-taken. Therefore, discovery relating to class certification and discovery relating to merits should be bifurcated as much as practicable. Accordingly, the Court adopts Defendant's timeline and plan for the first phase of discovery (*see* Doc. 9 at 1–2). The timeline for the second phase of discovery will be set after the Court

issues its decision on any motion for class and/or conditional certification.

Nevertheless, while the Court agrees with Defendant that bifurcated discovery is appropriate, the Court wants to make clear that Defendant is required to produce materials necessary for Plaintiff to seek conditional certification. If discovery disputes arise over whether a discovery issue is class or merit related, the Court anticipates permitting discovery on the issue.

In that vein, the parties already dispute whether Plaintiff should be provided with a list of class member names and contact information during the first phase of discovery. Defendant contends that production of such a list is premature. (Doc. 9 at 2). Defendant has offered to produce a redacted employee list (including first name, last initial, and dates of employment), yet Plaintiff argues that a redacted list is insufficient. The Court agrees with Plaintiff.

As courts have recognized, "[g]iven the Supreme Court's direction that the broad remedial goal of the FLSA should be enforced to the full extent of its terms, pre-certification discovery is appropriate to enable the plaintiff to define the class and identify similarly situated employees." *Boice v. M +W U.S., Inc.*, 130 F. Supp. 3d 677, 698 (N.D.N.Y. 2015)

(quoting *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 2010 WL 2362981, at *2 (S.D.N.Y. June 14, 2010)) (internal quotation marks and alterations omitted). Here, the Court finds that Defendant's production of an unredacted employee list is appropriate to enable Plaintiff to identify similarly situated employees, which is permissible discovery for Plaintiff during the first pre-certification phase of discovery.

Nevertheless, other discovery materials requested by Plaintiff in his opposition brief—such as pay stubs and copies of gift cards—are merit-based discovery and will not need to be produced by Defendant until the second phase of discovery.

## IV. CONCLUSION

Accordingly, as outlined above, Defendant's motion to bifurcate discovery (Doc. 9) is **GRANTED**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5016795

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 15 of 121

EQT Production Company v. Terra Services, LLC, Not Reported in Fed. Supp. (2014)

2014 WL 12838677
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

EQT PRODUCTION COMPANY, Plaintiff,
v.
TERRA SERVICES, LLC, Defendant.

Civil Action No. 14-1053
|
Signed 10/21/2014
|
Filed 10/22/2014

**Attorneys and Law Firms**

Patricia L. Dodge, Caleb M. Turner, Nicholas J. Bell, Chad I. Michaelson, Meyer, Unkovic & Scott LLP, Ryan James, Farneth Tomosovich, LLC, Pittsburgh, PA, for Plaintiff.

Daniel Carmeli, John K. Gisleson, Matthew H. Sepp, Morgan, Lewis & Bockius LLP, Pittsburgh, PA, Glen R. Stuart, Morgan, Lewis & Bockius LLP, Philadelphia, PA, Kenneth S. Komoroski, Morgan, Lewis & Bockius LLP, Canonsburg, PA, for Defendant.

## MEMORANDUM ORDER

Nora Barry Fischer, United States District Judge

**\*1** Pursuant to the Court's rulings at the Initial Case Management Conference, held on September 30, 2014, and the Court's Order of October 1, 2014, (Docket No. 21), Defendant, Terra Services, LLC ("Terra"), filed a Motion to Bifurcate Discovery on October 10, 2014, (Docket No. 25). Plaintiff, EQT Production Co. ("EQT"), filed its Response in Opposition on October 17, 2014. (Docket No. 30). The Motion is now ripe.

"The decision to bifurcate, and the manner in which bifurcation should be ordered, is left to the trial court's informed discretion and must be decided on a case by case basis." *Hartley-Culp v. Credit Mgmt. Co.*, No. 14-282, 2014 WL 4630852, at \*3 (citing *Idzojtic v. Pa. R.R. Co.*, 456 F.2d 1228, 1230 (3d Cir. 1972) ). "Bifurcation

"remains the exception rather than the rule." *Innovative Office Prods., Inc. v. Spaceco, Inc.*, No. 05-4037, 2006 WL 1340865, at \*1 (E.D. Pa. May 15, 2006). "Courts ... do not routinely grant motions to bifurcate discovery, unless there is some showing on the part of the moving party as to why bifurcation is appropriate." *Cephalon, Inc. v. Sun Pharm., Ltd.*, No. 11-5474, 2013 WL 3417416, at \*3 (D.N.J. July 8, 2013). "[T]he moving party bears the burden of demonstrating that bifurcation would serve judicial economy, avoid inconvenience, and not prejudice any of the parties." *Cephalon, Inc.*, 2013 WL 3417416 at \*3.

Though Terra argues that bifurcation would expedite proceedings in this case, its proposed schedule takes discovery in this case through the end of January, 2017. (Docket No. 25-1 at p. 2). EQT points out that this schedule "presumes an immediate decision from the Court on dispositive motions." (Docket No. 30 at p. 4). The Court agrees that this is unrealistic. Adding the several months it will no doubt take this Court to rule on said motions, under Terra's schedule, discovery in this case might remain open until 2018. Cognizant of the availability of witnesses and their diminishing ability to recall the events of 2012, the Court refuses to use its discretion to bifurcate discovery on this ground.

Additionally, as EQT argues, Terra's proposal would likely result in deposing the same witnesses twice–once in the liability phase, and again in the damages phase. This is the definition of inconvenience, and the additional cost of duplicative depositions and document review combine to counsel against bifurcation in this case.

Terra's objections are preserved as is the Court's right to bifurcate the trial of this action.

With the foregoing in mind, IT IS HEREBY ORDERED that Defendant's Motion to Bifurcate Discovery [25] is DENIED.

IT IS FURTHER ORDERED that the parties meet and confer and file a joint proposed case management order by **November 3, 2014**.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12838677

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.  1

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 16 of 121

Fania v. Kin Insurance, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 2607303
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Anthony FANIA, on Behalf of Himself
and Others Similarly Situated, Plaintiff,
v.
KIN INSURANCE, INC., Defendant.

Case No. 22-12354
|
Signed May 24, 2024

**Attorneys and Law Firms**

Alex Phillips, Strauss Borrelli PLLC, Chicago, IL, David H.
Fink, Nathan J. Fink, Fink Bressack PLLC, Bloomfield Hills,
MI, Anthony I. Paronich, Broderick Law P.C., Boston, MA,
for Plaintiff.

Dane Michael Lepola, Jonathan F. Karmo, Howard & Howard
Attorneys PLLC, Royal Oak, MI, Paul Heeringa, Manatt,
Phelps & Phillips, LLP, Chicago, IL, for Defendant.

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION TO BIFURCATE DISCOVERY**

GERSHWIN A. DRAIN, United States District Judge

### I. Introduction

**\*1** Plaintiff Anthony Fania ("Fania" or "Plaintiff") filed
this lawsuit in October 2022 on behalf of himself and others
similarly situated. [ECF No. 1]. The class action complaint
accuses Defendant Kin insurance ("Kin" or "Defendant")
of violating the Telephone Consumer Protection Act, 47
U.S.C. § 227 (b) (the "TCPA"). ECF No. 1, PageID.9.
Plaintiff's claim is based on an alleged "pre-recorded" call to
his cell phone on August 29, 2022.

Before the Court is Defendant Kin's Motion to Bifurcate
Discovery. It was filed on October 23, 2023. Plaintiff
responded on November 7, 2023, and Defendant replied on
November 9, 2023. The motion is fully briefed.

Upon review of the parties' briefing and applicable authority,
the Court concludes oral argument will not aid in the
resolution of this matter. Accordingly, the Court will resolve

Defendant's Motion for Bifurcation on the briefs. *See* E.D.
Mich. L.R. 7.1(f)(2). For the reasons set forth below,
Defendant's Motion is **GRANTED**.

### II. Factual and Procedural Background

Kin sells insurance products in multiple states and consumers
may request an insurance quote from Kin through various
websites. It alleges that, on August 29, 2022, Fania visited
www.dailyinsurancedeals.com (the "subject website"), to
request an insurance quote.

On the other hand, Plaintiff alleges that he "received a pre-
recorded telemarketing call from the Defendant on August
29, 2022," and during that call, a "recorded message asked
if the call recipient was looking for home insurance." ECF
No. 1, PageID.5. Plaintiff says he "recognized" that "he was
speaking to a robot, so he interrupted the recorded message
asked the robot a question" and did not receive a response.
*Id.* He was then told by a live agent that they were calling
from Kin Insurance. *Id.* Plaintiff "then received another call
from Tamely Jobs, who was following up on the pre-recorded
call that the Plaintiff received and continued to promote the
Defendant's services." *Id.*

Fania subsequently commenced the instant action. Kin filed a
Motion to Compel Arbitration, arguing that Fania had signed
an arbitration agreement. Because Fania denied signing the
agreement, the Court determined that Fania had "sufficiently
put[ ] 'in issue' the formation of the agreement and its alleged
signing by him." ECF No. 16, PageID.209. And the Court
stated that, "as required by [the Federal Arbitration Act, 9
U.S.C.] § 4, the Court will 'proceed summarily to the trial'
on the disputed question." *Id.* Accordingly, the Court set a
trial date and ordered the parties to conduct discovery "for the
limited purpose of addressing the contract formation issue[.]"
*Id.* at PageID.211.

Before the trial date, however, Defendant voluntarily
withdrew the Motion to Compel Arbitration and raised
the issue of bifurcation. *See* ECF No. 22. And the Court
subsequently ruled, by stipulation of the parties, that "merits
discovery may proceed generally while and until the Court
decides the bifurcation issue, provided that (a) Kin will
not need to respond to any classwide discovery issued
by Plaintiff until thirty (30) days after the Court rules
on bifurcation, and (b) Plaintiff shall not serve discovery
regarding classwide issues on third-parties while the Court
considers the bifurcation issue." ECF No. 26, PageID.256.

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 17 of 121

Fania v. Kin Insurance, Inc., Not Reported in Fed. Supp. (2024)

### III. Applicable Law and Analysis

**\*2** Fania is the sole named Plaintiff in this action. Defendant asserts that "[i]f a live person indeed initiated and conducted the call(s) at issue here or if Kin is not legally responsible for any supposed 'pre-recorded' calls that Plaintiff did receive (as discovery on these narrow issues will prove), there will be no need for invasive and burdensome additional discovery, let alone class discovery, because this entire case will be over (on its merits and for lack of standing)." ECF No. 28, PageID.266. Accordingly, Defendant argues that bifurcation is necessary to resolve "the narrow case-dispositive questions of[:] (1) whether Plaintiff himself received a pre-recorded call (and therefore could even attempt to bring a claim on behalf of the putative class)[,] and (2) whether Kin is legally responsible for such calls." *Id.*, at PageID.268.

District courts possess "inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " *Dietz v. Bouldin*, 136 S. Ct. 1885, 1891 (2016) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)). Additionally, Fed. R. Civ. P. 42 (b) permits a district court to "bifurcate trial on separate issues in furtherance of convenience, to avoid prejudice, or when separate trials will be conducive to expedition and economy." *Marchese v. Milestone Sys., Inc.*, No. 12-12276, 2013 WL 12183618, at \*2 (E.D. Mich. Dec. 3, 2013). Again, "[w]hether to try issues separately under Rule 42(b) is within the district court's discretion." *See Hines v. Joy Mfg. Co.*, 850 F.2d 1146, 1152 (6th Cir. 1988) (noting that a bifurcation of claims is permissible if it serves judicial economy and does not unfairly prejudice any party). However, "[t]he party seeking bifurcation has the burden of demonstrating judicial economy would be promoted and that no party would be prejudiced by separate trials." *Id.*, (quoting *K.W. Muth Co. v. Bing-Lear Mfg. Group*, No. 01-CV-71925, 2002 WL 1879943, \*3 (E.D. Mich. July 16, 2002)) (quotation marks and citation omitted). The decision to bifurcate is made "on a case-by-case basis" and is "[u]ltimately" a practical decision. *Id.* (quotation marks and citations omitted).

Under § 227 (b)(1)(A), it is unlawful for any person to "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party)" to a recipient in the United States "using any automatic telephone dialing system or an artificial or prerecorded voice." Thus, the dispositive issue for Fania turns on the question of whether he received a call that was made using prerecorded voice. *See, e.g., Ashland Hosp. Corp. v. Serv. Emps. Int'l Union*, 708 F.3d 737, 743 (6th Cir. 2013) (affirming dismissal of TCPA claims because plaintiff did not receive any prerecorded calls).

In the Court's view, bifurcating discovery into plaintiff specific and class wide phases is the most efficient way to proceed with this litigation. In cases asserting both individual liability and potential class action claims under the TCPA, courts have bifurcated discovery "where narrow, potentially dispositive, issues can be decided at the outset of a case prior to costly class discovery." *Pavelka v. Paul Moss Ins. Agency, LLC*, No. 1:22 CV 02226, 2023 WL 3728199, at \*2 (N.D. Ohio May 30, 2023); *see e.g., Akselrod v. MarketPro Homebuyers LLC*, No. CV CCB-20-2966, 2021 WL 100666, at \*2 (D. Md. Jan. 12, 2021) (bifurcating discovery in TCPA case after determining that whether an automatic dialing system was used was an issue of liability distinct from class certification, and "[l]imited discovery has the potential to simplify the case and to save both parties the time and expense of class discovery, which can be particularly resource intensive");

**\*3** Here, the need for class discovery may be eliminated if Kin is able to demonstrate that Fania, the sole named Plaintiff, lacks a viable individual claim. *See Cruz v. Farquharson*, 252 F.3d 530, 533 (1st Cir. 2001) ("Despite the fact that a case is brought as a putative class action, it ordinarily must be dismissed as moot if no decision on class certification has occurred by the time that the individual claims of all named plaintiffs have been fully resolved."). Further, class discovery regarding potential class members, the number of which is "likely at least in the thousands[,]" ECF No. 1, PageID.7, is not necessary to address certain issues that may be dispositive of Fania's individual claim and ability to represent the purported class. This includes whether the phone call was pre-recorded.

Additionally, the evidence so far discovered with respect to Fania has revealed a vigorous dispute regarding a purportedly fraudulent lead that resulted in Fania's information being entered on www.dailyinsurancedeals.com. It was either Fania, or someone pretending to be Fania, that consented to receive insurance quotes and arbitrate potential issues resulting from this transaction. In these circumstances, the Court finds that this narrow and potentially dispositive issue is distinct from issues of liability to be determined in this case on a class-

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 18 of 121

Fania v. Kin Insurance, Inc., Not Reported in Fed. Supp. (2024)

wide basis. Accordingly, and for purposes of efficiency, the Court will review evidence and make a determination with regard to Fania's plaintiff-specific claim prior to costly and time-consuming class discovery.

Proceeding in this manner serves the interests of justice and efficiency. *See* 🚩 *Physicians Healthsource, Inc. v. Janssen Pharm, Inc.*, Civil Action No. 12-2132 (FLW), 2014 WL 413534, at *4-5 (D.N.J. Feb. 4, 2014) (bifurcating discovery in TCPA fax case based on a narrow, potentially dispositive issue that was distinct from class issues, and recognizing that bifurcation had the potential to "save the parties and the Court from the substantial costs and burdens associated with whole scale class action discovery"); *see also Katz v. Liberty Power Corp., LLC*, No. 18-CV-10506-ADB, 2019 WL 957129, at *2 (D. Mass. Feb. 27, 2019) ("[C]lass discovery is not necessary to address certain issues that may be dispositive of Plaintiffs' individual claims or ability to bring the asserted class claims, including whether the phone numbers at issue are within the TCPA, whether named [p]laintiffs' are within the classes they purport to represent, and whether any named [p]laintiffs with a viable claim can demonstrate the Court's jurisdiction to resolve that claim."). Further, the distinctions between the narrow and potentially dispositive issue with respect to Fania, and the issues of liability to be determined on a class-wide basis render this case distinguishable from *McClusky.* There, the Court determined, in a non-TCPA case, that bifurcation was inappropriate because, *inter alia*, "the discovery relative to class issues and merits discovery will significantly overlap, thereby creating inefficiencies were the Court to bifurcate discovery." 🚩 *McCluskey v. Belford High Sch.*, No. 09-CV-14345, 2011 WL 13225278, at *3 (E.D. Mich. Mar. 10, 2011).

Plaintiff argues that bifurcating discovery would defeat efficiency and thereby prejudice him. He says he has previously made discovery requests for Kin to produce messages between it and dailyinsurancedeals.com, including on the process for verifying leads. Plaintiff believes that this information "affects Mr. Fania just as much as it does the class." ECF No. 32, PageID.321. His argument also suggests that bifurcation would engender additional motion practice about the distinction between merits discovery and class wide discovery. *Id.* And he says that:

> **\*4** Kin forecasted it will withhold documents like this if the Court

bifurcates discovery because it believes they relate only to "classwide" issues. In other words, Kin does not intend to produce "merits" discovery no matter how the Court defines it, meaning Mr. Fania will be back in Court to demand documents. That is not "efficient."

ECF No. 32, PageID.315.

Plaintiff's argument is not well taken. As stated *infra*, it was nearly seven months ago when the Court ordered the parties to conduct merits discovery regarding Plaintiff's claims and barred the parties from engaging in class-wide discovery. Class-wide discovery has been off limits, and merits discovery as to Fania is ongoing. Yet, Fania has not raised an issue or filed a discovery motion regarding any unsatisfied discovery requests, which belies his assertion that bifurcating this case "will lead to litigation over what 'bifurcation' means and delay this yet-to-start [class-wide discovery period] again." *Id.* However, Fania is permitted to file a motion if Kin wrongfully denies him discovery to which he is entitled given his individual claim.

In the Court's view, requiring the parties to continue down the path of Plaintiff specific discovery—rather than setting a new discovery schedule for class wide issues at this juncture—is the most efficient way to assure an expeditious resolution to this case. And it is the most efficient use of the Court's resources.

## IV. Conclusion

For the reasons stated above, the Court orders the following:

1. Defendant's Motion for Bifurcation is **GRANTED**.

2. Discovery will be phased/bifurcated according to the following schedule:

   a. Discovery as to the merits of Plaintiff's individual TCPA claim against Defendant shall proceed for **thirty (30) days** after entry of this order, subject to any extensions granted by the court;

   b. Opening summary judgment motions as to the merits of Plaintiff's individual TCPA claim shall be due

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 19 of 121

**Fania v. Kin Insurance, Inc., Not Reported in Fed. Supp. (2024)**

**thirty (30) days** after the close of the initial phase of individual discovery;

c. Oppositions to summary judgment due **thirty (30) days** after service of opening motions; and

d. Reply briefs in support of summary judgment due **fifteen (15) days** after service of oppositions.

3. Discovery during this initial period shall be limited to issues relevant to determining the merits of Plaintiff's individual TCPA claim.

4. The Parties may issue third party discovery requests during this initial period as needed, but class related

discovery shall not be allowed. To the extent Plaintiff has already issued any class discovery, Defendant need not respond to same.

5. If necessary, the Court will set a case management status conference and schedule for class wide discovery after it has ruled on summary judgment motion(s) relating to Plaintiff's individual claim.

**IT IS ORDERED**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 2607303

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2422617
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Joseph FRIEL, individually and on behalf
of others similarly situated, Plaintiff

v.

LINE 5, LLC and Headstart
Warranty Group, LLC, Defendants

No. 3:24cv1866
|
Signed August 21, 2025

**Attorneys and Law Firms**

Anthony I. Paronich, Pro Hac Vice, Paronich Law, P.C., Hingham, MA, Jeremy C. Jackson, Bower Law Associates, PLLC, State College, PA, Andrew Roman Perrong, Perrong Law LLC, Glenside, PA, for Plaintiff.

Brit J. Suttell, Barron & Newburger, P.C., Media, PA, for Defendant Line 5, LLC.

Andrew Michael Schwartz, Messer Strickler Burnette, Ltd., Downingtown, PA, Barry Guaglardi, Pro Hac Vice, Guaglardi & Meliti, LLP, Rochelle Park, NJ, for Defendant Headstart Warranty Group LLC.

**MEMORANDUM**

JULIA K. MUNLEY, JUDGE

 **\*1** This putative class action case involves automated telephone calls allegedly sent by companies selling, guaranteeing, and/or financing vehicle service contracts, otherwise known as extended car warranties. After receiving numerous unsolicited extended-warranty calls over a two-month period, Plaintiff Joseph Friel filed this action pursuant to the Telephone Consumer Protection Act of 1991, 🚩47 U.S.C. § 227, ("TCPA"), seeking to represent a nationwide class of robocall recipients and a class of recipients on the National Do Not Call Registry ("DNCR"). Before the court is a motion to strike the class allegations from Friel's complaint prior to discovery. Also pending is a motion to bifurcate discovery, which actually requests that discovery be conducted in three separate phases. Both motions are ripe for disposition.

**Background** [1]

Friel's TCPA complaint alleges that former defendant JEA Management Services d/b/a Covered Auto ("JEA") sent prerecorded telemarketing calls on behalf of Defendants Headstart Warranty Group, LLC ("Headstart") and Line 5, LLC ("Line5"), including to recipients on the DNCR without the call recipient's express written consent. (Doc. 1, Compl. ¶ 5).

As for the extended car warranties involved in this TCPA litigation, Friel's complaint details a joint enterprise among the JEA, Headstart, and Line5 entities. Id. ¶ 17. As alleged, JEA and Headstart sell vehicle service contracts with JEA acting as a sales agent and Headstart acting as the guarantor of the contracts. id. ¶¶ 14–15. Line5 handles customer management, payment processing, and provides financing for the contracts sold by JEA and guaranteed by Headstart. Id. ¶ 16. To generate business, JEA places telemarketing calls, some of which are prerecorded, on behalf of Headstart and Line5. Id. ¶ 17.

Friel further alleges that he maintains a personal residential telephone number, which has been on the DNCR since 2011. Id. ¶¶ 18–20. According to the plaintiff, he has never been a customer of JEA, Headstart, or Line5 and never inquired into being a customer of these entities. Id. ¶ 21. Nevertheless, Friel received at least fourteen (14) telemarketing calls from JEA between August 8, 2024 and September 27, 2024. Id. ¶ 22. The caller IDs from these incoming calls reflected different phone numbers from area codes associated with the Philadelphia, Allentown-Bethlehem-Easton, and Scranton-Wilkes-Barre metropolitan areas. Id. ¶¶ 22, 27.

Friel answered the calls. They all began with a prerecorded voice message with fake typing and office background noise. Id. ¶¶ 23, 24. A robotic voice greeted Friel by name, identified that it was calling on behalf of the "vehicle service department," and asked how the plaintiff was doing. Id. ¶ 24. Friel hung up on most of the calls. Id. ¶ 26.

Friel answered one of the calls on September 27, 2024. Id. ¶ 27. Plaintiff heard the above prerecorded message, responded to questions posed by the artificial intelligence agent, and was then transferred to a human representative. Id. ¶¶ 23–32. Next, Friel listened to that representative's sales speech about a vehicle service contract and the financing program offered by Defendant Line5. Id. ¶¶ 32–33. Subsequently, Friel

received various emails and text messages from Line5 and a copy of a vehicle service contract for signature. Id. ¶ 36. From these communications, Friel discerned JEA, Headstart, and Line5's roles in the telephone calls. Id. ¶¶ 37–39.

**\*2** Approximately one month later, on October 29, 2024, Friel initiated this putative class action against JEA, Headstart, and Line5 under 47 U.S.C. § 227(b) and 47 U.S.C. § 227(c)(5) seeking to represent himself and other similarly situated individuals. (Doc. 1, Compl. ¶¶ 90–99). JEA responded by filing three motions: 1) a motion to strike class allegations (Doc. 29); 2) a motion to dismiss for failure to state a claim, (Doc. 31), and 3) a motion to trifurcate discovery, (Doc. 33). JEA filed briefs in support of each motion. (Docs. 30, 32, 34). Defendant Line5 joined JEA's motion to strike and motion to trifurcate discovery. (Docs. 45–46).

On March 25, 2025, Friel filed a notice of voluntary dismissal regarding JEA. (Doc. 50). JEA's dismissal rendered the motion to dismiss moot. (Doc. 51). The court determined that Line5's joinder to the other motions required oppositional briefing. Id. Friel subsequently filed his briefs in opposition as ordered. (Docs. 52–53). Line5 then filed a reply brief regarding the motion to trifurcate discovery, (Doc. 54), but not the motion to strike. Based on the briefs of JEA and Friel, the motion to strike plaintiff's TCPA class allegations is ripe for disposition. Similarly, the motion seeking phased discovery is ready for a decision based upon the briefs of JEA, Friel, and Line5.

**Jurisdiction**

Because Friel brings suit under a federal statute, the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. See Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 387, 132 S.Ct. 740, 181 L.Ed.2d 881 (2012) (holding that nothing in the text, structure, or legislative history of the TCPA calls for displacement of federal question jurisdiction).

**Analysis**

**1. The TCPA and the Proposed Classes**

This putative class action concerns alleged violations of the TCPA. "The TCPA protects businesses and consumers from intrusive telemarketing communications." McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp., 606 U.S. 146, 149, 145 S.Ct. 2006, ——— L.Ed.2d ——— (2025). The TCPA

"makes it unlawful to use an automatic telephone dialing system or an artificial or prerecorded voice message, without the prior express consent of the called party, to call any... cellular telephone, or other service for which the receiver is charged for the call." Mims, 565 U.S. at 373, 132 S.Ct. 740 (citing 47 U.S.C. § 227(b)(1)(A)). The TCPA also "forbids using artificial or prerecorded voice messages to call residential telephone lines without prior express consent. Id. (citing 47 U.S.C. § 227(b)(1)(B)). "In plain English, the TCPA prohibited almost all robocalls to cell phones." Barr v. Am. Ass'n of Pol. Consultants, Inc., 591 U.S. 610, 615, 140 S.Ct. 2335, 207 L.Ed.2d 784 (2020) (footnote omitted).

Additionally, Section 227(b) contains a private right of action based on violations of that subsection or the regulations prescribed under that subsection. 47 U.S.C. § 227(b)(3). Under Section 227(b)(3), a person or entity may: 1) obtain injunctive relief; 2) recover actual monetary loss or receive $500 in damages, whichever is greater; or 3) both. See 47 U.S.C. § 227(b)(3)(A)–(C). "The TCPA imposes tough penalties for violating the robocall restriction," including trebling the above damages for willful or knowing violations, "which can add up quickly in a class action." Barr, 591 U.S. at 616, 140 S.Ct. 2335.

Section 227(c) concerns further protections of residential telephone subscribers' privacy rights and directs the Federal Communications Commission ("FCC") to prescribe regulations regarding do-not-call systems. See 47 U.S.C. § 227(c)(1)–(4). Section 227(c) "authorizes a private right of action for violation of the FCC's implementing regulations[ ]" related to do-not-call. See 47 U.S.C. § 227(c)(5); Mims, 565 U.S. at 375 & n.5, 132 S.Ct. 740. Section 227(c)(5) permits a civil action by "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations[.]" 47 U.S.C. § 227(c)(5). [2] Under Section 227(c)(5), a person or entity may: 1) obtain injunctive relief; 2) recover actual monetary loss or receive $500 in damages, whichever is greater; or 3) both. See 47 U.S.C. § 227(c)(5)(A)–(C). A

plaintiff may also seek treble damages for willful or knowing violations of the do-not-call regulations. Id.

**\*3** These statutory provisions and attendant regulations form the basis of Friel's complaint against the defendants. They also form the basis his two proposed classes. The proposed Robocall Class stems from the alleged Section 227(b) and related regulatory violations, while the proposed National Do Not Call Registry Class ("DNCR Class") derives from the alleged Section 227(c) and related regulatory violations.

### 2. Motion to Strike Class Allegations

There are two motions presently pending before the court. First, as mentioned above, Line5 joined in JEA's motion to strike the class allegations from Friel's complaint. The motion to strike is partly premised upon Rule 12(f) of the Federal Rules of Civil Procedure. Rule 12(f) provides that the court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). Rule 12(f) motions are designed to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters. Goode v. LexisNexis Risk & Info. Analytics Grp., Inc., 284 F.R.D. 238, 243 (E. D. Pa. 2012) (citations omitted); see also Mclnerney v. Moyer Lumber and Hardware, Inc., 244 F.Supp.2d 393, 402 (E.D. Pa. 2002). Providing relief under Rule 12(f) is largely disfavored and such motions are typically denied "unless the material bears no possible relation to the matter at issue and may result in prejudice to the moving party." Miller v. Group Voyagers, Inc., 912 F.Supp. 164, 168 (E.D. Pa. 1996). In the class action context, however, it is unlikely that a defendant can show that a plaintiff's class allegations constitute matters usually contemplated by Rule 12(f). See In re Ry. Indus. Emp. No-Poach Antitrust Litig., 395 F. Supp. 3d 464, 496 (W.D. Pa. 2019) (citations omitted).

The motion to strike is also premised upon Federal Rule of Civil Procedure 23, which governs the administration of class actions in federal courts. See Perrigo Institutional Inv. Grp. v. Papa, No. 24-2861, 2025 WL 2315977, at \*4 (3d Cir. Aug. 12, 2025). Although "an ingenious procedural innovationM" Eubank v. Pella Corp., 753 F.3d 718, 719 (7th Cir. 2014), "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' " Wal-Mart Stores, Inc. v. Dukes,

564 U.S. 338, 348, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) (quoting Califano v. Yamasaki, 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). Thus, to ensure that named plaintiffs are appropriate representatives of the class whose claims they wish to litigate, Rule 23(a) contains four requirements: numerosity, commonality, typicality, and adequacy of representation. See id. at 348–49, 131 S.Ct. 2541. Additionally, for a class to be certified, the requirements of Rule 23(b)(1), (2), or (3) must also be met. Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 590 (3d Cir. 2012).

Friel brings this putative TCPA class action pursuant to Rule 23(b)(2) and/or Rule 23(b)(3). (Doc. 1, Compl. ¶ 73). Rule 23(b)(2) is used to pursue injunctions in class actions. See In re: Google Inc. Cookie Placement Consumer Priv. Litig., 934 F.3d 316, 323 (3d Cir. 2019). The complaint requests injunctive relief to prohibit defendants from using prerecorded voices in the future and from making telemarketing calls to telephone numbers on the DNCR. (Doc. 1, Compl. ¶¶ 94, 99). Friel, however, also seeks statutory damages on behalf of himself and the putative classes. Id. ¶¶ 92-93, 98. Rule 23(b)(2) certification is not authorized when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant, or when each class member would be entitled to individualized award of monetary damages. Wal-Mart Stores, Inc., 564 U.S. at 360, 131 S.Ct. 2541. Rather, "individualized monetary claims belong in Rule 23(b)(3)." Id. at 362, 131 S.Ct. 2541. Under Rule 23(b)(3), a class action may be maintained if the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a) are satisfied and "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." [3] FED. R. CIV. P. 23(b)(3).

**\*4** Rule 23(c) further provides that "[a]t an early practicable time after a person sues... as a class representative, the court must determine by order whether to certify the action as a class action." FED. R. CIV. P. 23(c)(1)(A).

Additionally, Rule 23(d) permits the court to issue orders that: 1) "determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument[,]" FED. R. CIV. P. 23(d)(1)(A), and/or 2) "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly[,]" FED. R. CIV. P. 23(d)(1)(D). Consequently, where the goal of the motion to strike is to eliminate class allegations prior to discovery, other district courts have concluded that such motions should be considered under the above provisions of Rule 23, not under Rule 12(f). See In re Ry. Indus. Emp. No-Poach Antitrust Litig., 395 F. Supp. 3d at 496; see also Johnson v. Ally Fin. Inc., No. 1:16-CV-1100, 2017 WL 3433689, at *2 (M.D. Pa. Aug. 10, 2017) (Conner, J.) (concluding that a motion to strike class allegations is not an improper procedural device).

To determine whether the requirements of Rule 23 have been satisfied, "a district court must conduct a 'rigorous analysis.' " Landsman & Funk PC v. Skinder-Strauss Assocs., 640 F.3d 72, 93 (3d Cir. 2011) (quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008)). [4] There are "rare few" instances in which "the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." Id. at 93, n.30. Thus, "delving into the propriety of class certification" can be "the wrong focus" at an early stage of a proceeding where there has been no motion for class certification and no discovery. Id. at 93–94. After all, "[a]n order striking class allegations is functionally equivalent to an order denying class certification[.]" Microsoft Corp. v. Baker, 582 U.S. 23, 34, n.7, 137 S.Ct. 1702, 198 L.Ed.2d 132 (2017).

One of the "rare few" instances where an early motion to strike class allegations may be granted is where the class definitions create impermissible fail-safe classes. See Zarichny v. Complete Payment Recovery Servs., Inc., 80 F. Supp. 3d 610, 624 (E.D. Pa. 2015). "A fail-safe class is 'one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim.' " Id. (quoting Messner v. Northshore University HealthSystem, 669 F.3d 802, 825 (7th Cir .2012)).

Friel's Robocall Class is defined as:

> All persons in the United States who, (1) within four years prior to the commencement of this litigation until the class is certified (2) received one or more calls on their cellular telephone or any other protected telephone service (3) from or on behalf of JEA Management Services d/b/a Covered Auto, Headstart Warranty Group LLC, or Line 5, LLC, (4) sent using the same, or substantially similar, pre-recorded message used to contact the Plaintiff.

(Doc. 1, Compl. ¶ 74).

Friel's DNCR Class is defined as:

> All persons within the United States: (1) whose residential telephone numbers were on the National Do Not Call Registry for at least 31 days; (2) but who received more than one telephone solicitation call from Defendants or a third party acting on Defendants' behalf; (3) within a 12-month period; (4) within the four years prior to the filing of the Complaint.

Id.

The motion to strike asserts that the proposed class definitions are facially uncertifiable. Line5 has adopted JEA's arguments that the proposed class definitions are overbroad, lack commonality, and are defined vaguely. There are no specific arguments that the proposed classes are fail-safe, yet this consideration hangs over the analysis.

### a. Overbreadth Arguments

**\*5** Defendant Line5 has joined in former defendant JEA's argument that both the proposed Robocall Class and the

DNCR Class are overbroad. The Robocall Class definition is challenged as overbroad because it fails to exclude calls to individuals who consented to their receipt. [5] Similarly, the DNCR Class is challenged because this proposed class may include calls made to individuals with an established business relationship ("EBR") with the defendants and may include individuals who did not personally place their number on the DNCR. [6]

After careful consideration, however, Friel appears to be in a situation where he is forced to choose between two vulnerable alternatives in proposing class definitions at the outset of the litigation. On one hand, Friel must define his classes with reference to objective criteria. See Lewis v. Gov't Emps. Ins. Co., 98 F.4th 452, 462 (3d Cir. 2024) (citing Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015)). On the other hand, if Friel uses certain qualifiers, his proposed definitions could be deemed to advance improper fail-safe classes. [7]

As indicated above, "[a] fail-safe class bases its membership upon the validity of putative members' legal claims, meaning that 'a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment.'" Jackson, 2023 WL 2472606, at *3 (quoting Messner, 669 F.3d at 825). More simply stated, fail-safe classes preclude membership in the class unless a putative member would prevail on the merits. See Orduno v. Pietrzak, 932 F.3d 710, 716 (8th Cir. 2019).

**\*6** Fail-safe classes cannot satisfy the ascertainability requirement of some class actions. See Zarichny, 80 F. Supp. 3d at 625 (citation omitted); see also Byrd, 784 F.3d at 163 & n.7 (explaining that a plaintiff seeking certification under Rule 23(b)(3) must prove by a preponderance that the class is ascertainable, but that ascertainability is not a requisite of a Rule 23(b)(2) class). The ascertainability standard requires a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. Byrd, 784 F.3d at 163 (citations omitted).

In Zarichny, the Honorable Stewart R. Dalzell in the Eastern District of Pennsylvania determined that a putative

TCPA class was defined in a fail-safe manner and granted a motion to strike. 80 F.Supp. 3d at 623-26. The proposed TCPA class was comprised of "those people 'who received one or more telephone calls from [d]efendants on the individual's cellular telephone that was initiated using an automatic telephone dialing system' without prior con[s]ent[.]" Id. at 623. Because the class was defined in a manner which only would include those who did not provide the defendant with prior consent, the court determined that "there is no way to provide notice to that putative class without the sort of extensive fact-finding that class actions should avoid," and "at the conclusion of the litigation, should [the defendant] prevail against [the plaintiff], any other putative class recipient would be free to litigate the same claim against [the defendant]." Id. at 625–26. In other words, the TCPA class could not be certified as defined in the initial pleading because the issue of consent was central to the merits of the underlying dispute.

Accordingly, many district courts within the Third Circuit have determined that TCPA class definitions avoid fail-safe concerns by omitting the issue of consent or other merits-based criteria. See Jackson v. Direct Bldg. Supplies LLC, No. 4:23-CV-01569, 2024 WL 184449, at *9 & n.101 (M.D. Pa. Jan. 17, 2024) (Brann, C.J.) (collecting cases); see also Abella v. Student Aid Ctr., Inc., No. CV 15-3067, 2015 WL 6599747, at *4 (E.D. Pa. Oct. 30, 2015) (noting the lack of reference to an automatic telephone dialing system in the proposed class definition since that is a required element of a Section 227(b)(1)(A) claim)). [8] Consequently, to avoid fail-safe issues with his proposed Robocall Class in this case, Friel asserts that he intentionally did not include consent language in his class definition. (Doc. 53, Pl. Br. in Opp. at 13).

As indicated above, Line5 has adopted arguments challenging the proposed Robocall Class definition because it fails to exclude calls made with consent. In joining the motion to strike, Line5 also finds fault in the proposed DNCR Class definition because it fails to exclude calls to individuals with an EBR. Adding these qualifiers to the class definitions would incorporate more elements of liability into the definitions. That would then arguably require all putative class members to have winning TCPA claims before being included in the class. Although non-binding, the above cases discussing fail-safe classes would provide defendants with different arguments to strike the class allegations if Friel included reference to a lack of consent or an EBR in his proposed

definitions. The court cannot fault Friel for choosing to define his classes around TCPA merits-based criteria.

**\*7** As for authority binding on this court, "in the specific context of claims filed under the TCPA statute, it is difficult to resolve without discovery whether there are factual issues regarding class members' business relationships with defendants or whether they consented to the receipt of [automated phone calls]." 🚩⚠ Landmark, 640 F.3d at 93–94. Friel's complaint alleges that the proposed classes are identifiable as presently defined through defendants' dialer records, other phone records, and phone number databases. (Doc. 1, Compl. ¶ 79). In the absence of discovery into these records, the court is unwilling to determine whether Friel's classes are defined too broadly or whether they fall short of ascertainability. Line5 thus has not demonstrated a valid reason to strike Friel's class allegations based on the potential breadth of the proposed classes.

### b. Commonality Arguments

Line5 has also adopted JEA's arguments that Friel's proposed classes lack commonality, that is, "the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." 🚩 Wal-Mart Stores, Inc., 564 U.S. at 349, 131 S.Ct. 2541 (citing 🚩 FED. R. CIV. P. 23(a)). Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury, not merely that they have all suffered violation of the same provision of law. See 🚩 id. (citations omitted). The claims "must depend upon a common contention[,]" which "must be of such a nature that is capable of classwide resolution[,]" meaning that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." 🚩 Id. As observed, "[t]he commonality requirement is not especially arduous." Johnson, 2017 WL 3433689, at \*4.

For his part, Friel's complaint alleges that he received calls related to some extended-warranty sales effort using an artificial or prerecorded voice without his consent in violation of the TCPA. (Doc. 1, Compl. ¶¶ 18–31). Only discovery will reveal whether Friel's proposed classes sustained the same injuries from those sales efforts. Accordingly, the court also rejects arguments that the proposed classes are facially uncertifiable based on a lack of commonality.

### c. Vagueness Arguments

Lastly, Line5 has adopted JEA's arguments that the Robocall Class must be stricken for vagueness because that proposed definition uses the phrase "same, or substantially similar" when describing the prerecorded messages allegedly sent by the defendants. In support, the motion to strike argues that, as presently defined, there would be no way for defendants to know which putative class members received the exact message that Friel received, and which putative class members received a "substantially similar" message. (Doc. 30, JEA Br. in Supp. at 20–21). Furthermore, per the arguments advanced in the motion to strike, the "substantially similar" definition uses improper subjective criteria and is improperly imprecise for a class action. Id.

Friel counters that such a definition is not vague under the circumstances because it essentially contemplates that defendants could have violated the TCPA as to other putative class members through the same sales efforts, but by using a different robotic voice, for example, or the same voice with a different script. (Doc. 53, Pl. Br. in Opp. at 21). Moreover, Friel explains that, even with this definition, his proposed Robocall Class is limited to calls that presumably had the same factual predicate for being sent, i.e., sales calls. 🚩 Id. at 22.

Friel's argument signals that he is open to adding more qualifiers to his class definitions as this case moves forward. The court, however, will not strike the definitions or adjust any portion *sua sponte.* Discovery has not yet commenced and no motion to certify the class has been filed. To the extent that there are critical vagueness issues with Friel's proposed Robocall Class definition, those issues would be more easily understood following a period of discovery. Accordingly, the motion to strike Friel's class allegations will be denied.

### 3. Motion to Trifurcate Discovery

**\*8** On the issue of discovery, Defendant Line5 also joined in JEA's motion seeking to conduct discovery in three separate stages, that is, 1) discovery into Friel's individual claims; 2) discovery into the appropriateness of class certification if Friel's claims proceed; and 3) if any class is ultimately certified, merits discovery for the class or classes. (Doc. 34, JEA Br. in Supp.; Doc. 45, Line5 Joinder Notice). Friel opposes, arguing that, if this TCPA action has merit, a trifurcated course of discovery will lead to three rounds of written discovery, three rounds of depositions (with the same witnesses being deposed three times), three rounds

of potential discovery disputes, and then three rounds of dispositive motions. [9] (Doc. 52, PI. Br. in Opp. at 1-3).

Unlike JEA, which has been dismissed, Defendant Line5 filed an answer to Friel's complaint. (Doc. 20). Line5's answer does not raise any defenses unique to Friel's individual claims, only defenses common across the putative TCPA classes. (See Doc. 20, Affirmative and Other Defenses, ¶ 1 ("Line5 did not make or authorize any calls on its behalf."), ¶ 3 ("Upon information and belief, the alleged calls were not selling Line5's services, but rather the calls were made for the purpose of selling an extended car warranty provided by another of the defendants.")). Line5 has not otherwise demonstrated why Friel's specific TCPA claims would be any different from the claims of the putative class members. The court thus sees no reason to bifurcate, trifurcate, or otherwise order that discovery be conducted in phases at this time. Accordingly, the discovery motion will be denied, and this case will be scheduled for a case management conference.

### Conclusion

For the reasons set forth above, JEA's motion to strike class plaintiff's allegations and motion to trifurcate discovery will be denied. An appropriate order follows.

### All Citations

Slip Copy, 2025 WL 2422617

---

## Footnotes

1    This background section derives from the facts alleged in plaintiff's complaint. The court makes no determination as to the veracity of these allegations.

2    Pursuant to FCC regulations, "[n]o person or entity shall initiate any telephone solicitation to: ... A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government."
     47 C.F.R. § 64.1200(c)(2).

3    At this juncture, it is unknown how Friel will proceed if this matter reaches a motion for class certification. Given the availability of statutory damages of up to $1500 per class member under the TCPA, it may be later determined that this case is more driven by money damages than equitable relief, which would make certification under Rule 23(b)(2) inappropriate. See e.g. Jackson v. Locust Med., LLC, No. 4:22-CV-00424, 2024 WL 2701695, at *5 (M.D. Pa. May 24, 2024) (Brann, C.J.) (denying a plaintiff's motion to certify a class under Rule 23(b)(2) where the complaint included a request for statutory damages under the TCPA).

4    Landsman is an opinion that has been reinstated in part, to the extent it is consistent with Mims. See No. 09-3105, 2012 WL 2052685 (3d Cir. Apr. 17, 2012).

5    To succeed with a cause of action under 47 U.S.C. § 227(b)(1) under the circumstances alleged in the complaint, Friel must show that defendants: 1) made "any call...using any automatic telephone dialing system or an artificial or prerecorded voice[;]" 2) to "any telephone number assigned to a...cellular telephone service[;]" 3) without "the prior express consent of the called party[.]" 47 U.S.C. § 227(b)(1)(A)(iii).

6    There are certain regulatory defenses to TCPA actions premised upon 47 U.S.C § 227(c) and the do-not-call regulations. Pursuant to the regulations, a "telephone solicitation" does not include a call to any person with whom the caller has an EBR. 47 C.F.R. § 64.1200(f)(15)(ii). EBR is separately defined in

⚑47 C.F.R. § 64.1200(f)(5). Furthermore, pursuant to the do-not-call regulations, "[n]o person or entity shall initiate any telephone solicitation to...[a] residential subscriber who has registered his or her telephone on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." ⚑47 C.F.R. § 64.1200(c)(2). Defendant Line5 adopts JEA's argument that this requires individuals to personally register their phones on the DNCR. Friel counters that personal registration is not required and would be impossible to prove in any case. (Doc. 53, Pl. Br. in Opp. at 15–17). The court need not reach this issue in disposing of the motion to strike.

7    "Although the United States Court of Appeals for the Third Circuit has not explicitly considered whether fail-safe classes are permissible, it has approvingly cited rulings by other circuits that categorically disallow fail-safe classes." Jackson v. Meadowbrook Fin. Mortg. Bankers Corp., No. 4:22-CV-01659, 2023 WL 2472606, at *3 (M.D. Pa. Mar. 10, 2023) (Brann, C.J.) (citing ⚑Byrd, 784 F.3d at 167; ⚑In re Nexium Antitrust Litig., 777 F.3d 9, 22 (1st Cir. 2015); ⚑Messner, 669 F.3d at 825).

8    On the other hand, the Honorable Christopher C. Conner reached a slightly different result when faced with this issue on a motion to strike in Johnson. 2017 WL 3433689 at *2–*3. Although the proposed TCPA class in Johnson included reference to consent, Judge Conner determined that it was not a facially uncertifiable fail-safe class because the proposed class definition contained reference to business records, which, with discovery, could reveal an ascertainable class. Id. at *1, *4.

9    Defendant Line5 indicates in its reply brief (filed after JEA's dismissal) that it only wishes to *bifurcate*, not *trifurcate* discovery. (Doc. 54). After review of Line5's reply brief, Line5 proposes a course of discovery that has no discernable distinction from the one proposed by JEA in the motion as initially filed.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 28 of 121

Harris v. Shore Funding Solutions Inc., Not Reported in Fed. Supp. (2023)

2023 WL 3440077

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Tiffany HARRIS, individually and on behalf
of all others similarly situated, Plaintiff,

v.

SHORE FUNDING SOLUTIONS INC., Defendant.

23-CV-00789 (JMA) (JMW)

|

Signed April 21, 2023

**Attorneys and Law Firms**

Anthony Paronich, Esq., Paronich Law, P.C., Massachusetts, 350 Lincoln St., Suite 2400, Hingham, MA 02043, Attorney for Plaintiff.

Clifford B. Olshaker, Esq., Law Offices of Clifford B. Olshaker, 98-19 37th Avenue 2nd Fl., Corona, NY 11368, Attorney for Defendant.

**ORDER**

WICKS, Magistrate Judge:

**\*1** Plaintiff Tiffany Harris commenced this case as a class action alleging a violation of the Telephone Consumer Protection Act ("TCPA"). (DE 1.) The TCPA bars companies from making calls using automatic telephone dialing systems or using an artificial or pre-recorded voice to cell numbers.

*See* 🚩 47 U.S.C. § 227 *et seq.* Plaintiff alleges that on April 19, 2022, Defendant Shore Funding Solutions Inc. made an unsolicited pre-recorded telemarketing call to Plaintiff's number -- (205) 503-XXXX. [1] (DE 1 at ¶¶ 19-20.) Plaintiff then spoke to someone who said they were an employee of the Defendant who promoted a loan and sent a follow up email to her. (*Id.* ¶¶ 20-27.) Plaintiff's Complaint describes a proposed "Robocall Class" consisting of all persons within the United States whose cellular telephone numbers received a call from Defendant or a third-party on its behalf using pre-recorded messages within the four years preceding the complaint. (*Id.* at ¶ 30.) Before the Court now is the Defendant's contested motion for bifurcation of discovery.

The case is in its infancy. At the initial conference, the Court entered a Scheduling Order and set a briefing schedule for Defendant's motion to bifurcate discovery as to Plaintiff's individual claim and the proposed class. (DE 13.) Plaintiff has served discovery requests, but Defendant has not served any. The contested bifurcation motion was subsequently filed. (DE 16.) Oral argument was held on April 21, 2023. [2]

Having considered the parties' arguments, and for the reasons stated herein, Defendant's motion to bifurcate discovery is GRANTED.

**I. LEGAL STANDARD**

Bifurcation "is properly understood as a stay of class discovery pending resolution of plaintiff's individual claim."
🚩 *Chow v. SentosaCare, LLC*, No. 19-CV-2541 (FR), 2020 WL 559704, at \*1 (E.D.N.Y. Jan. 23, 2020). A district court has "considerable discretion to stay discovery" under Federal Rule of Procedure 26(c), with the moving party having the burden of establishing good cause. *See* 🚩 *Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of N.Y.*, No. 18-CV-4476 (LJL) (SLC), 2020 WL 1166047, at \*5 (S.D.N.Y. Mar. 11, 2020); *Mohammed Thani A.T. Al Thani v. Hanke*, 20-CV-4765 (JPC), 2021 U.S. Dist. LEXIS 395, 2021 WL 23312, at \*1 (S.D.N.Y. Jan. 4, 2021) ("Upon a showing of good cause[,] a district court has considerable discretion to stay discovery pursuant to Rule 26(c)" (alteration in original) (quoting *Rep. of* 🚩 *Turk. v. Christie's, Inc.*, 316 F. Supp. 3d 675, 677 (S.D.N.Y. 2018)); 🚩 *Physicians Healthsource, Inc. v. Janssen Pharms., Inc.*, No. 12-CV-2132, 2014 WL 413534, at \*4 (D.N.J. Feb. 4, 2014) (noting that the district court enjoys "broad discretion" in terms of bifurcating discovery).

**\*2** Good cause may exist "where the 'resolution of a single issue may resolve the case and render trial on the other issue[s] unnecessary,' " 🚩 *Charvat*, 2016 WL 207677, at \*2 (quoting *Tabor v. N.Y. City*, No. 11-CV-0195, 2012 WL 603561, at \*10 (E.D.N.Y. Feb. 23, 2012)), or where "a narrow, potentially dispositive issue," being "totally distinct from class issues," has the potential render Plaintiff's TCPA claim baseless, 🚩 *id.* (quoting 🚩 *Physicians Healthsource, Inc. v. Janssen Pharms., Inc.*, No. 12-CV-2132, 2014 WL 413534, at \*2 (D.N.J. Feb. 4, 2014)).

The Federal Rules of Civil Procedure do not squarely address the bifurcation of discovery. 🚩 *Cunningham v. Big Think*

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 29 of 121

Harris v. Shore Funding Solutions Inc., Not Reported in Fed. Supp. (2023)

*Cap. Inc.*, No. 21-CV-02162 (DRH) (JMW), 2021 WL 4407749, at *4 (E.D.N.Y. Sept. 27, 2021) (noting that the Rules "do not specifically address the issue of discovery bifurcation"); *see also* Alexa Ashworth, et al., *Bifurcation of discovery*, 10 Fed. Proc., L. Ed. § 26:88 (Mar. 2023) (noting that the court may bifurcate discovery, for example, "in class actions into sections related to the claims of the named plaintiffs and the class claims"). Rather, when confronted with the issue, courts turn to Rule 42(b), which sets forth the standard to be applied when considering consolidation and separation of cases for trial. *See* 🔖 *id.* (citing Fed. Civ. P. 42(b)). Borrowing from Rule 42, courts contemplate bifurcating discovery "[f]or convenience, to avoid prejudice, or to expedite and economize" the proceedings. Fed. Civ. P. 42(b); *see* 🔖 *Charvat v. Plymouth Rock Energy, LLC*, No. 15-CV-4106 (JMA) (SIL), 2016 WL 207677, at *1 (E.D.N.Y. June 5, 2013) ("The standards applicable to motions to bifurcate discovery appear to be the same as those addressed under Fed. R. Civ. P. 42(b).").

However, a survey of past cases within this Circuit suggests that bifurcation is the exception, not the rule. Indeed, courts are likely to deny bifurcation "where discovery relating to class issues overlaps substantially with merits discovery" given that, in such circumstances, "bifurcation will result in duplication of efforts and needless line-drawing disputes." 🔖 *Id.* at *1 (quoting 🔖 *Hines v. Overstock.com, Inc.*, No. 09-CV-991, 2010 WL 2775921, at *1 (E.D.N.Y. July 13, 2020)). Moreover, courts will not bifurcate if bifurcation will simply delay class certification or obfuscate the issue of what discovery relates to the class as opposed to the named plaintiff. 🔖 *Id.* (citing *True Health Chiropractic Inc. v. McKession Corp.*, No. 13-CV-2219 (JST), 2015 WL 273188, at *2–3 (N.D. Cal. Jan. 20, 2015)).

## II. DISCUSSION

Defendant seeks to bifurcate individual and class discovery to explore the threshold issue of whether Plaintiff received a call from Defendant at the (205) 503-XXXX number on April 19, 2022, and whether Plaintiff owns the phone to which the number is assigned. (DE 16 at 6.) Defendant requests a 90-day period for this limited discovery. Plaintiff prefers the status quo, with all discovery – as to the Plaintiff and Class – proceeding concomitantly.

Defendant relies on the following to establish good cause: (1) the limited discovery sought is distinct from class issues, (2) bifurcation would avoid unnecessary expensive and time-consuming class-discovery, (3) Plaintiff did not attach any evidence of a phone call to her Complaint and provides no evidence that the call actually took place, and (4) in another case involving the same Plaintiff, the defendant's counsel identified the (205) 503-XXXX number as being advertised in connection with a custom home building business rather than with Plaintiff. (DE 16 at 5.) Plaintiff, on the other hand, resists bifurcation on the basis that: (1) there is evidence that Plaintiff received the phone call and owns the number, and (2) it is atypical to bifurcate discovery. (DE 17 at 2-3.)

**\*3** Defendant's request for limited discovery as to (1) whether Plaintiff received a phone call on April 19, 2022, and (2) whether she owns the phone number -- because Plaintiff has not offered any evidence to support either allegation. Plaintiff in response attached a phone bill (DE 17-2) that reflects that the (205) 503-XXXX number belongs to her and copy of the email she received after the alleged phone call (DE 17-3). Defendant contends that Plaintiff has not laid a foundation for the phone bill as a business record. As to the email, Defendant notes that it is addressed to a "William," not Plaintiff. (DE 17-3.) Additionally, the email does not reference a phone call. (DE 17-3.)

Plaintiff also provided an affidavit that states that she owns the phone number (205) 503-XXXX, received a pre-recorded call on April 19, 2022, from Defendant and after speaking with someone named "Dan Katz" identifying themselves as an employee of Defendant, received an email from Dan Katz consistent with the offer made on the call. (DE 17-1.) Plaintiff further states that she has produced a redacted copy of her phone bill to show she owns the number at issue and that she has no affiliation with the person or business that Defendant's counsel states appears to be associated with the number. (DE 17-1.)

Defendant argues that the affidavit is null and void because it does not conform to the requirements for an unsworn declaration under 28 U.S.C. § 1746 and can be given no weight. (DE 16-2 at 2.) However, section 1746(2) permits submission of an unsworn declaration to the court if it includes a statement substantially in the following form as required: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)." *See* 28 U.S.C. § 1746(2). The affidavit provides that it was "Executed under the pains and penalties

of perjury at warrior Alabama this 28th day of March, 2023." (DE 17-1.) This is sufficient. *See LeBoeuf, Lamb, Greene MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999)* (finding a signed and dated affidavit stating "[u]nder penalty of perjurys, I make the statements contained herein" substantially complied with § 1746(2) even though it did not state the exact language or that the contents were "true and correct").

Considering all the above, limiting discovery for a certain period as to whether Defendant in fact even called Plaintiff at that number would be efficient and avoids costly and potentially unnecessary class discovery in this matter. Defendant maintains that it has no record whatsoever of a call made to (205) 503-XXXX on April 19, 2022. (DE 16 at 4.) Defendant's counsel even candidly states that this is the first TCPA case where his client has no such record. (DE 16 at 4.) Defendant also points to the fact that Plaintiff subpoenaed her own cellphone carrier to obtain evidence regarding the call, that subpoena is returnable April 6, 2023, yet Plaintiff has not indicated what response, if any, was received from the carrier. (DE 16-2 at 2.)

First, limited discovery regarding whether Defendant called Plaintiff would not overlap with and is distinct from class issues. In *Charvat,* the court found much of the discovery sought was relevant not only to the individual claims but also to the class claims including documents related to "telemarketing scripts, policies, contracts, practices and procedures, complaints received, investigations of those complaints and audits of third-party providers" and more. *Id. at *2.* Presumably, Defendant's proposed discovery would involve Plaintiff's cellphone records, Defendant's call records for April 19, 2022, and other categories that do not specifically relate to the larger proposed class of individuals who received calls within the four years predating the complaint. This would also include Defendant's records as they relate to outgoing calls to Plaintiff.

**\*4** Thus, this is not an instance where the proposed limited discovery "overlaps substantially" with class discovery and where "bifurcation will result in duplication of efforts and needless line-drawing disputes." *Charvat, 2016 WL 207677, at *1.* *Cf. Physicians Healthsource, Inc., 2014 WL 413534, at *4* (finding the issue of whether the faxes sent to Plaintiff were informational, and thus, actionable under the TCPA, to be totally distinct from class issues);

*see also Leschinsky v. Inter–Continental Hotels Corp.,* No. 8:15-cv-1470-T-30 (MAP), 2015 WL 6150888, at *1 (M.D. Fla. Oct. 15, 2015)* (granting limited discovery for 90 days in a TCPA case to whether the named plaintiff received the calls manually and how many calls were made) (cited in *Charvat, 2016 WL 207677, at *2).*

Second, resolution of this "narrow, potentially dispositive issue" has the potential to render Plaintiff's TCPA claim baseless and may resolve the case since Defendant intends to initiate dispositive motion practice following discovery as to whether Plaintiff received a phone call from Defendant on April 19, 2022. (DE 16 at 4.) *See Charvat, 2016 WL 207677, at *1.* Moreover, unlike in *Charvat,* where the complaint identified two other individuals that the Court noted could serve as class representatives if Plaintiff's claim was defeated, here no one else is specifically identified, and thus, resolution of Plaintiff's claim can lead to a "prompt, efficient resolution of this litigation." *Charvat, 2016 WL 207677, at *3.*

Third, limited discovery here has the potential to save the parties from the costs resulting from class action discovery, which can involve "hefty litigation expenses and an extensive use of judicial resources...." *Physicians Healthsource, Inc., 2014 WL 413534, at *4.* Those costs can be particularly unforgiving for defendants. *See id.* For example, here Defendant notes that Plaintiff has already propounded discovery requests that include a document demand for Defendant to "produce all documents containing ... information for each outbound telemarketing call sent by you or your vendors" in the last four years. (DE 16 at 4; DE 16-1). Again, compare with *Charvat* where the court noted that defendant had submitted no information suggesting that the discovery requests would be voluminous, unduly burdensome to produce or disproportionate to the needs of the case. *See Charvat, 2016 WL 207677, at *2.* Defendant there did not identify which discovery requests could be objectionable as class based. *See id.*

Plaintiff relies heavily on *Charvat, 2016 WL 207677, at *6-7, Reisman v. Northeastern Power and Gas LLC,* No. 23-CV-620 (S.D.N.Y. Mar. 3, 2023) (memo endorsement) (DE 12), and *Katz v. Allied First Bank, SB, Civil Action,* No. 22-CV-5277 (N.D. Ill. Jan. 3, 2023) (electronic order) (DE 14).

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 31 of 121

Harris v. Shore Funding Solutions Inc., Not Reported in Fed. Supp. (2023)

However, each of those cases denied motions to bifurcate because of the substantial overlap of discovery identified between Plaintiff's claim and the anticipated class discovery. That is not the case here. Plaintiff also points to *Naiman v. Big Think Capital Inc.*, No. 22-cv-2531 (WFK) (JMW) (E.D.N.Y. filed May 3, 2023) as an example of a TCPA case where parties have proceeded without bifurcated discovery. The simple fact that parties in one other case did not seek to bifurcate discovery holds no persuasive value with respect to the propriety of bifurcation here where, *inter alia*, the proposed discovery does not substantially overlap with class discovery. *Cf.* Cunningham, 2021 WL 4407749, at *4 (defendant sought bifurcation though the motion was denied because of the substantial overlap between merits and class discovery as to the question of consent).

 **5**  In sum, Defendant has established good cause for limited discovery related to Plaintiff's individual claim -- specifically as to the issue of whether Defendant made a call to Plaintiff on April 19, 2022 at the (205) 503-XXXX number. Given that such discovery would not result in duplication of efforts or substantially overlap with class discovery, it would be practical and would ensure the "just, speedy, and inexpensive determination" of the action. Fed. R. Civ. P. 1. Moreover,

granting Defendant's motion will not cause undue burden and expense to Plaintiff nor would it prejudice Plaintiff because this case is in the nascent stages. Defendant conceded at oral argument a 90-day period was not necessary to complete limited discovery. As such, the limited discovery shall conclude on or before June 30, 2023.

## CONCLUSION

Defendant's motion for bifurcation of individual and class discovery is therefore GRANTED as follows: discovery is limited to whether on April 19, 2022 Plaintiff received a call from Defendant at the (205) 503-XXXX number and ownership of the subject phone. This also includes discovery of Defendant as to calls made to Plaintiff. This limited discovery shall be complete on or before June 30, 2023. On or before June 23, 2023, the parties are directed to file a joint status report with a proposed schedule for remaining discovery following the limited discovery ordered herein.

### All Citations

Not Reported in Fed. Supp., 2023 WL 3440077

---

### Footnotes

1    The parties have informally agreed to keep the phone number confidential and have referred to it throughout their papers in this redacted format.

2    Counsel for Plaintiff failed to appear but notified chambers following the argument of the circumstances which the Court finds excusable.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4630852
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Dawn HARTLEY–CULP, individually and on
behalf of all others similarly situated, Plaintiff
v.
CREDIT MANAGEMENT COMPANY, Defendant.

Civil Action No. 3:CV–14–0282.
|
Signed Sept. 15, 2014.

**Attorneys and Law Firms**

Cynthia Levin, Law Offices of Todd M. Friedman, PC., King
of Prussia, PA, for Plaintiff.

James McNally, Justin M. Tuskan, Metz Lewis Brodman
Must O'Keefe LLC, Pittsburgh, PA, for Defendant.

*MEMORANDUM AND ORDER*

THOMAS M. BLEWITT, United States Magistrate Judge.

**I. BACKGROUND.**

 **\*1**  This putative class action case was instituted, through
counsel, on February 17, 2014, by Plaintiff Dawn Hartley–
Culp, individually and on behalf of all others similarly
situated. (Doc. 1). Named as sole Defendant is Credit
Management Company ("CMC"). Plaintiff alleges that
Defendant CMC began placing a series of calls to her cellular
telephone ("cell phone") beginning in November of 2013.
Plaintiff alleges that the calls made by Defendant CMC to
her cell phone violated the Telephone Consumer Protection
Act ("TCPA"), 47 U.S.C. §§ 227, *et seq.,* since the
calls were placed by an automated telephone dialing system
("ATDS") or, by an artificial or recorded voice without her
prior express consent. Plaintiff also alleges that Defendant
CMC left numerous pre-recorded messages on her cell phone.

This Court has jurisdiction over this case pursuant to 28
U.S.C. § 1331.[1]

On April 8, 2014, after being granted an extension of time,
Defendant CMC filed its Answer to the Complaint with
Affirmative Defenses. (Doc. 8). Defendant CMC admitted
that it contacted Plaintiff for the purpose of collecting a debt
which Plaintiff allegedly owed. In its Affirmative Defenses,
Defendant CMC asserted that Plaintiff gave express consent
to CMC's client to whom Plaintiff allegedly owed the debt,
and that the calls made to Plaintiff were not placed via an
ATDS.[2]

Subsequently, the Court issued a scheduling order and set case
deadlines, and then extended the deadlines on two occasions.
(Docs. 19, 22 & 26). The current discovery deadline is
November 28, 2014. Plaintiff's Motion for Class Certification
is due December 12, 2014.

Pursuant to 28 U.S.C. § 636(c), the parties consented to
proceed before the undersigned for all matters. (Doc. 17).

The parties are currently engaged in discovery. Plaintiff
indicates that on July 26, 2014, she served written discovery
on Defendant and scheduled a Rule 30(b)(6) deposition for
August 26, 2014.

On August 12, 2014, Defendant CMC filed a Motion
to Bifurcate Discovery, or in the alternative, to Stay
Proceedings. (Doc. 23). Defendant CMC simultaneously filed
its support brief with Exhibits. (Docs. 24 & 24–1 to 24–4).
Plaintiff filed her opposition brief on August 28, 2014. (Doc.
28). Defendant filed its reply brief on September 9, 2014, with
Exhibits. (Docs. 29, 29–1 & 29–2).

Defendant CMC seeks the Court to bifurcate discovery into
two phases with the first phase limited to the issue of whether
Plaintiff expressly consented to receiving calls on her cell
phone. Defendant CMC maintains that if it proves Plaintiff
provided her express consent, then the calls it placed to her do
not violate the TCPA. Defendant CMC then states that if it can
show the calls placed to Plaintiff did not violate the TCPA,
then Plaintiff will not be able to proceed as the representative
of the purported class.

In the alternative, Defendant CMC moves the Court to
stay all proceedings in this case since it contends that
many of Plaintiff's allegations in her Complaint turn on
issues currently pending before the Federal Communication
Commission ("FCC"). Defendant CMC states that the FCC
has primary jurisdiction to determine the issues raised by
Plaintiff in this case.

**II. DISCUSSION.**

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 33 of 121

Hartley-Culp v. Credit Management Co., Not Reported in Fed. Supp. (2014)

**\*2** Initially, based on the very recent Middle District of Pennsylvania case of *Fenescey v. Diversified Consultants, Inc.,* 2014 WL 2526571 (M.D. Pa. June 4, 2014, J. Conaboy),

which is directly on point with our case, as well as *Gager v. Dell Financail Services, LLC,* 727 F.3d 265, 2013 WL 4463305 (3d Cir.2013), and based on the well-reasoned decision of Judge Conaboy, with which we completely concur, we will deny Defendant CMC's alternative Motion to Stay all Proceedings in this case under the primary jurisdiction doctrine. This Court in *Fenescey* largely relied upon the Third Circuit's decision in *Gager v. Dell Financial Services, LLC,* 727 F.3d 265, 2013 WL 4463305 (3d Cir.2013). This Court in *Fenescey* stated that "[g]iven the force and clarity of the [*Gager*] precedential opinion, we have no need to further evaluate the doctrine of primary jurisdiction on the question of whether the TCPA applies to debt collection calls made to cellular phones." 2014 WL 2526571, \*2. This Court in *Fenescey* also found that based on *Gager,* there was no basis to stay its case on the ATDS issue. *Id.,* \*3. [3]

Since we concur entirely with the Court in *Fenescey,* we do not repeat its decision herein, and shall deny Defendant CMC's alternative Motion to Stay Proceedings in this case.

Next, we turn to Defendant CMC's primary Motion to Bifurcate Discovery.

As mentioned, Plaintiff alleged in her Complaint that Defendant CMC violated the TCPA by placing calls to her cellular telephone number without her prior express consent using an automatic telephone dialing system, and by leaving serval voice mail messages. The TCPA makes it unlawful to "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). Also, as stated, the TCPA applies to debt collection calls made to cellular phones. *Fenescey,* 2014 WL 2526571, \*2(citing *Gager, supra* ). "Prior express consent is deemed to be granted only if the wireless number is provided by the consumer to the creditor, and the number was provided during the transaction that resulted in the debt owed." *Wattie–Bey v. Step hen and Michaels Assoc., Inc.,* 2014 WL 123597, \*2 (M.D.Pa. Jan.14, 2014) (citation omitted). Also, the burden is on the creditor regarding the issue of whether express consent was provided and the

creditor must show that the required prior express consent was obtained. *Id.* (citation omitted).

There is no question that the Court, in its discretion, can bifurcate discovery under Fed.R.Civ.P. 42. In *Stemrich v. Zabiyaka,* 2014 WL 931069, \*1 (M.D.Pa. March 10, 2014), the Court stated:

Under Federal Rule of Civil Procedure 42, a trial court may, in its discretion, bifurcate a trial. The rule provides as follows:

**\*3** For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial.

Fed.R.Civ.P. 42(b). The decision to bifurcate, and the manner in which bifurcation should be ordered, is left to the trial court's informed discretion and must be decided on a case by case basis. *See Idzojtic v. Pennsylvania R.R. Co.,* 456 F.2d 1228, 1230 (3d Cir.1972) ("The district court is given broad discretion in reaching its decision whether to separate the issues of liability and damages."). In exercising its discretion, the court "must weigh the various considerations of convenience, prejudice to the parties, expedition, and economy of resources." *Emerick v. U.S. Suzuki Motor Corp.,* 750 F.2d 19, 22 (3d Cir.1984). The moving party bears the burden of establishing that bifurcation is appropriate. *See Innovative Office Prods., Inc. v. Spaceco, Inc.,* Civ. No. 05–cv–4037, 2006 WL 1340865, \*1 (E.D.Pa. May 15, 2006).

We disagree with Defendant CMC and its contentions in its briefs that discovery at this stage of the case, *i.e.,* before Plaintiff files her Motion for Class Certification, should be limited to the issue of whether its calls to Plaintiff fall within the "prior express consent" exception. As stated, the burden is on the creditor (in this case Defendant CMC) regarding the issue of whether prior express consent was provided. Also, as stated, the burden is on Defendant CMC to demonstrate that it did not use an automated telephone service when it contacted Plaintiff. If Defendant CMC can meet either of its burdens, Defendant CMC will be entitled to summary judgment on Plaintiff's TCPA claim. On the other hand, if genuine disputes of material fact exist as to whether Defendant obtained Plaintiff's prior express consent, then Defendant will not be

entitled to summary judgment on Plaintiff's TCPA claim. *Wattie–Bey v. Step hen and Michaels Assoc., Inc.,* 2014 WL 123597, *3. Likewise, if disputed issues of fact remain as to whether Defendant CMC used automated telephone services in its contacts with Plaintiff, then summary judgment will not be appropriate. *Id.,* *6(citations omitted). However, we concur with Plaintiff that "whether or not [Defendant] CMC had [prior express consent] to contact Plaintiff is not a threshold question that must be resolved at this stage, before the parties have had an opportunity to conduct class-wide discovery." (Doc. 28–1, p. 6, citing *Grant v. Capital Mgmt. Servs., L.P.,* 449 Fed.Appx. 598, 600 (9th Cir.2011) (" 'express consent' is not an element of a TCPA Plaintiff's prima face case, but rather is an affirmative defense for which the Defendant bears the burden of proof.").

We also agree with Plaintiff that despite Defendant CMC's contention and its Exhibits, that it would not be unduly burdensome on Defendant at this point of the case to respond to Plaintiff's discovery requests, including requests regarding the putative class action. Also, we find prejudice to Plaintiff if discovery was bifurcated as Plaintiff maintains. As Plaintiff points out, she "primarily seeks documents that are ordinarily maintained as business records, and to the extent that CMC will be burdened by having to produce any such documents, CMC can respond with the appropriate objections and substantiate them during the meet and confer process." (Doc. 28–1, p. 5). Defendant CMC will still be able to conduct any discovery it deems necessary to try and meet its burden as to its affirmative defenses, and it will be able to file a dispositive motion at the conclusion of discovery. Moreover, we agree with Plaintiff that she should have the benefit of discovery before she has to file her Motion for Class Certification, especially since Plaintiff has the burden of class certification. *See Hawk Valley, Inc. v. Taylor,* —— F.R.D. ——, 2014 WL1302097 (E.D.Pa. March 31, 2014)

(citation omitted) (court granted Plaintiff's motion for class certification in a TCPA unsolicited-fax case since it found, in part, common issues of law and fact predominated).

**\*4** Finally, we concur with Plaintiff that bifurcation of discovery in this case will increase litigation expenses by protracting the discovery period and by duplicating the discovery process, including the depositions.

### III. CONCLUSION.

Accordingly, the Court will deny entirely Defendant CMC's Motion to Bifurcate Discovery, or in the alternative, to Stay Proceedings **(Doc.23).** [4]

An appropriate Order will be issued.

### *ORDER*

**AND NOW,** this *15* day of **September, 2014,** based on the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendant CMC's Motion to Bifurcate Discovery, or in the alternative, to Stay Proceedings **(Doc.23)** is **DENIED IN ITS ENTIRETY.**

2. The discovery deadline in this case is extended to **December 29, 2014,** and the deadline for Plaintiff's Motion for Class Certification is extended to **January 12, 2015.**

**All Citations**

Not Reported in Fed. Supp., 2014 WL 4630852

---

### Footnotes

1    Jurisdiction of this Court is properly based on federal question, 28 U.S.C. § 1331, pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227, *et seq. See Fenescey v. Diversified Consultants, Inc.,* 2014 WL 2526571 (M.D.Pa. June 4, 2014).

2    According to Defendant CMC's Doc. 24 brief, p. 3 n. 2, Plaintiff allegedly owed a debt to Defendant CMC's client Extendicare Health Services, Inc. Defendant CMC notes that it is presently pursuing discovery to try and

show that Plaintiff voluntarily provided her cell phone number to Extendicare staff during her intake interview upon becoming a patient of Extendicare's rehabilitation division.

3    *See* *Gager v. Dell Financail Services, LLC,* 727 F.3d 265, 2013 WL 4463305 (3d Cir. Aug.22, 2013) (Third Circuit Court reversed dismissal of case alleging violations of 47 U.S.C. § 227(b) (1)(A)(iii), "the TCPA's provision banning certain automated calls to cellular phones."). In *Gager,* Plaintiff alleged that Defendant was obliged under the TCPA to stop autodialed calls to her cellular phone since she withdrew her prior express consent to be called on said phone via an automatic dialing system. The District Court granted Defendant's Rule 12(b)(6) Motion to Dismiss since it found that Plaintiff could not revoke her prior express consent. *See* *Gager v. Dell Financail Services, LLC,* 2012 WL 1942079 (M.D.Pa. May 29, 2012). The Third Circuit Court reversed the dismissal and found that "(1) the TCPA affords [Plaintiff] the right to revoke her prior express consent to be contacted on her cellular phone via an autodialing system and (2) there is no temporal limitation on that right." 727 F.3d 265, 2013 WL 4463305, *2.

4    The Court notes that it will, sua sponte, extend the discovery deadline and the deadline for Plaintiff to file her Motion for Class Certification. The discovery deadline will be extended to December 29, 2014, and Plaintiff's Motion for Class Certification will be extended to January 12,2015.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2004-2 Trade Cases P 74,620

KeyCite Yellow Flag

Distinguished by   In re Special Grand Jury 89-2,   10th Cir.(Colo.),   June
15, 2006

2004 WL 2743591
United States District Court, E.D. Pennsylvania.

In re PLASTICS ADDITIVES
ANTITRUST LITIGATION

No. Civ.A. 03–2038.
|
Nov. 29, 2004.

*MEMORANDUM ORDER*

DAVIS, J.

**\*1** Presently before the Court are Defendants' Joint Motion
for Bifurcation of Discovery and Entry of a Scheduling
Order (Doc. No. 88) filed on September 14, 2004; Plaintiffs'
Opposition to Motion for Bifurcation (Doc. No. 92) filed on
October 1, 2004; Defendants' Joint Memorandum in Further
Support of Defendants' Motion for Bifurcation of Discovery
and Entry of a Scheduling Order (Doc. No. 98) filed on
October 21, 2004; Plaintiffs' Motion for Entry of Proposed
Discovery Scheduling Order (Doc. No. 93) filed on October 1,
2004; Defendants' Opposition to Plaintiffs' Motion for Entry
of Proposed Scheduling Order (Doc. No. 96) filed on October
15, 2004; and Plaintiffs' Reply Memorandum in Support of
Motion for Entry of Proposed Discovery Scheduling Order
(Doc. No. 103) filed on November 10, 2004.

For the following reasons, Defendants' motion to bifurcate
will be DENIED and Plaintiffs' Motion for Entry of Proposed
Discovery Scheduling Order will be GRANTED in part and
DENIED in part.

I. Factual and Procedural History
This case is a class action antitrust case concerning the plastics
additives industry. Defendants are alleged manufacturers and/
or sellers of plastic additives. (Am. Compl. at ¶¶ 19–29).
Plaintiffs are allegedly purchasers of "plastics additives,"
what the plaintiffs define as "heat stabilizers, impact
modifiers, and processing aids used to process plastics." (Am.
Compl. at ¶ 7). Plaintiffs seek to represent a nationwide class

of purchasers of plastics additives for the time period of
January 1, 1990 through December 31, 2003. (*Id.* at ¶ 1).

In February 2003, the United States Department of Justice
Antitrust Division ("DOJ") commenced an investigation into
the plastics additives industry. (Def. Mot. to Bifurcate, at 4).
Two grand juries were convened in the Northern District of
California. (*Id.*). Both grand juries are currently proceeding
in secret. One grand jury is focusing on heat stabilizers
and the other grand jury involves heat impact modifiers and
processing aids. (*Id.*). All defendants have been subpoenaed
as part of one or both of the investigations. (*Id.*).

On March 28, 2003, plaintiff Gitto/Global Corporation filed
a complaint on behalf of themselves and the putative class,
alleging that defendants engaged in a price-fixing scheme
for the sale of plastic additives in violation of the Sherman
Antitrust Act, 15 U.S.C. § 1. (Doc. No. 1). Subsequently,
six separate complaints were filed against defendants based
upon alleged antitrust violations. On August 14, 2003, this
Count entered a pretrial order consolidating the seven related
actions under a master file, directing plaintiffs to file a
consolidated complaint, and holding discovery in abeyance
pending the resolution of motions filed in response to the
complaint. (Doc. No. 23). [1]

Plaintiffs filed an amended complaint on September 3, 2003.
(Doc. No. 28). Plaintiffs contend that defendants violated
Section 1 of the Sherman Act, 15 U.S.C. § 1, by
engaging in a conspiracy in restraint of trade to artificially
raise, fix, and/or stabilize prices for plastic additives in
the united states. (*Id.* at ¶¶ 49–50). Plaintiffs contend that
defendants agreed to charge prices at higher levels and to
allocate prices in order to artificially manipulate the price of
plastic additives. (Id. at ¶ 50). Plaintiffs further allege that
they had no knowledge of the conspiracy because defendants
fraudulently concealed it. (*Id.* at ¶ 52). As a result, plaintiffs
allege that they and other members of the class were required
to pay more for plastic additives than they would have in a
competitive marketplace. (Id. at ¶ 11).

**\*2** On December 1, 2003, defendants moved for dismissal
and partial dismissal. (Doc. No. 54, 56). This Court denied
defendants' motions on May 26, 2004, prompting the parties
to meet to discuss an ongoing plan for discovery. (Doc. No.
72). The parties failed to reach an agreement on a discovery
schedule, and, on September 14, 2004, defendants moved
for bifurcation of discovery and for a stay of merits-based

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 37 of 121

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

discovery. (Doc. No. 88). On October 1, plaintiffs filed a motion for entry of plaintiffs' proposed scheduling order. (Doc. No. 92). After an array of briefs and response briefs, the final brief in support of the parties' respective positions was filed on November 10, 2004. (Doc. No. 103).

## II. Motion to Bifurcate

Defendants have moved this Court to bifurcate discovery into class certification issues and merit-based issues. Defendants present three major reasons for bifurcation. First, defendants claim that bifurcation will promote the early and efficient resolution of class issues contemplated by Federal Rule of Civil Procedure 23©(1). (Def. Mot. To Bifurcate, at 7–13). Second, defendants claim that bifurcation is necessary due to pending grand jury proceedings in California. (*Id.,* at 13–17). Third, defendants claim that bifurcation will save the parties time and expense because resolution of the class certification issue will influence further proceedings. (*Id.,* at 11). This Court rejects defendants' arguments in favor of bifurcation.

Class certification must be made "as soon as practicable after commencement of an action." Fed.R.Civ.P. 23(c)(1) & (3). This mandate recognizes that "class certification or its denial will have a substantial impact on further proceedings, including the scope of discovery, the definition of issues, the length and complexity of trial, and the opportunities for settlement." Federal Judicial Center, Manual For Complex Litigation § 11.213, at 40 (4th ed.2004). To ensure that the mandate of Federal Rule of Civil Procedure 23(c)(1) is followed, courts have the discretion to "allow classwide discovery on the certification issue and postpone discovery on the merits." *Washington v. Brown & Williamson Tobacco,* 959 F.2d 1566, 1570–1571 (11th Cir.1992).

The Third Circuit has not set a bright line test as to when a court should bifurcate discovery in class action litigation. Generally, however, courts allow classwide discovery on the certification issue and postpone classwide discovery on the merits of the claims when bifurcation serves the interests of "fairness and efficiency." *See* Manual for Complex Litigation § 11.213, at 40 ("discovery may proceed concurrently if bifurcating class discovery from merits discovery would result in significant duplication of effort and expense to the parties"); *see also Williamson Tobacco Corp.,* 959 F.2d at 1570–71 ("[t]o make early class determination practicable and to best serve the interests of fairness and efficiency, courts

may allow classwide discovery on the certification issue and postpone classwide discovery on the merits").

**\*3** Both parties rely upon the Manual for Complex Litigation (the "Manual") as an authoritative source to determine when bifurcation is fair and efficient. (Def. Mot. to Bifurcate, at 5; Pl. Opp'n to Mot. to Bifurcate, at 9). According to the Manual, "courts often bifurcate discovery between certification issues and those related to the merits of the allegation." *Id.* § 21.14, at 256. Nonetheless, the Manual voices several concerns with bifurcation. The Manual notes that the distinction between merits-based discovery and class-related discovery if often blurry, if not spurious. *See id.* § 21.14, at 255 ("generally, application of the Rule 23 criteria requires the judge to examine the elements of the parties' substantive claims and defenses in order to analyze commonality, typicality, and adequacy of representation under Rule 23(a)"). The Manual further notes that "some merits discovery during the precertification period is generally more appropriate for cases that are large and likely to continue even if not certified." *Id.; see also Gray v. First Winthrop,* 133 F.R.D. 39, 41 (N.D.Cal.1990) (denying order to stay merits-based discovery until resolution of class certification motion would be "unworkable," "impracticable," and "inefficient" and would deny plaintiffs ability to develop facts in support of motion). Accordingly, the Manual suggests that the prime considerations in whether bifurcation is efficient and fair include whether merits-based discovery is sufficiently intermingled with class-based discovery and whether the litigation is likely to continue absent class certification.

Bifurcation would be inefficient, unfair, and duplicative in this case for several reasons. First, bifurcation would further delay the resolution of the litigation in derogation of Rule 1 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 1 (procedural rules must be administered to secure "the just, speedy, and inexpensive determination of every action"). This case has already been on the docket for over 18 months without a decision on class certification. Failure to permit simultaneous discovery of merits-related and class-related issues will further delay the length of the overall discovery period, thereby inhibiting plaintiffs from receiving an expeditious resolution of their claims.[2] *See, e.g., In re Sulfuric Acid Antitrust Litigation,* MDL No. 1561, No. 03 C 4576 (N.D.Ill.2003) (refusing to bifurcate discovery in antitrust litigation in part because of delays created by bifurcation). Bifurcation would also belie principles of judicial economy, as the Court may be forced to spend

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 38 of 121

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

time and resources resolving discovery disputes over what is "merit" discovery as compared to "class" discovery. *See, e .g., In re Hamilton Bancorp, Inc. Securities Litigation,* 2002 WL 463314, at *1 (S.D.Fla. Jan.14, 2002) (noting that "bifurcation of discovery may well-increase litigation expenses by protracting the completion of discovery, coupled with endless disputes over what is 'merit' versus 'class' discovery").

**\*4** Second, class certification discovery in this litigation is not "easily" differentiated from "merits" discovery. *See, e.g.,* 🚩 *Gray,* 133 F.R.D. at 41 (noting that "discovery relating to class certification is closely enmeshed with merits discovery" and "cannot be meaningfully developed without inquiry into basic issues of the litigation"). There will be a substantial overlap between what is needed to prove plaintiff's price-fixing claims, as well as the information needed to establish class-wide defenses, and what is needed to determine whether the elements of class certification are met. For example, according to the defendants' proposed scheduling order, determination of whether the elements of class certification are met[3] would require discovery into whether the agreements between the parties for the sale of plastic additives, competitor contracts, defendants' business plans and strategies for marketing and selling plastic additives, the impact of the defendants' conduct on plaintiffs, and services provided by defendants to plaintiffs in connection with the sale of plastic additives. (Def. Proposed Scheduling Order, attached as Exhibit A). Discovery on these issues will also be necessary to prove the merit of plaintiffs' claim, namely whether defendants' engaged in a nation-wide price-fixing scheme for the sale of plastic additives and whether, as a result, the plaintiffs suffered damages. *See, e.g.,* 🚩 *In re Linerboard Antitrust Litigation,* 305 F.3d 145, 151 (3d Cir.2002) (damages in antitrust litigation can be proved by establishing that free market prices would be lower than prices paid and that plaintiffs made purchases at higher prices). Due to the intermingling of the facts necessary to evaluate class certification and the merits of plaintiffs' claims, separating the two would duplicate discovery efforts, which, in turn, would force both parties to incur unnecessary expenses and would further protract the litigation.

Third, contrary to defendants' assertions, there is no reason to believe that denial of class certification will terminate this litigation. *See* Manual for Complex Litigation § 21.14, at 256 (bifurcation not appropriate if litigation likely to proceed without certification). Seven individual lawsuits

were filed against the defendants and then consolidated under this master file. The six additional lawsuits have not been terminated, but, instead, have been stayed pending class certification in this litigation. If class certification is denied, it is reasonable to assume that the individual plaintiffs will pursue their claims through the cases that are currently stayed. (Pl. Opp'n to Def. Mot. to Bifurcate, at 10). This is particularly true because one of the defendants, Crompton Corporation ("Crompton"), has been accepted into the Department of Justice's corporation leniency program, and has agreed to assist plaintiffs' counsel in the prosecution of claims against non-settling defendants. (*Id.,* at 10–11). The likelihood of the continuation of individual claims, regardless of class certification, belies whatever time and expense may be saved in the future through the narrowing of discovery pursuant to the resolution of class certification motions.

**\*5** Because bifurcation of discovery would be inefficient, unfair, and duplicative, this Court denies defendants' motion to bifurcate discovery into a class-based stage and a merits-based stage.[4]

III. Motion to Stay Merits–Based Discovery

In addition to the request for straightforward bifurcation, defendants expressly ask this Court to issue a stay of all merits-based discovery pending a determination of class certification. (Def. Mot. to Bifurcate, at 12–13). Defendants support their argument by reference to the standard for determining whether to stay civil proceedings pending the resolution of related criminal proceedings. (*Id.,* at 12–13). In so doing, defendants implicitly ask this court to stay merits-based discovery until the outcome of ongoing grand jury proceedings in California. (*Id.,* at 15) ("If, however, the grand jury has not concluded by the time the class certification motion has been decided, the Court can re-evaluate at that time whether to permit merits discovery to go forward and with what limitations").

It is well-settled that defendants in a criminal prosecution do not have a due process right to stay proceedings in a parallel civil case. 🚩 *United States v. Kordel,* 397 U.S. 1, 9–10, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970). However, it is equally well-settled that the Court has the inherent authority to control the disposition of cases on it dockets. *See, e.g.,* 🚩 *Landis v. North Am. Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936). This includes the power to stay civil discovery until

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 39 of 121

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

termination of related criminal proceedings. *See* 🚩*Texaco, Inc. v. Borda,* 383 F.2d 607, 608 (3d Cir.1967).

The "stay" of a civil case is an "extraordinary remedy." *Weil v. Markowitz,* 829 F.2d 166, 174 n. 17 (D.C.Cir.1987). In determining whether the "extraordinary" remedy of a stay is appropriate, this Court looks at five competing interests:

(1) interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay;

(2) burden which any particular aspect of the proceedings may impose on defendants;

(3) convenience of the court in the management of its cases, and the efficient use of judicial resources;

(4) interests of persons not parties to the civil litigation; and

(5) interest of the public in the pending civil and criminal litigation.

*See, e.g.,* 🚩*Golden Quality Ice Cream Co. v. Deerfield Specialty,* 87 F.R.D. 53, 56 (E.D.Pa.1980) (promulgating factors). Ultimately, the decision whether to grant a stay must be made on a case-by-case basis. *See Shirsat v. Mutual Pharmaceutical Co.,* 1995 WL 695109, at *1 (E.D.Pa. Nov.21, 1995).

This Court refuses to bifurcate discovery on the basis of concurrent grand jury proceedings that may extend indefinitely. To the extent that defendants are asking for an official stay on merits-based discovery pending the resolution of grand jury proceedings, and perhaps even criminal prosecutions, this Court also denies the defendants' request based upon a balancing of all relevant factors. *See Sterling Nat'l Bank v. A–1 Hotels Int'l, Inc.,* 175 F.Supp.2d 573, 579 (S.D.N.Y.2001) (treating request for stay of depositions for six months as request for stay of case pending resolution of ongoing grand jury proceedings and criminal investigations because "the argument for a further stay [six months later] will be at least as potent as it is now").

A. Plaintiffs' Interest and Potential Prejudice

**\*6** Staying merits-based discovery would prejudice plaintiffs by preventing the expeditious resolution of the lawsuit. *See, e.g .,* *Sterling Nat'l Bank,* 175 F.Supp.2d at 575 (concluding that "it would be perverse if plaintiffs who

claim to be the victims of criminal activity were to receive slower justice than other plaintiffs because the behavior they allege is sufficiently egregious to have attracted the attention of the criminal authorities"). It is "only through the discovery procedure that a plaintiff can determine the merit (or lack of merit) in his [or her] case and develop the strategy which will guide him [or her] throughout the litigation." 🚩*Golden Quality Ice Cream Co.,* 87 F.R.D. at 56. While the initiation and resolution of the California grand jury proceedings against defendants may narrow the scope of this litigation, this possibility is too remote to be considered at this stage. Furthermore, staying discovery on this rationale would result in an indefinite stay, as there is no way to predict when grand jury proceedings will end, whether an indictment will be delivered, and whether criminal proceedings will ensue. *See In re Residential Doors Antitrust Litigation,* 900 F.Supp. 749, 756 (E.D.Pa.1995) (rejecting argument that discovery can be stayed without prejudice to plaintiffs until completion of government's criminal investigation of unspecified others at unknown future date).

B. Burden on Defendants

Defendants have not established that they would suffer actual prejudice if merits-based discovery proceeds. As corporations, defendants will not be able to invoke the privilege against self-incrimination. *See* 🚩*United States v. Kordel,* 397 U.S. 1, 9, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970) (right against self-incrimination not available to corporations). However, if defendants' employees invoke their Fifth Amendment right against self-incrimination during the discovery process, such as by refusing by refusing to answer deposition questions or interrogatories, the defendants' chances of success at trial may diminish. Indeed, a court may impose "reasonable" discovery sanctions in such a situation, such as preventing the witness from testifying on behalf of the defendant concerning the factual matters that were concealed by the invocation of the Fifth Amendment.

*See, e.g.,* 🚩*Securities & Exch. Comm'n v. Graystone Nash, Inc.,* 25 F.3d 187, 190 (3d Cir.1994) (reliance on Fifth Amendment right against self-incrimination in civil cases may give rise to adverse inference against party claiming benefits).

This Court recognizes the seriousness of defendants' concerns. However, the weight to be attached to these fears is minimized by the layers of speculation upon which they are built. *See Sterling Nat'l Bank,* 175 F.Supp.2d at 578

Case 1:25-cv-01410-JKM  Document 23-4  Filed 11/21/25  Page 40 of 121

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

(denying motion to stay pending resolution of grand jury proceedings because "there is no way of measuring with any precision what questions defendants may refuse to answer, or what damage may be done to their position in the civil case by any assertions of privilege they choose to make"). Defendants presume that employees, who have yet to be indicted, will need to, and will actually invoke, their Fifth Amendment privilege during discovery. *Id.* Defendants then presume that this Court will impose discovery sanctions for the exercise of this right. *Id.* These presumptions render the actual prejudice to defendants "inherently unclear" at this pre-indictment phase. *Id* . at 577–578.

**\*7** This Court also finds defendants' fears concerning discovery sanctions incommensurate with defendants' request for a stay of merits-based discovery. Because merits-based discovery and class-based discovery overlap, the progression of class-based discovery, to which defendants have agreed, may require the defendants' employees to exercise their Fifth Amendment rights during discovery events. Paradoxically, this would lead to the very result that defendants' request for a stay seeks to prevent. Accordingly, defendants' failure to request a blanket stay of all discovery pending the resolution of criminal grand jury proceedings in California undermines their argument that a stay of merits-based discovery will avoid actual prejudice.

Finally, this Court notes that defendants have not argued that merits-based discovery will divert resources that may be necessary for defense of a possible criminal action. Nor have defendants argued that the expense of defending the civil litigation and the grand jury proceedings in California would be unreasonable. Accordingly, although the defendants may experience some future prejudice if this Court refuses to grant a stay of merits-based discovery, particularly with respect to negative inferences to be drawn from the exercise of Fifth Amendment rights by individual witnesses, this prejudice is both remote and uncertain. *See* State Farm Mutual Automobile Ins. Co. v. Beckham–Easley, 2002 WL 31111766, at *2 (E.D.Pa. Sept.18, 2002) (pre-indictment requests for stay are typically denied because risks are more remote than for indicted defendant). [5]

#### C. Burden on the Court

Staying merits-based discovery in the litigation hinders the Court's responsibility to keep its docket moving to provide litigants with a timely and effective resolution of their claims. *See, e.g., Dawson v. Dodd,* 1999 WL 410366, at *3 (E.D.Pa.

June 17, 1999) ("The Court has a responsibility to control the disposition of the cases on its docket with economy of time and effort for all actors including itself."). To delay merits-based discovery pending the resolution of grand jury proceedings at some unforeseeable date in the future would hinder the Court from performing its responsibility. This duty is particularly important when, as in the instant matter, the complaint that is the subject of the motion to stay has been lingering on the docket for more than 18 months.

The Court realizes that, in some instances, staying discovery until the resolution of parallel criminal proceedings may minimize the Court's burden. A stay may avoid duplicative judicial efforts, eliminating the need for parties to claim the Fifth Amendment right against self-incrimination or removing the burden upon plaintiffs to prove antitrust liability. *See, e.g.,* White v. Mapco Gas Products, Inc., 116 F.R.D. 498, 502 (E.D.Ark.1987). In this case, however, these possibilities are too remote to be given significant consideration. *See, e.g.,* Anthony v. City of Philadelphia, 2001 WL 118964, at *2 (E.D.Pa. Feb.9, 2001) (rejecting argument as too speculative that plaintiff and court will benefit from stay because resolution of criminal case may reduce or simplify issues). There has been no indictment handed down in either of the grand jury proceedings. *See* Sterling Nat'l Bank, 175 F.Supp.2d at 580 (refusing to grant stay of parallel civil proceedings when no indication that grand jury's investigation reached critical stage or that indictment is imminent because stay would "substantially halt the civil litigation indefinitely, without any predictability as to when the case would return to the Court's active docket"). As such, no criminal charges have been filed, nor has a date been set for trial. It is therefore uncertain how long the requested stay will last, and whether future criminal proceedings will alleviate the evidentiary and analytical burdens on the parties and on the court. *See Beckham–Easley,* 2002 WL 3111176, at *3 Beckham–Easley, 2002 WL 3111176, at *3 (denying motion to stay discovery despite defendants' contentions that indictment would be issued within 120 days from filing motion to stay). Accordingly, the interests of immediate judicial economy trump the defendants' speculations that waiting until the completion of grand jury proceedings would lessen the court's burden.

#### D. Burden on Non-parties

**\*8** Corporations speak and function only through their officers and employees. *See* Upjohn, 449 U.S. at 389–392. As the defendants note, the DOJ frequently requires current

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 41 of 121

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

and former employees from companies under investigation to testify before the grant jury. (Def. Mot. To Bifurcate, at 14–15). These employees are not parties to this litigation. However, if faced with a discovery request, whether in the form of depositions, written interrogatories, or document production, these witnesses may have to invoke their Fifth Amendment right against self-incrimination to avoid disclosing information that may lead to a future criminal conviction. The pressure of whether to invoke this right during civil discovery can be severe. *See* 🚩 *Golden Quality Ice Cream,* 87 F.R.D. at 58; *see also* 🚩 *White,* 116 F.R.D. at 503 (noting that corporations' officers and managers may have Fifth Amendment privileges by virtue of grand jury probe and that interest of non-parties against self-incrimination favors staying discovery).

While the dilemma of whether a non-party should invoke her Fifth Amendment right against self-incrimination may be severe, the personal consequences that attach to this decision are not as grave. This Court may not impose discovery sanctions on non-parties who invoke their Fifth Amendment rights during civil discovery. Nor can the exercise of this right be used against such witnesses in future criminal prosecutions. 🚩 *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (no adverse inference may be drawn nor penalty imposed on criminal defendant who chooses not to testify by exercising Fifth Amendment right against self-incrimination). Furthermore, to lessen the burden on non-party witnesses in deciding to invoke the privilege, defendants may seek the entry of a protective order, which forbids the dissemination of information gathered through civil discovery to outside parties. Finally, to this Court's knowledge, no indictments have been handed down against defendants or their employees, thereby further weakening the degree of risk to non-parties if merits-based discovery progresses. *See Sterling Nat'l Bank,* 175 F.Supp.2d at 578 (noting that burden is greater to indicted party because risk of liberty, importance of safeguarding constitutional rights, and strain on resources and attention make defending parallel civil litigation particularly difficult). Consequently, the burden on non-parties in this instance is marginal.

### E. Public Interest

Public interest considerations weigh against granting a stay of merit-based discovery. The public's interest in vigorously enforcing national anti-trust laws through the expeditious resolution of a private antitrust litigation is particularly great.

*See* 🚩 *Golden Quality Ice Cream,* 87 F.R.D. at 58; *In re Residential Doors,* 900 F.Supp. at 756 (public interest prejudiced by delay in discovery proceedings in class action antitrust litigation). This interest is even greater when the nature of the litigation is a class action lawsuit, filed on behalf of nationwide consumers of a particular product over the course of more than a decade. Furthermore, the public also has a significant interest in ensuring the flow of this Court's judicial docket so that justice may be administered to the instant litigants, as well as all other litigants before this Court, in a timely fashion. These interests are not rendered less acute by the federal government's decision to spend resources on behalf of the public investigating potential antitrust violations by defendants and convening grand jury proceedings, particularly when no indictments have been delivered and when the federal government has not intervened to request a stay of discovery on the basis of ensuring the secrecy, integrity, and timeliness of such proceedings. *See, e.g., Kaiser v. Steward,* 1997 WL 66186, at *5 (E.D.Pa.1997) (refusing blanket stay of civil proceedings pending outcome of criminal trial, even when government prosecuting parallel criminal case requests stay to prevent defendants from using civil discovery as vehicle to gain information on possible future criminal prosecutions); 🚩 *Golden Quality Ice Cream,* 87 F.R.D. at 58 (public interest in quick and diligent resolution of antitrust violations through private litigation only weakened when federal government receives indictment and chooses to prosecute criminal antitrust case).

**\*9** The defendants ask the Court to weigh these significant interests against the public interest in maintaining the secrecy of grand jury proceedings, as embodied in Rule 6(e) of the Federal Rules of Criminal Procedure. Defendants note that witnesses may be asked to provide testimony and documents that reveal information provided to the grand jury, thereby helping the litigants in this matter to identify other witnesses who have been called to testify before one or both grand juries. (Def. Mot. To Bifurcate, at 17). As stated more fully in Section III.A.1 of this opinion, Rule 6(e) neither applies to witnesses nor to documents created independent of grand jury proceedings. *See* Fed. R.Crim. Pro. 6(e). Accordingly, defendants' argument that permitting civil merits discovery will violate the grand jury secrecy provisions of Rule 6(e) is unfounded.

### F. Conclusion

A careful weighing of the factors indicates that discovery should not be bifurcated. Nor should merits-based

discovery be stayed pending the resolution of class certification, ongoing grand jury proceedings, or subsequent criminal prosecutions. This Court recognizes the legitimacy of defendants' concerns about possible prejudice from employees asserting their right against self-incrimination during the discovery process. Nonetheless, rather than delaying this litigation to allay defendants' speculative concerns, such as by staying merits-based discovery or preventing the taking of depositions of defendants' employees prior to class certification, this Court will progress with discovery and will attempt to accommodate defendants' concerns if and when the situations triggering these concerns actually arise.

IV. Plaintiffs' Motion for Entry of a Scheduling Order

Plaintiffs argue that the Court should enter the proposed scheduling order, which does not bifurcate discovery. Plaintiffs' scheduling order allocates sixty days for the completion of discovery concerning class certification issues. (Pl. Proposed Order, at ¶ 2(d)). It imposes the following obligations on the parties. First, it requires defendants to produce within forty-five days of the order all documents relating to plastics additives "that were produced to the Department of Justice, any grand jury, and any investigatory authority, foreign or domestic (including but not limited to the European Union, Canada, or Japan), on a rolling basis...." (*Id.* at ¶ 2(a)). Second, it requires defendants to produce within sixty days of the order "in electronic format, all transactional data relating to their sales of Plastics Additives, as defined in the Complaint, in the United States during the period January 1, 1990 through to December 31, 2003" and to make available defendants' documentation and computer personnel to help understand and use the data. (*Id.* at ¶ 2(b)). Third, it requires plaintiffs to produce within 45 days "all documents relating to their purchases of plastics additives ... from the defendants." (*Id.* at ¶ 2(c)).

**\*10** Defendants object to this proposed scheduling order on several grounds. First, defendants contend that the production of all documents produced to the DOJ, any grand jury, or any domestic investigatory authority violates Rule 6(e) of the Federal Rules of Criminal Procedure. (Def. Opp'n to Pl. Mot., at 8–12). Second, defendants contend that the production of all documents produced to any foreign investigatory authority is excessively burdensome and not geared towards the acquisition of relevant evidence. (*Id.* at 11–13). Third, defendants contend that sixty days is insufficient to conduct class-related discovery and allows for inadequate time for factual development on class issues. (*Id.*,

at 15). Fourth, defendants contend that the discovery plan imposes no reciprocal burden upon plaintiffs to produce data in electronic format and to provide technical assistance to defendants in understanding the use of that data. (*Id.*). Finally, defendants contend that they should be expressly allowed to take discovery from plaintiffs related to plaintiffs' sales of plastics products to their customers. (*Id.*).

A. Documents related to plastic additives that were submitted to the Department of Justice, any grand jury, and any domestic investigatory body

Defendants claim that defendants should not have to produce documents related to plastic additives that were submitted as part of a domestic government investigation because Rule 6(e)(2) of the Federal Rules of Criminal Procedure bars disclosure and because case law does not dictate such a result. (Def. Mem. In Opp'n to Pl. Mot., at 8).

1. Rule 6(e)(2) is inapplicable.

Defendants claim that Federal Rule of Criminal Procedure 6(e)(2) prevents plaintiffs from receiving documents that defendants produced to the DOJ in connection with California grand jury investigations. (Def. Mem. in Opp'n to Pl. Mot., at 8). Defendants' arguments lack legal support.

Federal Rule of Criminal Procedure 6(e)(2)(A) states that "no obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B)." Fed.R.Crim.P. 6(e)(2)(A). Rule 6(e)(2)(B) prohibits certain people from disclosing "a matter occurring before the grand jury." Fed.R.Crim.P. 6(e)(2)(B). This list of persons includes the following: a grand juror; an interpreter; a court reporter; an operator of a recording device; a person who transcribes recorded testimony; an attorney for the government; or any person to whom disclosure is made. *Id.* Conspicuously absent from this list are witnesses, whether witnesses that testify at grand jury proceedings or witnesses that provide documents to grand juries during the course of their proceedings. *See* Susan W. Brenner, Gregory G. Lockhart, Federal Grand Jury: A Guide to Law and Practice § 8.3.1 (2004); *see also* Andrea M. Nervi, FRCP 6(E) And the Disclosure of Documents Reviewed by a Grand Jury, 57 U. Chi. L.Rev. 221, 224–225 (1990). This omission was not unintentional, as the Advisory Committee Note to Rule 6(e) specifies that the rule "does not impose any obligation of secrecy on witnesses." *Id.*

**\*11** Despite its express language, courts disagree as to whether Rule 6(e)(2) applies to witnesses and other private

2004-2 Trade Cases P 74,620

parties not listed in the rule. 🚩 *Compare Illinois v. Sarbaugh,* 552 F.2d 768, 777–78 (7th Cir.1977) (private corporations indicted through grand jury proceedings subject to secrecy obligations of Rule 6(e), although state demonstrated particularized need within meaning of Rule 6(e) to force corporate employer of grand jury witness to turn over transcripts of grand jury testimony concerning highway construction fraud) *and* 🚩 *Cumberland Farms, Inc. v. Browning–Ferris Ind., Inc. .,* 1989 WL 90884, at *1 (E.D.Pa. April 18, 1989) (applying Rule 6(e) without discussion to private party defendants and requiring showing of particularized need for documents created by or for grand jury) *with* 🚩 *In re Grand Jury Subpoena Duces Tecum,* 575 F.Supp. 1219, 1221 (E.D.Pa.1983) (Rule 6(e) does not impose obligation of secrecy on witnesses, nor does the court retain a general supervisory authority to impose restraints on witnesses who seek to disclose testimony given before grand jury). Although the Third Circuit has not squarely addressed this issue, this Court agrees with those courts holding that Rule 6(e)(2) does not impose secrecy obligations on a witness who supplies documents to a grand jury proceeding. *See, e.g.,* 🚩 *In re Wirebound Boxes Antitrust Litigation,* 126 F.R.D. 554, 555–556 (D.Minn.1989) (defendants in antitrust litigation are not among the parties enumerated in Rule 6(e)(2) and are required to release documents which were produced independent of the grand jury); 🚩 *Golden Quality Ice Cream Co., Inc.,* 87 F.R.D. at 59 (disclosure of documents produced by defendants in class action to grand jury not prohibited by Federal Rule of Criminal Procedure 6(e)). This analysis comports with the text of the rule and with the advisory comment explaining the purpose and genealogy of the rule. *See* Fed.R.Crim.P. 6(e) (no obligation of secrecy on any person except those listed in Rule 6(e)(2)(B)).

Furthermore, even if Rule 6(e)(2) was applicable to private parties not listed in the rule, documents generated for purposes independent of the grand jury investigation, such as during the ordinary course of a defendant's business, are not "matters occurring before the grand jury." *See, e.g.,* 🚩 *In re Grand Jury Matter* (Catania), 682 F.2d 61, 64 (3d Cir.1982) (information developed by the FBI during course of investigation and presented to federal grand jury was not subject to Rule 6(e) because information exists apart from and was developed independently of grand jury, even though developed with an eye towards ultimate use in grand jury proceeding); *In re Grand Jury Matter,* 640 F.Supp. 63, 65 (E.D.Pa.1986) (Rule 6(e) does not apply to materials created

for purposes independent of the grand jury investigation and, thus, business records subpoenaed by grand jury could be disclosed to Inspector General as part of a separate investigation). The Third Circuit has expressly declared that "information does not become a matter occurring before the grand jury simply by being presented to the grand jury, particularly where it was developed independently of the grand jury." *U.S. v. Chang,* 2002 WL 31108904, at *2 (3d Cir. Sept.20, 2002) (unpublished opinion); 🚩 *In re Grand Jury Matter* (Catania), 682 F.2d at 64. Nonetheless, materials created at a grand jury's request, such as subpoenas, transcripts, and document lists, constitute matters "occurring before the grand jury" within the meaning of Rule 6(e), thereby requiring parties to demonstrated particularized need to acquire these materials. *See, e.g.,* 🚩 *United States v. Procter & Gamble Co.,* 356 U.S. 677, 683, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958) (requiring party seeking grand jury transcript to demonstrate "particularized" need for disclosure).

**\*12** Because defendants are not one of the enumerated parties in Rule 6(e), and because the defendants have not asserted that the documents were created at the request of grand jury proceedings in California rather than during the ordinary course of defendants' business operations, the obligation of secrecy does not apply.[6] *See* Manual for Complex Litigation § 11.49 ("The production to a grand jury of otherwise discoverable material does not, however, entitle it to Federal Rule of [Criminal] Procedure 6 protection. Copies of material produced to a grand jury are subject to discovery ."). Indeed, this Court does not believe that the production of documents submitted during the California grand jury proceedings is likely to disclose the "essence" of those proceedings. *See, e.g.,* *In re Grand Jury Investigation,* 630 F.2d 996, 1000 (3d Cir.1980) (holding that Rule 6(e)'s policy of secrecy "designed to protect from disclosure only the essence of what takes place in the grand jury room" and recognizing that mere fact that particular document was reviewed by grand jury does not subject document to Rule 6(e) protections). Consequently, defendants' objection to plaintiffs' proposed order on the ground of Rule 6(e)(2) lacks merit.

2. Plaintiffs' request for all documents submitted to the DOJ, any grand jury, and any domestic investigatory body is supported by case law.

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 44 of 121

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

Rejecting the defendants' defense to plaintiffs' discovery request is not the same as endorsing the content of plaintiffs' proposed order. It appears, however, that defendants in antitrust litigation regularly agree through joint discovery schedules to produce documents submitted to the DOJ, grand juries, and other investigatory authorities concerning the basis for the antitrust civil suit. *See, e.g., In re Acrylonitrile Butadiene Rubber (NBR) Antitrust Litigation,* 03–cv–1898 (W.D. Pa. June 14, 2004) (parties agreeing in proposed discovery schedule to produce documents submitted to grand jury or DOJ); *In re Rubber Chemicals Antitrust Litigation,* 03–CV–1496 (N.D.Cal. Jan. 26, 2004) (documents produced to grand jury or DOJ subpoenas in related criminal investigation included within Rule 26 initial disclosures); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation,* 03–MD–1542 (PCD) (D.Conn. Oct. 31, 2003) (parties agreeing in proposed discovery schedule to produce all documents submitted to DOJ or grand jury). This willingness to produce such documents at the outset of litigation signals the appropriateness and relevance of such a discovery request.

Plaintiffs also cite several cases in which defendants have been compelled to produce documents relating to government investigations. *See, e.g.,* 🚩*In re Wirebound Boxes Antitrust Litigation,* 126 F.R.D. at 556 (requiring defendants to product "documents which they submitted to the government in response to an investigation of the wirebound box industry and which they created independently from any such investigation); 🚩*Golden Quality Ice Cream,* 87 F.R.D. at 59. These cases recognize the relevance of these documents to antitrust litigation. *See* 🚩*In re Wirebound Boxes Antitrust Litigation,* 126 F.R.D. at 556. They also recognize that the production of these documents will impose only a minimum burden on the defendants, "since the documents in question have already been identified and sorted." *See, e.g.,* 🚩*Golden Quality Ice Cream,* 87 F.R.D. at 59. In fact, ordering production of these documents "seems to accord with prevailing practice." *Id.* [7]

**\*13** This Court agrees with the logic of *In re Wirebound Boxes AntiTrust Litigation* and *Golden Quality Ice Cream.* [8] Applying this logic, defendants shall be required to produce all documents that were produced to the DOJ, any grand jury, and any domestic investigatory authority in connection with an investigation of the plastics additives industry. *See* Grand Jury Law and Practice § 5:6 (2d ed.2004) (evidence

obtained independently of the grand jury proceeding does not ordinarily constitute a "matter occurring before the grand jury," even if same witness or similar evidence has been or will be presented to grand jury).

### B. Documents related to plastics additives that were submitted to foreign investigatory bodies

Defendants present two major objections to the proposal that defendants produce all documents turned over to foreign investigatory bodies in conjunction with the investigation of the plastics additives industry. First, defendants claim that documents produced to foreign investigative authorities are irrelevant to this lawsuit. (Def. Opp'n To Pl. Mot., at 12). Specifically, defendants claim that plaintiffs have alleged only that defendants engaged in a price-fixing conspiracy "in the United States," rather than a foreign price-fixing conspiracy; that foreign investigators focus on domestic markets over which they have control and jurisdiction; and that foreign investigators generally conduct wholesale seizures of files, thereby collecting documents irrelevant to the antitrust issues in this litigation. (*Id.*)

Second, defendants claim that this request, at such an early stage in the litigation, would impose an unnecessary burden on the parties. (*Id.* at 13). Defendants stress that foreign investigators may object to the production of documents, as the United States often does, and that production may disclose information about ongoing investigations. (*Id.*). Defendants further claim that foreign criminal investigations into alleged antitrust violations involve a different process than domestic criminal investigations into alleged antitrust violations. (*Id.*). Accordingly, because of this methodological difference, defendants claim that they would need to conduct a thorough review of the documents to determine the applicability of evidentiary privileges, that this review would be complicated by the fact that many of the documents are not likely to be in English, and that companies in defendants' position are not likely to have copies of documents that were seized pursuant to a foreign investigation into the plastic additives industry. (*Id.*).

Plaintiffs respond to defendants' objections by arguing that documents produced to foreign investigative bodies are as relevant as those produced to grand juries in the United States. (Pl. Reply Mem., at 8). Plaintiffs cite a recent order from *In re: Automotive Refinishing Paint Antitrust Litigation,* MDL Docket No. 1426 (E.D.Pa. October 29, 2004) (J. Surrick), in which the court affirmed its previous order requiring antitrust defendants, in response to document requests and

interrogatories, to produce documents submitted to foreign investigative bodies relating to the production, pricing, marketing, sale, or distribution of automotive refinishing paint. *Id.* at *5–6. The court reasoned that such information was relevant because foreign-price fixing activities would impact the domestic market for automotive refinishing paint, because evidence of foreign price-fixing among defendants would establish the existence of an illegal conspiracy in restraint of trade within the meaning of 🔖 section 1 of the Sherman Act, and because evidence of foreign price-fixing would be material "to prove that they had the opportunity and ability to engage in domestic price-fixing for automotive refinishing paint." *Id.* at *8. The court further reasoned that the burden of producing these documents would not be significant because defendants had already agreed to produce all documents and information related to the United States; thus, requiring blanket production was easier than compelling defendants to sift through documents submitted to foreign investigative bodies for materials relevant to the United States. *Id.* at *10–11.

 **\*14**  It is well-settled that courts presiding over antitrust cases generally take a liberal view of relevance in determining the scope of discovery. *See, e.g.,* 🔖 *New Park Entm't, LLC v. Elec. Factory Concerts, Inc.,* 2000 WL 62315, at *3 (E.D.Pa. Jan.13, 2000)* (internal quotations omitted). Applying this expansive view of relevance, this Court agrees that documents produced to foreign investigative bodies are relevant to determine whether defendants have engaged in price-fixing that affects American commerce. Regardless of whether plaintiffs have alleged a global conspiracy, materials produced to international government authorities may cover transactions involving the sale or marketing of plastic additives in the United States. They may also cover transactions and decision-making outside the United States that influence the sale or marketing of plastic additives in the United States. Accordingly, these documents may lead to evidence that illuminates defendants' motive and opportunity for the alleged conspiracy within the United States, the breadth of the conspiracy, and the manner by which defendants fraudulently concealed the conspiracy from plaintiffs. *See, e.g., In re Vitamins Antitrust Litigation,* 2001 WL 1049433, at *11–12 (D.D.C. June 20, 2001)* (refusing to place geographic limitation on merits-based discovery in global price-fixing case because, although acts or communications outside the United States may be admissible to establish existence of conspiracy). In addition, such materials may help plaintiffs to discover the identity and

location of potential witnesses and to impeach defendants' trial witnesses. *Id.*

This Court also rejects defendants' position that production of all documents submitted to international investigative authorities concerning plastic additives at this juncture in the litigation would pose a substantial burden on defendants. The scope of document production in antitrust litigation is often quite expansive. *See, e.g.,* 🔖 *In re Fine Paper Antitrust Litigation,* 685 F.2d 810, 818 (3d Cir.1982)* (no abuse of discretion where trial court permitted taking of 270 depositions and production of nearly two million documents in complex, nationwide antitrust claim); 🚩 *In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 614 (7th Cir.1997)* (pretrial discovery involved more than 1,000 depositions and over fifty million pages of documents); *In re Linerboard Antitrust Litigation,* 296 F.Supp.2d 568, 577 (E.D.Pa.2003)* (pretrial discovery required production of millions of pages of documents). Furthermore, although foreign antitrust investigations generally may be conducted in a distinct manner from domestic antitrust investigations, defendants have not provided this Court with specific, individualized reasons why the production of documents that defendants supplied to foreign investigative bodies would be burdensome in this particular litigation. Defendants fail to present evidence, such as affidavits from employees or written documentation, indicating that wholesale files were seized from defendants' international offices, that the documents produced to foreign investigative authorities are in languages other than English, or that defendants would need to review each and every document to determine whether it invokes applicable privileges. Nonetheless, this Court gives serious consideration to the defendants' generic contention that companies subject to foreign seizures of corporate records are not likely to have either lists of the documents seized or records indicating what was taken. Accordingly, defendants shall be required to provide documents related to plastic additives that were produced to foreign investigatory authorities, to the extent that defendants have knowledge of the identity of these documents and/or can reasonably obtain knowledge of the identity of these documents.

  C. Time Period
  **\*15**  Defendants contend that the proposed discovery schedule of 60 days for class-related discovery is unrealistic. (Def. Opp'n to Pl. Mot., at 15). Defendants claim that this period allows inadequate time for factual development on class issues. (*Id.*).

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

This Court has refused to bifurcate discovery. This decision may require the parties to spend substantial time in responding simultaneously to merits-based discovery and class-based discovery. Because merits-based discovery may deflect attention and resources from establishing a record for class certification, this Court agrees that sixty days for class-based discovery is inadequate, particularly when both party may employ expert witnesses in support of their respective positions on class certification. *See, e.g .,* *Larson v. Burlington Northern and Santa Fe Railway Co.,* 210 F.R.D. 663, 667 (D.Minn.2002) (granting bifurcation but supplying only ninety days to create record for class certification). Instead, this Court will give the parties 120 days to conduct fact-based discovery on the class certification issue.

### D. Production of Data in Electronic Format and Technical Assistance

Defendants also object to the obligation that defendants provide data in electronic format to plaintiffs and that defendants provide technical assistance to plaintiffs in understanding this data. (Def. Opp'n to Pl. Mot., at 15). Defendants do not question the relevance of these obligations, only the fact that no similar burden is imposed upon plaintiffs. (*Id.*).

This Court agrees with defendants' objections. Both parties must provide all transactional data in electronic format, to the extent reasonably feasible. *See, e.g., In re: Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation,* 03–MD–1542 (D.Conn. October 31, 2003) (parties agree to produce transactional data in electronic format, but only to extent "reasonably feasible"). However, defendants shall not be required to make available "documentation and computer personnel" to help plaintiffs understand that data. Requiring this condition as a matter of right in contested litigation undermines the adversarial nature of antitrust litigation. Unless otherwise agreed upon, interpretations of data produced through discovery should be obtained through traditional discovery outlets and through the hiring of expert witnesses. Although the parties may privately agree to provide technical assistance to one another, this Court will not impose such an obligation on either party as a matter of course.

### E. Discovery of Downstream Data

Defendants further object to the plaintiffs' proposed discovery order on the basis that the discovery order does not require plaintiffs to produce information about "demand conditions on the end markets for defendants' products and the varying types of pricing terms to the proposed class members that have resulted from those conditions." (Def. Mem. In Opp'n to Pl. Mot., at 3). Defendants claim that this information must be provided at the outset of the discovery period because it is relevant to whether plaintiffs meet the elements necessary for class certification. (*Id.* at 15).

**\*16** Plaintiffs note that their proposal does not prohibit defendants from requesting this information, as both parties are free to serve discovery requests seeking any information they require. (Pl. Reply Mem., at 9). However, in an effort to preempt future discovery disputes, plaintiffs note that case law prevents discovery of events occurring in the chain of distribution after the initial sales of the price-fixed product, information otherwise known as "downstream data." (*Id.* at 15; Pl. Mem. In Opp'n to Def. Mot., at 19–25).

This Court agrees that plaintiffs' proposed schedule does not prohibit defendants from seeking downstream data, to the extent relevant, through discovery. This Court also agrees that defendants have not established the relevance of plaintiffs' downstream data to the merits of plaintiffs' claims or to class certification issues. Defendants provide no case law in support of their argument. In fact, the case law brought to the Court's attention holds that downstream data is irrelevant to determine whether defendants are liable for price-fixing under the Sherman Act. *See, e.g., Illinois Brick Co. v. Illinois,* 431 U.S. 720, 724–725, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (holding that the overcharged direct purchaser, and not other indirect purchasers who receive the passed-on price of the illegal overcharge, may sue to recover the illegal overcharge and that antitrust defendants may not introduce evidence that indirect purchasers were injured by illegal overcharge) (citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)). As such, courts have refused to require production of downstream data in antitrust price-fixing cases. *See, e.g., In re Vitamins Antitrust Litigation,* 198 F.R.D. 296, 301 (D.D.C.2000) (noting that "no court has even allowed production of individualized downstream data" in antitrust case and refusing to grand defendants' motion to compel documents that relate to plaintiffs' use, manufacture, sale, marketing, distribution, or supply of vitamin products); *In re Wirebound Boxes Antitrust Litigation,* 131 F.R.D. 578 (D.Minn.1990)

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 47 of 121

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

(denying motion to compel document requests for materials concerning plaintiffs' financial information in price-fixing antitrust litigation because plaintiffs do not seek to recover lost profits); *In re Carbon Dioxide Antitrust Litigation,* MDL 940, slip op. at 4 (M.D.Fl. Nov. 19, 1993) (refusing to permit discovery in antitrust litigation of plaintiffs' sales, profits, and costs of products for which liquid carbon dioxide and nitrogen are used because plaintiffs seek to recover overcharges from defendants' antitrust violations). Consequently, although this Court will not *per se* preclude defendants at this time from requesting downstream data through discovery, this Court will certainly not require plaintiffs to produce downstream data at the outset of the discovery period through the entry of a scheduling order.

V. Conclusion

For the following reasons, defendants' motion to bifurcate discovery is denied and plaintiffs' motion for entry of a discovery schedule is granted in part and denied in part. An order and scheduling order consistent with this opinion follow.

*ORDER*

**\*17**  AND NOW, this _____ day of November 2004, upon consideration of Defendants' Join Motion for Bifurcation

of Discovery and Entry of a Scheduling Order (Doc. No. 88) filed on September 14, 2004, Plaintiffs' Opposition to Motion for Bifurcation (Doc. No. 92) filed on October 1, 2004, Defendants' Joint Memorandum in Further Support of Defendants' Motion for Bifurcation of Discovery and Entry of a Scheduling Order (Doc. No. 98) filed on October 21, 2004, Plaintiffs' Motion for Entry of Proposed Discovery Scheduling Order (Doc. No. 93) filed on October 1, 2004, Defendants' Opposition to Plaintiffs' Motion for Entry of Proposed Scheduling Order (Doc. No. 96) filed on October 15, 2004, and Plaintiffs' Reply Memorandum in Support of Motion for Entry of Proposed Discovery Scheduling Order (Doc. No. 103) filed on November 10, 2004, it is hereby ORDERED as follows:

1. Defendants' Motion for Bifurcation is DENIED.

2. Plaintiffs' Motion for Entry of a Proposed Scheduling Order is GRANTED in part and DENIED in part.

3. Discovery shall be completed according to the Scheduling Order that accompanies this Order. [*]

**All Citations**

Not Reported in Fed. Supp., 2004 WL 2743591, 2004-2 Trade Cases P 74,620

---

**Footnotes**

1    By order dated September 15, 2004, the other six cases against defendants were placed in deferred status pending the outcome of class certification in this litigation.

2    This delay is evident from the defendants' proposed order bifurcating discovery, which would not resolve the issue of class certification until (at a minimum) March 2006 and which, throughout this period, would not permit plaintiffs to engage in merits-based discovery. (Def. Mot. to Bifurcate, at 20). Defendants' proposed scheduling order delays both the class certification issue and the ultimate resolution of this litigation, whether through a trial on the merits, settlement, or dispositive motions. (*Id.*). Defendants' proposed scheduling order therefore violates the rationale of efficiency upon which the theory of discovery bifurcation is based.

3    Class action certification is appropriate only if the following four elements are met: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representatives will fairly and adequately protect the interests of the class ("adequacy of representation"). *See* Fed.R.Civ.P. 23(a).

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

4    This Court also disagrees with defendants' assertions that bifurcation is appropriate because other state courts, which are adjudicating state antitrust claims concerning plastics additives against the same defendants, have chosen to bifurcate discovery. Defendants cite two orders from parallel state litigation in Ohio and California for this proposition. However, these cases are not relevant to this Court's analysis. First, in *Competition Collision Center LLC v. Crompton Corp., et al.,* Case No. CGC–04–431278 (Cal.Super.Ct. May 13, 2004), the California Superior Court only stated that the discovery period *"may* be bifurcated into class certification and other issues" [emphasis added]. Second, in *Heritage Plastics, Inc. v. Rohm and Haas Company, et al.,* Case No. 03–CV–0113 (Ohio CCP July 26, 2004), the Court of Common Pleas for Belmont County, Ohio bifurcated discovery, but implied that bifurcation was appropriate primarily because of the congestion in the Court's docket and because federal antitrust litigation against the same defendants was proceeding in this Court.

5    Defendants claim that no general rule exists disfavoring pre-indictment requests for a stay of parallel civil proceedings. (Def. Mem. In Further Support of Mot. to Bifurcate, at 8 n. 7). Defendants also claim, that, if such a rule exists, it is inapplicable in this situation because defendants have not asked for a blanket stay of all civil proceeding, only merits-based discovery. (*Id.*). Although this Court agrees that there is no *per se* rule against pre-indictment stays of parallel civil proceedings, there is certainly a strong judicial preference against such stays. *See, e.g., Sterling Nat'l Bank,* 175 F.Supp.2d at 576–77 (courts generally grant the extraordinary remedy of stay only after defendant seeking stay has been indicted). Furthermore, the logic behind rejecting a blanket stay of parallel civil proceedings prior to a defendant's indictment applies with equal force to a determination of whether merits-based discovery should be stayed pending ongoing grand jury proceedings. In fact, the argument in favor of a stay of merits-based discovery at the pre-indictment phase may be weaker than the argument in favor of a blanket stay because, in the former situation, defendants and their employees may be forced into the Fifth Amendment dilemma through the progression of class-based discovery even if the stay is granted.

6    Defendants have not asked this Court to exercise its supervisory powers over grand jury proceedings as a basis to prevent disclosure of the documents at issue. Accordingly, this Court need not address whether a federal court has the authority to supplement the text of Rule 6(e)(2) by imposing the obligation of secrecy on witnesses or other private parties not mentioned in the rule. *See* Brenner, Federal Grand Jury § 8.3.1 (noting that "it is unclear whether courts have the authority to supplement" Rule 6(e)'s provisions to impose secrecy obligation on parties not enumerated).

7    In *In re Wirebound Boxes AntiTrust Litigation,* defendants were not required to produce all documents related to government investigations into the wirebound box industry 136 F.R.D. at 556. Instead, the court struck a compromise between the need of civil litigants to discover relevant materials and the need to preserve the secrecy of the grand jury process, regardless of the literal text of Rule 6(e). *Id.* The court achieved this balance by requiring defendants to produce all documents created independently from any government investigation, while requiring plaintiffs to show particularized need prior to disclosing documents created by a grand jury or at a grand jury's request, such as subpoenas, transcripts, and lists of documents. *Id.* Although this Court agrees with the general principles of *In re Wirebound Boxes AntiTrust Litigation,* it will not adopt a judicially created discovery limitation in contravention of the literal text of Rule 6(e), which imposes no secrecy obligation on witnesses or private parties who supply documents to grand jury proceedings.

8    The case cited in support of defendant's position, *In re Sulfuric Acid Antitrust Litigation,* 2004 WL 769376, at *3–5 (N.D.Ill. April 9, 2004), which prevented discovery in antitrust litigation of all documents related to sulfuric acid that were provided to a grand jury in connection with a related criminal investigation, is inapplicable. The court in *In re Sulfuric Acid Antitrust Litigation* was compelled to follow the Seventh Circuit's interpretation of Rule 6(e) as covering documents supplied to a grand jury, although created for purposes other than or independent of grand jury investigations. *Id.* at *3. It was also forced to follow the Seventh Circuit's

2004-2 Trade Cases P 74,620

interpretation of Rule 6(e)(2)(B) as covering civil defendants who have supplied documents to a grand jury in a related criminal investigation. 🚩 *Id.* at *2.

\*      Editor's Note: Scheduling Order is not included in this publication.

---

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 50 of 121

Lathrop v. Uber Technologies, Inc., Not Reported in Fed. Supp. (2016)

🚩 KeyCite Yellow Flag

Distinguished by   Allen v. Protective Life Insurance Company,   E.D.Cal.,
December 12, 2023

2016 WL 97511
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

James LATHROP, et al., Plaintiffs,
v.
UBER TECHNOLOGIES, INC., Defendant.

Case No. 14-cv-05678-JST
|
Signed 01/08/2016

**Attorneys and Law Firms**

Hassan Ali Zavareei, Andrea R. Gold, Andrew J. Silver,
Tycko & Zavareei LLP, Washington, DC, Evan Matthew
Meyers, Myles P. McGuire, Mcguire Law, P.C. Chicago, IL,
Kristen Law Sagafi, Tycko & Zavareei LLP, Oakland, CA,
for Plaintiff.

James G. Snell Perkins Coie LLP, Palo Alto, CA, Debra
Rae Bernard, Perkins Coie LLP, Martin Wojslaw Jaszczuk,
Nick James Digiovanni, Locke Lord LLP, Chicago, IL, Nicola
Carah Menaldo, Perkins Coie LLP, Seattle, WA, Sarah J.
Crooks, Perkins Coie LLP, Portland, OR, Susan Jane Welde,
Locke Lord LLP, Los Angeles, CA, for Defendant.

**ORDER DENYING DEFENDANT'S
MOTION TO STAY PROCEEDINGS**

Re: ECF No. 71

JON S. TIGAR, United States District Judge

**\*1** Before the Court is Defendant Uber Technologies, Inc.'s
("Uber") Motion to Stay. ECF No. 71. For the reasons set forth
below, the Court will deny the motion.

## I. BACKGROUND

### A. Procedural History
On December 31, 2014, Plaintiffs filed this putative class
action against Uber for alleged violations of the Telephone

Consumer Protection Act ("TCPA"). Second Amended
Complaint, ECF No. 54 ("SAC"). Uber "is a nationwide
passenger transportation service that connects riders and
drivers through a cellular telephone application." Id. ¶ 5.
According to Plaintiffs, "Uber's recruiting tactics include
sending prolific text messages to prospective Uber drivers."
Id. ¶ 10. Plaintiffs allege that they received recruiting texts
from Uber without providing prior express consent. Id. ¶¶
32, 48, 61, 75, 88, 98. Plaintiffs Justin Bartolet, Sandeep Pal,
Jonathan Grindell, and Jennifer Reilly further allege that they
continued to receive texts after asking Uber to stop. Id. ¶¶ 53,
70, 82, 93. Plaintiffs allege that in making these texts, Uber
used a device that qualifies as an "automatic telephone dialing
system" as defined by 🚩 47 U.S.C. § 227(a)(1). Id. ¶¶ 30, 46,
59, 73, 86, 96.

On November 13, 2015, Uber filed a Motion to Stay
Proceedings in light of two pending appeals. [1] ECF No.
71 at 1–2. Uber argues that both the D.C. Circuit's review
of the FCC's 2015 Omnibus Order of the TCPA in ACA
International, et al. v. Federal Communications Commission,
No. 15-1211 (D.C. Cir. filed July 10, 2015), and the Supreme
Court's upcoming decision in Spokeo, Inc. v. Robins, 135
S.Ct. 1892 (2015), could fundamentally alter the outcome of
this case. Id.

### B. The FCC's 2015 Order and the D.C. Circuit Appeal in
### ACA International
On July 10, 2015, the FCC issued a Declaratory Ruling
and Order, addressing a number of petitions related to
the TCPA. See 🚩 In the Matter of Rules & Regulations
Implementing the Telephone Consumer Protection Act of
1991, 30 F.C.C. Rcd. 7961 (July 10, 2015) ("2015 FCC
Order"). Uber specifically highlights the FCC's rulings on
"automatic telephone dialing system," "called party," and
revocation of consent. [2] ECF No. 71 at 12–15. Uber contends
that the definitions of these terms are at issue in this case
and request a stay while the definitions of these terms are
contested. Id. at 15–17.

**\*2** To qualify as an automatic telephone dialing system,
equipment must have "the capacity (A) to store or produce
telephone numbers to be called, using a random or sequential
number generator; and (B) to dial such numbers." 🚩 47
U.S.C. § 227(a)(1)(A). In its July 2015 order, the FCC
clarified that the TCPA's use of the term "capacity" in the
definition of "automatic telephone dialing system" does not

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 51 of 121

Lathrop v. Uber Technologies, Inc., Not Reported in Fed. Supp. (2016)

exempt equipment that lacks the "present ability" to dial randomly or sequentially. [3] 2015 FCC Order ¶ 15. "In other words, the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities." Id. ¶ 16.

The FCC also concluded that the term "called party" should be defined as "the subscriber, i.e., the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan." Id. ¶ 73. The FCC created a very limited safe harbor for "callers who make calls without knowledge of reassignment and with a reasonable basis to believe they have valid consent to make the call." Id. at ¶ 72. Subject to this exception, "calls to reassigned wireless numbers violate the TCPA when a previous subscriber, not the current subscriber or customary user, provided the prior express consent on which the call is based." Id. at ¶ 73.

Although the TCPA does not explicitly discuss revocation of consent, the FCC determined that "the most reasonable interpretation of consent is to allow consumers to revoke consent if they decide they no longer wish to receive voice calls or texts." Id. ¶ 56.

After the FCC issued its ruling, nine companies, trade associations, and other entities filed petitions with the U.S. Court of Appeals for the District of Columbia Circuit seeking review of the 2015 FCC Order. The petitions were subsequently consolidated into a single case, ACA International, et al. v. Federal Communications Commission, No. 15-1211. The petitions request that the D.C. Circuit vacate the FCC's ruling with regard to the potential liability for calls to reassigned cell phone numbers and the definition of an "automatic telephone dialing system." The D.C. Circuit set a briefing schedule requiring all briefs to be filed by February 24, 2016. It is unknown when the D.C. Circuit will schedule oral argument or issue a decision.

### C. The Supreme Court's Pending Decision in Spokeo

In Robins v. Spokeo, Inc., 742 F.3d 409 (9th Cir. 2014) cert. granted, 135 S. Ct. 1892 (2015), the plaintiff alleged violations of the Fair Credit Reporting Act ("FCRA"), based on a website's publication of inaccurate consumer information regarding the plaintiff. 742 F.3d at 410. The district court ruled that the plaintiff had not alleged any actual or imminent harm because plaintiff only alleged the misinformation

harmed his employment prospects. Id. The Ninth Circuit reversed and held that the alleged violation of the plaintiff's statutory rights under the FCRA, in itself, was sufficient to satisfy the injury-in-fact requirement. Id. at 413–14. The Ninth Circuit held that the relevant interests protected by the FCRA were "sufficiently concrete and particularized" to satisfy the requirements of Article III. Id. Because the panel determined that the plaintiff had standing based on the alleged violations of his statutory rights, the panel did not decide whether harm to the plaintiff's "employment prospects or related anxiety could be sufficient injuries in fact." Id. at 414 n.3.

**\*3** On April 27, 2015, the United States Supreme Court granted the defendant's petition for a writ of certiorari, Spokeo, Inc. v. Robins, 135 S. Ct. 1892 (2015). The question presented was, "[w]hether Congress may confer Article III standing upon a plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of a federal statute," Pet. Writ of Cert. at i, Spokeo, Inc. v. Robins, No. 13-1339 (U.S. May 1, 2014); Br. of Pet'r at i, Spokeo, Inc. v. Robins, No. 13–1339 (U.S. July 2, 2015). The Supreme Court heard oral argument on November 2, 2015 and a decision is expected by June 2016.

Uber contends that the result in Spokeo is important because Plaintiffs have only alleged statutory damages without identifying concrete harm. ECF No. 71 at 20–21.

### II. LEGAL STANDARD

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936). Whether to stay proceedings is entrusted to the discretion of the district court. See id. 254–55 ("How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.").

In deciding whether to stay proceedings pending resolution of an appeal in another action, a district court must weigh various competing interests, including the possible damage which may result from granting a stay, the hardship a party may suffer if the case is allowed to go forward, and "the orderly course of justice measured in terms of the simplifying

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 52 of 121

Lathrop v. Uber Technologies, Inc., Not Reported in Fed. Supp. (2016)

or complicating of issues, proof, and questions of law which could be expected to result from a stay." 🔖 Lockyer v. Mirant Corp., 398 F.3d 1098, 1110 (9th Cir. 2005). The burden is on the movant to show that a stay is appropriate. See 🔖 Clinton v. Jones, 520 U.S. 681, 708 (1997).

## III. DISCUSSION

Uber contends that the possibility that the 2015 FCC Order will be vacated by the D.C. Circuit "is far from speculative." Id. at 16. Uber particularly stresses that two of the five FCC Commissioners issued strong dissents to the Order, arguing that the Order deviated from the plain language of the TCPA. Uber also brings two cases to the Court's attention in which the district courts granted stays pursuant to the D.C. Circuit's decision in ACA International: 🔖 Gensel v. Performant Techs., Inc., No. 13-C-1196, 2015 WL 6158072 (E.D. Wisc. Oct. 20, 2015) and 🔖 Fontes v. Time Warner Cable, Inc., No. CV14-2060-CAS(CWx), 2015 WL 9272790 (C.D. Cal. Dec. 17, 2015).

In Gensel v. Performant Techs., Inc, the court concluded that it appeared that the FCC's definition of "capacity" contradicted the plain language of the statute. 🔖 2015 WL 6158072, at *2 (E.D. Wis. Oct. 20, 2015). As such, the agency's interpretation would not be entitled deference on appeal. The court stayed the case pending ACA International and a Seventh Circuit appeal. The court noted that "most importantly, if the Seventh Circuit were to rule that 'capacity' means 'present capacity' in accordance with the plain language of the statute, such a ruling would be dispositive of the instant case because it is undisputed that [the defendant's] telephony system did not and does not have the capacity to randomly or sequentially call phone numbers." Id. Fontes v. Time Warner Cable, Inc. similarly discussed the FCC's broadened definition of "capacity." See 🔖 2015 WL 9272790, at *4 (C.D. Cal. Dec. 17, 2015) ("[T]he FCC adopted a broader definition of 'automatic telephone dialing system' that focuses on a device's potential capabilities, as opposed to a narrow definition based on a device's present capabilities." (emphasis in original)).

 **4** Uber argues that should the D.C. Circuit vacate the FCC's "potential capacity" definition, the focus and scope of discovery would constrict. ECF No. 77 at 15. "For example, if the D.C. Circuit vacates the FCC's expanded definition of 'ATDS,' Plaintiffs will not be able to argue that they are entitled to discovery on the 'potential ability' of

Uber's systems, significantly reducing discovery." Id. Uber asserts that it did not send text messages using an automatic telephone dialing system. See ECF No. 56 (Answer) at 17. Uber similarly contends that its discovery obligations may narrow should the D.C. Circuit address the definition of "called party" or the means a party may use to revoke consent. ECF No. 77 at 16.

Plaintiffs counter that the FCC Order's definitions are not new, are likely to be upheld due to their long-standing history, and have been adopted by numerous courts over the years. Id. at 15–18. Plaintiffs also point out that regardless of the D.C. Circuit's decision, the parties would "still need to obtain the relevant facts in discovery, as well as the expert opinions necessary, for the Court to apply the law to the undisputed facts." ECF No. 74 at 25. Thus, for example, even if the D.C. Circuit invalidated the FCC's interpretation of an ATDS, "[d]iscovery is still necessary and this Court must still determine whether the calling equipment that Uber actually used qualifies as an ATDS under the TCPA...." Id.

The Court finds that a stay in favor of the D.C. Circuit's decision in ACA International is not appropriate. First, while the briefing schedule is set in the case, oral argument has not yet been scheduled and neither the parties and nor the Court can forecast when the D.C. Circuit will ultimately issue a decision. Plaintiffs argue persuasively that they would suffer prejudice from a stay because the case would extend for an indeterminate length of time, increase the difficulty of reaching class members, and increase the risk that evidence will dissipate. ECF No. 74 at 26–27. Moreover, as counsel for Uber acknowledged at the hearing on this motion, the D.C. Circuit is unlikely to be the final step in the litigation over the FCC's 2015 Omnibus Order. Whichever party is unsuccessful in that court is almost certain to appeal to the Supreme Court. Thus, even the most optimistic estimate of the time required for a decision from the D.C. Circuit significantly understates both the delay a stay might engender and the concomitant prejudice to Plaintiff.

Second, although the decision in ACA International may vacate portions of the 2015 FCC Order, discovery in this case will be required regardless of the outcome in that one. See 🔖 28 U.S.C. § 2342(1) (stating that court of appeals, including the D.C. Circuit, may "enjoin, set aside, suspend (in whole or in part) or [ ]determine the validity" of final FCC orders). Even if the D.C. Circuit were to modify or vacate the 2015 FCC Order, factual disputes, such as whether an ATDS was used and whether text recipients provided their consent,

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 53 of 121

Lathrop v. Uber Technologies, Inc., Not Reported in Fed. Supp. (2016)

will remain here. Although Uber may suffer hardship, in the form of additional discovery, the Court concludes that this potential hardship does not merit a stay in this case. Uber has not persuaded the Court that the potential changes in the playing field of this case—the size of which are currently unknowable—are so substantial or work such a hardship on Uber that a stay is necessary or appropriate.

The Court also declines to grant the stay based on the pendency of Spokeo. In the case at bar, Plaintiffs have articulated concrete harm to them, and are not simply relying on a bare violation of the statute. ECF No. 54 ¶¶ 114–116. In addition to claiming statutory and punitive damages, Plaintiffs allege they and members of the class "suffered damages in the form of text message, data, and other charges to their cellular telephone plans." Id. ¶ 116. Based on the allegations in the Second Amended Complaint, the Court concludes that Plaintiffs have sufficiently stated an injury in fact. See, e.g., Johnson v. Navient Sols., Inc., No. 115CV00716LJMMJD, 2015 WL 8784150, at *2 (S.D. Ind. Dec. 15, 2015) (denying motion to stay in TCPA action pursuant to Spokeo because plaintiff's intrusion of privacy allegation stated a claim for actual harm); Doe v. Selection.com, No. 15-cv-02338-WHO, 2015 WL 5853700 at *5 (N.D. Cal. Oct. 8, 2015) (denying motion to stay in FCRA action because plaintiff adequately alleged actual injury and because balance of hardships did not warrant a stay). As Uber concedes, it may seek discovery on "whether it can mount a *factual* attack" to Plaintiffs' claims of injury as well as class certification issues. ECF No. 77 at 21. But neither Uber's description of the proceedings in Spokeo nor the Court's independent review persuade the Court that Spokeo is likely to render this case moot.

**\*5** In sum, Uber may face additional discovery obligations but has not established that this hardship justifies staying the case, which would otherwise be delayed with no identifiable end to the stay. Decisions in ACA International and Spokeo may have a beneficial impact on the case by clarifying questions of law. Nonetheless, Uber has not shown this is one of the "rare circumstances" in which a stay pending the resolution of an appeal in another case is appropriate. See Landis, 299 U.S. at 255.

## CONCLUSION

For the foregoing reasons, the Court denies Uber's Motion to Stay.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 97511

---

### Footnotes

1    Three additional TCPA cases against Uber are pending: (1) Kolloukian v. Uber Technologies, Inc., Case No. 2:15-cv-02856-PSG-JEM filed in the Central District of California on April 17, 2015; (2) Vergara v. Uber Technologies, Inc., Case No. 1:15-cv-06942 filed in the Northern District of Illinois on August 7, 2015; and

(3) Kafatos v. Uber Technologies, Inc., Case No. 3:15- cv-03727 filed in the Northern District of California on August 14, 2015. Uber filed motions to stay in each case. In Kolloukian, the plaintiff did not oppose the motion, and the court granted the motion to stay. See ECF No. 84, Ex. A. In Vergara, the court denied the motion to stay but encouraged the parties to limit discovery. See ECF No. 85, Exs. A and B. The motion to stay in Kafatos is currently pending before this Court.

2    Uber also flagged the FCC's interpretation of "call." See ECF No. 71 at 14. However, because petitioners did not brief this issue on appeal, Uber no longer relies on the challenge as a basis for granting the stay. ECF No. 77 at 8 n.2.

3    The FCC has previously interpreted an ATDS as "cover[ing] any equipment that has the specified capacity to generate numbers and dial them without human intervention, regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." In re the Rules and Regulations

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 54 of 121

**Lathrop v. Uber Technologies, Inc., Not Reported in Fed. Supp. (2016)**

Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014, 14017 (2003) ("2003 FCC Order"). The FCC has also ruled that "predictive dialers" fall "within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." Id. Predictive dialers have hardware that, "when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, from a database of numbers." Id. The 2015 FCC Order justified its "potential capacity" interpretation based on the 2003 FCC Order: "By finding that, even when the equipment presently lacked the necessary software, it nevertheless had the requisite capacity to be an autodialer, the Commission implicitly rejected any "present use" or "current capacity" test." 2015 FCC Order ¶ 16.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Disagreed With by   A Fast Sign Co., Inc. v. American Home Services, Inc.,
Ga.,   November 5, 2012

2007 WL 3169078
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Bruce LEVITT, et al.

v.

FAX.COM, et al.

Civil No. WMN–05–949.
|
May 25, 2007.

**Attorneys and Law Firms**

Michael Craig Worsham, Law Office of Michael Craig
Worsham, Forest Hill, MD, Stephen Howard Ring, Stephen
H. Ring PC, Germantown, MD, for Bruce Levitt, et al.

Rodney E. Gould, Rubin Hay and Gould PC, Framingham,
MA, Thomas S. Hood, Hood and Scholnick PA, Towson, MD,
for Fax.Com, et al.

*MEMORANDUM*

WILLIAM M. NICKERSON, United States Senior District
Judge.

 **\*1**  This suit arises out of three facsimile transmissions sent
to Plaintiff Bruce Levitt in January and February of 2001.
These transmissions advertised vacation packages offered
by Defendant JD & T Enterprises, Inc. d/b/a Travel to Go
(JD & T) and it is alleged that identical transmissions were
sent, unsolicited, to thousands of Maryland residents. It is
undisputed that the fax transmissions were actually sent by
Defendant Fax.com. Furthermore, it is also undisputed that
Fax.com was hired to send the faxes, not by JD & T directly,
but by Creative Marketing Concepts (CMC), an independent
marketing company hired by Defendant JD & T to market its
vacation packages.

Plaintiff filed this action in the Circuit Court for Baltimore
City on May 7, 2001, alleging violations of the Telephone
Consumer Protection Act, 47 U.S.C. § 227 (TCPA). The
TCPA makes it generally unlawful "to use any telephone

facsimile machine, computer, or other device to send an
unsolicited advertisement to a telephone facsimile machine."
42 U.S.C. § 227(b)(1)(C). Plaintiff initially named only
Fax.com and JD & T as defendants.

On December 24, 2002, Judge Marcella Holland of the
Baltimore City Circuit Court certified this suit as a class
action. The class of plaintiffs was defined as:

> All persons, including business entities
> of any form, in Maryland, who
> received unsolicited advertisements
> transmitted by Fax .com, Inc, via
> facsimile promoting products and
> services offered for sale by or through
> JD & T Enterprises, Inc.

Order dated Dec. 24, 2002. Shortly thereafter, the Baltimore
City Circuit Court granted a motion for summary judgment in
favor of all defendants and dismissed the case. This dismissal
was subsequently reversed by the Maryland Court of Appeals.
Levitt v. Fax.com, Inc ., 857 A.2d 1089 (Md.2004). After
the case was remanded to the Circuit Court, Plaintiff filed
a "Second Amended Class Action Complaint" on February
23, 2005. This pleading added new defendants, including
Creative Marketing Concepts, LLC and several individuals.
Two of the newly added individual defendants, [1] Matthew
Buecler and Jeanette Bunn, removed the action to this Court
on April 7, 2005, pursuant to provisions of the then recently
enacted "Class Action Fairness Act of 2005," 28 U.S.C.
1332(d) (CAFA). On October 12, 2005, this Court denied
Plaintiff's motion to remand and on December 1, 2005, this
Court granted a motion to dismiss Buecler and Bunn.

During the period of time between the certification of the class
action and the denial of Plaintiff's motion to remand, *Fax.com*
apparently went out of business and ceased its participation
in this litigation. Thus, the only remaining active defendant
is Defendant JD & T. On January 12, 2007, Defendant JD &
T filed a motion to decertify the class action. Paper No. 40.
That motion is now ripe.

"Even after a certification order is entered, the judge remains
free to modify it in the light of subsequent developments in
the litigation." *General Tel. Co. of the Southwest v. Falcon,*

457 U .S. 147, 160 (1982). In fact, a court "is duty bound to monitor [the] class decision and, where certification proves improvident, to decertify, subclassify, alter, or otherwise amend its class certification." *Chisolm v. TranSouth Financial Corp.* 194 F.R.D. 538, 544 (E.D.Va.2000). Like the decision to initially certify a class, a decision to decertify a class is left to the court's discretion. *Doe v. Lally,* 467 F.Supp. 1339 (D.Md.1979).

**\*2** Defendant JD & T raises three arguments as to why this Court should decertify the class. First, it argues that, now that the case is in a federal court, certification must be re-evaluated under the federal class certification rule. Although Maryland's class certification rule, Md. R. 2–231, is patterned after federal rule, Fed.R.Civ.P. 23, Defendant contends that the presumptions and burdens applied in interpreting the two rules are not identical. Second, Defendant contends that changes in the posture of the case, specifically, the fact that Fax.com is no longer actively participating in the litigation, have rendered continued treatment of this case as a class action unmanageable. Fax.com, according to JD & T, was the only source of critical information regarding the identity of those who received the facsimile transmissions, as well as those that may have consented to the transmissions. Finally, JD & T argues that the state court's certification decision was simply wrong.

For the reasons explained below, the Court finds JD & T's second argument compelling. Under the current posture of this litigation, class certification is no longer appropriate under Rule 23. Thus, the Court need not reach the issue of whether the state court's certification decision was flawed or whether it would have been different under the federal rule.

Rule 23(a) sets out four threshold requirements that must be satisfied by the putative class before a class action can be certified. The class representative must establish that

> 1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative

parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These four prerequisites are frequently referred to as "numerosity," "commonality," "typicality," and "adequacy of representation," respectively.

Once these four prerequisites are established, the plaintiff must still satisfy one of the three criteria of section (b) of Rule 23 before a class can be certified. Under 23(b) the potential class representative must show either that: 1) separate actions would result in inconsistent adjudications or the interests of non-parties would be substantially impaired; 2) final injunctive or declaratory relief is appropriate to the class as a whole; or 3) common questions of law or fact predominate over any questions affected only individual members and a class action is the superior method of fairly and efficiently adjudicating the controversy. Here, Plaintiff asserted, and the state court found, that class certification was appropriate under the state rule equivalent of the third subparagraph of Rule 23(b). *See* Second Amend. Compl. ¶ 21 (citing Md. Rule 2–231(b)(3)). Defendant argues, and this Court agrees, that Plaintiff simply cannot establish the prerequisites of commonality or typicality, nor can he demonstrate that common questions predominate over questions affecting the individual class members.

**\*3** Commonality, by definition, requires that there are questions of law or fact that are "common" to the class. "A common question is one that can be resolved for each class member in a single hearing, such as the question of whether an employer engaged in a pattern and practice of unlawful discrimination against a class of its employees. A question is not common, by contrast, if its resolution turns on a consideration of the individual circumstances of each class member." *Thorn v. Jefferson–Pilot Life Ins. Co.,* 445 F.3d 311, 319 (4th Cir.2006) (internal quotations and citations omitted). The need for a case-by-case determination of a material issue for each class member's claim also denotes that the claims of the class representative are not "typical" of the claims of the individual class members. *See Stott v. Haworth,* 916 F.2d 134, 145 (4th Cir.1990).

In order to establish a claim under the TCPA, a plaintiff must have received a facsimile transmission that was "unsolicited." Under the statute, "unsolicited" means transmitted without

the recipient's "prior express invitation or permission." 47 U.S.C. § 227(a)(5). The recipient's prior invitation or permission could have been given orally or in writing. *Id.* (stating that invitation or permission can be given "in writing or otherwise"); *see also Carnett's Inc. v. Hammond,* 610 S.E.2d 529, 531 (Ga.2005).

Under the Federal Communications Commission's (FCC's) TCPA implementing regulations in effect at the time Plaintiff received the fax transmissions from JD & T, "express permission [was] also deemed given by those recipients having an 'established business relationship' " with the sender of the fax transmission.[2] *Carnett,* 610 S.E.2d at 531. An "established business relationship" is defined as "a prior or existing relationship formed by a voluntary two-way communication ... with or without an exchange of consideration...." 47 C.F.R. § 64.1200(f)(3). "The FCC has opined that the established business relationship exemption is broad and that you have an established business relationship with a person or entity if you have made an inquiry, application, purchase, or transaction regarding products of services offered by such person or entity." *Carnett,* 610 S.E.2d at 531–32 (internal citations omitted).[3]

It is this need to make a determination for each class member as to whether the facsimile transmission was unsolicited, both by the lack of express permission and by the absence of a prior business relationship, that makes class treatment of this action inappropriate and unmanageable. This determination of whether invitation or permission was given is, of necessity, highly individualized and would require a separate inquiry for each individual class member in light of their particular relationship or lack of relationship with each of the defendants. Under the current posture of this case, there is simply no available method for class-wide determination of this issue.

**\*4** Numerous courts, citing the lack of commonality, typicality and predominance of common issues, have determined that TCPA claims cannot be brought as a class action. *See, e.g., Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 403–04 (E.D.Pa.1995)(observing that "the essential question of fact that each potential plaintiff must prove is whether a specific transmission to its machine was without express invitation or permission on its part."); *Kenro, Inc. v. Fax Daily, Inc.,* 962 F.Supp. 1162, 1169–70 (S.D.Ind.1997)

(noting that it would be required "to conduct individual inquiries with regard to each potential class member in order to determine whether each potential class member had invited or given permission for transmission of the challenged fax advertisements."); *Blitz v. Xpress Image, Inc.,* Civ. No. 05–679, 2006 WL 2425573 (N.C.Super.Aug.23, 2006) (denying class certification upon the conclusion that "there is no avoiding an individualized inquiry into the facts and circumstances of each recipient's 'invitation and permission' should this matter proceed as a class action," as well as need for individualized determination of applicability of "established business relationship"); *Carnett's Inc. v. Hammond,* 610 S.E.2d 529, 532 (Ga.2005) (noting that while the predominate *question* of whether facsimiles were unsolicited was common to all class members, "a common question is not enough when the *answer* may vary with each class member and is determinative of whether the member is properly part of the class."); *Rondos v. Lincoln Prop. Co.,* 110 S.W.3d 716, 721–22 (Tex.Ct.App.2003) (reversing certification of class upon concluding that the predominant issue for litigation would be whether individual fax owners gave permission to receive advertisements); *Livingston v. U .S. Bank, N.A.,* 58 P.3d 1088, 1091 (Colo.App.2002) (upholding trial court's determination that "the question whether any particular fax recipient gave 'prior express invitation or permission' would have to be decided on an individual basis and therefore would overwhelm, let alone predominate over, the common issues").

It is conceivable, while the actual transmitter of the facsimiles in question, Fax.com, was available to actively participate in this litigation, that these issues could have been resolved in some more global fashion. In moving to certify the class in the state court and in his pleadings opposing this motion to decertify, Plaintiff averred that Fax.com had a database and log of the transmissions at issue in this matter. *See* Aug. 7, 2002, Mem. in Support of Class Cert.;[4] Opp. at 14. Information that Fax.com might have as to the source of its databases might be instructive as to issues of consent: was the database constructed from customer lists provided by CMC, lists purchased from some third party, numbers generated by Fax.com computers randomly dialing and hunting for fax machines, or some combination thereof? Regardless of what insight *Fax.com* might have been able to provide, however, there is no evidence in the record that JD & T has, or ever had, any information regarding the content or construction of the databases used by Fax.com.

**\*5** This absence of available information about the database renders this case, in its present posture, readily distinguishable from at least some of the cases relied upon by Plaintiff where class certification of TCPA claims was found appropriate. For example, in 📁 *Kavu, Inc. v. Omnipak Corp.,* Civ. No. 06–109, 2007 WL 201093, (W .D.Wash. Jan. 23, 2007), the record before the certifying court included the identity of the specific third party supplier of the database that was used to send the offending faxes as well as an explanation of the particular method used by that third party to construct the database. The defendant, in fact, asserted in the litigation that the recipients' inclusion in that database demonstrated consent to receive facsimiles. *Id.* at \*3. Because the validity of that assertion could be tested on a class-wide basis, the Court distinguished the case before it from the more typical TCPA case: "whether the facsimile was 'unsolicited' appears to be more of a common issue in this case than in the cases that denied class certification .... [where] the issue of whether each potential class member gave permission to receive the facsimiles was key." *Id.; see also,* 🚩 *Gene & Gene, LLC v. Biopay, LLC,* Civ. No. 05–121, 2006 WL 3933312 at \*2 (M.D.La. Dec. 20, 2006) (record before the court contained database with names and contact information for the alleged unlawful facsimile transmissions). [5]

Implicitly acknowledging the importance of some means by which to identify those who received the offending facsimiles and those who may have consented to that receipt, Plaintiff devotes much of his opposition to an attempt to show that JD & T has or had possession of this information, or at least should have had possession of this information. In this attempt, however, Plaintiff seriously misconstrues the record. For example, Plaintiff declares that Jeannette Bunn, JD & T's president, "selected the geographic areas to be targeted" by the facsimile advertisements. Opp. at 6. This statement is presumably based upon a series of emails from JD & T to individuals associated with Fax.com and CMC. While Bunn made geographic suggestions in these emails as to the *content* of the facsimile advertisements, *i.e.,* recommending the addition of particular vacation destinations, [6] there is nothing in these emails or elsewhere in the record to suggest that she had any input into the geographic areas to which those advertisement were to be sent.

Similarly, Plaintiff cites to a series of emails where complaints about the receipt of facsimiles are forwarded to Bunn and Bunn contacts the marketing company to have the telephone

numbers removed from the call list. Plaintiff argues that these emails show that "JD & T thus helped 'maintain' the fax list" and "Bunn thus carelessly and recklessly proceeded to help in the deletion process, without taking the extra step of ascertaining whether prior consents were being obtained, and without implementing a policy to be sure they were obtained where needed." Opp. at 8, 9. While these emails might have relevance to issues of liability, they do not shed light on the propriety of class certification. If anything, they reinforce the fact that JD & T did not have immediate access to the database and thus had to relay the complaints elsewhere.

**\*6** In his opposition, Plaintiff asserts that he is attaching what he claims to be "3 representative pages" of "[t]he Fax.com database [which he] obtained through a former employee." Opp. at 8. Given the undisputed significance of this database, it is remarkable that Plaintiff mentions that it has come into his possession almost in passing. The Court surmises that Plaintiff's nonchalance with regard to this "evidence" is explained by Plaintiff's apparent inability to render it admissible. As JD & T observes, Plaintiff makes no effort, whatsoever, to authenticate this evidence. Furthermore, from the dates on the "representative pages," it appears this list is from a time period three years after the time relevant to this action. Finally, there is nothing about these pages indicating that they contain telephone numbers to which JD & T advertisements were sent. As evidence in this action, these pages as presented are essentially worthless and the Court suspects from the offhanded way that they were introduced that Plaintiff's counsel realizes as much.

Plaintiff also cites a January 28, 2003, letter from counsel for JD & T to Plaintiff's counsel in which it is stated that 36,877 transmissions of the specific advertisement at issue in this action were sent to Maryland fax numbers during the relevant time period. Pl.'s Ex. 7. This letter, Plaintiff claims, demonstrates that JD & T "had a method to determine Maryland recipients of the specific unsolicited travel faxes at issue." Opp. at 12. The value of this letter as evidence relevant to issues of class certification, however, is also highly suspect. First, the letter clearly states that it is a "***CONFIDENTIAL SETTLEMENT COMMUNICATION PER JUDGE HOLLAND—NOT TO BE USED IN LITIGATION.***" That aside, the letter also clearly relates that the information is coming from Fax.com, not JD & T. [7] Furthermore, the letter explains that, because of the way that the database was encrypted to protect its contents from theft, there is no way to obtain the individual numbers that comprise the database.

Unable to provide any evidence that JD & T actually had access to the database used by Fax.com to send the advertisement, Plaintiff argues, in the alternative, that JD & T *should* have had that access. Plaintiff opines that "[i]f Fax.com represented that it had obtained prior consents, one would expect that JD & T would want to confirm this fact, and see some kind of evidence in support." Opp. at 16. Plaintiff argues that, based upon JD & T's inability to prove that consent was given, a finding of lack of consent "should apply uniformly, across the board, as to all class members." *Id.* at 15.

This argument is based upon an interpretation of the statute not supported by the language of the statute itself or by the case law. Plaintiff contends, without citation, that "[e]ven if a member of the class had given permission to Fax.com to send faxes ... any such permission would not extend to JD & T." Opp. at 17. If, hypothetically, a consumer requested that Fax.com send information about travel packages and Fax.com then sent that consumer a facsimile about travel packages offered by JD & T, it is hard to imagine how that transmission could be deemed "unsolicited." Under the statute, the term " 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 🚩 47 U.S.C. § 227(a)(5). The statute does not designate to whom the permission must be given. If permission is given to the transmitter of the facsimile, the marketing company, or the provider of the advertized product or services, the statute would not be violated.

**\*7** Once all the smoke is blown away, it appears that Plaintiff's true position is that this action is amenable to class treatment because the class members do not actually need to prove that the facsimiles in question were "unsolicited" in order to make out a claim under the TCPA. In Plaintiff's "common sense" view, "[i]t is unfathomable that anyone would actually give consent to receive via facsimile a barrage of ads like those at issue in this action." Opp. at 15 n. 7. [8] Thus, it can simply be presumed, according to Plaintiff, that the transmissions were unsolicited.

The Court has no doubt that this assumption would hold true for a majority of consumers. Most consumers do not wish for their facsimile machines to be tied up or their toner and paper wasted receiving and printing faxed advertisements. Just because that is true of most, however, does not permit the Court to adopt a presumption that it is true of all.

Again, if Fax.com had remained involved in this litigation, information regarding the sources of telephone numbers in its database might have allowed some global determinations of consent. But without Fax.com's participation, that is simply not possible. [9]

Plaintiff raises one additional argument that warrants brief mention. Plaintiff argues that CAFA, the Class Action Fairness Act, somehow "weighs in favor of certification." Opp. at 2. Plaintiff correctly observes that this Court has already held that, because CAFA allows for the aggregating of class member claims, " 'there is no dispute that the instant suit satisfies' " CAFA's jurisdictional criteria. Opp. at 17 (quoting Oct. 12, 2005 Mem. at 2). Because Plaintiff's individual damages would be below the requisite amount in controversy for diversity jurisdiction, Plaintiff opines that decertification would divest this Court of subject matter jurisdiction of his claims. *Id.* at 18.

In the context of post-removal reduction of the amount in controversy under the general diversity jurisdiction statute, courts have uniformly held that "diversity jurisdiction is determined at the time the action commences, and a federal court is not divested of jurisdiction ... if the amount in controversy subsequently drops below the minimum jurisdictional level." 🚩⚠️ *Hill v. Blind Indus. & Serv. of Md.,* 179 F.3d 754, 757 (9th Cir.1991). Because of the recentness of CAFA's enactment, few courts have considered the effect of post-removal certification or decertification decisions on continued federal jurisdiction. In the one decision of which this Court is aware that reached the issue, *Davis v. Homecomings Financial,* Civ. No. 05–1466, 2007 WL 905939 (W.D.Wash. March 22, 2007), the court held that a similar "time of removal" principle would apply.

In *Davis,* the plaintiff proposed a nation-wide class. After removal to federal court, the class was certified as state-wide class only which brought the amount in controversy under CAFA's requisite $5 million threshold. Nonetheless, following the principle that the amount in controversy is determined as of the time of the removal, the court concluded that it could retain jurisdiction over the now diminished class action. The court reasoned that Congress is presumed to be aware of the legal context in which it is legislating and, despite this presumed knowledge, "there is no indication that Congress intended to alter the established authority regarding subsequent changes to the amount in controversy." *Id.* at * 1. This Court agrees with that reasoning and concludes

that decertification of the class will not divest this Court of jurisdiction over Plaintiff's now lone claim.

**\*8** For the above stated reasons, the Court concludes that the class should be decertified. A separate order will issue.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 3169078

---

### Footnotes

1    There is no indication in the record that any of the other defendants added in the Second Amended Complaint were ever served with process.

2    Congress subsequently amended the TCPA to codify the "established business relationship" exception to TCPA liability in the facsimile context. 47 U.S.C. § 227(b)(1)(C)(i).

3    When Congress codified the "established business relationship" exception, it adopted by reference the FCC's definition of the term. 47 U.S.C. 227(a)(2) ("[t]he term 'established business relationship' for the purposes only of [ 47 U.S .C. § 227(b)(1)(C)(i) ] shall have the meaning given the term in [ 47 C.F.R. 64.1200]").

4    Defendant included quoted text from this memorandum in its motion, Mot. at 9, but the memorandum itself is not a part of record in this Court and Defendant did not supply it with its motion. As Plaintiff did not challenge Defendant's citation, the Court assumes its accuracy.

5    The court in *Gene & Gene,* did not base its decision on the availability of that database. Instead, after acknowledging that "federal courts have consistently denied class certification," 240 F.R.D. at 242, the court proceeded to examine "Fifth Circuit precedent in order to ascertain how a federal court within the Fifth Circuit should decide this matter." *Id.* Under its view of Fifth Circuit precedent, the court opined that the requirements of commonality and typically are "not demanding." *Id.* at 244. In contrast, the Fourth Circuit has held that, "in class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(b) (2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over' other questions." *Lienhart v. Dryvit Systems, Inc.,* 255 F.3d 138, 147 n. 4 (4th Cir.2001) (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 609 (1997)). Thus, in the Fourth Circuit, "[t]he common questions must be dispositive and overshadow other issues." *Lienhart,* 255 F.3d at 146.

In addition to distinguishable facts and law, all three of the cases relied upon by Plaintiff—*Kavu, Gene & Gene; and Lampkin v. GGH,* 146 P.3d 847 (Okla.Civ.App.2006), a recent decision from the intermediate appellate court of Oklahoma—endorsed what this Court views as a flawed class definition. The class definitions in all three actions, like the class definition approved by the state court in the instant action, required a determination of the merits in that all the definitions limit class membership to those who received "unsolicited" facsimiles. *Kavu,* 2007 WL 201093 at \* 2 (defining class as "[a]ll persons who received an unsolicited advertisement ..."); *Gene & Gene,* 240 F.R.D. at 241 (defining class as "all recipients of unsolicited telefacsimile messages and/or advertisements ..."); *Lampkin,* 146 P.3d at 851 (defining class as "[h]imself and all entities and persons ... who received unsolicited fax advertisements ..."); Dec. 24, 2002,

Order (defining class as "[a]ll persons, including business entities of any form, in Maryland, who received unsolicited advertisements transmitted by Fax.com, Inc...."). Deciding the merits of individuals' claims in order to determine the members of the class is not appropriate. *See* ⚑ *Eisen v. Carlisle v. Jacquelin,* 417 U.S. 156, 177 (1974); *See also,* ⚑ *Forman,* 164 F.R .D. at 403; ⚑ *Intratex Gas Co. v. Beeson,* 22 S.W.3d 398, 404– 06 (Tex.2000) (collecting cases and explaining why a "fail-safe class," *i.e.,* a class whose definition includes a determination of the merits, is untenable).

6        *See, e.g.,* Opp. at 10 (" '... regarding adding some areas to the fax piece? I asked if you could add Sun Valley, ID as it is a popular destination for skiing and we have inventory there that is not moving at all.' ") (quoting Oct. 6, 2001 email from Bunn to Robin Posser).

7        For a brief period of time, early in this litigation, counsel for Fax.com also represented JD & T. At the time this letter was sent, Fax.com was clearly the main target of this litigation as evidenced by the fact that JD & T is mentioned nowhere in the letter.

8        Annoying as unsolicited facsimiles might be, the Court questions if three facsimiles can be fairly deemed "a barrage."

9        In an effort to compensate for Fax.com's absence from this litigation, Plaintiff submitted materials from other proceedings related to Fax.com. For example, Plaintiff submitted a portion of the testimony of Thomas Roth, one of Fax.com's officers, given in a January 31, 2003, hearing before the Securities and Exchange Commission. In his testimony, Mr. Roth states that some of the numbers in Fax.com's database were obtained by having computers randomly dial phone numbers fishing for facsimile machines. Faxes to these numbers, Roth acknowledged, would be unsolicited. But Roth also testified that *Fax.com* would purchase some numbers from list brokers. He made no representation in the testimony provided by Plaintiff that faxes sent to numbers on those purchased lists would be unsolicited. There is no testimony regarding the source of the database used to fax the JD & T material. Furthermore, as JD & T had no opportunity to cross examine Roth, this testimony is likely inadmissible in this action.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Declined to Extend by Quinn v. Specialized Loan Servicing, LLC, N.D.Ill., February 9, 2017

2015 WL 5032052
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Logan LOREAUX, et al., Plaintiffs,
v.
ACB RECEIVABLES MANAGEMENT,
INC., et al., Defendants.

Civil Action No. 14–710 (MAS).
|
Signed Aug. 25, 2015.

**Attorneys and Law Firms**

Joseph K. Jones, Law Offices of Joseph K. Jones, LLC, Fairfield, NJ, Benjamin Jarret Wolf, Law Offices of Joseph K. Jones LLC, New York, NY, for Plaintiffs.

Jonathan S. Ziss, Goldberg Segalla LLP, Philadelphia, PA, for Defendants.

MEMORANDUM OPINION

BONGIOVANNI, United States Magistrate Judge.

**\*1** This matter comes before the Court upon Defendant ACB Receivables Management, Inc.'s ("ACB") motion to bifurcate discovery. [Docket Entry No. 24]. Plaintiffs Logan Loreaux, an infant by parent and natural guardian Katelyn Jones, and Katelyn Jones ("Plaintiffs") oppose ACB's motion. The Court has fully reviewed and considered all of the arguments made in support of and in opposition to ACB's motion. The Court considers same without oral argument pursuant to L.Civ.R. 78.1(b). For the reasons set forth more fully below, ACB's motion is GRANTED.

**I. Background and Procedural History**
In light of the parties' familiarity with the facts of this matter, they shall not be restated at length herein. Instead, the Court shall recount only those facts necessary for the resolution of ACB's motion to bifurcate. This case concerns whether the debt collection correspondence sent by ACB to Plaintiffs allegedly listing an "Amount Due" different than the "Amount Owed" was false, deceptive or misleading within the meaning of the Fair Debt Collection Practices Act (the "FDCPA"). Plaintiff alleges that the correspondence sent out was deceptive and false in violation of the FDCPA. In contrast, ACB argues that the correspondence did not warrant any plausible misleading or incorrect interpretation and, therefore, does not violate the FDCPA.

Through this motion, ACB asks that discovery be initially limited to Plaintiffs' claims that the debt collection correspondence sent to them by ACB, listing an "Amount Due" different than the "Amount Owed," was false, deceptive or misleading. (ACB Br. at 1; Docket Entry 24). ACB believes Plaintiffs' individual claims regarding the correspondence involve a narrow, potentially dispositive issue that is isolated and distinct from class discovery. (Id. at 2). After conducting the aforementioned limited discovery, ACB anticipates filing a motion for summary judgment with regard to Plaintiffs' individual claims that ACB's correspondence to them violated the FDCPA because it was deceptive and false. (ACB Reply Br. at 1; Docket Entry No. 29).

ACB contends that bifurcating discovery in this manner represents the most efficient and effective approach to this litigation. Specifically, ACB claims that bifurcating discovery would allow the parties to expeditiously reach potentially case dispositive motion practice. In this regard, ACB notes that if its anticipated motion for summary judgment is granted, said motion would dispose of the entire action, maximizing efficiencies and cost savings by rendering class discovery entirely unnecessary. (ACB Br. at 2). Further, ACB claims that even if its summary judgment motion is denied, the case will not have been derailed because complete class discovery can still occur without any prejudice to Plaintiffs.

Relying on *Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc.,* No. 3:12–cv–02132 FLW–TJB, Docket Entry No. 52–1 (D.N.J. Sept. 13, 2013), ACB argues that bifurcation is appropriate given the narrow, potentially case dispositive issue to be addressed by the Court coupled with the fact that class wide discovery creates significant costs and burdens it and the Court. (Id. at 3). ACB notes that in *Physicians Healthsource,* the Court granted a motion to bifurcate where there was a limited and potentially dispositive issue involving the plaintiff's Telephone Consumer Protection Act ("TCPA") claim. In so doing, the Court took note of the costs associated with class discovery as well as the fact that the defendant's anticipated summary judgment motion could render said discovery unnecessary.

**\*2** With respect to the discovery already sought by Plaintiffs, ACB argues that several of the class discovery demands propounded are unduly burdensome on their face. ACB notes that it uses a third party vendor to generate its debt collection correspondence and that the production of the information requested would require ACB to review private information and medical claim information with regards to members of the proposed class and family members of the class insured under their guarantor's healthcare policy. (*Id.* at 2–3). Thus, ACB anticipates dealing with HIPAA issues in the course of providing the information requested by Plaintiffs. (*Id.* at 3).

ACB notes that pursuant to FED.R.CIV.P. ("Rule") 42(b), it is within a trial court's discretion to bifurcate discovery and courts consider judicial economy and expedition when making such a decision. (*Id.*) ACB argues that because there is no significant overlap between the individual discovery relevant to Plaintiffs' specific claims and class-wide discovery, there is no danger of duplication or of increase in litigation costs if discovery is done in two steps. (ACB Reply Br. at 6). ACB claims that conducting discovery in two phases will neither be protracted nor unduly delay these proceedings because key, pertinent facts relevant to the individual claims are already in the record as well as the Rule 26 disclosures served by the parties. Further, ACB notes that initial written individual discovery is well underway, including ACB's document production, interrogatory responses, and responses to Plaintiffs' requests for admissions. (*Id.* at 7).

Further, ACB argues that the earlier denial of its motion to dismiss does not constitute a determination that Plaintiffs' individual FDCPA claims are meritorious because the applicable standard for a motion to dismiss is highly deferential; whereas, the applicable standard for a motion for summary judgment requires Plaintiffs to present more facts and evidence to establish their claims. (ACB Br. at 4). ACB contends that the Court has yet to consider the meaning of the two amounts listed on the debt collection correspondence and, thus, has not made a decision on whether Plaintiffs have legally viable claims. (*Id.*) ACB argues that discovery should be bifurcated to address this narrow issue first so that ACB can file a motion for summary judgment on same. ACB argues that doing so would allow the Court to address the merits of this issue before determining class certification, a costly and time consuming undertaking. (*Id.* at 4–5). As a result, ACB claims that bifurcating discovery would preserve judicial resources and the litigants' resources as well. Lastly, ACB argues that denying bifurcation would

prevent an early and efficient determination regarding the merits of Plaintiffs' individual claims and, therefore, would go against the principles embodied in Rule. 1. (*Id.* at 5–6).

In response to Plaintiffs' arguments asserting that their requested class discovery only entails production of debt collection correspondence to all class members, ACB points out that Plaintiffs have yet to withdraw their other class-based discovery requests or their discovery requests directed to Defendants' net worth information. (ACB Reply Br. at 5). Because Plaintiffs have failed to offer any explanation regarding their additional class-based discovery requests and have, likewise, failed to have withdrawn same, ACB claims bifurcation is necessary. Further, ACB contends that even providing only debt collection correspondence to all class members would prove burdensome to it for the reasons described above.

**\*3** Plaintiffs, however, claim that the requested bifurcation should be denied because ACB cannot meet the legal standard for it in part because the requested discovery is neither overly complicated nor unduly burdensome. As such, Plaintiffs argue that ACB's motion should be denied. (Pl. Opp. Br. at 2; Docket Entry 28). With respect to the discovery requests they have served, Plaintiffs suggest entering into Stipulation/ Consent Order limiting same. (*Id .*) Plaintiffs argue that really the only class discovery at issue is directed to the sole issue of how many letters similar to that sent to Plaintiffs were mailed by ACB to other New Jersey consumers during the class period. (*Id.*) Plaintiffs contend that medical information, including sensitive HIPAA information, will not be needed in the course of discovery. Indeed, Plaintiffs assert that they only request the debt collection letters sent by ACB. (*Id.* at 3).

Further, Plaintiffs contend that ACB's arguments regarding the burdensomeness and cost of not bifurcating discovery are totally conclusory in nature and should be afforded no weight. In this regard, Plaintiffs argue that ACB's claims amount to nothing more than blanket generalizations without any evidence of the approximate costs associated with discovery, name of the third party vendor alluded to by ACB or the business relationship between ACB and that vendor. (*Id.* at 3–4). Plaintiffs distinguish this matter from the *Physicians Healthsource* case, noting that that matter involved a TCPA violation, not a FDCPA violation. (*Id.* at 5).

Relying on Rule 42(b), Plaintiffs argue that ACB has failed to sustain its burden because it has yet to prove that bifurcation would best serve the interests of judicial economy and that

it would not unduly prejudice Plaintiffs. Further, Plaintiffs argue that here there is no need to divide discovery as to liability and damages. (*Id.* at 6–7). Again, Plaintiffs claim that it would not be burdensome for ACB to provide Plaintiffs with the form debt collection letters, similar to the debt collection letter ACB mailed them, which were sent to New Jersey consumers that stated different monetary amounts for "Amount Owed" and "Amount Due." For these reasons, Plaintiffs argue that ACB's motion to bifurcate discovery should be denied.

## II. Analysis

Federal Rule of Civil Procedure 42(b) governs requests to bifurcate. According to Rule 42(b), "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Under Rule 42(b), "a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management." *Medpointe Healthcare, Inc. v. Hi-Tech Pharmacal Co., Inc.,* Civil Action No. 03–555(MLC), Civil Action No. 04–1686(MLC), 2007 U.S. Dist. LEXIS 4652, at *12–13, 2007 WL 188285 (D.N.J. Jan. 22, 2007) (internal quotation marks and citation omitted). Further, the broad discretion afforded courts in handling discovery disputes extends to decisions over bifurcating discovery. *See Weiss v. First Unum Life Ins. Co.,* Civil Action No. 02–4249(GEB), 2008 WL 755958, *1 (D.N.J. March 19, 2008); *see also Bandai America Inc. v. Bally Midway Mfg. Co.,* 775 F.2d 70, 74 (3d Cir.1985) (holding that bifurcation orders and orders controlling order of discovery are reviewed for abuse of discretion).

**\*4** Here, the Court finds that bifurcating discovery as proposed by ACB is warranted under Rule 42(b). In this regard, the Court agrees with ACB that a narrow, potentially dispositive issue exists concerning whether ACB's correspondence to Plaintiffs violated the FDCPA's prohibition against deceptive and false communications. Further, the Court is not persuaded by Plaintiffs' argument that the denial of ACB's Motion to Dismiss precludes summary judgment being granted in ACB's favor. The District Court never determined whether the existence of the two conflicting amounts on the debt correspondence does, in fact, represent a violation of the FDCPA as argued by Plaintiffs. As a result, depending on what evidence is ultimately presented,

the District Court may determine that summary judgment is warranted.

In addition, the Court finds that whether ACB's correspondence to Plaintiffs is deceptive and false is a narrow and distinct issue that does not implicate class wide discovery. Further, the Court finds that there will be no significant overlap between the two and therefore no real danger of a duplication of efforts or corresponding increase in litigation costs. Moreover, the Court finds that bifurcating the two issues has the potential to save the parties and the Court from the substantial costs and burdens associated with whole scale class action discovery. While Plaintiffs fault ACB for not supporting their claims concerning the burdens and costs associated with class action discovery, it is generally recognized that class actions involve the potential "for hefty litigation expenses and an extensive use of judicial resources in the resolution of these claims[.]" *Bais Yaakov of Spring Valley v. Peterson's Nelnet, LLC,* Civ. No. 11–00011, 2013 WL 663301, at *5 (D.N.J. Feb.21, 2013). It is also generally understood that the costs can be particularly "enormous" for defendants. *Id.* Furthermore, while the Court agrees with Plaintiffs that medical information, including sensitive HIPAA information, will likely not be needed in the course of discovery, the Court finds that bifurcating discovery and, as a result, providing ACB with an opportunity to file a motion for summary judgment, will best serve the interests of judicial economy and promote efficiency.

For the reasons stated above, the Court finds that bifurcating discovery into two phases will promote the efficient resolution of this matter. It will allow the Court to address a narrow, potentially dispositive issue in a timely and cost effective manner with no significant prejudice to Plaintiffs. Consequently, the Court hereby bifurcates discovery as requested by ACB. The parties are therefore directed to meet and confer to submit a proposed schedule for the first phase of discovery. This schedule shall be submitted no later than ***September 14, 2015.***

## III. Conclusion

For the reasons set forth above, ACB's motion to bifurcate discovery is GRANTED. An appropriate Order follows.

## All Citations

Not Reported in F.Supp.3d, 2015 WL 5032052

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Newell v. Aliera Healthcare, Inc., Not Reported in Fed. Supp. (2020)

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 66 of 121

2020 WL 13568762
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

Jourey NEWELL, on behalf of himself
and others similarly situated, Plaintiff,
v.
ALIERA HEALTHCARE, INC. and
Insurance Care Now, LLC, Defendants.

CIVIL ACTION FILE No. 1:19-cv-01489-SCJ
|
Signed April 6, 2020

**Attorneys and Law Firms**

Anthony Paronich, Broderick & Paronich, P.C., Hingham, MA, Brian K. Murphy, Pro Hac Vice, Jonathan P. Misny, Pro Hac Vice, Murray Murphy Moul + Basil LLP, Columbus, OH, Steven Howard Koval, The Koval Firm, LLC, Atlanta, GA, for Plaintiff.

Brent David Hitson, Matthew T. Mitchell, Pro Hac Vice, Burr & Forman, Birmingham, AL, Sarah Craig, Burr and Forman LLP, Tampa, FL, Eric Joseph Breithaupt, Stites & Harbison, PLLC, Atlanta, GA, Louis G. Fiorilla, Burr & Forman, LLP, Atlanta, GA, for Defendant Aliera Healthcare, Inc.

Todd I. Stone, The Stone Law Group, Fort Lauderdale, FL, Benjamin S. Klehr, Gustav H. Small, Jr., Small Herrin, LLP, Atlanta, GA, for Defendant Insurance Care Now, LLC.

### ORDER

STEVE C. JONES, UNITED STATES DISTRICT JUDGE

**\*1** This matter appears before the Court on Aliera Healthcare, Inc.'s ("Aliera") Motion to Bifurcate Discovery. Doc. No. [35]. [1]

## I. BACKGROUND

### A. Facts

Plaintiff Jourey Newell ("Plaintiff") filed this putative class action against Aliera and Insurance Care Now, LLC ("Insurance Care Now") (collectively, "Defendants") on

April 2, 2019, alleging a violation of the Telephone Consumer and Protection Act, 47 U.S.C. § 227 ("TCPA"). Doc. No. [1]. In his Complaint, Plaintiff alleges that Aliera "commissioned automated telemarketing calls to [Plaintiff] and other putative class members without their prior express written consent." Id. ¶ 2. Plaintiff further alleges that said calls were made pursuant to an arrangement between Aliera and its telemarketer, Insurance Care Now. Id. ¶ 3. More specifically, Plaintiff claims that on March 26, 2019, he received a call on his cell phone from Insurance Care Now. Id. ¶ 27. When Plaintiff answered the call, he heard a "distinctive click and a pause," which is "a telltale sign of a predictive dialer." [2] Id. ¶¶ 28–32. Because of the predictive dialer, Plaintiff claims that he was greeted with "dead air" until a live person came on the line. Id. ¶ 33. Eventually, "Sean" of Insurance Care Now, using a scripted sales pitch, asked Plaintiff about insurance and promoted "Carewell by Aliera," an Aliera insurance product. Id. ¶ 34. Plaintiff alleges that he received this call from Insurance Care Now even though he had previously placed his cellphone number on the National Do Not Call Registry. Id. ¶ 26.

### B. Definition of ATDS

The TCPA makes it illegal to "make any call ... using any automatic telephone dialing system ["ATDS"] or an artificial or prerecorded voice "to "any telephone number assigned to a paging service[ ] or cellular telephone service" without the "prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A). It further defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." Id. § 227(a)(1).

In 2003, the Federal Communications Commission ("FCC") issued an order stating that "predictive dialers" [3] fell within the meaning and statutory definition of an ATDS and thus were subject to the TCPA's restrictions on the use of autodialers. See In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14,014, 14,093 (2003). The FCC subsequently affirmed this definition in 2008. See In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 23 FCC Rcd. 559 (2008).

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 67 of 121

Newell v. Aliera Healthcare, Inc., Not Reported in Fed. Supp. (2020)

**\*2**  In 🚩 Glasser v. Hilton Grand Vacations Co., LLC, 948 F.3d 1301, 1306 (11th Cir. 2020), the Eleventh Circuit weighed in on the definition of an ATDS, holding that only those devices that dial randomly or sequentially generated numbers (without any human intervention whatsoever) constitute an ATDS. [4] Conversely, "predictive dialers", which the Eleventh Circuit defined as devices "that call a list of pre-determined potential customers"—are not an ATDS under the TCPA. 🚩 Id. at 1308–09. This is because predictive dialers do not "randomly or sequentially" dial numbers, but instead dial previously identified numbers from a stored list. Id.

### C. Motion to Bifurcate Discovery
In light of the Eleventh Circuit's decision in Glasser, Aliera moves the Court to bifurcate discovery into two distinct segments: (1) limited discovery into the merits of Plaintiff's individual TCPA claim, followed by (2) class-wide discovery, if Plaintiff's individual claim survives. [5] Doc. No. [35]. Aliera specifically contends that limited discovery will confirm that Plaintiff was not called with an ATDS as defined under the TCPA. Id. at p. 5. Aliera further asserts that limited discovery will demonstrate that Plaintiff consented to be called on his cell phone and that suffered no "injury in fact" that could confer standing upon him to pursue his TCPA claim. Id. Ultimately, Aliera suggests that "[t]argeted discovery at the outset into these discreet, individual issues will spare the parties, their counsel, and this Court an unnecessary and burdensome foray into class-wide discovery." Id.

Plaintiff has since filed a response in opposition to Aliera's motion. Doc. No. [41]. This matter is now ripe for review, [6] and the Court rules as follows.

### II. LEGAL STANDARD
Aliera fails to cite to any legal authority in support of its request to bifurcate discovery in this matter. See Doc. No. [35]. Nevertheless, the Court independently notes that Federal Rule of Civil Procedure 42 governs requests to bifurcate. More specifically, Rule 42(b) provides that trial courts may hold separate trials "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). See also Hartley-Culp v. Credit Mgmt. Co., No. CV-14-0282, 2014 WL 4630852, at *2 (M.D. Pa. Sept. 15, 2014) (applying the TCPA) ("There is no question that the Court, in its discretion, can bifurcate discovery under Fed. R. C. P. 42(b).").

Trials courts have broad discretion in determining whether bifurcation is appropriate. See 🚩 Griffin v. City of Opa-Locka, 261 F.3d 1295, 1301 (11th Cir. 2001). Bifurcation may be appropriate where the "resolution of a single issue may resolve the case and render trial on the other issue[s] unnecessary." Tabor v. New York City, 11–CV–0195, 2012 WL 603561, at *10 (E.D.N.Y. Feb. 23, 2012) (Report and Recommendation), adopted by, 2012 WL 869424 (E.D.N.Y. Mar. 14, 2012) (bifurcating discovery in the context of a Monell claim). This reasoning also applies in the TCPA context. See, e.g., Leschinsky v. Inter–Continental Hotels Corp., No. 8:15–cv–1470–T–30MAP, 2015 WL 6150888, at *1 (M.D. Fla. Oct. 15, 2015) (granting motion to bifurcate and initially limiting discovery to whether the calls the named plaintiff received were dialed manually and how many calls she received); 🚩 Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc., No. 12-2132, 2014 WL 413534, at *2 (D.N.J. Feb. 4, 2014) (granting motion to bifurcate where "a narrow, potentially dispositive issue exist[ed] concerning whether the faxes sent [were] informational and therefore not actionable under the TCPA," and this issue was "totally distinct from class issues"). The moving party bears the burden of establishing that bifurcation is appropriate. See 🚩⚠ Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d 1307, 1323–24 (5th Cir. 1976). [7]

### III. DISCUSSION
**\*3**  Upon review, the Court finds that bifurcating discovery as proposed by Aliera is warranted under Rule 42(b). In this regard, the Court agrees with Aliera that a narrow, potentially dispositive issue exists concerning whether Plaintiff was called by an ATDS as defined under binding Eleventh Circuit precedent. Specifically, Plaintiff alleges in his Complaint that he was called with a "predictive dialer," and Glasser has since confirmed that such a device is not an ATDS for purposes of creating liability under the TCPA. Consequently, depending on what evidence is ultimately presented, the Court may determine that Plaintiff's individual TCPA claim fails as a matter of law.

For similar reasons, the Court also finds that targeted discovery on the issue of consent is also warranted. [8] As Aliera correctly points out, prior express consent to receive the calls at issue is a complete defense to a TCPA claim. See, e.g., 🚩 Mais v. Gulf Coast Collection Bureau, Inc., 768 F.3d 1110, 1126 (11th Cir. 2014). Because consent is a dispositive

Newell v. Aliera Healthcare, Inc., Not Reported in Fed. Supp. (2020)

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 68 of 121

issue, as with the ATDS issue, limited discovery on how Aliera or Insurance Care Now acquired Plaintiff's contact information and whether that acquisition constitutes consent under the TCPA "has the potential to save the parties and the Court from the substantial costs and burdens associated with whole scale class action discovery." 🚩Physicians Healthsource, Inc., 2014 WL 413534, at *4.

Finally, the Court is not convinced that Plaintiff will be prejudiced by bifurcation. While Plaintiff raises concern over delay and the possibility that evidence will be lost or destroyed, these concerns are not overly persuasive. As parties to this lawsuit, both Aliera and Insurance Care Now are on notice to preserve evidence pertaining to this matter. [9] Furthermore, any prejudice to Plaintiff is significantly outweighed by the potential burdens and costs associated with unnecessary class action discovery. See, e.g., Bais Yaakov of Spring Valley v. Peterson's Nelnet, LLC, Civ. No. 11-00111, 2013 WL 663301, at *5 (D.N.J. Feb. 21, 2013) (holding that it is generally recognized that class actions involve the potential "for hefty litigation expenses and an extensive use of judicial resources in the resolution of these claims[.]").

Everything considered, the Court finds that bifurcating discovery into two phases (i.e., limited discovery into the merits of Plaintiff's individual TCPA claim followed by class-wide discovery if Plaintiff's individual TCPA complaint survives) will promote the efficient resolution of this matter. It will allow the Court to address a narrow, potentially dispositive issue in a timely and cost-effective manner with no significant prejudice to Plaintiff.

## IV. CONCLUSION

Accordingly, Aliera's Motion to Bifurcate Discovery is **GRANTED**. Doc. No. [35]. The parties are **ORDERED** to submit a proposed amended scheduling order consistent with this Order **no later than Monday, April 13, 2020**.

**IT IS SO ORDERED** this 6th day of April, 2020.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 13568762

---

## Footnotes

1    Insurance Care Now, LLC has also joined in this motion. Doc. No. [47].

2    In his Complaint, Plaintiff defines a "predicative dialer" as an automated dialing system that "dials thousands of numbers at once, and only transfers the call to a live agent once a human being is on the line." Doc. No. [1], ¶ 30.

3    The FCC specifically defined a "predictive dialer" as an "automated dialing system that uses a complex set of algorithms to automatically dials' consumers telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call." 🚩In re TCPA Rules & Regulations, 18 FCC Rcd. 14,014, 14,022 n.31 (2003).

4    The Eleventh Circuit joined several other courts in adopting this ATDS interpretation. See, e.g., 🚩Dominguez v. Yahoo, Inc., 894 F.3d 116, 119 (3rd Cir. 2018); DeNova v. Ocwen Loan Servicing, No. 8:17-cv-2204-T-23AAS, 2019 WL 463552 at *3–4 (M.D. Fla. Sept. 24, 2019); Adams v. Safe Home Sec. Inc., No. 3:18-cv-03098-M, 2019 WL 3428776, at *3–4 (N.D. Tex. July 30, 2019); Keyes v. Ocwen Loan Servicing, LLC, 335 F. Supp. 3d 951, 962–63 (E.D. Mic. 2018).

5    Aliera states that it intends to file a motion for judgment on the pleadings as soon as practicable. Doc. No. [35], p. 8 n.9.

Newell v. Aliera Healthcare, Inc., Not Reported in Fed. Supp. (2020)

Case 1:25-cv-01410-JKM     Document 23-4     Filed 11/21/25     Page 69 of 121

6      The Court did not allow a reply. Doc. No. [40], p. 2.

7      In 🚩⚠️ Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered prior to the close of business on September 30, 1981 by the United States Court of Appeals for the Fifth Circuit.

8      The Court agrees with Plaintiff that discovery on the issue of standing is not warranted. Namely, the fact that Plaintiff has previously filed TCPA lawsuits (with nothing more) is insufficient to warrant targeted discovery on the issue of whether Plaintiff suffered a concrete injury such that his individual claim can proceed.

9      The Court set aside the entry of default against Insurance Care Now on March 26, 2020. Doc. No. [46].

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 70 of 121

Pavelka v. Paul Moss Insurance Agency, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 3728199

Only the Westlaw citation is currently available.

United States District Court, N.D. Ohio, Eastern Division.

Jackson PAVELKA and Kaylee Pavelka, Plaintiffs,

v.

PAUL MOSS INSURANCE AGENCY,

LLC dba Epiq Insurance Agency, Defendant.

CASE NO. 1:22 CV 02226

|

Signed May 29, 2023

|

Filed May 30, 2023

**Attorneys and Law Firms**

Taylor True Smith, Woodrow & Peluso, Denver, CO, Scott D. Simpkins, Climaco, Wilcox, Peca, Tarantino & Garofoli, Cleveland, OH, for Plaintiffs.

Matthew N. Foree, Freeman Mathis & Gary, Atlanta, GA, Steven J. Forbes, Freeman Mathis & Gary, Cleveland, OH, for Defendant.

**MEMORANDUM OF OPINION AND ORDER**

DONALD C. NUGENT, United States District Judge

**\*1** This case is now before the Court on *Defendant's Motion for Determination That Plaintiffs Are Not Proper Parties and to Dismiss the Complaint* (ECF #20) ("*Motion to Dismiss*"), filed by Defendant Paul Moss Insurance Agency ("Defendant" or "Paul Moss Insurance") on March 31, 2023. Plaintiffs Jackson Pavelka and Kaylee Pavelka ("Plaintiffs") filed their opposition to Defendant's motion on April 18, 2023 (ECF #22), and Defendant filed a reply on May 12, 2023 (ECF #24). For the reasons set forth below, Defendant's *Motion to Dismiss* (ECF #20) is DENIED.

**I. BACKGROUND FACTS**

On December 9, 2022, Plaintiffs filed this action against Defendant under the Telephone Consumer Protection Act,

🚩 47 U.S.C. § 227, *et seq.* ("TCPA"), alleging two claims of violation of the TCPA. The first claim alleges that Defendant Paul Moss Insurance made calls to Plaintiffs using

an automatic telephone dialing system ("ATDS") without Plaintiffs' consent (ECF #1 [*Complaint*], ¶ 36-43). The second claim alleges that Defendant made calls to Plaintiffs using a prerecorded voice without Plaintiffs' consent (ECF #1, ¶¶ 44-50). Plaintiffs' *Complaint* also seeks to raise these claims as a class action "individually and on behalf of all others similarly situated" (ECF #1, Caption & ¶¶ 17, 28-35) on behalf of two putative nationwide classes.

The gist of Defendant's *Motion to Dismiss* are assertions that: (1) Paul Moss Insurance did not initiate *any* call with Plaintiffs, but rather that it received a "warm transfer" (in effect, that Paul Moss Insurance received the transfer of an initial call from another entity, Datalot, with Plaintiff Kaylee Pavelka on the line, based on the direction or consent of Kaylee Pavelka after she received the initial call from Datalot), and that Paul Moss Insurance does not utilize an ATDS system; (2) Paul Moss Insurance (again) did not make any telephone calls to Plaintiffs, and that it does not use a prerecorded voice in its communications; (3) Plaintiffs have not identified any "harm" caused by Defendant, based on the fact that Paul Moss Insurance did not initiate any calls with Plaintiffs (effectively, that Plaintiffs "lack standing" for their claims); and (4) Plaintiffs have not identified any facts that Paul Moss Insurance could be held "vicariously liable" for any calls made by third parties, including Datalot (effectively, that no "agency" existed between Paul Moss Insurance and any third party).

Among the items submitted in support of Defendant's motion are copies of texts between Paul Moss Insurance and Kaylee Pavelka indicating that Ms. Pavelka consented to receiving the texts from Paul Moss Insurance, and that the texts were in fact responsive to information provided by Ms. Pavelka, as well as recordings of two telephone conversations Ms. Pavelka had, first, with Datalot, and then with Paul Moss Insurance, each of which last a number of minutes long and evidence a consensual exchange of information between the caller and Ms. Pavelka. There is no dispute that the only Plaintiff who had *any* interaction with Defendant Paul Moss Insurance (or Datalot) was Plaintiff Kaylee Pavelka, who is the "primary and customary user" of the cellular phone at issue in this case (ECF #1, ¶ 18). [1]

**II. APPLICABLE LAW**

**\*2** The TCPA makes it illegal to "make any call (other than a call made for emergency purposes or made with the

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 71 of 121

Pavelka v. Paul Moss Insurance Agency, LLC, Not Reported in Fed. Supp. (2023)

prior express consent of the called party) using any automatic telephone dialing system or an artificial prerecorded voice ... to any telephone assigned to a paging service [or] cellular service[.]" 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA defines ATDS as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The Supreme Court has further held that to qualify as an "automatic telephone dialing system" within the meaning of the TCPA, a device must have the "capacity to use a random or sequential number generator to either store or produce phone numbers to be called." *Facebook Inc. v. Duguid*, 141 S. Ct. 1163, 1173 (2021).

### III. <u>ANALYSIS</u>

Defendant's motion raises a number of factual issues that make the granting of a motion to dismiss premature at this time. Both Plaintiffs and Defendant, in their briefing on Defendant's motion, present a number of matters that are outside the Pleadings, including various contract provisions between Defendant Paul Moss Insurance and Datalot, affidavits, copies of text messages, and recordings of the telephone conversations between Plaintiff Kaylee Pavelka and Datalot and between Plaintiff Kaylee Pavelka and Defendant Paul Moss Insurance. While FED. R. CIV. P. 12(d) permits a court to then treat a motion to dismiss under FED. R. CIV. P. 12(b) or a motion for judgment on the pleadings under FED. R. CIV. P. 12(c) as one for summary judgment under FED. R. CIV. P. 56, [2] the rule also requires that "[a]ll parties must be given a reasonable opportunity to present all material that is pertinent to the motion." FED. R. CIV. P. 12(d).

This case is still in its preliminary stages and discovery is ongoing. At the Case Management Conference, held on February 27, 2023, Defendant (following the position it raised in the FED. R. CIV. P. 26(f) and LR 16.3(b) *Planning Report of the Parties*, ECF #14) suggested that the Court bifurcate discovery, under Fed. R. Civ. P. 42(b), to first address the liability claims under the TCPA related to Plaintiffs individually, and to accept summary briefing and rule upon such individual liability issues first, before expanding the scope of discovery to encompass Plaintiffs' asserted "class action" claims, as the individual liability claims would likely be dispositive of whether the case should thereafter proceed as a "class action." (ECF #14, PageID #64-66).

Federal Rule of Civil Procedure 42(b) provides, in pertinent part: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third party claims." FED. R. CIV. P. 42(b). "As to the bifurcation of liability and class discovery, the court considers (1) the overlap between individual and class discovery, (2) whether bifurcation will promote Federal Rule of Civil Procedure 23's requirement that certification be decided at 'an early practicable time,' (3) judicial economy, and (4) any prejudice likely to flow from the grant or denial of a stay of class discovery." *Akselrod v. MarketPro Homebuyers LLC*, Civil No. CCB-20-2966, 2021 WL 100666, at *2 (D. Md. Jan. 12, 2021) (citing 1 McLaughlin on Class Actions § 3:10 (11th ed. 2014)).

In cases asserting both individual liability and potential "class action" claims under the TCPA, courts have often approved bifurcating discovery in such cases where narrow, potentially dispositive, issues can be decided at the outset of a case prior to costly class discovery. *See, e.g., Akselrod*, 2021 WL 100666, at *2 (bifurcating discovery in TCPA case after determining that whether an ATDS was used was an issue of liability distinct from class certification, and "[l]imited discovery has the potential to simplify the case and to save both parties the time and expense of class discovery, which can be particularly resource intensive"); *Physicians Healthsource, Inc. v. Janssen Pharm, Inc.*, Civil Action No. 12-2132 (FLW), 2014 WL 413534, at *4-5 (D.N.J. Feb. 4, 2014) (bifurcating discovery in TCPA fax case based on a narrow, potentially dispositive issue that was distinct from class issues, and recognizing that bifurcation had the potential to "save the parties and the Court from the substantial costs and burdens associated with whole scale class action discovery").

**\*3** In another case, similar to this one, where the issue of the plaintiff's consent was a key dispositive issue, the court highlighted the appropriateness of bifurcating the individual liability and class discovery:

> Upon review, the Court finds that bifurcating discovery as proposed by [Defendant] is warranted under Rule 42(b). In this regard, the Court agrees with [Defendant] that a narrow, potentially dispositive issue exists concerning whether Plaintiff was called by an ATDS[.] Specifically, Plaintiff alleges in his complaint that he was called with a "predictive dialer." ... [D]epending on what evidence

is ultimately presented, the Court may determine that Plaintiff's individual TCPA claim fails as a matter of law.

For similar reasons, the Court also finds that targeted discovery on the issue of consent is also warranted. As [Defendant] correctly points out, prior express consent to receive the calls at issue is a complete defense to TCPA claims. Because consent is a dispositive issue, as with the ATDS issue, limited discovery on how [Defendant] acquired Plaintiff's contact information and whether that acquisition constitutes consent under the TCPA "has the potential to save the parties and the Court from the substantial costs and burdens associated with whole scale class action discovery."

\* \* \*

Everything considered, the Court finds that bifurcating discovery into two phases (*i.e.*, limited discovery into the merits of Plaintiff's individual TCPA claim followed by class-wide discovery if Plaintiff's individual TCPA complaint survives) will promote the efficient resolution of this matter. It will allow the Court to address a narrow, potentially dispositive issue in a timely and cost-effective manner with no significant prejudice to Plaintiff.

*Newell v. Aliera Healthcare, Inc.*, Civil Action No. 1:19-CV-01489-SCJ (N.D. Ga. Apr. 6, 2020) (citations omitted, bracketed inserts provided, parenthetical insert in original).

The Court finds that bifurcation of discovery to first address the individual liability claims, and then to entertain possible summary judgment motion practice on Plaintiffs' individual claims, prior to class action discovery, is appropriate under FED. R. CIV. P. 42(b). The Court also finds that the parties should be given an opportunity to complete discovery on Plaintiffs' individual liability claims prior to any summary judgment motion practice that may be initiated on those individual claims at a later date.

Accordingly, *Defendant's Motion for Determination That Plaintiffs Are Not Proper Parties and to Dismiss the Complaint* (ECF #20) is premature, and is not in a posture to rule upon at this time.

## IV. CONCLUSION

For each of the reasons stated above, *Defendant's Motion for Determination That Plaintiffs Are Not Proper Parties and to Dismiss the Complaint* (ECF #20) is DENIED.

The parties are directed to continue discovery on Plaintiffs' individual liability claims, with the intention of addressing and briefing these potentially dispositive claims first, before undertaking class action discovery and any related briefing in connection with Plaintiffs' class action claims.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3728199

---

## Footnotes

1    Plaintiff Jackson Pavelka (Kaylee Pavelka's husband) is named as a Plaintiff solely because he is the "subscriber" for the subject phone's cellular account (ECF #1, ¶ 19).

2    Defendant's motion, while captioned *Defendant's Motion for Determination That Plaintiffs Are Not Proper Parties and to Dismiss the Complaint*, does not cite any of the provisions of FED. R. CIV. P. 12(b) (grounds for motions to dismiss) or 12(c) (motion for judgment on the pleadings).

---

**End of Document**                                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Declined to Extend by Quinn v. Specialized Loan Servicing, LLC,
N.D.Ill., February 9, 2017

2014 WL 413534
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

PHYSICIANS HEALTHSOURCE, INC., Plaintiff,

v.

JANSSEN PHARMACEUTICALS,

INC., et al., Defendants.

Civil Action No. 12–2132 (FLW).
|
Feb. 4, 2014.

**Attorneys and Law Firms**

Matthew Nicholas Fiorovanti, Giordano Halleran & Ciesla
P.C., Red Bank, NJ, Michael J. Canning, Giordano, Halleran
& Ciesla, P.C., Middletown, NJ, for Plaintiff.

Marsha Jessica Indych, Drinker Biddle & Reath LLP,
New York, NY, Kathleen M. Fennelly, Thomas R. Curtin,
George C. Jones, Graham Curtin, P.A., Morristown, NJ, for
Defendants.

MEMORANDUM OPINION

BONGIOVANNI, United States Magistrate Judge.

**\*1** This matter comes before the Court upon Defendants
Alert Marketing, Inc., Janssen Pharmaceuticals, Inc. and
Ortho–McNeil Pharmaceutical, LLC's (identified as Ortho–
McNeil Pharmaceutical, Inc.) (collectively "Defendants")
motion to bifurcate discovery. [Docket Entry No. 52].
Plaintiff Physicians Healthsource, Inc. ("Plaintiff") opposes
Defendants' motion. The Court has fully reviewed and
considered all of the arguments made in support of and in
opposition to Defendants' motion. The Court considers same
without oral argument pursuant to L.Civ.R. 78.1(b). For the
reasons set forth more fully below, Defendants' motion is
GRANTED.

**I. Background and Procedural History**

In light of the parties' familiarity with the facts of this
matter, they shall not be reinstated at length herein. Instead,
the Court shall recount only those facts necessary for the
resolution of Defendants' motion to bifurcate. This case
concerns whether two identical unsolicited faxes sent by
Defendants to Plaintiff on or about April 8, 2008 and May
6, 2008 violated the Telephone Consumer Protection Act
("TCPA"). The faxes concern the reclassification of Levaquin
for insurance purposes. [1] Plaintiff alleges that the faxes were
sent as commercial advertisements in violation of the TCPA.
In contrast, Defendants argue that the faxes are informational
and, therefore, exempted from the TCPA.

In response to Plaintiff's Complaint, Defendants j ointly
moved to dismiss Plaintiff's claims arguing that the faxes as
a matter of law were informational and, as such, exempted
from the TCPA. The District Court held argument on
Defendants' motion. For the reasons set forth on the record on
January 31, 2013 and for those set forth in the Supplemental
Opinion dated February 6, 2013, the District Court granted
Defendants' motion to dismiss, finding that "the faxes are
indeed informational and that they include only an incidental
amount of commercial material." (Supplemental Opinion of
2/6/2013 at 1; Docket Entry No. 28). Consequently, the
District Court determined that the "faxes are not actionable
under the TCPA." (Id.)

Plaintiff responded to this decision by filing a motion
to reconsider the District Court's January 31, 2013 Order
pursuant to FED.R.CIV.P. 59(e) and L.Civ.R. 7.1(i). In
the alternative, Plaintiff sought leave to file an amended
complaint. The District Court denied Plaintiff's motion for
reconsideration finding that Plaintiff had not asked the court
to "correct errors of law or fact upon which [its] rulings were
based in order to prevent manifest injustice, [n]or was there
an intervening change in the prevailing law." (Opinion of
6/6/2013 at 6; Docket Entry No. 43). Instead, the District
Court noted that Plaintiff's motion for reconsideration was
based on two new allegations that Plaintiff referred to as new
evidence: (1) the receiver of the faxes in question, a physician,
never prescribed Levaquin; and (2) because Levaquin was
reclassified in 2004, not in 2008 when the faxes were sent,
the fax "created a 'false impression that it was being sent for
informational purposes.'" (Id. (quoting Plaintiff's Opp. Brief
at 6)). The District Court found that these new allegations
were not evidence for reconsideration purposes and since
there was no allegation that the information supporting these
allegations was not available when the District Court rendered

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 74 of 121

Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc., Not Reported in...

its initial decision, there was no basis upon which the District Court could reconsider its prior rulings.

**\*2** The District Court also found that Plaintiff's proposed amended complaint was futile because the only new allegations set forth in the pleading concerned the alleged fact that there was no prior business relationship between the parties. The District Court found these allegations to be insufficient because its "prior holding that the fax is an advertisement is not relevant to a finding of a prior business relationship, and as a result, amending the Complaint to include such allegations would not change the result." (*Id.* at 7). In addition, the District Court noted that Plaintiff's proposed amended complaint was devoid of any allegations that the faxes at issue "could not be considered truly informational" because "Levaquin was actually reclassified in 2004, and since the drug was already a Tier 2 drug in 2008, there was no 'reclassification,' 'up-to-date,' or 'breaking news' reimbursement information" to be disseminated at the time they were sent. (*Id.*) While Plaintiff raised these assertions in its brief, the District Court could not consider same because they were un-pled.

Despite the failures in Plaintiff's proposed amended complaint, the District Court permitted Plaintiff to amend its Complaint, although not in the form submitted with Plaintiff's motion. Instead, the District Court permitted Plaintiff to "amend its Complaint with whatever allegations it deems would be sufficient." (*Id.* at 8). In so doing, the District Court specifically noted that it was not making any findings as to whether Plaintiff's allegations concerning the timing of Levaquin's reclassification could state a claim.

Plaintiff filed its Amended Complaint on June 26, 2013. [Docket Entry No. 45]. Defendants filed answers in response to same on July 19, 2013. [Docket Entry Nos. 47 & 48]. Shortly thereafter, the Court set an Initial Conference with the parties to discuss the schedule to be set in this matter. During the Initial Conference, Defendants indicated their desire to bifurcate discovery. The Court directed Defendants to file a motion to that effect. Defendants did so by filing the instant motion.

Defendants seek to bifurcate discovery into two phases. During the first phase, the parties would focus on discovery related to whether the faxes at issue are informational or whether the informational content is a sham designed to conceal the fact that they are advertisements. During the second phase, the parties would conduct discovery on all

matters, including class action issues. Before the second phase of discovery commences, Defendants would file a motion for summary judgment on the issue of whether the faxes are informational and therefore exempted from the TCPA. Using this approach, the parties would only engage in class action discovery if Plaintiff survived Defendant's anticipated motion for summary judgment.

Defendants argue that bifurcating discovery in this matter is warranted in light of the narrow, potentially dispositive issue that exists concerning whether the faxes at issue are informational. Defendants argue that this issue is "totally distinct from class action discovery" and "can be fully explored in a limited time, with limited costs, and with limited burdens on the parties and the Court." (Def. Br. at 4; Docket Entry No. 52). In contrast, Defendants argue that unbounded class action discovery involves substantial costs and burdens both for the parties and the court. Further, Defendants claim that the burden of class discovery is significantly greater for defendants than plaintiffs. Indeed, Defendants contend that "[c]ertification and potential class liability are a sword of Damocles for Defendants[.]" (*Id.* at 5). Defendants argue that this would be particularly true here where the District Court has previously determined that the faxes at issue are informational. Consequently, Defendants argue that they should not be forced to spend resources engaging in class discovery from the outset. Instead, they argue that the most efficient manner for this case to proceed is for discovery to be bifurcated so that the issue of whether the faxes are informational, and therefore exempted under the TCPA, can be decided first.

**\*3** Plaintiff opposes Defendants' motion to bifurcate. Plaintiff argues that, despite Defendants' claims to the contrary, bifurcation will not promote efficiencies in the litigation of this matter. In this regard, Plaintiff claims that "[n]o matter what evidence or testimony Defendants could hope to submit to support any forthcoming motion for summary judgment, there will at the very least still remain a genuine question of fact since the documents presented by Plaintiff already show *no Tier ranking change.*" (Pl. Opp. Br. at 2; Docket Entry No. 53). Further, Plaintiff argues that Defendants have not shown that it will be more timely and less costly to litigate this matter by bifurcating discovery. Indeed, Plaintiff claims that "Defendants provide no analysis whatsoever of the expected savings of time and costs, rendering their motion wholly conclusory." (*Id.* at 4).

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 75 of 121

Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc., Not Reported in...

In contrast, Plaintiff contends that bifurcation will just further delay this case, which has already been "pending for almost eighteen months due in large part to Defendants' insistence that the faxes were informing of a Levaquin Tier change." (*Id*) Specifically, Plaintiff contends that if this matter is bifurcated, the first phase of discovery will take nearly a year to complete. Plaintiff argues that such an expense of time cannot be justified. Plaintiff also argues that Defendants "fail to explain just how separation of the Tier change issue from the normal class certification discovery can be accomplished." (*Id.* at 5).

In addition, Plaintiff argues that bifurcation ignores the need to preserve evidence in this TCPA matter. Plaintiff notes that in TCPA cases, electronic discovery involves databases of transmissions records. Plaintiff further notes that both IT and non-IT personnel are responsible for the integrity of these databases. Plaintiff argues that given the different personnel involved in maintaining the databases, there is always a risk that the actual integrity of the databases has been compromised. Plaintiff claims that this issue is compounded by the fact that "the steps taken to actually send the faxes at issue may involve known *and even* unknown outside parties or vendors" coupled with the common practice in data storage to delete data on quick intervals to increase efficiencies and decrease costs. (*Id.* at 7). As such, Plaintiff argues that there is a risk that vendors, both known and unknown, may be deleting or destroying databases relevant to this case. Plaintiff argues that bifurcation will only multiply problems associated with evidence preservation by delaying Plaintiff's ability to secure evidence for almost a year.

Indeed, Plaintiff argues that it will be inherently prejudiced if this matter is bifurcated. In this regard, Plaintiff claims that "[s]ince no discovery has occurred in this case, Plaintiff will be forever prejudiced if evidence relevant to proving this case, evidence in the form of electronic data, is innocently destroyed or deleted as a matter of course by anyone who participated in the sending of the faxes at issue here." (*Id.* at 8). For these reasons, Plaintiff argues that Defendants' motion to bifurcate discovery should be denied.

## II. Analysis

**\*4** Federal Rule of Civil Procedure 42(b) governs requests to bifurcate. According to Rule 42(b), "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Under Rule 42(b), "a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in

trial management." *Medpointe Healthcare, Inc. v. HiTech Pharmacal Co., Inc.,* Civil Action No. 03–555(MLC), Civil Action No. 04–1686(MLC), 2007 U.S. Dist. LEXIS 4652, at *12–13, 2007 WL 188285 (D.N.J. Jan. 22, 2007) (internal quotation marks and citation omitted). Further, the broad discretion afforded courts in handling discovery disputes extends to decisions over bifurcating discovery. See *Weiss v. First Unum Life Ins. Co.,* Civil Action No. 02–4249(GEB), 2008 WL 755958, * 1 (March 19, 2008); *see also Bandai America Inc. v. Bally Midway Mfg. Co.,* 775 F.2d 70, 74 (3d Cir.1985) (holding that bifurcation orders and orders controlling order of discovery are reviewed for abuse of discretion).

Here, the Court finds that bifurcating discovery as proposed by Defendants is warranted under Rule 42(b). In this regard, the Court agrees with Defendants that a narrow, potentially dispositive issue exists concerning whether the faxes sent to Plaintiffs are informational and therefore not actionable under the TCPA. Further, the Court is not persuaded by Plaintiff's argument that the information contained in and attached to its Amended Complaint regarding the lack of Levaquin Tier changes since at least 2004 precludes summary judgment being granted in Defendants' favor. Defendants have already referenced evidence of Tier changes occurring as late as 2007. Conflicting evidence does not always preclude summary judgment. Moreover, the District Court never determined that Plaintiff's now asserted sham allegations do, in fact, state a claim. As a result, even absent Tier changes, the District Court could find that the faxes are informational. As a result, depending on what evidence is ultimately presented, the District Court may determine that summary judgment is warranted.

In addition, the Court finds that the issue concerning whether the faxes here are informational is totally distinct from class issues. Unlike Plaintiff, the Court finds that there will be no significant overlap between the two and therefore no real danger of a duplication of efforts or increasing increase in litigation costs. Moreover, the Court also finds that bifurcating the two issues has the potential to save the parties and the Court from the substantial costs and burdens associated with whole scale class action discovery. While Plaintiff faults Defendants for not supporting their claims concerning the burdens and costs associated with class action discovery, it is generally recognized that class actions involve the potential "for hefty litigation expenses and an extensive use of judicial resources in the resolution of these claims[.]" *Bais Yaakov of Spring Valley v. Peterson's Nelnet, LLC,*

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 76 of 121

Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc., Not Reported in...

Civ. No. 11–00011, 2013 WL 663301, at *5 (D.N.J. Feb.21, 2013). It is also generally understood that the costs can be particularly "enormous" for defendants. *Id.*

**\*5** Similarly, the Court finds Plaintiff's projection regarding how long the first phase of discovery will take to be unreasonable. The discovery at issue in phase one is narrow and relates solely to whether the faxes sent to Plaintiff are informational or whether their apparent informational content is a sham. Given this limited scope of discovery, there is simply no reason why it should take close to a year to complete. Instead, the Court is confident that it can be conducted in approximately 4 months.

Further the Court is not convinced that Plaintiff will be prejudiced by bifurcation. While Plaintiff raises concerns over delay and the possibility that evidence will be lost or destroyed, these concerns are not overly persuasive. First, the faxes at issue were sent in the Spring of 2008, nearly four years before Plaintiff elected to file suit. If evidence preservation and the elapse of time were a substantial concern, one would have expected this case to have been filed more expediently. Second, the fact that no discovery has taken place to date can hardly be blamed on Defendants. In response to Plaintiff's original Complaint, Defendants filed a motion to dismiss. Defendants succeed on that motion: the District Court determined that Plaintiff had failed to assert a viable claim under the TCPA. In response to the District Court's decision, Plaintiff moved for reconsideration or in the alternative to file an amended Complaint. The District Court denied Plaintiff's motion for reconsideration and found that Plaintiff's proposed amended complaint failed to state a claim under the TCPA. Nevertheless, the District Court permitted Plaintiff to file an amended pleading, albeit not in the form attached to the motion for reconsideration. Plaintiff filed its Amended Complaint on June 26, 2013, over 14 months after the initial Complaint was filed. Defendants certainly are not responsible for delaying discovery during this period of time. Quite to the contrary, they moved to dismiss Plaintiff's Complaint and they succeeded on that motion. Third, Defendants have notified third parties of this lawsuit and have put them on notice to preserve evidence. Under these circumstances, the Court finds that Plaintiff will not be prejudiced by an additional 4 month delay caused by bifurcating discovery into two phases.

Everything considered, the Court finds that bifurcating discovery into two phases will promote the efficient resolution of this matter. It will allow the Court to address a narrow, potentially dispositive issue in a timely and cost effective manner with no significant prejudice to Plaintiff. Consequently, the Court hereby bifurcates discovery as requested by Defendants. The parties are directed to submit a proposed schedule for fact discovery concerning whether the faxes sent were informational or whether their apparent informational content was a sham and the faxes were in reality advertisements. The schedule submitted shall have this phase of discovery closing no later than June 13, 2014. [2]

### III. Conclusion

**\*6** For the reasons set forth above, Defendants motion to bifurcate discovery is GRANTED. An appropriate Order follows.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 413534

---

## Footnotes

1    The specific content of the faxes is discussed in detail in the District Court's Supplemental Opinion dated February 6, 2013 [Docket Entry No. 28]. As such, the Court does not go into further detail here.

2    The Court notes that after Defendants' motion to bifurcate was filed, Defendants filed a motion for summary judgment. In response, Plaintiff has filed an opposition arguing that certain discovery is needed in order to respond to Defendants' motion for summary judgment. This Opinion does not reach that issue, but only addresses Defendants' motion to bifurcate.

**End of Document**

2018 WL 11264884
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Bilal SALEH, individually and on behalf of
a class of others similarly situated, Plaintiff,

v.

CRUNCH, LLC, a Delaware limited liability
company, Crunch Franchising, LLC, a Delaware
limited liability company and DeLiu, LLC, a
Delaware limited liability company doing business
as Crunch Fitness Oakland Park, Defendants.

Case No. 17-62416-Civ-COOKE/HUNT
|
Signed 02/28/2018

## Attorneys and Law Firms

Jibrael Jarallah Said Hindi, The Law Offices of Jibrael S. Hindi, Fort Lauderdale, FL, Bret Leon Lusskin, Jr., Bret Lusskin, P.A., Aventura, FL, Sean Martin Holas, Scott David Owens, Scott D. Owens, P.A., Hollywood, FL, for Plaintiff.

Ian C. Ballon, Pro Hac Vice, Lori Chang, Pro Hac Vice, Valerie W. Ho, Pro Hac Vice, Greenberg Traurig LLP, Los Angeles, CA, Ian M. Ross, Stumphauzer Foslid Sloman Ross & Kolaya, PLLC, Miami, FL, Paul K. Silverberg, Silverberg & Weiss, P.A., Weston, FL, for Defendants Crunch, LLC, Crunch Franchising, LLC.

David K. Markarian, Markarian & Hayes, Palm Beach Gardens, FL, Paul K. Silverberg, Silverberg & Weiss, P.A., Weston, FL, for Defendant DeLiu, LLC c/o Marc Delisle, Managing Member 4801 Peregrine Point Circle West Sarasota, FL 34231.

## ORDER DENYING MOTION
## TO STAY PROCEEDINGS

MARCIA G. COOKE, United States District Judge

**\*1** THIS CAUSE came before the Court on Defendants Crunch, LLC's and Crunch Franchising, LLC's Motion to Stay Proceedings Pending a Decision by the Ninth Circuit Court of Appeals (ECF No. 35), which Defendant DeLiu, LLC has since joined. *See* Notice of Adoption/Joinder, ECF No. 40. Plaintiff filed a Response in Opposition (ECF No. 43),

and Defendants subsequently filed a Reply (ECF No. 45). I have reviewed the pertinent portions of the record, and am otherwise fully advised in the premises. For the reasons stated below, Defendants Motion to Stay is denied.

Defendants move to stay the instant proceedings pending a decision by the Ninth Circuit Court of Appeals in *Marks v. Crunch San Diego, LLC*, Appeal No. 14-56834 (9th Cir.). According to Defendants, the Ninth Circuit in *Marks* is set to rule on whether the Texmunication platform is an automatic telephone dialing system ("ATDS") within the meaning of the Telephone Consumer Protection Act ("TCPA"),[1] an appeal from a district court ruling in ⚑ *Marks v. Crunch San Diego, LLC*, 55 F. Supp. 3d 1288, 1292 (S.D. Cal. 2014) which found that Textmunication did not constitute an ATDS. In Plaintiff's Complaint (ECF No. 1), Plaintiff alleges Defendants sent texts through the Textmunication platform; Defendants therefore argue this case should be stayed pending the Ninth Circuit's decision because "an affirmance of that case would be authoritative of Crunch's liability in this case." Motion, 2.

A district court has broad discretion in determining whether a stay is appropriate. 🔖 *Clinton v. Jones*, 520 U.S. 681, 706 (1997). A stay is "based on a balancing test in which the movant bears the burden of showing either 'a clear case of hardship or inequity' if the case proceeds, or little possibility the stay will harm others." 🔖 *Dunn v. Air Line Pilots Ass'n*, 836 F. Supp. 1574, 1584 (S.D. Fla. 1993), *aff'd*, 🔖 193 F.3d 1185 (11th Cir. 1999) (citing 🔖 *Landis v. North American Co.*, 299 U.S. 248, 254–55 (1936)). "The proponent of a stay bears the burden of establishing its need." 🔖 *Clinton*, 520 U.S. at 708. I find that a stay in this matter is not appropriate at this time.

First, a decision in *Marks v. Crunch San Diego, LLC*, Appeal No. 14-56834 (9th Cir.) would not necessarily be authoritative. The ruling on appeal in *Marks* was made on a motion for summary judgment, after the parties had developed a factual record. While the texting platform at issue may be the same in both cases, it is possible that the Plaintiff in the instant case may discover or present different facts than the parties in *Marks*. "Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." 🔖 *Landis v. N. Am. Co.*, 299 U.S. 248,

Saleh v. Crunch, LLC, Not Reported in Fed. Supp. (2018)

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 79 of 121

255 (1936). Further, a decision in *Marks* will not define the rights of both parties nor will it automatically moot this case. While the Ninth Circuit's affirmance or rejection of the district court's finding might be persuasive in the instant matter, it is not binding on this Court. *See* ⚑ *McGinley v. Houston, 361 F.3d 1328, 1331 (11th Cir. 2004)* ("A circuit court's decision binds the district courts sitting within its jurisdiction...."). Nor would there be a preclusive effect, as "[Plaintiff] was not a party to the [California] action, [his] interests were not adequately represented, and [he] did not have the opportunity to litigate the issues presented in the [California] action." *Int'l Ship Repair & Marine Servs., Inc. v. N. Assur. Co. of Am., 503 F. App'x 681, 683 (11th Cir. 2013)*. After a ruling by the Ninth Circuit, the parties would still need to litigate the applicability of the *Marks* decision to the facts of the instant case. As such, Plaintiff should be allowed to litigate this matter and develop his own factual record. Defendants can argue the correctness and applicability of the Ninth Circuit's ruling once it has been made.

**\*2** Second, if the D.C. Circuit's and Ninth Circuit's decisions are imminent, as Defendants argue, then there is a good chance the decisions will be issued in time to shape the parties' discovery and/or any motions for summary judgment. Third, and last, Defendants have not shown that a denial of the stay will result in any undue prejudice to them other than that they *may* have more favorable caselaw to bolster their position at a later date. These are not sufficient reasons to warrant a stay of this matter, especially where a stay would prolong this matter on the Court's docket and could conceivably prejudice Plaintiff by the fading memory of any witnesses. *See Yong v. Peraza, 2015 WL 4639736, \*2 (S.D. Fla. Aug. 4, 2015)*.

For the foregoing reasons, it is hereby **ORDERED and ADJUDGED** that Defendant's Motion to Stay Proceedings (ECF No. 35) is **DENIED**.

**DONE and ORDERED** in chambers, at Miami, Florida, this 28 th day of February 2018.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 11264884

---

## Footnotes

1     The Ninth Circuit is, in turn, awaiting a ruling from the D.C. Circuit in *ACA Int'l v. F.C.C.*, Appeal No. 15-1211 (D.C. Cir.) on the validity of the Federal Communication Commission's 2015 Regulations, which, the petitioners in the case argue, expanded the statutory definition of an ATDS impermissibly. *See* ⚑ *Marks v. Crunch San Diego, LLC, No. 14-56834 (9th Cir.)* ECF No. 62.

---

**End of Document**                                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 980383
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

Emmanuel SANAAH, Plaintiff,

v.

Nurse Debb HOWELL, Warden Arellano,
Major Scott Grover, Life Safety Coordinator
and Maintenance Supervisor, and
Maintenance Worker Lt. Bosley, Defendants.

Civil Action No. 08–cv–02117–REB–KLM.
|
April 9, 2009.

**Attorneys and Law Firms**

Emmanuel Sanaah, Crowley, CO, pro se.

### ORDER

KRISTEN L. MIX, United States Magistrate Judge.

**\*1** This matter is before the Court on Defendants' **Motion to Stay Discovery** [Docket No. 33; Filed April 8, 2009] (the "Motion"). The Court has reviewed the Motion, the entire case file and applicable case law and is sufficiently advised in the premises.

Defendants request that the above-captioned case be stayed until resolution of their pending Motion to Dismiss [Docket No. 32; Filed April 8, 2009]. *Motion* [# 33] at 1. As grounds, Defendants argue that they have raised the defense of qualified immunity in their Motion to Dismiss, and that all discovery should be stayed until the Court makes a legal determination on Defendants' entitlement to qualified immunity. *Id.*

IT IS HEREBY **ORDERED** that the Motion is **DENIED** for the reasons set forth below.

Stays are generally disfavored in this District. *See Wason Ranch Corp. v. Hecla* (unpublished decision). However, a stay may be appropriate in certain circumstances, and the Court weighs several factors in making a determination regarding the propriety of a stay. *See* String Cheese Incident, LLC v.

*Stylus Show, Inc.,* No. 02–cv–01934, 2006 WL 894955, at \*2 (D.Colo. Mar. 30, 2006) (unpublished decision) (denoting a five-part test). The Court considers (1) the interest of Plaintiff; (2) the burden on Defendants in going forward; (3) the Court's convenience; (4) the interest of nonparties, and (5) the public interest in general. *Id.* Here, those factors weigh against entry of a stay.

Although Plaintiff's position on this issue is not known, the Court has generally found that with the passage of time, the memories of the parties and other witnesses may fade, witnesses may relocate or become unavailable, or documents may become lost or inadvertently destroyed. As such, delay may diminish Plaintiff's ability to proceed. By contrast, Defendants do not suggest any undue burden in proceeding with the case, other than the ordinary burdens associated with defending a case. While Defendants do contend that their assertion of a qualified immunity defense entitles them to a stay, a review of the Motion to Dismiss reveals that success on the merits of such a defense is not assured. [1] On balance, the Court finds that the consideration of these two factors weighs against the imposition of a stay in this case.

The Court also considers its own convenience, the interest of nonparties, and the public interest in general. None of these factors prompts the Court to reach a different result. The Court is inconvenienced by an ill-advised stay because the delay in prosecuting the case which results from imposition of a stay makes the Court's docket less predictable and, hence, less manageable. This is particularly true where there is a pending Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), for which ultimate success is not guaranteed. While the Court identifies no particular interest of persons not parties to the litigation, the Court identifies a strong interest held by the public in general regarding the prompt and efficient handling of all litigation. Under these circumstances, the Court finds that a stay of the case is not warranted.

**\*2** The parties are reminded of their obligation to comply with my Order of February 11, 2009 [Docket No. 24] setting a Preliminary Scheduling Conference in this matter for **April 21, 2009 at 10:30 a .m.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 980383

## Footnotes

1    The Court expresses no opinion about the merits of the Motions to Dismiss, but merely notes that Defendants' qualified immunity defense is not particularly well developed or compelling on its face.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 82 of 121

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

KeyCite Yellow Flag

Distinguished by  Cunningham v. CBC Conglomerate LLC,  E.D.Tex.,
December 4, 2019

2019 WL 1506378
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

James E. SHELTON

v.

NATIONAL GAS & ELECTRIC, LLC

CIVIL ACTION NO. 17-4063
|
Filed 04/05/2019

**Attorneys and Law Firms**

Clayton S. Morrow, Morrow & Artim, P.C., Pittsburgh, PA,
Anthony Paronich, Broderick & Paronich, P.C., Boston, MA,
for James E. Shelton.

Ezra Dodd Church, Andrew W. Katz, Morgan Lewis &
Bockius, LLP, Philadelphia, PA, Michelle Pector, Morgan
Lewis & Bockius LLP, Houston, TX, for National Gas &
Electric, LLC.

## MEMORANDUM

R. BARCLAY SURRICK, District Judge

**\*1** Plaintiff brought suit against Defendant alleging
violations of the Telephone Consumer Protection Act of 1991,

47 U.S.C. § 227 ("TCPA"). Presently before the Court is
Defendant's Motion to Dismiss Plaintiff's Complaint pursuant
to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and
12(b)(6). (ECF No. 5.) For the reasons that follow, we will
deny Defendant's Motion.

## I. BACKGROUND

### A. Factual Background

Plaintiff's Complaint alleges that he has a permanent
residence in Pennsylvania, but attends school at Case Western
University in Ohio, where he has lived while attending school
since August 25, 2017. (Compl. ¶ 7, ECF No. 1; Affidavit of
Pl. ¶¶ 11-12, Pl.'s Resp. to MTD Ex. 2, ECF No. 8.) Plaintiff

also owns a cell phone with a 484 area code. (Compl. ¶ 24.)
The 484 area code represents a Pennsylvania phone service
region. Plaintiff's phone number is also registered on the
National Do Not Call Registry, which alerts telemarketers that
Plaintiff does not want to receive solicitations at that number.
(*Id.* ¶¶ 14, 24.) Plaintiff alleges that this cell phone is the
only phone that he owns, but that he also uses it for business
purposes. (Affidavit of Pl. ¶¶ 2, 5.) Specifically, Plaintiff owns
a business called Final Verdict Solutions, which "is in the
judgment collection business." (*Id.* ¶¶ 5, 7.) Plaintiff does not
purchase or use telephones "for the sole purpose of bringing
lawsuits under the TCPA." (*Id.* ¶ 4.) However, his business
website states that telemarketers are not welcome to call his
cell number. (*Id.* ¶ 9.)

Plaintiff alleges that, on August 18, 2017, just before he
went to Ohio to attend school, he received a telemarketing
call on his cell phone from Defendant, National Gas &
Energy, LLC. (Compl. ¶ 23.) Defendant is an energy company
that is incorporated and headquartered in Texas. (*Id.* ¶¶ 8,
20.) Plaintiff has never done any business with Defendant,
provided Defendant with his phone number, or consented to
receive telemarketing calls from Defendant. (*Id.* ¶ 30-31.)
When Plaintiff received Defendant's call, he allowed it to
go to voicemail. (*Id.* ¶ 25.) The voicemail was comprised
of a "distinctive click and pause, followed by Defendant's
telemarketing representative saying 'hello.' " (*Id.* ¶ 26.)
Plaintiff called Defendant back and "received a scripted pitch
from Victor Melendez about National Gas's services." (*Id.* ¶
28.) Plaintiff described the call as "a nuisance" and "annoying
and harassing," and stated that it "occupied Plaintiff's
telephone line from legitimate communication." (*Id.* ¶ 38.) He
also alleges that at least nine other callers have reported that
they have received calls from the same number and the calls
were telemarketing calls. (*Id.* ¶ 37.)

### B. Procedural Background

On September 11, 2017, Plaintiff filed a Complaint against
Defendant for violating the TCPA, which prohibits automated

telemarketing calls made to cell phone numbers. 47 U.S.C.
§ 227(b)(1)(A)(iii). Plaintiff seeks to represent a class of
individuals who have experienced the same harm caused
by Defendant. On November 13, 2017, Defendant filed the
instant Motion to Dismiss Plaintiff's Complaint, asserting
that Plaintiff lacks standing to assert the claim and that this
Court cannot exercise personal jurisdiction over Defendant.
(MTD, ECF No. 5.) In addition, Defendant requested a stay of
the proceedings pending a decision by the Court of Appeals

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 83 of 121

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

for the D.C. Circuit in a case that may have shed light on whether Plaintiff stated a claim. On November 21, 2017, Plaintiff filed a Response in opposition to Defendant's Motion to Dismiss and request to stay. On March 16, 2018, the D.C. Circuit issued an opinion in the aforementioned case, *ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018). On April 3 and 5, 2018, by letters to the Court, counsel for Plaintiff and Defendant supplemented their briefs with analyses of the effect of *ACA International* on Defendant's Motion to Dismiss the Complaint pursuant to Rule 12(b)(6).

## II. DISCUSSION

**\*2** The section of the TCPA at issue here prohibits "any person within the United States" from "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1). The statute defines "automatic telephone dialing system" ("ATDS")[1] as "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." *Id.* § 227(a)(1). The statute provides that a person may bring a private right of action based on violation of subsection (b) to enjoin the person in violation and/or "to recover for actual monetary loss from such a violation, or to receive $ 500 in damages for each such violation, whichever is greater." *Id.* § 227(b)(3).

In its Motion, Defendant seeks to dismiss the Complaint because, it argues, Plaintiff's judgment recovery business precludes him from asserting an injury-in-fact or that his damages fall within the "zone of interests" necessary to establish standing. Defendant also argues that Defendant's connections to Pennsylvania are too tenuous for this Court to exercise personal jurisdiction. Finally, Defendant argues that *ACA International* changed the definition of ATDS such that Plaintiff has failed to adequately allege that such a service was used in this case. (Def.'s Letter re *ACA Int'l*, on file with the Court.)

In his Response, Plaintiff argues that his judgment recovery business does not preclude him from asserting either an injury-in-fact or that he is within the zone of interests of the TCPA. He also asserts that Defendant's connections to Pennsylvania support specific personal jurisdiction, and that

the D.C. Circuit's decision in *ACA International* does not have any effect on the case at this stage of litigation and will only serve to streamline discovery with respect to the technology that was used in making the call to Plaintiff. (Pl.'s Letter re *ACA Int'l*, on file with the Court.)

We will address each of Defendant's arguments.

### A. 12(b)(1) Motion to Dismiss for Lack of Standing

"The doctrine of standing incorporates both a constitutional element and a non-constitutional, 'prudential' element." *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 174-75 (3d Cir. 2001) (citation omitted). Each of these elements has a separate test, and the plaintiff has the burden of showing that they have standing sufficient to confer subject matter jurisdiction under both tests. *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). Defendant argues that Plaintiff cannot establish either constitutional or prudential standing. We will address constitutional standing before turning to prudential standing.

A challenge to standing under Rule 12(b)(1) can take two forms: a facial challenge or a factual challenge. When a facial challenge is made, the court is restricted to a review of the allegations in the pleadings and any documents referenced therein. *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 177 (3d Cir. 2000). When a factual challenge is made, a party challenges the facts alleged in the pleadings by presenting contrary evidence. *Id.* In a factual challenge to standing, "no presumptive truthfulness attaches to the plaintiff's allegations" and the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Davis*, 824 F.3d at 346 (citation and alterations omitted). Defendant's challenge appears to be factual, given that it primarily criticizes Plaintiff's expressed motives in bringing this action and attaches additional evidence, such as Plaintiff's business webpage and evidence of other lawsuits. Therefore, we will consider all the evidence in the record to assess Defendant's constitutional and prudential challenges to Plaintiff's standing.

### 1. Constitutional Standing

**\*3** A plaintiff must demonstrate their constitutional standing by showing: "(1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 84 of 121

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

of, and (3) a likelihood that the injury will be redressed by a favorable decision." 🚩 *In re Nickelodeon Consumer Privacy Litig.,* 827 F.3d 262, 272 (3d Cir. 2016) (citation and internal quotation marks omitted). Defendant only challenges the injury-in-fact prong of this test. To establish an injury-in-fact, Plaintiff must show that he has suffered "an invasion of a legally protected interest" that is both "actual or imminent, not conjectural or hypothetical" and "concrete and particularized." 🚩 *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citation omitted). The Third Circuit Court of Appeals has held that "the actual or threatened injury required by Art[icle] III may exist *solely by virtue of statutes creating legal rights,* the invasion of which creates standing." 🚩 *In re Horizon Healthcare Servs. Inc. Data Breach Litig.,* 846 F.3d 625, 636 (3d. Cir. 2017) (citation and internal quotation marks omitted) (emphasis in original). [2] A concrete injury has been pled when one sues under a statute alleging "the very injury [the statute] is intended to prevent." 🚩 *Susinno v. Work Out World Inc.,* 862 F.3d 346, 351 (3d Cir. 2017) (citation and internal quotation marks omitted).

Plaintiff has sufficiently alleged an injury-in-fact. When enacting the TCPA, Congress stated that is was motivated by "outrage[ ] over the proliferation of intrusive, nuisance calls to their homes from telemarketers" to "[b]an[ ] such automated or prerecorded telephone calls to the home." TCPA, Pub. Law No. 102-243, § 2(6), (12), 105 Stat. 2394 (1991). Plaintiff has alleged that he received an automated telemarketing call from Defendant that was a nuisance and was annoying and harassing. This is the very injury the statute was intended to prevent. *See* 🚩 *Susinno,* 862 F.3d at 351-52 ("[I]n asserting 'nuisance and invasion of privacy' resulting from a single prerecorded telephone call, [plaintiff's] complaint asserts 'the very harm that Congress sought to prevent,' arising from prototypical conduct proscribed by the TCPA."); *Abramson v. CWS Apt. Homes, LLC,* No. 16-426, 2016 U.S. Dist. LEXIS 146627, at *6, 2016 WL 6236370 (W.D. Pa. Oct. 24, 2016) (finding that plaintiff adequately alleged injury-in-fact under TCPA because he received automated calls in violation of TCPA).

**\*4** Defendant argues that Plaintiff cannot demonstrate an injury-in-fact because he operates a professional judgment recovery business and "a TCPA litigation operation" in which he files TCPA lawsuits either to generate profit or punish telemarketers. (MTD 6, 7.) Defendant contends that Plaintiff's

claim is "based on calls to a business number *that the plaintiff used specifically to drum up TCPA litigation.*" (MTD 5 (emphasis in original).) To support its argument, Defendant attaches a screenshot of Plaintiff's business webpage, in which Plaintiff states:

> If you are reading this website, you are most likely a telemarketer that has illegally called my phone. You are going to be sued. I played along with your telemarketer script in order to find out who you really are.... Put [Plaintiff's cell number] on your do not call list.... [H]ire a really good lawyer."

(MTD 6-7.) The page also has a tab for "James' TCPA Cases," and Defendant notes that Plaintiff filed seven TCPA lawsuits in 2017. (*Id.*) Defendant asserts that, under the circumstances, the calls are neither intrusive nor a nuisance, but rather something that Plaintiff "hopes for and encourages." (*Id.* at 1, 6-7.)

Defendant cites the case of 🚩 *Stoops v. Wells Fargo Bank, N.A.,* 197 F.Supp.3d 782 (W.D. Pa. 2016), in support of its position. In 🚩 *Stoops,* the court granted summary judgment in favor of the defendant in a TCPA action because the plaintiff could not prove that it had sustained an injury-in-fact. Specifically, the plaintiff, a Pennsylvania resident, had purchased more than 35 cell phones, registered them in Florida in order to draw telemarketers targeting "economically depressed" consumers, recorded all telemarketing calls she received in order to file TCPA lawsuits, and admitted at deposition that the phones were used solely for that purpose. 🚩 *Id.* at 788. The court held that, "[b]ecause Plaintiff has admitted that her only purpose in using her cell phones is to file TCPA lawsuits, the calls are not 'a nuisance and an invasion of privacy.' " 🚩 *Id.* at 800.

Even if this Court were bound by the decision in 🚩 *Stoops,* neither the facts nor the procedural posture of this case mirror it. First, the court in 🚩 *Stoops* was deciding a motion for summary judgment and, thus, had the benefit of discovery to support its decision. Here, we are dealing with a Motion to Dismiss in which we have a limited amount of evidence

to consider. Most importantly, Defendant has not introduced any evidence that Plaintiff's phone is used solely for business purposes or "specifically to drum up litigation." Although Plaintiff's website lists his cell phone number as his business number, and Plaintiff himself admitted in an affidavit that he uses his cell phone number for his judgment recovery business, it would be premature to conclude that Plaintiff's *only* purpose in using his cell phone is to file lawsuits. Indeed, we can infer from Plaintiff's affidavit, in which he states that his cell phone is his only phone, that the phone is also used for non-business purposes. With the benefit of discovery, Defendant may ultimately be able to establish its position, but dismissal would be improper at this stage given the lack of evidence to substantiate Defendant's claims. *See Cunningham v. Capital Advance Sols., LLC*, Civil Action No. 17-13050, 736 Fed.Appx. 875, 2018 U.S. Dist. LEXIS 197590, at *8-12, 2018 WL 6061405 (D.N.J. Nov. 20, 2018) (denying motion to dismiss pursuant to 🚩*Stoops* even though plaintiff had filed more than 85 TCPA lawsuits because plaintiff identified "various non-business purposes for which he utilizes his cell phone" and discovery would reveal whether plaintiff was more similar to plaintiff in 🚩*Stoops* ); *Abramson v. Oasis Power LLC*, No. 18-479, 2018 U.S. Dist. LEXIS 129090, at *17, 2018 WL 4101857 (W.D. Pa. July 31, 2018) (denying motion to dismiss TCPA claim pursuant to 🚩*Stoops* because only evidence in record did not indicate that cell phone's sole purpose was to bring TCPA lawsuits).

 **\*5**  In addition, the fact that Plaintiff warns telemarketers on his website that he will sue them if they violate the TCPA does not raise an inference that he "hopes for and encourages" potential defendants, acquires phones to increase his chances of receiving calls, or is doing anything other than exercising his rights. The fact that he "play[s] along" with telemarketing scripts to "find out who [they] really are" is not as devious as Defendant suggests. A plaintiff must know the name of the telemarketer that violated the TCPA in order to bring suit against it, and the content of the message can help prove that it was a solicitation. Defendant also focuses on the fact that it was only after Plaintiff called Defendant back that he received any sort of marketing message. Defendant argues that, before Plaintiff made that call, Plaintiff's only "injury" was a single missed call and a voicemail comprised only of a "hello." Therefore, Defendant argues, any telemarketing was essentially sought out, such that Plaintiff cannot allege he was injured. However, the plain language of the TCPA requires only that a person have "ma[d]e a call ... using any [ATDS] ... to any telephone number assigned to a ... cellular

telephone service." 🚩47 U.S.C. § 227(b)(1). The statute does not require that the plaintiff have answered the call, received any message, or spoken to any person, and Defendant has not cited to any case law interpreting the TCPA to require such involvement. Plaintiff's injury was the receipt of a call in violation of the TCPA.

### *2. Prudential Standing*

The requirement of prudential standing is a judicial self-management tool used "to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." 🔶*Joint Stock Soc'y*, 266 F.3d at 179 (citation omitted). In the Third Circuit, prudential standing requires that:

1. a litigant assert his [or her] own legal interests rather than those of third parties,

2. courts refrain from adjudicating abstract questions of wide public significance which amount to generalized grievances, and

3. a litigant demonstrate that her interests are arguably within the zone of interests intended to be protected by the statute, rule, or constitutional provision on which the claim is based.

🚩*Freeman v. Corzine*, 629 F.3d 146, 154 (3d Cir. 2010) (citation omitted). In this case, Defendant challenges only the third requirement, that Plaintiff's interests fall within the zone of interests intended to be protected by the statute.

Plaintiff has demonstrated that his interests fall within the zone of interests intended to be protected by the TCPA. As stated above, Congress was clear when it enacted the TCPA that its purpose is to protect consumers from intrusive, nuisance automated telemarketing calls. *See also* 🚩*Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 325 (3d Cir. 2015) ("[The] primary concern in enacting 🚩§ 227(b)(1)(B) was to protect [the called] party from unwanted robocalls. This necessarily means that the 'called party' is within the zone of interests protected by the Act."). Again, Plaintiff has alleged that he received an automated marketing call from a company with whom he had no relationship, and it was an annoying, harassing nuisance.

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 86 of 121

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

Defendant argues that, because Plaintiff operates a business that includes filing TCPA lawsuits for profit, his interests do not fall within the zone of interests intended to be protected by the statute. Defendant again cites to 🚩 *Stoops.* On the issue of prudential standing, the court in 🚩 *Stoops* held that the plaintiff did not have prudential standing because "Plaintiff's interests, which include purchasing cell phones with the hope of receiving calls from creditors for the sole purpose of collecting statutory damages, are not 'among the sorts of interests [the TCPA was] specifically designed to protect.' "

🚩 *Stoops*, 197 F.Supp.3d at 805.

In this case, Defendant has not offered any evidence that Plaintiff purchased his cell phone with the hope of receiving calls for the sole purpose of collecting statutory damages. Again, we note that 🚩 *Stoops* was a decision on a motion for summary judgment and had the benefit of complete discovery, including a deposition in which the plaintiff admitted her motives. The only evidence before the Court at this stage demonstrates that Plaintiff has requested in multiple forms that he not be targeted for solicitation—by registering his number on the Do Not Call Registry and stating on his website that he does not wish to receive such calls—and that he derives a profit when companies simultaneously ignore his requests and violate the TCPA. The fact that Plaintiff derives a profit from these lawsuits is exactly what Congress intended. *See* 🚩 47 U.S.C. § 227(b)(3), 🚩 (c)(5) (providing statutory damages to plaintiffs in private actions pursuant to TCPA); *see also Bais Yaakov of Spring Valley v. Educ. Testing Serv.*, No. 13-4577, 2019 U.S. Dist. LEXIS 43985, at *44, 2019 WL 1244949 (S.D.N.Y. Mar. 18, 2019) ("In the absence of authority to the contrary, the Court concludes that Plaintiff's filing of other TCPA lawsuits does not remove it from the zone of interests that the TCPA was intended to protect."); 🚩 *Cunningham v. Rapid Response Monitoring Servs.*, 251 F.Supp.3d 1187, 1197 (M.D. Tenn. 2017) (finding that "professional plaintiff" had prudential standing despite using TCPA for profit because "[t]he TCPA does not merely contemplate self-interested plaintiffs—it encourages them." (citing TCPA's statutory damages provision for private actions) ). Moreover, there is no evidence that Plaintiff hopes he will receive such calls or that he has taken any action to increase his chances of receiving the calls. As stated above, Plaintiff's only intentional engagement with Defendant was calling it back to "find out who [it] really [was]," which is a prerequisite to filing a lawsuit. At this stage, there is no evidence that Plaintiff is doing anything other than "pursu[ing] his rights." *CWS Apt. Homes*, 2016 U.S. Dist. LEXIS 146627, at *7, 2016 WL 6236370 (finding prudential standing even though plaintiff had filed sixteen other TCPA lawsuits); *see also Hossfeld v. Compass Bank*, No. 16-2017, 2017 U.S. Dist. LEXIS 182571, at *39, 2017 WL 5068752 (N.D. Ala. Nov. 3, 2017) (declining to follow *Stoops'* reasoning on prudential standing until factual record more developed).

**\*6** Therefore, at this juncture, Plaintiff has adequately demonstrated that he has suffered an injury-in-fact and that his interests are within the zone of interests the TCPA was intended to protect.

### B. 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

Next, Defendant asserts that this Court lacks personal jurisdiction over it. A district court "typically exercises personal jurisdiction according to the law of the state where it sits." 🚩 *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007); Fed. R. Civ. P. 4(k)(1)(A) (stating that service of summons "establishes personal jurisdiction over a defendant: (A) who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located"). Pennsylvania's long-arm statute authorizes courts to exercise personal jurisdiction "to the fullest extent allowed under the Constitution of the United States...." 42 Pa. Cons. Stat. Ann. § 5322(b). Due process requires that the nonresident defendant have "minimum contacts" with the forum state, and "that the exercise of jurisdiction comport with 'traditional notions of fair play and substantial justice.' " 🚩 *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) (quoting 🚩 *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ).

Two types of personal jurisdiction have evolved from these due process principles: general jurisdiction and specific jurisdiction. General personal jurisdiction is satisfied when a defendant's "affiliations with the State are so continuous and systematic as to render them essentially at home in the forum state." 🚩 *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011) (citation and internal quotation omitted); *see also* 🚩 *Chavez v. Dole Food Co., Inc.*, 836 F.3d 205, 223 (3d Cir. 2016). Specific personal jurisdiction exists when "the

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 87 of 121

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

plaintiff's cause of action arises out of a defendant's forum-related activities, such that the defendant should reasonably anticipate being haled into court in that forum." *Remick, 238 F.3d at 255* (citation and internal quotation marks omitted). In order to assert specific personal jurisdiction, Plaintiff must show that his claim arises out of or relates specifically to activities that Defendant purposefully directed at Pennsylvania. *Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007)* (citations omitted).

When faced with a Rule 12(b)(2) motion to dismiss based on lack of personal jurisdiction, the court must accept the plaintiff's allegations as true and resolve disputed facts in favor of the plaintiff." *Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 368 (3d Cir. 2002)*. If a defendant contends that the Court lacks personal jurisdiction over it, then the plaintiff must "prove by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009)* (quoting *Dayhoff Inc. v. H. J. Heinz Co., 86 F.3d 1287, 1302 (3d Cir. 1996)*). As is the case here, if the district court does not hold an evidentiary hearing, a plaintiff "need only establish a prima facie case of personal jurisdiction." *Id.* (citation omitted).

### 1. Parties' Arguments

Defendant is a Texas corporation with its principal place of business in Texas. Plaintiff does not contend that general personal jurisdiction exists here. Instead, Plaintiff contends that the Court can exercise specific personal jurisdiction over Defendant. Defendant argues that Plaintiff cannot establish that specific personal jurisdiction exists because Plaintiff was not a resident of Pennsylvania, or was not in Pennsylvania, when Defendant called him. In support of this argument, Defendant cites to another TCPA lawsuit that Plaintiff filed in Ohio, *Shelton v. LIG International, LLC*, No. 17-1868, ECF No. 1 (N.D. Ohio, filed Sept. 6, 2017) (*"Shelton v. LIG"*). In that complaint, filed the same month as the Complaint here, Plaintiff alleges that he is an Ohio resident and that, as an Ohio resident, he received calls to his private cell number during the summer of 2017, including on August 1, 3, 4, 8, 9, 21, 22, 23, and 29, 2017. *Shelton v. LIG* Compl. ¶¶ 5-6, 24-48. Defendant notes that the call in this case allegedly took place on August 18, 2017, and that Plaintiff alleges he was a Pennsylvania resident at that time. Defendant adds that, because Plaintiff was neither a resident of Pennsylvania nor in Pennsylvania at

the time of the call, the fact that Plaintiff has a Pennsylvania area code, alone, is not enough to support jurisdiction.

**\*7** As mentioned above, Plaintiff rebuts Defendant's argument with an affidavit in which he states that he attends school in Ohio and has lived there while attending school since August 25, 2017, but that he maintains a permanent residence in Pennsylvania. Moreover, he alleges that he was in Pennsylvania when he received the call in this case, despite having stated in *Shelton v. LIG* that he received calls on August 1, 3, 4, 8, 9, 21, 22, 23, and 29, 2017, as an Ohio resident. Plaintiff also attached a credit card statement from August of 2017 showing that he made purchases in Pennsylvania until August 24, 2017. (Credit Statement, Pl.'s Resp. Ex. 2) Finally, Plaintiff argues that the state with which a plaintiff's area code is associated is generally dispositive evidence that a defendant targeted that forum and subjected itself to personal jurisdiction there.

### 2. Analysis

Plaintiff has satisfied his burden of demonstrating that specific personal jurisdiction exists. In TCPA cases, courts generally find that specific personal jurisdiction exists when a defendant sends a message into the forum state by targeting a phone number in that forum. However, courts do not consistently define whether and when a phone number is "in" a particular forum. Some courts find the location of the area code to be dispositive, while others find the residency of the plaintiff or the location where the call was received to be dispositive. *See, e.g.,* *Abramson v. Agentra, LLC, No. 18-615, 2018 WL 6617819, at *4, 2018 U.S. Dist. LEXIS 212285, at *12 (W.D. Pa. Dec. 18, 2018)* ("At this juncture it is reasonable to infer from the allegations in the amended complaint that Agentra purposefully aimed its conduct at Pennsylvania by contacting directly Abramson's Pennsylvania mobile and residential telephone numbers."); *Hicks v. Health Ins. Innovations, Inc., No. 17-3344, 2017 WL 6764054, at *3, 2017 U.S. Dist. LEXIS 214098, at *4 (D.N.J. Dec. 20, 2017)* (finding that New Jersey court lacked personal jurisdiction over TCPA defendant because plaintiff "merely maintains a cell phone with a New Jersey area code" and was not citizen of New Jersey, did not receive the calls in question in New Jersey, and did not allege that she suffered any harm in New Jersey); *CWS Apt. Homes, 2016 U.S. Dist. LEXIS 146627, at *10, 2016 WL 6236370* (finding area code dispositive of personal jurisdiction in TCPA case and listing cases that have held

same); *Michaels v. Micamp Merch. Servs.*, No. 13-191, 2013 U.S. Dist. LEXIS 159782, 2013 WL 5970340 (W.D. Pa. Nov. 8, 2013) (finding Pennsylvania lacked personal jurisdiction over TCPA defendant because plaintiff was merely present in Pennsylvania when she received call in question, but was not Pennsylvania resident, did not have Pennsylvania phone number, and did not allege that defendant knew she was in Pennsylvania).

Here, we need not decide which factors are dispositive because Plaintiff has demonstrated that he was a Pennsylvania resident when he received the call, was physically present in Pennsylvania, and has a Pennsylvania phone number. Although Plaintiff's explanation of his dual residency is not a model of jurisdictional clarity, he has asserted in an affidavit, as he is required, that he was in fact a Pennsylvania resident at the time he received the call from Defendant. A credit card statement from August of 2017 supports Plaintiff's assertions that he was in Pennsylvania at the time he received the call and was still a Pennsylvania resident at the time. It is common for students to maintain two residences. The date of the move, August 25th, is consistent with a move in preparation for a new school year. Therefore, the statements in Plaintiff's affidavit are not as implausible as Defendant suggests. Moreover, Plaintiff allegedly moved to Ohio after the call in this case was made, but before the calls from the defendant in *Shelton v. LIG* ceased, so it is not unreasonable for Plaintiff to file his *LIG* lawsuit in Ohio and assert that he is an Ohio resident for the purposes of that action. Given Plaintiff's affidavit, credit card statement, and Pennsylvania area code, we need not engage in any further analysis.

**\*8** Plaintiff has also adequately demonstrated the remaining elements of a personal jurisdiction analysis. The call in question was clearly related to Defendant's contacts with Pennsylvania, which included targeting a phone number in Pennsylvania. Moreover, exercising personal jurisdiction over Defendant would not offend the traditional notions of fair play and substantial justice. These traditional notions include analysis of five factors: "the burden on the defendant, the interests of the forum State, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." 🚩 *Grand Entm't Grp. v. Star Media Sales*, 988 F.2d 476, 483 (3d Cir. 1993) (quoting 🚩 *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) ).

Defendant has not argued that it would be burdened by being called into Pennsylvania for litigation of this case, although we can assume some hardship given that it is based in Texas. However, "when minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." 🚩 *Asahi*, 480 U.S. at 114, 107 S.Ct. 1026. With regard to the next two factors, Plaintiff clearly has an interest in obtaining relief under the TCPA, and Pennsylvania has an interest in protecting its residents from TCPA violations. 🚩 *Id.* And with regard to the last two factors, Defendant has not argued that jurisdiction would be unreasonable based on the interstate judicial system's interest in obtaining the most efficient resolution of controversies or the shared interest of the several States in furthering fundamental substantive social policies. We may properly assert personal jurisdiction over Defendant.

### C. 12(b)(6) Motion to Dismiss for Failure to State a Claim

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. A motion under Rule 12(b)(6) tests the sufficiency of the complaint against the pleading requirements of Rule 8(a). Under Rule 8(a)(2), "[a] pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " 🚩 *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting 🚩 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). Courts need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." 🚩 *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. This " 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." 🚩 *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting 🚩 *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955).

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 89 of 121

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

### 1. Relevant Law

As stated above, the section of the TCPA at issue here prohibits "any person within the United States" from "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any [ATDS] ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b) (1). The statute defines ATDS as "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." *Id.* § 227(a)(1). Therefore, to state a cause of action under the TCPA, "a plaintiff must allege that (1) a call was made; (2) the caller used an [ATDS] ...; (3) the telephone number called was assigned to a cellular telephone service; and (4) the caller did not have prior express written consent of the recipient. *Richardson v. Verde Energy USA, Inc.*, No. 15-6325, 2016 U.S. Dist. LEXIS 175642, at *5, 2016 WL 7375028 (E.D. Pa. Dec. 19, 2016) (citing 47 U.S.C. § 227(b)(1)(A)(iii) ).

Defendant challenges only the second of the above requirements, that it used an ATDS. Defendant argues that the D.C. Circuit's recent decision in *ACA International* confirms that Plaintiff cannot prevail on his TCPA claim because the court in that case narrowed the definition of an ATDS such that Plaintiff's allegations that Defendant used such a system no longer state a claim. Plaintiff counters that his allegations are broad enough to encompass Defendant's use of an ATDS that still qualifies as such even after *ACA International*, and that only discovery will reveal whether Defendant used an ATDS within the meaning of the TCPA.

### 2. Regulatory and Case Law Background

**\*9** Pursuant to authority granted to the Federal Communication Commission ("FCC") in the TCPA,[3] the FCC has issued declaratory orders that, among other things, have expanded the kinds of devices that they consider to have the "capacity" to function as autodialers, including a device called a "predictive dialer." In an order issued in 2003, the FCC explained that:

A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. ... *In some instances, a consumer answers the phone only to hear "dead air" because no telemarketer is free to take the call.*

*In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Red. 14014, 13 ¶ 8 n. 31 (2003) ("2003 Order") (emphasis added). The FCC went on to find that such dialers are autodialers because "[t]he hardware, *when paired with certain software*, has the *capacity* to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers," even though, "in most cases, telemarketers program the numbers to be called into the equipment." *Id.* at 205 ¶ 131 (emphasis added). In 2008, the FCC addressed a challenge to, and reaffirmed, its finding that predictive dialers are autodialers. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Red. 559, 566 ¶¶ 12-14 (2008) ("2008 Order"). The FCC again reaffirmed its finding that predictive dialers are considered autodialers in an order issued in 2015. *In re Rules & Regulations Implementing the Tel. Consumer Protection Act of 1991*, 30 FCC Red. 7991, 7974 ¶ 10 (2015) ("2015 Order"). In the 2015 Order, the FCC clarified that "the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities." *Id.* at 7974 ¶ 16. Thus, even if a device does not have the current capacity to generate and dial phone numbers, if the device can be paired with software to do so in the future, it qualifies as an ATDS whether or not the software has in fact been installed—as the FCC has described predictive dialers since 2003. The FCC also declined to adopt a rule that would "clarify[ ] that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention," *id.* at 7976 ¶ 17, thus implying that a device could still be considered an ATDS even if it required some level of human intervention to generate and dial numbers.

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 90 of 121

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

### 3. Recent Statutory Interpretation

In 🔖 *ACA International v. FCC*, the D.C. Circuit upheld certain challenges to the FCC's 2015 Order. First, the court struck down the portions of the 2015 Order stating that a device is considered an ATDS even if it cannot presently generate or dial phone numbers without human intervention, but has the capacity to do so with additional software. 🔖 *ACA Int'l*, 885 F.3d at 700. [4] Next, the court struck down the portions of the 2015 Order stating that a device could qualify as an ATDS even if it requires some human intervention to generate or dial phone numbers. 🔖 *Id.* at 703. Notably, the court "did not specify that a particular ATDS definition was wrong or what types of devices would qualify as an ATDS." *Wilson v. Quest Diagnostics Inc.*, No. 18-11960, 2018 U.S. Dist. LEXIS 212023, at *6 (D.N.J. Dec. 10, 2018).

**\*10** The Third Circuit adopted 🔖 *ACA International* in 🔖 *Dominguez v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018), and stated that, "[i]n light of the D.C. Circuit's holding, we interpret the statutory definition of an autodialer as we did prior to the issuance of 2015 Declaratory Ruling." 🔖 *Id.* at 119. The court then stated that a device is an ATDS if it has "the present capacity to function as an autodialer." 🔖 *Id.* at 119, 121. Thus, predictive dialers are still considered autodialers so long as they have the present capacity—rather than a hypothetical future capacity, with the addition of software—to generate and dial phone numbers. *See, e.g.*, *Might v. Capital One Bank United States, N.A.*, No. 18-716, 2019 WL 544955, at *3, 2019 U.S. Dist. LEXIS 21379, at *8-9 (W.D. Okla. Feb. 11, 2019) (holding that, after *ACA Int'l*'s treatment of predictive dialers, "the issue is whether the calls about which Plaintiff complains were the product of a machine that was capable at that time of generating random and sequential numbers, not whether the call to him was the result of such."); *Collins v. Nat'l Student Loan Program*, No. 17-5345, 2018 U.S. Dist. LEXIS 214251, at *14, 2018 WL 6696168 (D.N.J. Dec. 20, 2018) (holding that device with predictive capabilities was not an ATDS because plaintiff failed to prove on summary judgment that device "has the 'present capacity' to initiate autodialed calls to cell phone numbers without modifications to the system"); 🔖 *Richardson v. Verde Energy USA, Inc.*, 354 F.Supp.3d 639, 650 (E.D. Pa. 2018) ("[T]he Court concludes that a

predictive dialing device that merely dials numbers from a stored list of numbers—rather than having generated those numbers either randomly or sequentially—is not an ATDS."); *Gonzalez v. Ocwen Loan Servicing, LLC*, No. 18-340, 2018 U.S. Dist. LEXIS 153480, at *15, (M.D. Fla. Sep. 5, 2018) ("Having considered the statute [after *ACA Int'l*], this Court concludes that the definition of an ATDS *would not include* a predictive dialer that lacks the capacity to generate random or sequential telephone numbers and dial them; but it *would include* a predictive dialer that has that capacity." (emphasis in original) ).

In the context of a motion to dismiss, a plaintiff must allege facts that make it plausible that the defendant used a device that had the present capacity to generate and dial phone numbers. [5] In *Wilson v. Quest Diagnostics Inc.*, the court analyzed 🔖 *ACA International* and 🔖 *Dominguez* and found that the plaintiff had properly pleaded that the defendant used an ATDS. 2018 U.S. Dist. LEXIS 212023 at *8-9. She alleged that the defendant used a predictive dialer, as evidenced by "a momentary pause before someone started speaking to her," and that the defendant was attempting to collect a debt owed by someone other than her. *Id.* at *8. The court found that these allegations raised a plausible inference that the defendant used a predictive dialer that had the present capacity to function as an autodialer. *Id.* at *8-9; *see also* 🔖 *Maes v. Charter Commc'n.*, 345 F.Supp.3d 1064, 1070 (W.D. Wis. 2018) (finding plaintiff adequately pleaded use of ATDS when complaint stated that plaintiff heard dead air after answering, because predictive dialers can still be autodialers after *ACA Int'l*); 🔖 *Whitehead v. Ocwen Loan Servicing, LLC*, No. 18-470, 2018 U.S. Dist. LEXIS 182386, at *11, 2018 WL 5279155 (M.D. Fla. Oct. 24, 2018) ("Whitehead's allegations—hearing a pause when she answered before hearing a voice plus her allegations that Ocwen used an ATDS—satisfy her burden at this stage in the proceedings." (citation omitted) ); 🔖 *Sieleman v. Freedom Mortg. Corp.*, No. 17-13110, 741 Fed.Appx. 631, 2018 U.S. Dist. LEXIS 129698, at *12-14, 2018 WL 3656159 (D.N.J. Aug. 2, 2018) (finding that plaintiff adequately alleged use of ATDS, post-*ACA Int'l* and -*Dominguez*, when he alleged that there was pause after he picked up and that he did not actually qualify for service being offered).

### 4. Application to Plaintiff's Complaint

Case 1:25-cv-01410-JKM   Document 23-4   Filed 11/21/25   Page 91 of 121

Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)

**\*11**  Here, Plaintiff's allegations raise a plausible inference that Defendant used a predictive dialer with the present capacity to generate and dial phone numbers. First, Plaintiff has alleged that Defendant used an ATDS. (Compl. ¶ 27.) He further alleged that "the call to the Plaintiff was transmitted using technology capable of *generating* thousands of similar calls per day." (*Id.* ¶ 5 (emphasis added).) He supports this assertion with allegations that he argues are indicative of an ATDS: he had no prior relationship with Defendant; the geographic distance between the parties; the "distinctive click and pause, followed by the Defendant's telemarking representative saying 'hello' " in the voicemail Defendant left him; and at least nine other callers have identified calls from the same number as "spam." (*Id.* ¶¶ 26-28, 30, 36-37.)

Defendant argues that these allegations only support the inference that it used a device with the "potential, theoretical capability" to function as an autodialer. (Def.'s Letter re *ACA Int'l.*) Defendant adds that Plaintiff should have alleged that Defendant "placed a call to Plaintiff using a device that could make calls without human intervention." (Def's Letter re *ACA Int'l.*) However, Plaintiff's allegations are similar to those in *Wilson* and the other cases cited above that denied motions to dismiss on the same grounds. Moreover, we cannot require a plaintiff to make allegations regarding the technical aspects of a device, including the precise level of human intervention needed to place a call, when he or she has no way of knowing those details prior to discovery. *See Battaglia v. Quicken Loans, Inc.*, No. 18-1104, 2019 U.S. Dist. LEXIS 17782, at *6, 2019 WL 430042 (W.D.N.Y. Feb. 4, 2019) (refusing to require plaintiff to allege details regarding defendants' calling technology at pleading stage because "it would be virtually impossible" and "would make callers virtually immune to TCPA claims" (citation and internal quotation marks omitted) ); *Wilson*, 2018 U.S. Dist. LEXIS 212023, at *8-9 (denying motion to dismiss based on allegation of

dead air after answering because, "[d]uring discovery, the parties can explore the actual configuration of the dialing equipment used to call Plaintiff, as such evidence could shed light on whether Quest used a device capable of making autodialed calls" (citation omitted) ); *Whitehead*, 2018 U.S. Dist. LEXIS 182386, at * 11, 2018 WL 5279155 (holding that allegations regarding dead air and use of ATDS are sufficient to state claim because "[t]here is no way for Plaintiff to know the technological capabilities of the device(s) used to place the calls at issue in this case short of Plaintiff learning that information in discovery.").

Defendant adds that an ATDS was not used to place the call at issue because informal discovery has shown that Plaintiff "was called only after a National Gas representative selected a specific number to call and physically clicked on a 'connect' button in order to initiate the call." (Def's Letter re *ACA Int'l.*) Even if we were to accept Defendant's interpretation of *ACA International*—that a device cannot be considered an ATDS if it requires any human intervention to function— there is no evidence in the record regarding the device used in this case. Discovery may in fact reveal that the device at issue here required some amount of human intervention to function. However, this is not the time to address the existence or ramifications of such intervention. Plaintiff's limited allegations regarding use of an ATDS are sufficient to survive dismissal.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion will be denied. An appropriate Order follows.

### All Citations

Not Reported in Fed. Supp., 2019 WL 1506378

---

## Footnotes

1    Courts discussing the TCPA use the terms "ATDS" and "autodialer" interchangeably to refer to automatic telephone dialing systems.

2    We note that 🚩 *Horizon* was decided after 🚩 *Spokeo, Inc. v. Robins*, ⸺ U.S. ⸺, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016), and 🚩 *Doe v. National Board of Medical Examiners*, 199 F.3d 146 (3d Cir. 1999). Defendant relied on 🚩 *Spokeo* and 🚩 *Doe* for the proposition that "[m]erely invoking a federal statute is

**Shelton v. National Gas & Electric, LLC, Not Reported in Fed. Supp. (2019)**

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 92 of 121

insufficient, on its own, to confer standing." (MTD 5.) However, the court in 🚩*Horizon* acknowledged 🚩*Doe* as being "not ... entirely consistent" and stated that cases subsequent to 🚩*Doe* "have been decidedly in favor of allowing individuals to sue to remedy violations of their statutory rights, even without additional injury." 🚩*Horizon*, 199 F.3d at 635-36. The court in 🚩*Horizon* also interpreted 🚩*Spokeo* to mean that "there are some circumstances where the mere technical violation of a procedural requirement of a statute cannot, in and of itself, constitute an injury in fact." *Id.* at 638. In this case, we are not dealing with a "mere technical violation of a procedural requirement of a statute," but rather a violation of the substantive rights conferred in the TCPA. Importantly, the 🚩*Horizon* court stated that, "[a]lthough it is possible to read the Supreme Court's decision in 🚩*Spokeo* as creating a requirement that a plaintiff show a statutory violation has caused a 'material risk of harm' before he can bring suit, we do not believe that the Court so intended to change the traditional standard for the establishment of standing." *Id.* at 637-38 (internal citation omitted). Accordingly, we believe that the rule in *Horizon*—that a substantive statutory violation, alone, creates an injury—is the most appropriate to apply in this situation.

3    The TCPA explicitly confers upon the FCC "the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution." TCPA, Pub. Law No. 102-243, § 2(13).

4    The court's primary concern was that smartphones—the cellular devices used by "a significant majority of American adults"—would fall into this category, such that "an uninvited call or message from a smartphone violates the statute even if autodialer features were not used to make the call or send the message." 🚩*Id.* at 697.

5    We note that some courts do not require any factual allegations with regard to autodialers other than that the defendant used one. *See, e.g., Abella v. Student Aid Ctr., Inc.*, No. 15-3067, 2015 U.S. Dist. LEXIS 147299, at *6, 2015 WL 6599748 (E.D. Pa. Oct. 30, 2015) (denying motion to dismiss because plaintiff alleged that defendant used ATDS); *Gross v. Weinstein, Weinburg & Fox, LLC*, 123 F.Supp.3d 575, 580 (D. Del. 2015) ("Plaintiffs have adequately alleged a claim on which relief may be granted.... Plaintiffs allege that WWF 'used, controlled, and/or operated automatic telephone dialing systems' in violation of the [TCPA]."). We need not decide whether a plaintiff is required to make additional factual allegations because, as discussed below, Plaintiff here has already done so.

---

**End of Document**        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 863601
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Margo SIMMONS, individually and on behalf
of all others similarly situated, Plaintiff,

v.

AUTHOR REPUTATION PRESS LLC, Defendant.

Civil Action No. 24-12330-BEM
|
Signed March 18, 2025

**Attorneys and Law Firms**

Anthony I. Paronich, Paronich Law, P.C., Hingham, MA, for Plaintiff.

Andrew M. Schneiderman, O'Hagan Meyer, Needham, MA, for Defendant.

**MEMORANDUM AND ORDER**

MURPHY, Judge

**\*1** For the reasons stated herein, the Court DENIES Defendant Author Reputation Press LLC's request to bifurcate and ADOPTS Plaintiff Margo Simmons's proposed case schedule.

**I. Introduction**

Plaintiff Margo Simmons alleges that Defendant Author Reputation Press LLC violated the Telephone Consumer Protection Act of 1991 ("TCPA") by telemarketing to phone numbers on the National Do Not Call Registry. Dkt. 1 ¶ 3. Plaintiff makes these allegations individually and on behalf of a putative class of other individuals similarly situated. *Id.* ¶¶ 31–38.

Defendant asks the Court to bifurcate the issues in this case so that it can "address the viability of Plaintiff's individual TCPA claim before engaging in costly and time-consuming class discovery." Dkt. 15 at 5–6. In its briefing, Defendant identifies a non-exhaustive list of seven defense-related "issues" to be explored during the first phase of litigation. *See id.* at 6. Defendant's proposed schedule contemplates that this phase will take approximately four months, with motions for

summary judgment and trial to follow on the individual claim. *Id.* at 9–10.

**II. Legal Standard**

Federal Rule of Civil Procedure 26 affords district courts "broad discretion" in managing the timing and sequencing of discovery. 🚩 *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998); *see also* Local Rule 16.3(a)(3)(B) (providing for courts' ability to "sequence discovery into two or more stages"). Likewise, the decision to segregate certain claims for separate disposition under Federal Rule of Civil Procedure 42 "is a matter peculiarly within the discretion of the trial court." *Gonzalez-Marin v. Equitable Life Assur. Soc. of U.S.*, 845 F.2d 1140, 1145 (1st Cir. 1988). [1]

Notwithstanding this authority, "[b]ifurcation is ordinarily the exception and not the rule." *Hewlett-Packard Co. v. Genrad, Inc.*, 882 F. Supp. 1141, 1158 (D. Mass. 1995); *see also* 🚩 *Wilson v. Quest Diagnostics, Inc.*, 2019 WL 7560932, at \*4 (D.N.J. Aug. 22, 2019) (highlighting potential unfairness and inefficiency of bifurcation).

**\*2** Faced with similar requests, "[c]ourts in this district have bifurcated individual merits and class discovery where doing so served the interests of justice given the allegations and circumstances of particular cases." *Katz v. Liberty Power Corp., LLC*, 2019 WL 957129, at \*2 (D. Mass. Feb. 27, 2019) (granting bifurcation in TCPA case); *Osidi v. Assurance IQ, LLC*, 2022 WL 623733, at \*1 (D. Mass. Mar. 3, 2022) (same).

**III. Discussion**

Defendant has not shown here that bifurcation would "serve[ ] the interests of justice." *Katz*, 2019 WL 957129, at \*2; *Osidi*, 2022 WL 623733, at \*1. *Katz* and *Osidi*—two cases wherein the court granted bifurcation of individual TCPA claims—are both distinguishable. In each of those cases, the court was presented with a clear, documented deficiency in the plaintiff's individual claim. [2] *See* Defendants' Memorandum in Support of Motion to Bifurcate Individual and Class Discovery at 5–7, *Katz*, Civ. No. 18-10506 (demonstrating, with record evidence, reasonable suspicion that the plaintiff's phone number would not qualify for TCPA protection); Local Rule 16.1(d) Joint Statement at 6–7, *Osidi*, Civ. No. 21-11320 (highlighting "pure legal" issue of TCPA consent, made salient and relevant by the defendant's record evidence,

requiring "minimal, if any, additional discovery" before summary judgment).

Here, by contrast, Defendant has provided the Court no specific basis on which to conclude that Plaintiff's individual claims are particularly vulnerable to early defeasance. Rather, Defendant has merely pointed out that individual claims are subject to individual defenses, but that is true for all putative class-action plaintiffs.

**IV. <u>Conclusion</u>**

For these reasons, Defendant's request for bifurcation is DENIED. The Court ADOPTS Plaintiff's proposed pretrial schedule. *See* Dkt. 15 at 7–8.

**So Ordered.**

**All Citations**

Slip Copy, 2025 WL 863601

---

## Footnotes

1    Defendant frames its proposal as a plan for discovery, Dkt. 15 at 5–6, but that plan also contemplates separate summary judgment briefings and trials on the individual claims, Dkt. 15 at 9–10, implicating Rule 42. *See* *Wilson v. Quest Diagnostics, Inc.*, 2019 WL 7560932, at *2 (D.N.J. Aug. 22, 2019) (framing a similar dispute under Rule 42); *cf.* *DeRubeis v. Witten Techs., Inc.*, 244 F.R.D. 676, 678–82 (N.D. Ga. 2007) (ordering pure sequencing of discovery in a trade secret case). At bottom, both rules place the decision squarely within the discretion of the trial court. *See* *Crawford-El*, 523 U.S. at 598; *Gonzalez-Marin*, 845 F.2d at 1145. However, courts have expressed particular concern against "routine[ ] order[ing]" of separate trials. *Abbott Biotechnology Ltd. v. Centocor Ortho Biotech, Inc.*, 55 F. Supp. 4d 221, 222 (D. Mass. 2014) (quoting *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 795 F. Supp. 501, 503 (D. Mass. 1992), *aff'd*, 36 F.3d 1147 (1st Cir. 1994), *abrogated on other grounds by* *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)); *see also* *Chapman ex rel. Est. of Chapman v. Bernard's Inc.*, 167 F. Supp. 2d 406, 417 (D. Mass. 2001) (placing burden on party seeking bifurcation under Rule 42).

2    The Court does not intend to suggest that a "clear, documented deficiency" is either a necessary or sufficient condition for bifurcation, only that the circumstances here are unlike those in *Katz* or *Osidi*.

---

**End of Document**                                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Disagreed With by *Wiggins v. Bank of America, North America,*
S.D.Ohio, September 22, 2020

2019 WL 4382204
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Caroline SIMON, individually and on behalf
of all others similarly situated, Plaintiff,

v.

ULTIMATE FITNESS GROUP, LLC d/b/
a Orangetheory Fitness, and Does 1 Through
10, inclusive, and each of them, Defendants.

No. 19 Civ. 890 (CM)
|
Signed 08/19/2019

**Attorneys and Law Firms**

Todd Friedman, Law Offices of Todd M. Friedman,
Woodland Hills, CA, for Plaintiff.

Cary Brian Samowitz, Rachael C. Kessler, Cassandra
Beckman Widay, DLA Piper US LLP, New York, NY, Edward
Dean Totino, Baker & McKenzie LLP, Los Angeles, CA, for
Defendants.

**MEMORANDUM DECISION AND ORDER
DENYING MOTIONS TO DISMISS OR STAY**

McMahon, C.J.:

**\*1** Plaintiff Caroline Simon brings this class action
against Ultimate Fitness Group, LLC d/b/a Orangetheory
Fitness ("Defendant" or "Orangetheory") and ten unnamed
employees or agents of Orangetheory, alleging violations
of the Telephone Consumer Protection Act of 1991, 47
U.S.C. § 227 ("TCPA"). The TCPA prohibits the making and
sending of telemarketing calls and texts through an automated
telephone dialing system ("ATDS" or "autodialer") without
the consent of the recipient.

Orangetheory now moves to dismiss the Class Action
Complaint (hereinafter referred to as the "Complaint") for
lack of personal jurisdiction and for failure to state a claim.
In the event that the motion to dismiss is denied, Defendant

also moves to stay the proceedings while awaiting the
Federal Communications Commission's ("FCC's") release of
the revised definition of an ATDS.

For the reasons set forth below, all of Orangetheory's motions
are denied.

**I. Factual Background**
The following facts are drawn from the allegations in the
Complaint, which are presumed true for the purposes of these
motions.

Plaintiff Caroline Simon ("Plaintiff" or "Simon") is a resident
of New York. (Compl. dated Jan. 31, 2019, Dkt. No. 11
("Compl.") ¶ 4.)

The Complaint originally stated in error that Orangetheory
had its principal place of business in New York City. (Compl.
¶ 5.) However, Plaintiff now agrees that Orangetheory is a
Delaware corporation with its principal place of business and
headquarters in Florida. (See Pl.'s Mem. of Law in Opp. Mot.
to Dismiss, Dkt. No. 36 ("PL MTD Opp.") at 4 n.2; Def.'s
Mem. of Law in Supp. of Mot. to Dismiss, Dkt. No. 32 ("Def.
MTD Br.") at 1; see also Decl. of Charlene Barone in Supp. of
Def.'s Mot. to Dismiss, Dkt. No. 33 ("Barone Decl.") ¶¶ 2–3.)

In or about May 2018, Simon received an unsolicited text
message from Defendant on her cell phone. (Compl. ¶ 8.) The
last four digits of the sender's number were "5443." (*Id.*) In
or about June 2018, Simon continued to receive unsolicited
text messages from Defendant, sent from Defendant's "text
number" 797-979. (*Id.* ¶ 9.) Defendant allegedly contacted
or attempted to contact Simon from telephone numbers
confirmed to belong to Defendant, including but not limited
to 797-979. (*Id.* ¶ 11.)

Although Simon does not allege what the text messages said,
she alleges Defendant sent her "spam advertisements and/or
promotional offers." (*Id.* ¶ 9.) She alleges the text messages
were sent via Defendant's "SMS blasting platform," which
she alleges is classified as a prohibited "automatic telephone
dialing system" (ATDS) under the Telephone Consumer
Protection Act ("TCPA"). (*Id.* ¶ 10.)

Simon was never a customer of Orangetheory, and never
provided her cellular telephone number to it. (*Id.* ¶ 14.)
Defendant and its agents never received Simon's prior express
consent to receive unsolicited text messages, pursuant to

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 96 of 121

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

47 U.S.C. § 227(b)(1)(A). (*Id.*) Defendant's texts were not for emergency purposes, as defined by 47 U.S.C. § 227(b)(1)(A). (*Id.* ¶ 12.)

**\*2** Simon now brings this action on behalf of a putative class of individuals within the United States who also received unsolicited text messages from Defendant within four years of the date of Simon's filing of her Complaint. (*Id.* ¶ 16.) While Simon is not sure exactly how large the putative class is, she believes the class could contain hundreds of thousands of people. (*Id.* ¶ 18.)

With respect to injury, Simon alleges that she and members of the putative class were harmed by Defendant's acts because the unsolicited text messages caused the class members to "incur certain telephone charges or reduce cellular telephone time for which Plaintiff and the Class members previously paid, and invad[ed] the privacy of said Plaintiff and the Class members." (*Id.* ¶ 19.)

## II. Procedural History

In her Complaint filed on January 31, 2019, Simon asserts two causes of action on behalf of herself and the class: first, for negligent violations of the TCPA (Count 1), and, second, for knowing and/or willful violations of the TCPA (Count 2). (*Id.* ¶¶ 28–37.) The Complaint seeks $500 in statutory damages for each of Defendant's negligent violations of the TCPA (*Id.* ¶¶ 28–31), and up to $1,500 in statutory damages for each of Defendant's knowing and/or willful violations of the TCPA. (*Id.* at 6.)

Orangetheory now moves to dismiss the Complaint against it for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), and for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (Dkt. No. 31.) Should those motions fail, Orangetheory asks the Court to stay Simon's action pending new FCC rules that might affect the definition of an autodialer under the TCPA. (Dkt. No. 34.)

## III. Discussion

### A. Defendant's Motion to Dismiss Under Rule 12(b)(2) for Lack of Personal Jurisdiction Is Denied

#### 1. Applicable Legal Standard

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendants. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003); *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). The plaintiff's burden of proof "depends upon the procedural context in which the jurisdictional challenge is raised." *Navaera Scis., LLC v. Acuity Forensic Inc.*, 667 F. Supp. 2d 369, 373 (S.D.N.Y. 2009). Where, as here, no evidentiary hearing has been held, plaintiffs "need only make a *prima facie* showing of personal jurisdiction." *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (citation omitted). "This showing may be made through the plaintiff's own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *Id.* The pleadings, affidavits, and other supporting materials are construed in a light most favorable to plaintiffs, and all doubts are resolved in their favor. *Id.*

Because Simon's claim is based on the TCPA, which is silent about service of process, state law informs whether the court has personal jurisdiction over Orangetheory. *Sea Tow Servs. Int'l, Inc. v. Pontin*, 472 F. Supp. 2d 349, 358 (E.D.N.Y. 2007) (quoting *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990)).

To determine whether personal jurisdiction exists over a non-domiciliary, the court engages in a two-step inquiry. *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007)). The court first applies the long-arm statute of the forum state, to see whether it permits the exercise of personal jurisdiction over the defendants. If the laws of the forum state permit jurisdiction, the court then considers whether the exercise of such jurisdiction comports with constitutional due process. *See Best Van Lines*, 490 F.3d at 244.

**\*3** Because the Court is located in New York, the Court applies New York law. *See Chloe*, 616 F.3d at 163. Under New York's long-arm statute, there are two ways to establish personal jurisdiction over a defendant: (1) "general jurisdiction" under N.Y. C.P.L.R. § 301; and (2) "specific jurisdiction" under N.Y. C.P.L.R. § 302. As will be discussed,

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 97 of 121

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

only the latter constitutes a possible basis for asserting personal jurisdiction over Orangetheory in this case.

### 2. The Court Has Specific Jurisdiction over Orangetheory with Respect to Simon's Claim

Simon originally plead in error that Defendant's principal place of business was in New York City. (Compl. ¶ 5.) If that were true, there would be no question that Defendant is "at home" in New York and is thus subject to the general jurisdiction of this Court. *Daimler AG v. Bauman*, 571 U.S. 117, 136–37 (2014). However, because Orangetheory is actually a Delaware corporation with its principal place of business in Florida, the Court can only exercise specific jurisdiction over it—that is, jurisdiction that arises out Simon's and the putative class members' claims with respect to Defendant's conduct alleged in the suit. (Pl. MTD Opp. at 4); *see Daimler*, 571 U.S. at 137.

Defendant does not challenge that this Court has specific jurisdiction over Defendant with respect to Simon's claim and the claims of any New York residents who may be in the putative class. (Def. MFD Br. at 4 ("... the Court presumably has specific jurisdiction over [Plaintiff's] claim against Defendant....").) Defendant argues, however, that Supreme Court's recent decision in *Bristol-Myers Squibb v. Superior Court of California*, 137 S. Ct. 1773 (2017), prevents the Court from exercising personal jurisdiction over Defendant with respect to the claims of putative class members who are not New York residents.

### 3. The *Bristol-Myers Squibb* Decision

Defendant argues that *Bristol-Myers Squibb v. Superior Court of California*, 137 S. Ct. 1773 (2017), requires this Court to dismiss the claims of absent, non-New York class members, because the Court lacks specific jurisdiction over Orangetheory with respect to those claims. (Def. MTD Br. at 4.)

In *Bristol-Myers Squibb*, a group of 678 plaintiffs filed a mass action, under eight identical complaints, against Bristol-Myers Squibb in California state court, for injuries caused by one of Bristol-Myers Squibb's drugs, Plavix. *Bristol-Myers Squibb*, 137 S. Ct. at 1778. Only 86 of the plaintiffs

were California residents. *Id.* The other 592 plaintiffs were residents of other States, and so had not suffered their injuries within California. *Id.* The California Supreme Court found that the lower courts had personal jurisdiction over Bristol-Myers Squibb, given the company's extensive contacts with California and the similarities between the claims of the California plaintiffs and the non-California plaintiffs. *Id.* at 1779. The Supreme Court reversed: without an actual connection between the out-of-state plaintiffs' claims and the defendant's activities in California, California state courts' exercise of personal jurisdiction over Bristol-Myers Squibb with respect to the non-California plaintiffs' claims would violate the Due Process Clause of the Fourteenth Amendment. *Id.* at 1781, 1783.

The Supreme Court explicitly "[left] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1784. The Supreme Court therefore left it to the lower courts to determine whether *Bristol-Myers Squibb*'s holding applies to nationwide class actions brought pursuant to Fed. R. Civ. P. 23. In practice, this question has fallen to the district courts; as far as this Court is aware, no circuit court has yet to weigh in on the matter. *See Suarez v. Cal. Nat. Living, Inc.*, 17-cv-9847, 2019 WL 1046662, at *6 (S.D.N.Y. Mar. 5, 2019).

**\*4**  District courts generally take one of three approaches.

First, many courts hold that *Bristol-Myers Squibb* does not apply outside of the context of mass tort cases. *See, e.g.*, *Sanchez v. Launch Tech. Workforce Solutions, LLC*, 297 F. Supp. 3d 1360, 1365 (N.D. Ga. 2018); *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 126 (D.D.C. 2018); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. 09-md-2047, 2017 WL 5971622, at *12–*14 (E.D. La. Nov. 30, 2017); *Cabrera v. Bayer Healthcare, LLC*, LA 17-cv-8525, 2019 WL 1146828, at *8 (C.D. Cal. Mar. 6, 2019); *Gress v. Freedom Mortg. Corp.*, No. 1:19-cv-375, 2019 WL 2612713, at *6–*7 (M.D. Pa. June, 26, 2019); *Hicks v. Rous. Baptist Univ.*, 17-cv-629, 2019 WL 96219, at *5–*6 (E.D.N.C. Jan. 3, 2019). Under this view, there is no constitutional unfairness in subjecting a defendant to the class claims of out-of-state plaintiffs in Rule 23 class actions, as long as a court has jurisdiction over the class representative's

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 98 of 121

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

claims. *Sanchez,* 297 F. Supp. 3d at 1366. The due process issue is avoided because Rule 23 class certification already protects a defendant's due process rights. *Id.* at 1365–66 (quoting *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797 (1985)).

Another set of district courts holds the opposite: the same due process concerns that animated *Bristol-Myers Squibb* necessarily apply to nationwide class actions in federal courts. They hold there is no principled way to distinguish between the strictures of the Fourteenth Amendment Due Process Clause and the Fifth Amendment Due Process Clause. *See, e.g., Gazzillo v. Ply Gem Indus., Inc.,* 17-cv-1077, 2018 WL 5253050, at *7 (N.D.N.Y. Oct. 22, 2018); *DeBernardis v. NBTY, Inc.,* No. 17 C 6125, 2018 WL 461228, at *2 (N.D. Ill. Jan. 18, 2018); *Greene v. Mizuho Bank, Ltd.,* 289 F. Supp. 3d 870, 874–75 (N.D. Ill. 2017); *Maclin v. Reliable Reports of Tex., Inc.,* 314 F. Supp. 3d 845, 850–51 (N.D. Ohio 2018).

A third set of district courts opts to defer this issue until class certification: since unnamed plaintiffs are merely *potential* class members who may never actually be joined to this action, it would be premature for a court to decide whether there is specific jurisdiction over the defendant(s) with respect to their claims. *See Suarez,* 2019 WL 1046662, at *6 (citing *Gonzalez v. Costco Wholesale Corp.,* 16-cv-2590, 2018 WL 4783962, at *8 (E.D.N.Y. Sept. 29, 2018)); *Chernus v. Logitech, Inc.,* No. 17-cv-673, 2018 WL 1981481, at *7–*8 (D.N.J. Apr. 27, 2018); *see also Campbell v. Freshbev LLC,* 322 F. Supp. 3d 330, 337 (E.D.N.Y. 2018) (citing the "unsettled nature of the law following *Bristol-Myers*" as another reason to defer on personal jurisdiction).

### 4. The Court Defers This Question Until Class Certification

Orangetheory "believes that it would be preferable to make this argument at the time that Plaintiff moves to certify a class." (Def. MTD Br. at 4 n.2.) Orangetheory represents that it made its motion now only to preserve the issue of personal jurisdiction, which is waived if not raised in a responsive pleading or motion to dismiss. (*Id.; see also* Reply in Supp.

of Def.'s Mot. to Dismiss Pl.'s Class Action Compl., Dkt. No. 38 ("Def. MTD Reply") at 2.)

**\*5** The Court agrees that it is appropriate to defer questions regarding the class claims until class certification. *See Campbell,* 322 F. Supp. 3d at 337; *Gonzalez,* 2018 WL 4783962, at *8. "[I]n contrast to *Bristol-Myers,* there are no actual 'non-forum state plaintiffs' or putative class members to speak of yet in this case, making Defendants' motion to dismiss or strike patently premature." *Bank v. CreditGuard of Am.,* No. 18-cv-1311, 2019 WL 1316966, at *12 (E.D.N.Y. Mar. 22, 2019). The Court will consider this issue when and if Plaintiff moves for class certification. The Court notes that the issue is preserved.

### B. Defendant's Motion to Dismiss Count 1 (Negligent Violation of the TCPA) and Count 2 (Knowing or Willful Violation of the TCPA) for Failure to State a Claim under Rule 12(b)(6) Is Denied

#### 1. Applicable Legal Standard

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), the Court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor. *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir. 2006) (internal citation omitted), The claims will survive the motion to dismiss as long as they contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The plaintiff must do more, however, than merely attach "labels and conclusions" to bald factual assertions. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

#### 2. The Telephone Consumer Protection Act (TCPA)

Congress enacted the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, ("TCPA") to hold telemarketers accountable for spamming customers with intrusive nuisance calls. *See Mims v. Arrow Fin. Servs., LLC,* 565 U.S. 368, 370–71 (2012). The TCPA makes it unlawful to "make any call (other than a call made for emergency purposes or made

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 99 of 121

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

with the prior express consent of the called party) using any *automatic telephone dialing system* ... to any telephone number assigned to a ... cellular telephone service ... unless such call is made solely to collect a debt owed to or guaranteed by the United States[.]" 47 U.S.C. § 227(b)(1)(a)(iii) (emphasis added).

The TCPA defines an "automatic telephone dialing system," or "ATDS," as "equipment which has the *capacity*—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added).

The definition of an "automatic telephone dialing system"—and the attendant concept of "capacity"—are central to the statute.

"The FCC has the authority to promulgate regulations implementing the TCPA." *King v. Time Warner Cable Inc.*, 894 F.3d 473, 474 (2d Cir. 2018) (citing 47 U.S.C. § 227(b)(2)). "In 2015, the FCC issued a Declaratory Ruling and Order that, among other things, attempted to clarify the TCPA's requirement that, to qualify as an autodialer under the statute, a device must have the 'capacity' to dial random and sequential numbers." *Id.* (citing *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7973–74 (2015) (the "2015 Ruling")). "The Commission asserted that an expansive interpretation of the term 'capacity' was consistent with both Congress's intent that the TCPA have a broad protective reach, and with the Commission's previous orders. Accordingly, the FCC 'declined to define a device's "capacity" in a manner confined to its "present capacity." Instead, the agency construed a device's "capacity" to encompass its "potential functionalities" with modifications such as software changes.' " *Id.* (quoting *ACA Int'l v. FCC*, 885 F.3d 687, 693–94 (D.C. Cir. 2018) (in turn quoting 2015 Ruling)).

**\*6** In 2018, the 2015 Ruling was struck down by the D.C. Circuit in *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018). The D.C. Circuit held that, per the text of the statute, the ATDS' *present* functions must include the ability to generate random or sequential numbers, even if that function was turned off when the system sent the offending calls or text messages in question. *Id.* at 699.

After the D.C. Circuit vacated the 2015 Ruling, the FCC sought public comment on the meaning of "capacity" under the TCPA's definition of an autodialer. *See Consumer and Governmental Affairs Bureau Seeks Comment on Interpretation of the Telephone Consumer Protection Act in Light of the D.C. Circuit's ACA International Decision*, 83 Fed. Reg. 26,284 (June 6, 2018). The notice stated that the agency would take comments until October 24, 2018. The FCC has taken no further action.

In the meantime, on June 29, 2018, the Second Circuit published a decision adopting the definition of "capacity" articulated by the D.C. Circuit in *ACA International*:

> In sum, we conclude that the term "capacity" in the TCPA's definition of a qualifying autodialer should be interpreted to refer to a device's current functions, absent any modifications to the device's hardware or software. That definition does not include every smartphone or computer that might be turned into an autodialer if properly reprogrammed, but does include devices whose auto dialing features can be activated, as the D.C. Circuit suggested, by the equivalent of "the simple flipping of a switch."

*King*, 894 F.3d at 481 (citing *ACA Int'l*, 885 F.3d at 696).

At present—in the absence of any valid agency rule interpreting "capacity"—the Second Circuit's decision in *King* is binding on this Court.

### 3. Simon Has Plausibly Plead that Orangetheory Used an ATDS

To state either a negligent violation or willful violation claim under the TCPA, a plaintiff must allege the following basic elements: "(1) [a defendant] called her on her cell phone; (2) using an automated dialing system or pre-recorded voice; (3) without her consent." *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 725 (S.D.N.Y. 2015), *rev'd on other grounds*, 894 F.3d 473 (2d Cir. 2018); *see also Rotberg v. Jos. A. Bank Clothiers, Inc.*, 345 F. Supp. 3d 466, 474 (S.D.N.Y. 2018).

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 100 of 121

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

The parties agree that Simon has pleaded the first and third elements. Simon alleges that she received text messages from Defendant on multiple occasions between May and June 2018. (Compl. ¶ 9.) Since a text message is the same as a "call" under the TCPA, Simon has shown the first element of her claim. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 666–67 (2016). In addition, Simon also alleges that she has never been a customer of Defendant's and that she has never given Defendant her cell phone number. (Compl. ¶ 14.) This allows the Court to draw a direct inference that Defendant never received Simon's "prior express consent." 47 U.S.C. § 227(b)(1)(A)(iii).

Defendant instead moves to dismiss both TCPA claims (Counts 1 and 2) on the ground that Simon has not plausibly plead enough facts suggesting the use of an ATDS.

I find that she has.

Courts find that the use of a "short code telephone number" plausibly indicates that the Defendant used an ATDS. *Rotberg*, 345 F. Supp. 3d at 476–77; *see also* *Krady v. Eleven Salon Spa*, No. 16-cv-5999, 2017 WL 6541443, at *4 (E.D.N.Y. July 28, 2017), *report and recommendation adopted*, 2017 WL 6542462 (E.D.N.Y. Dec. 21, 2017) (collecting cases on short codes and other indicia of ATDS). In addition, courts have found that if the texts are of an "impersonal, generic nature," they plausibly indicate the use of an ATDS. See *Krady*, 2017 WL 6541443, at *4; *see also* *Unchageri v. YuppTV USA, Inc.*, No. 17-CV-3862, 2018 WL 1184737, at *3 (N.D. Ill. Mar. 7, 2018).

*7 Here, Simon asserts that she received the text message via "Defendant's SMS blasting platform," which plausibly alleges that the text messages were sent widely and to multiple numbers. (Compl. ¶ 10.) Although Simon does not allege the specific contents of the text messages, she alleges Defendant sent her "spam advertisements and/or promotional offers"—which plausibly suggest impersonal, generic messages. Most persuasively, Simon claims to have received several unsolicited text messages over a period of two months from a variety of numbers, including the short code text number "797-979," which, as other courts have held, is plausible indicia of an ATDS. (*Id.* ¶ 9.) At this stage, Plaintiff has done all she must to plead this element of her claim.

Defendant's motion to dismiss Counts 1 and 2 of the Complaint for failure to state a claim under Rule 12(b)(6) is, therefore, DENIED.

### C. Defendant's Motion to Stay Is Denied

Defendant has filed a separate motion asking the Court stay the case until the FCC promulgates a new final rule, or issues a new declaratory ruling, defining "autodialer" and "capacity." Defendant identifies two grounds for such a stay: *first*, the Court's inherent power to issue stays to control its docket, and, *second*, the Court's authority to issue a stay under the doctrine of primary jurisdiction.

For the following reasons, Orangetheory's motion is denied without prejudice to renewal at a later stage of the litigation.

### 1. Defendant Has Not Shown It Is Entitled to a Stay

In deciding whether to grant a stay under its inherent powers, the Court must consider: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007).

Defendant fails to make the required showing on any of these factors. Orangetheory has not made *any* showing—let alone a strong one—that any ruling by the FCC would likely exclude the device used by Orangetheory to spam Simon, so as to enable it to succeed on the merits. In addition, Orangetheory has not demonstrated irreparable injury; it notes only that it is potentially on the hook for substantial damages, given the putative nationwide class. Monetary damages, of course, do not by themselves constitute irreparable injury.

Simon, on the other hand, persuasively argues that she would be injured by a stay, particularly because discovery has yet to commence, and evidence is at risk of being lost. This injury, which is both likely and irreparable, far outweighs the injury posed by a potential future judgment for money damages.

Finally, Orangetheory argues that the public interest favors issuing a stay, because of the "risk of disparate interpretations of the TCPA in the absence of clear guidance from the

FCC." (Mem. of Law in Supp. of Def.'s Mot. to Stay, Dkt. No. 35 ("Def. Stay Br.") at 15.) However, the Second Circuit's interpretation of "capacity" in *King*, according to Orangetheory, is in line with nearly all other circuits that have reached the issue. (*See id.* at 12–14.) The risk seems small. If and when the FCC rules, we will deal with it.

### 2. The Primary Jurisdiction Doctrine Does Not Mandate a Stay

Defendant also argues that the abstention doctrine of primary jurisdiction requires staying the case.

"The doctrine of primary jurisdiction allows a federal court to refer" or stay "a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222–23 (2d Cir. 1995). In the Second Circuit, the "inquiry has generally focused on four factors:

**\*8** (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether a prior application to the agency has been made.

*Ellis v. Tribune Television Co.*, 443 F.3d 71, 82–83 (2d Cir. 2006). Courts "must also balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *Id.* at 83 (internal quotation omitted).

Defendant argues that "the FCC is currently considering the precise questions at issue here," because, in its June 2018 request for comments, it asked the following questions: "What constitutes an [ATDS]? How "automatic" must dialing be for equipment to qualify as an [ATDS]? Must such a system dial numbers without human intervention? If equipment

cannot itself dial random or sequential numbers, can that equipment be an [ATDS]?" (Def. Stay Br. at 3.)

Putting aside for the moment that agency requests for comment are often broader than the scope of the final rule, the takeaway from Defendant's brief is that degree of human interaction with the purported autodialer lies at the heart of this lawsuit. But neither Simon nor this Court knows anything about the system that was allegedly used to send text messages on behalf of Orangetheory. The Court certainly does not know if "human intervention" is what will tip the scales in favor of either plaintiff or defendant, and therefore whether this case is susceptible of resolution by the FCC's rulemaking —if that is even what the FCC intends to do. *See Gould v. Farmers Ins. Exch.*, 326 F.R.D. 530, 531 (E.D. Mo. 2018) ("[T]he FCC has not indicated whether it will pursue a formal rulemaking or some other proceeding following the collection of comments on this issue" of what constitutes "capacity."). Put differently, "a stay is not prudent at this time because, at a minimum, discovery of the nature of [Defendant's] calling system and [Defendant's] contacts with Plaintiffs is required before any definitive legal standard under the TCPA can be applied to [Defendant's] conduct herein." *Somogyi v. Freedom Mortg. Corp.*, No. 17-cv-6546, 2018 WL 3656158, at *1 (D.N.J. Aug. 2, 2018).

Finally, even if Orangetheory had identified the specific question at issue and the Court were convinced that the FCC was taking action would resolve it—I am not—delay and prejudice would still justify denying the motion. It is well known that, "If the FCC does proceed with a formal rulemaking, such a process will likely take years[.]" *Gould*, 326 F.R.D. at 532. Further, any final rule promulgated by the FCC would almost certainly be subject to a pre-enforcement challenge—and would likely be stayed pending the resolution of that challenge, which could also take years. In the meantime, it is clear that critical evidence, including records from any third parties that Orangetheory may have contracted with for its telephone marketing, may be lost or destroyed.

That said, it is possible that the regulatory landscape will have changed significantly once discovery concludes. Therefore, while the Court denies Orangetheory's motion to stay the case now, that ruling is without prejudice to Orangetheory's renewal of its motion, if and when: (1) the issues for trial are narrowed; (2) the scope and timeline of the FCC's action becomes clearer; and (3) a stay would not pose irreparable harm to Plaintiff and the putative class.

### IV. Conclusion

**\*9**  For the aforementioned reasons, Defendant's motion to dismiss for lack of personal jurisdiction is denied; the motion to dismiss for failure to state a claim is denied; and the motion to stay is denied.

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 31 and 34.

This constitutes the written decision and order of the Court.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4382204

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 603561
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

John TABOR, Plaintiff,
v.
NEW YORK CITY, et al., Defendants.

No. 11 CV 0195 FB.
|
Feb. 23, 2012.

**Attorneys and Law Firms**

Duncan Archie Peterson, Peterson, Delle, Cave, LLP., New York, NY, for Plaintiff.

Matthew Modafferi, New York City Law Department, New York, NY, for Defendants.

*REPORT AND RECOMMENDATION*

POLLAK, Magistrate J.

 **\*1** On January 13, 2011, plaintiff John Tabor commenced this action, pursuant to 42 U.S.C. § 1983, and the Fourth, Fifth, and Fourteenth Amendments to the Constitution, naming as defendants the City of New York, Detective James Ropenus, Detective McLaughlin, Police Officer Singletary, District Attorney ("DA") Richard Brown, Assistant District Attorney ("ADA") Marjorie Fisher, ADA Keisha Espinal, ADA Lauren Parsons, ADA Kenneth Applebaum, and Police Commissioner Raymond Kelly. Plaintiff alleges that his constitutional rights were violated when defendants acted in accordance with the Queens District Attorney's Office's policy and practice of refusing to investigate cases when an accused individual refuses to sign a pre-arraignment waiver.

Currently pending before this Court is plaintiff's motion to amend his Complaint to name two additional defendants from the Queens DA's Office—ADA Mike Schindhelm and Detective Investigator Mary Picone. Defendants oppose the amendment on grounds of futility and cross-move to dismiss the plaintiff's claims against D.A. Brown, ADAs Fisher, Espinal, Parsons, Applebaum, and Police Commissioner Kelly. In a separate letter motion dated September 16, 2011,

defendants move to bifurcate discovery on plaintiff's *Monell* claims against the City.

For the reasons set forth below, this Court: 1) denies plaintiff's motion to amend; 2) recommends that plaintiff's claims against DA Brown, and ADAs Fisher, Espinal, Parsons, and Applebaum be dismissed; and 3) grants defendants' motion to bifurcate *Monell* discovery until after the motion for summary judgment is decided; and 4) reserves decision on defendant's motion to bifurcate the trial.

*FACTUAL BACKGROUND*

The Complaint alleges that from 1999 until November 14, 2005, plaintiff John Tabor resided with Rashida Hassan and her teenaged daughter, Aneesha Hassan, in a two-story home located at 188–25 Keeseville Avenue, St. Albans, New York. (Compl.[1] ¶¶ 14–15). Mr. Tabor's mother lived on the first floor of the house, while Mr. Tabor and the Hassans lived on the second floor. (*Id.* ¶¶ 17, 18). According to the Complaint, Aneesha was having problems in school and objected to Mr. Tabor's efforts to impose discipline and encourage her to focus on her school work. (*Id.* ¶¶ 28–38).

On November 14, 2005, Tabor was arrested in Connecticut; he subsequently pleaded guilty to burglary, and was incarcerated until May 2008. (*Id.* ¶¶ 41–42). Upon his release in May 2008, Tabor returned to live with Ms. Hassan at the Keeseville Avenue address. (*Id.* ¶ 44). On or about March 15, 2009, Ms. Hassan moved out of Tabor's apartment to an apartment in Ozone Park, Queens. (*Id.* ¶¶ 45–46).

On March 22, 2009, Aneesha lodged a complaint with the police, alleging that on November 15, 2005, Tabor raped her. (*Id.* ¶ 47). She claimed that the two of them were alone in the house at the time, and that she screamed during the entire incident. (*Id.* ¶¶ 49, 51, 52). Aneesha further claimed that she "was absolutely certain" that the rape occurred on the last day that Tabor was home prior to his arrest. (*Id.* ¶ 53).

 **\*2** The two detectives who interviewed Aneesha—Detective Ropenus and Officer Singletary—also interviewed Aneesha's mother, Ms. Hassan, who not only stated that she was home the last day before Tabor was arrested, but who also did not corroborate Aneesha's statement. Ms. Hassan neither stated that she heard Aneesha scream, nor that Aneesha appeared traumatized in any way that day. (*Id.* ¶¶ 61, 62).

On March 25 and 26, 2009, the detectives went to the Tabor residence to speak to Mr. Tabor, but nobody answered the door, despite plaintiff's claim that on both occasions, Tabor, his mother, his niece and her four small boys were at home. (*Id.* ¶¶ 63–67). On March 29, 2009, the detectives arrived at the home and asked Tabor to accompany them to the precinct. (*Id.* ¶ 68). When informed that he was being charged with raping Aneesha on November 15, 2005, Tabor claims that he told Detective Ropenus, " 'That's impossible! I was in jail in Connecticut." ' (*Id.* ¶¶ 74, 78).

Plaintiff alleges that the officers' investigation was "incomplete and woefully inadequate." (*Id.* ¶ 82). They failed to obtain a search warrant for the premises to collect physical evidence, failed to perform a physical inspection of the house to determine that the house was small and sounds were audible throughout, failed to determine that Mrs. Tabor was home that day and living on the first floor, and relied solely on the evidence presented by Aneesha, "whose statement was verifiably false and who had a motive to lie." (*Id.* ¶¶ 69, 70, 71, 80). The Complaint alleges that there were other steps that the officers could have taken but failed to take, including obtaining Tabor's criminal history, which would have shown that he was incarcerated on November 15, 2005. (*Id.* ¶¶ 91, 92).

With respect to the Queens DA's Office and the various ADAs named in the Complaint, plaintiff alleges that as a matter of practice and policy, the DA's Office conducts pre-arrangement interviews of defendants as part of the "Central Booking Interview Program." (*Id.* ¶ 97). Plaintiff alleges that the DA's Office refuses to conduct proper investigations where the defendant does not waive his Fifth Amendment right to remain silent and agree to this pre-arraignment interview. (*Id.* ¶ 98).

In Tabor's case, he alleges that at the time of his arrest, he was assigned a member of the Queens County 18b panel to represent him; this attorney was a former Queens County ADA. (*Id.* ¶¶ 103–04). Plaintiff declined to sign an arraignment waiver under New York Criminal Procedure Law ¶ 180.80, which the DA's Office asks for "in order to gain more time to investigate their case." (*Id.* ¶ 108). Plaintiff claims that when defendants refuse to sign the arraignment waiver, the DA's Office has a practice and policy of failing to conduct proper investigations of defendants' cases. (*Id.* ¶ 109). Plaintiff claims that because he failed to sign the arraignment waiver, the ADAs and police failed to investigate the contradictions in Aneesha's statement, failed to interview

witnesses, failed to obtain a search warrant, and failed to investigate where plaintiff was on the day of the alleged rape. (*Id.* ¶¶ 111, 112). Despite defense counsel's representation that plaintiff was incarcerated on November 15, 2005, the DA's Office failed to obtain plaintiff's parole records or determine if he was in fact in jail at the time of the alleged rape. (*Id.* ¶¶ 114–129).

**\*3** On April 3, 2009, the grand jury returned an indictment charging Tabor with rape on November 13, 2005. (*Id.* ¶¶ 139–40). The ADA informed defense counsel that the complaining witness had changed the date on which she alleged the rape occurred. (*Id.* ¶¶ 138, 139).

On March 26, 2010, a jury acquitted Tabor of all charges, and he was released after spending a year in Rikers Island. (*Id.* ¶¶ 154–56). Plaintiff brings claims of false arrest, malicious prosecution, violation of plaintiff's rights under the New York State Constitution, a *Monell* claim on the practice and policy of not investigating cases in the absence of an arraignment waiver, and loss of familial relationship.

### 1. *Plaintiff's Motion to Amend*

By Notice of Motion dated August 18, 2011, plaintiff moves to amend his Complaint, pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, to add two new defendants: ADA Mike Schindhelm and Detective Investigator Mary Picone. Plaintiff alleges that these two individuals were responsible for conducting the unconstitutional pre-arraignment interview in which he alleges that he was told, "if there is something you would like us to investigate concerning this incident, you must tell us now so that we can look into it." (Pl.'s Mem.[2] at 1). Plaintiff claims that because he exercised his Fifth Amendment right to remain silent, the DA's Office and the NYPD failed to investigate the circumstances surrounding the rape allegations. (*Id.*)

#### A. *Motion to Amend—Standards*

As a general matter, Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleading once as a matter of right within 21 days after serving it, or, if the pleading is one to which a response is required, within 21 days after the filing of a responsive pleading, motion to dismiss, motion for a more definite statement, or motion to strike. Fed.R.Civ.P. 15(a)(1). Otherwise, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed.R.Civ.P. 15(a)(2). The Rule provides that

"[t]he court should freely give leave when justice so requires," *id.,* and courts have liberally construed this directive. *See* *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also* *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 283 (2d Cir.2000), *cert. denied,* 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000); *Chapman v. YMCA of Greater Buffalo,* 161 F.R.D. 21, 24 (W.D.N.Y.1995) (noting that "[t]he stated purpose of Rule 15 is to allow a party to correct an error that might otherwise prevent the court from hearing the merits of the claim").

Although the decision to grant a party's motion to file an amended pleading lies within the trial court's discretion, *see* *Foman v. Davis,* 371 U.S. at 182; *see also* *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995); *In re 'Agent Orange' Prods. Liab. Litig.,* 220 F.R.D. 22, 24 (E.D.N.Y.2004), the court should consider a number of factors, "including undue delay, bad faith, undue prejudice to the opposing party, or futility" *id.* (citations omitted), or whether the amendment is " 'unlikely to be productive.' " *Id.* (quoting *Ruffalo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993)); *see also* *Foman v. Davis,* 371 U.S. at 182; *SCS Commc'ns, Inc. v. Herrick Co., Inc.,* 360 F.3d 329, 345 (2d Cir.2004); *Fariello v. Campbell,* 860 F.Supp. 54, 70 (E.D.N.Y.1994) (opining that the "party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial") (citation omitted). [3] Where there has been "inordinate delay" without a "satisfactory explanation" offered and prejudice to the non-moving party is shown, the Court may deny the motion to amend. *Scottish Air Int'l., Inc. v. British Caledonian Group. PLC,* 152 F.R.D. 18, 29 (S.D.N.Y.1993) (citing *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990)).

### B. *Analysis*

**\*4** Plaintiff contends that his motion is timely and that there has been no undue delay because he filed his motion to amend shortly after counsel was informed of the identity of the two individuals who conducted the pre-arrangement interview. (Pl.'s Mem. at 3). Plaintiff further argues that there has been no "bad faith" in that plaintiff has agreed to defendants' counsel's requests for adjournment of the time to Answer and to delay depositions. (*Id.*) Finally, plaintiff argues that there will be no prejudice as defendants have long been on notice of this issue since the original Complaint mentions the basis for this claim. (*Id.*)

Defendants appear to object to the proposed amendment only on grounds of futility, Defendants contend that the claim against ADA Schindhelm is futile because he is entitled to absolute immunity for his role in conducting the pre-arrangement interview. (Defs.' Mem. [4] at 3). Defendants further claim that, contrary to plaintiff's allegations, Mary Picone is not an NYPD officer, but rather is an employee of the DA's Office, and as such, she is entitled to the same absolute immunity, making her addition to the Complaint futile as well. (*Id.* at 4).

### C. *Prosecutorial Immunity*

It is well-established that prosecutors are entitled to absolute immunity for conduct "intimately associated with the judicial phase of the criminal process." *Van de Kamp v. Goldstein,* 555 U.S. 335, 335, 129 S.Ct. 855, 172 L.Ed.2d 706 (2009) (citing *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). To determine whether specific conduct is "intimately associated with the judicial phase of the criminal process," *id.,* courts apply a "functional approach" that looks to the function being performed by the prosecutor. *See* *Hill v. City of New York,* 45 F.3d 653, 660 (2d Cir.1995). Thus, while the Second Circuit has declined to "establish a bright line commencement-of-proceedings test," *Barbera v. Smith,* 836 F.2d 96, 100–101 (2d Cir.1987), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989); *Powers v. Coe,* 728 F.2d 97, 104 (2d Cir.1984), absolute immunity for prosecutorial conduct is "broadly defined" and encompasses " 'virtually all acts, regardless of motivation, associated with [a prosecutor's] function as advocate." ' *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994).

The Supreme Court in *Imbler* emphasized that a prosecutor's conduct is subject to absolute immunity "both in deciding which suits to bring and in conducting them in court." 424 U.S. at 424. Thus, this immunity includes "not only their conduct of trials, but all of their activities that can be fairly characterized as closely associated with the conduct of litigation or potential litigation," including the choice not to initiate a prosecution. *Barrett v. United States,* 798 F.2d 565, 571–72 (2d Cir.1986). *See also* *Trammell v. Coombe,* No. 95 CV 1145, 1996 WL 601704 at \*2–3 (S.D.N.Y.1996).

In this regard, absolute prosecutorial immunity has generally been found in cases where some type of formal proceeding had been commenced or was being commenced by the conduct at issue. *See* Barbera v. Smith, 836 F.2d at 101 (citing *Ybarra v. Reno Thunderbird Mobile Home Village,* 723 F.2d 675, 678 (9th Cir.1984) (holding prosecutor absolutely immune from suit for destruction of exculpatory evidence where defendant arrested but not indicted). Thus, when the prosecutor has been presented with probable cause, the prosecutor's role is more likely to be advocatory rather than investigatory. *See* Consin v. Small, 325 F.3d 627, 633 (5th Cir.2003) (citing *Hill v. City of New York,* 45 F.3d at 662–63)). Here, even before the ADAs conducted the pre-arraignment interview, the officers had probable cause to arrest plaintiff based on the statements of the complaining witness. *See* Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir.2006).

**\*5** By contrast, where no proceedings have begun and the prosecutor is acting in an investigative capacity, such as by providing the police with legal advice on investigative techniques, qualified immunity generally applies. *See McCray v. City of New York,* Nos. 03 CV 9685, 03 CV 9974, 03 CV 10080, 2007 U.S. Dist. LEXIS 90875, 2007 WL 4352748 (S.D.N.Y. Dec. 11, 2007); *see also* Barrett v. United States, 798 F.2d at 573 (finding only qualified immunity where defendant was only a prospective defendant).

At the same time, however, the Supreme Court has made it clear that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom....Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence." Imbler v. Pachtman, 424 U.S. at 431, n. 33.

In *Barbera v. Smith,* the Second Circuit divided the pre-litigation functions of a prosecutor into two categories: "(1) the supervision of and interaction with law enforcement agencies in acquiring evidence which might be used in a prosecution, and (2) the organization, evaluation, and marshaling of this evidence into a form that will enable the prosecutor to try a case or to seek a warrant, indictment, or

order." 836 F.2d at 100 (citing *Powers v. Coe,* 728 F.2d at 103, 104). Where the prosecutor's conduct falls within that first category and consists mostly of actions that are of "a police nature," in that the prosecutor's actions seem primarily to involve directing the police investigation, the prosecutor is only entitled to qualified immunity to the extent that the conduct at issue "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Buckley v. Fitzsimmons, 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

As the Court in *Imbler* explained, acts undertaken by a prosecutor in preparing to initiate a judicial proceeding are protected by absolute immunity, because to "expos[e] the prosecutor to liability for the initial phase of his prosecutorial work could interfere with his exercise of independent judgment at every phase of his work ... thus, we shield the prosecutor seeking an indictment because any lesser immunity could impair the performance of a central actor in the judicial process." 475 U.S. at 341–43. Thus, courts have held that prosecutors are entitled to absolute immunity when accused of a failure to investigate. *See, e.g.,* Crews v. County of Nassau, No. 06 CV 2610, 2007 WL 4591325, at *51–52 (E .D.N.Y. Dec. 27, 2007) (prosecutor entitled to absolute immunity for failure to investigate alibis at defense counsel's request); Marczeski v. Hardy, 213 F.Supp.2d 135, 141 (D.Conn.2002) (noting that "this court has held that claims based on an alleged failure to investigate come within the absolute immunity afforded by *Imbler"* ); Woolfolk v. Thomas, 725 F.Supp. 1281, 1283 (N.D.N.Y.1989) (holding that the "decision to investigate is sufficiently closely related to the decision not to prosecute" so that absolute immunity applied).

**\*6** Plaintiff argues that because the pre-arrangement interview conducted by ADA Schindhelm and Investigator Picone was pre-arraignment, pre-grand jury, pre-trial, and before charges had been brought, the timing of the interview makes it clear that it falls within the category of investigative work. (Pl.'s Reply [5] at 4). Moreover, plaintiff contends that the specific words used by these prospective defendants support his theory that the defendants were engaging in an investigative function. (*Id.*) ("If there is something you would like us to investigate concerning this incident, you must tell us now so we can look into it").

While the defendant had not been indicted at the time of the pre-arraignment interview, he had been arrested based on the statement of the complaining witness that she had been raped. The purpose of the pre-arraignment interview was for the prosecution to evaluate the evidence and decide whether to present the case to the Grand Jury. *See* 🚩 *Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (finding acts taken in evaluating evidence and preparing to seek indictment covered by absolute immunity).

While there is no dispute that the prosecutor used the words "investigate" and "look into," it is also undisputed that plaintiff did not provide the prosecutors with any information that he felt they should investigate. He exercised his right to remain silent. Unlike a *Brady* violation, where the prosecutor is in possession of exculpatory information that he is duty bound to disclose, *see* 🚩 *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), here the prosecutor is charged with failing to independently conduct an investigation for evidence or witnesses that might exonerate the defendant. *See* 🚩 *Armstead v. Town of Harrison,* 579 F.Supp. 777, 780–71 (S.D.N.Y.1984) (stating that although the plaintiff sought to impose a duty on the prosecutor to act as an advocate and investigate for the defendant, "these duties are grossly inconsistent with an adversary system of justice and there is no support for imposing them." *United States v. Schneider,* 395 F.3d 78, 89 (2d Cir.2005); *see also People v. Benard,* 63 Misc.2d 176, 184, 620 N.Y.S.2d 242 (holding that ADA's duty to seek out and disclose exculpatory material is not triggered unless the defendant specifically requests this information). In *Trammel v. Coombe,* the court held that the decision not to investigate is so closely intertwined with the decision not to prosecute that to deny immunity for a failure to investigate would offer an obvious means to circumvent the doctrine of prosecutorial immunity. No. 95 CV 1145, 1996 WL 601704, at *3 (S.D.N.Y. Oct.18, 1996) (concluding that the prosecutors were entitled to absolute immunity for failing to investigate plaintiff's claimed violations).

Having considered the arguments of both sides, the Court finds that an amendment to add ADA Schindhelm as a defendant would be futile because his conduct at the pre-arraignment interview, regardless of the words used, was not the type of "investigative function" that normally falls outside the category of conduct subject to absolute immunity. Rather, he was acting in connection with his function as a prosecutor, evaluating the evidence in order to determine whether to present the case to the grand jury; thus, he

receives absolute immunity. To hold otherwise would not only penalize prosecutors and put them at risk for offering defendants an opportunity to speak to them before presenting cases to the grand jury, but it would impose upon them an obligation to investigate that goes beyond clearly established principles of constitutional law.

**\*7** Similarly, with respect to defendant Picone, as a non-lawyer employee of the DA's Office, she is "entitled to the same degree of immunity as the [district attorney] himself for [her] activities while assisting the investigation and prosecution" of the case. 🚩 *Hill v. City of New York,* 45 F.3d at 660; 🚩⚠ *Davis v. Grusemeyer,* 996 F.2d 617, 632 (2d Cir.1993) (holding that investigators performing work in connection with a criminal prosecution are entitled to the same absolute immunity as to the prosecutor); *see also Goncalves v. Reynolds,* 198 F.Supp.2d 278 (W.D.N.Y.2001) (finding investigator for sheriff's department who was working at the direction of the DA's Office entitled to absolute immunity).

Accordingly, because the Court finds that the amendment would be futile, the Court denies plaintiff's motion to amend to add ADA Schindhelm and Investigator Picone as defendants.

## II. *Defendants' Motion to Dismiss*

Defendants cross-move to dismiss the district attorney defendants to the extent that they are sued in their official capacities, arguing that the basis for a suit for money damages against a District Attorney or an assistant district attorney is actually a suit against the State of New York and barred by the Eleventh Amendment. (*See* Defs'. Mem. at 5 (citing 🚩 *Ying Jin Gan v. City of N.Y.,* 996 F.2d 522, 536 (2d Cir.1993); 🚩 *Rodrigues v. Weprin,* 116 F.3d 62, 66 (2d Cir.1997)). Defendants also contend that like ADA Schindhelm, the DA, and other ADAs are entitled to absolute immunity for the reasons discussed above. (*See* Defs'. Mem. at 6 (citing 🚩 *Buckley v. Fitzsimmons,* 509 U.S. at 273; and 🚩 *Imbler v. Pachtman,* 424 U.S. at 431)).

Defendants also seek to dismiss the claims asserted against Police Commissioner Kelly for his lack of any personal involvement in the alleged deprivation of constitutional rights. (*See* Defs'. Mem. at 7 (quoting 🚩 *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (holding that the

"personal involvement of defendant in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983"))). Since plaintiff has voluntarily agreed to withdraw his claims against Commissioner Kelly, there is no need to address this argument.

A. *Standards on Motion to Dismiss*

It is well-established that courts evaluate a motion for judgment on the pleadings, pursuant to Rule 12(c), under the same standard as a motion to dismiss under Federal Rule of Procedure 12(b)(6). [6] *See, e.g., Hayden v. Paterson,* 594 F.3d 150, 157, n. 4 (2d Cir.2010). When deciding a motion to dismiss a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Second Circuit has stated that a court must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993); *see also Gorman v. Consol. Edison Corp.,* 488 F.3d 586, 591–92 (2d Cir.2007). In addition, the court must give plaintiff's claims "a liberal construction." *Johnson v. New York City Transit Auth.,* 639 F.Supp. 887, 891 (E.D.N.Y.1986) (citing *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)), *aff'd in part and vacated in part on other grounds,* 823 F.2d 31 (2d Cir.1987). However, the court is not required to accept the truth of legal conclusions couched as factual allegations. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986).

**\*8** In *Bell Atlantic Corporation v. Twombly* and *Ashcroft v. Iqbal,* the Supreme Court clarified the pleading standards under which courts are to evaluate a motion to dismiss, "arguably shift[ing] pleading standards from 'simple notice pleading' to a 'more heightened form of pleading.' " *Barbosa v. Continuum Health Partners, Inc.,* 716 F.Supp.2d 210, 214 (S.D.N.Y.2010) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

Now, when deciding a Rule 12(b)(6) motion to dismiss, the court should consider whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. at 1940 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S.Ct. at 1949; *see also Hayden v. Paterson,* 594 F.3d 150, 160–61 (2d Cir.2010). Under this heightened pleading standard, labels, conclusions, and mere recitation of the elements of a cause of action will not suffice. *Ashcroft v. Iqbal,* 129 S.Ct. at 1950; *see also Bell Atl. Corp. v. Twombly,* 550 U.S. at 545. Instead, a plaintiff must provide enough factual support that, if true, would "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. at 555. However, while the plausibility standard does not rise to the level of a probability requirement, the plausibility standard nevertheless demands that a plaintiff demonstrate " 'more than a sheer possibility that a defendant has acted unlawfully.' " *Barbosa v. Continuum Health Partners, Inc.,* 716 F.Supp.2d at 215 (quoting *Ashcroft v. Iqbal,* 129 S.Ct. at 1949). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *see also Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995), *cert. denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). Ultimately, when the well-pleaded facts allow no more than an inference of a "mere possibility of misconduct," and plaintiff has only alleged, rather than shown, an entitlement to relief, the federal pleading standard of Rule 8(a)(2) has not been satisfied. *Ashcroft v. Iqbal,* 129 S.Ct. at 1950.

B. *Analysis*

In opposing defendants' motion, plaintiff argues that defendants have attempted to expand the categories of conduct for which absolute immunity applies to encompass all acts undertaken by the individual prosecutors. (Pl.'s Mem. in Opp. [7] at 2–3). As with ADA Schindhelm, plaintiff argues that the unconstitutional pre-arraignment interview, arraignment waiver, and "bad faith failure by Defendants to carry out any form of investigation into Mr. Tabor's case" is conduct of an investigator, not a prosecutor, and therefore,

any individual associated with these events is not subject to absolute immunity. (*Id.* at 3).

**\*9** However, as discussed above in analyzing plaintiff's proposed claims against ADA Schindhelm, the Court finds that the conduct engaged in by the prosecutors during the pre-arraignment interview was not investigatory in nature, but rather constituted part of the process by which the prosecutor made a determination whether to proceed to the grand jury with the charges. Similarly, any alleged failure of the prosecutors to investigate Tabor's case beyond what actions they did take is not a duty imposed on prosecutors under the law as it currently exists.

Beyond these allegations, plaintiff's Complaint fails to allege what specific violative conduct was engaged in by ADAs Fisher, Applebaum, Espinal, and Parsons. It does not appear that they were even present during the pre-arraignment interview. Thus, based on the facts as currently alleged in the Complaint, it appears that they would be protected by absolute immunity. Absolute immunity has been found to apply even where the prosecutor knowingly prosecutes an innocent person, *see Shmueli v. City of New York,* 424 F.3d 231, 236–39 (2d Cir.2005); where there is an absence of probable cause, ⚑ *Bernard v. County of Suffolk,* 356 F.3d 495, 503 (2d Cir.2004); where the prosecutor relies on false evidence to bring the case, ⚑ *Dory v. Ryan,* 25 F.3d at 83; or where the prosecutor withheld exculpatory evidence. *See* ⚑ *Van de Kamp v. Goldstein,* 555 U.S. 335, 129 S.Ct. 855, 172 L.Ed.2d 706 (2009).

Given that the Court has rejected plaintiff's argument with respect to ADA Schindhelm, and that no basis for distinguishing the conduct of the other ADAs has been presented, the Court respectfully recommends that the claims against these defendants be dismissed.[8] Plaintiff does not address the defendants' Eleventh Amendment argument, but it seems clear that this provides an alternate ground for dismissal of the claims against the DA defendants. *See, e.g.,* ⚑ *Rodriguez v. Weprin,* 116 F.3d 62, 66 (2d Cir.1997).

### III. *Motion to Bifurcate Monell Claim*

By letter motion dated August 25, 2011, defendants seek an order bifurcating plaintiff's claims against the individually named defendants from the claims brought against the City, and staying all *Monell* discovery until liability against the individual defendants has been established. (Defs.' 8/25/11 Ltr.[9] at 1). In connection with this request, defendants seek to stay the plaintiff's Notice of Deposition for a Rule 30(b)(6) witness, as well as the depositions of ADAs Fisher and Applebaum regarding interviews of detainees prior to arraignment. (*Id.*)

Defendants contend that bifurcation will further "the goals of convenience and efficiency" while also conserving the time and resources of the parties and the court. (*Id.* at 2).

### A. *Standards*

In order to hold a municipality liable under ⚑ Section 1983, a plaintiff must first establish that the individual defendants' actions amounted to a constitutional violation, and secondly, must show that a policy or custom of the municipality caused their violative conduct. ⚑ *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); ⚑ *Oklahoma v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). If the plaintiff cannot show that the individual defendant's conduct was a constitutional violation, then the *Monell* claim must be dismissed.

**\*10** Bifurcation is appropriate when the resolution of a single issue may resolve the case and render trial on the other issue unnecessary. *See* ⚑ *Ismail v. Cohen,* 706 F.Supp. 243, 251 (S.D.N.Y.1989), *aff'd,* ⚑ 899 F.2d 183 (2d Cir.1990); *see also* ⚑ *Vickare v. AMBAC, Inc.,* 106 F.3d 457, 466 (2d Cir.1996); ⚑ *Ricciuti v. N.Y. City Transit Auth.,* 796 F.Supp. 84, 86 (S.D.N.Y.1992). In this Circuit, courts often order bifurcation in 1983 civil rights cases where there are *Monell* claims against the municipality. *See, e . g.,* ⚑ *Amato v. City of Saratoga Springs,* 170 F.3d 311, 316 (2d Cir.1999); *Jones v. City of New York,* No. 10 CV 5387, 2011 U.S. Dist LEXIS 31561, at \*2–3 (E.D.N.Y. Mar. 27, 2011); *Williams v. City of New York,* No. 07 CV 5362, 2008 U.S. Dist LEXIS 104730, at \*8 (E.D.N.Y. Dec. 29, 2008) (noting that bifurcation is a "common practice" in this Circuit in civil rights cases); *Busch v. City of New York,* No. 00 CV 5211, 2002 U.S. Dist LEXIS 18337, at \*9–10, 2002 WL 31051589 (E.D.N.Y. Sept.9, 2002); *Duke v. County of Nassau,* No. 97 CV 1495, 2000 U.S. Dist LEXIS 22415, at \*2–3 (E.D.N.Y. Oct. 26, 2000). In *Morales v. Irizarry,* the court stated, "[t]he overwhelming authority holds that ... the most prudent course is to try the *Monell* claims separately and to stay discovery concerning

those claims." 95 CV 5068, 1996 U.S. Dist. LEXIS 15613, at *3, 1996 WL 609416 (S.D.N.Y. Oct. 22, 1996).

Here, defendants contend that issues of efficiency and convenience weigh in favor of bifurcation because the task of litigating the *Monell* claim will be burdensome and time consuming. (Defs.' 8/25/11 Ltr. at 3). Defendants contend that among the discovery sought by plaintiff is testimony from numerous individuals regarding the Queens DA's Office policies and practices. (*Id.*) Defendants contend that resolution of the plaintiff's claim that the individual defendants violated his rights will allow the court to expedite trial of those issues and conserve resources. Defendants intend to move for summary judgment on the issue of probable cause for the arrest, and if they succeed, discovery on the *Monell* claim will be unnecessary. (*Id.* at 4).

In opposing bifurcation, plaintiff argues that the defendants' fear of extensive *Monell* discovery is unfounded. (Pl.'s 9/9/11 Ltr. [10] at 1). Plaintiff insists that he only seeks to depose the one 30(b)(6) witness that the City identifies in response to his Notice of Deposition. (*Id.*) In response to defendants' argument that the discovery needed for the *Monell* claim is different from the evidence required to prove the claims against the individual defendants, plaintiff argues that they are intrinsically intertwined and the claims against the individual defendants would require proof of the same evidence. (*Id.* at 1–2).

In this case, the Court agrees that bifurcation, at least for discovery purposes, is appropriate. If the district court adopts this Court's recommendation to dismiss the claims against the DA and the ADAs on immunity grounds, the challenge to the pre-arrangment process and arraignment waiver falls. Even if the Court were to permit these claims to proceed, defendants correctly note that if they can establish that the defendant officers had probable cause to arrest plaintiff based on Anecsha's statement, plaintiff's claims against the individual defendants would fail because a finding of probable cause defeats both claims for false arrest and malicious prosecution. *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995). *See also Obilo v. City Univ. of New York,* No. 01 CV 5118, 2003 U.S. Dist. LEXIS 2886, at *34, 2003 WL 715749 (E.D.N.Y. Feb. 28, 2003) (holding that "probable cause to arrest is sufficient for probable cause to prosecute unless facts come to light between the arrest and arraignment that vitiate the probable cause"). Here, although plaintiff contends that the ADAs failed to investigate the basis for his

arrest, in particular, his incarceration at the time, this is of no consequence to the question of the propriety of the pre-arraignment interview; even if the prosecutors had a duty to investigate, [11] plaintiff declined to provide them with any information from which to commence an investigation. Thus, at this time, there is no discernable causal connection between the pre-arraignment interview and any injury suffered by plaintiff.

**\*11** Accordingly, having considered all of the circumstances here, the Court grants defendants' request to bifurcate discovery on the *Monell* claim. If defendants are not successful in moving for summary judgment, then the 30(b)(6) deposition sought by plaintiff's counsel can be completed expeditiously and the case moved quickly to trial. This Court reserves decision on the motion to bifurcate the trial, finding that it would be better to consider this issue after summary judgment motions are decided and the scope of the trial is clarified.

*CONCLUSION*

Accordingly, for the reasons stated herein, the Court 1) denies plaintiff's motion to amend to add ADA Schindhelm and Investigator Mary Picone as defendants; 2) respectfully recommends that the court grant defendants' motion to dismiss plaintiff's claims against DA Brown, Commissioner Kelly, and the ADA defendants; 3) grants defendants' motion to bifurcate *Monell* discovery until after the motion for summary judgment is decided; and 4) reserves decision on defendant's motion to bifurcate the trial.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. Section 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health & Human Servs. .,* 892 F.2d 15, 16 (2d Cir.1989).

The Clerk is directed to send copies of this Order to the parties either electronically through the ECF system or by mail.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 603561

---

**Footnotes**

1      Citations to "Compl." refer to the proposed Amended Complaint, dated August 18, 2011 and filed on August 19, 2011.

2      Citations to "Pl.'s Mem." refer to the Memorandum of Law in Support of Plaintiff John Tabor's Motion to Amend the Complaint, dated August 18, 2011.

3      To determine whether an amendment would cause undue prejudice, courts consider whether the amendment "would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; *or* (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *In re 'Agent Orange' Prods. Liab. Litig.,* 220 F.R.D. at 25 (quoting *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993)) (emphasis in original). However, "[m]ere delay," without a showing of bad faith or prejudice, is not sufficient grounds for a court to deny leave to amend. *Id.; see also United States v. Cont'l Ill. Nat'l. Bank & Trust Co.,* 889 F.2d 1248, 1254–55 (2d Cir.1989).

4      Citations to "Defs.' Mem." refer to Defendants' Opposition to Plaintiff's Motion to File An Amended Complaint and their Cross Motion to Dismiss Certain Individual Defendants, dated September 2, 2011.

5      Citations to "Pl.'s Reply" refer to the Reply Memorandum of Law in Further Support of Plaintiff John Tabor's Motion to Amend the Complaint, dated September 9, 2011.

6      As an initial matter, plaintiff argues that defendants' motion fails to state under which provision of the Federal Rules of Civil Procedure they are moving. Plaintiff argues that if defendants are moving pursuant to Fed.R.Civ.P. 12(c), as they indicated at the conference before this Court, then a motion seeking to dismiss only specific defendants is improper because a Rule 12(c) motion is designed to implicate the pleadings in their entirety. (Pl.'s Mem. at 1 (citing *Curran v. Cousins,* 509 F.3d 36, 44 (1st Cir.2007)). Although plaintiff is correct that a Rule 12(c) motion "implicates the pleadings as a whole," *see Koninklijke Philips Electronics N.V. v. The ADS Group,* 694 F.Supp.2d 246, 251, n. 7 (S.D.N.Y.2010), he misinterprets what this means and how it applies here. Since motions to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) must be filed by defendants before they submit their Answer, *see* Fed.R.Civ.P. 12(b), courts evaluating Rule 12(b)(6) motions only review the Complaint and its attachments. In contrast, a motion for judgment on the pleadings pursuant to Rule 12(c) may be filed "at any time '[a]fter the pleadings are closed,' as long as the motion does not delay the trial." *Koninklijke Philips Electronics N.V. v. The ADS Group,* 694 F.Supp.2d at 251, n. 7 (quoting Fed.R.Civ.P. 12(c)). Accordingly, courts evaluating Rule 12(c) motions may consider all of the documents and exhibits filed in the case to that point, including the Answer and any attached exhibits. *See id.* (noting that "[a] Rule 12(c) motion differs from a Rule 12(b)(6) motion in that it implicates the pleadings as a whole as opposed to simply the complaint and its attachments") (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure,* §§ 1367, 1368 (2d ed.1995)). Consequently, the fact that defendants' motion for judgment on the pleadings "implicates the pleadings as a whole" means that this Court may review all of the parties' submissions in rendering a judgment; it does not mean that defendants are limited under Fed.R.Civ.P. 12(c) to moving to dismiss all defendants or none of them.

7 Citations to "Pl.'s Mem. in Opp." refers to Plaintiffs John Tabor's Opposition to Defendants' Cross–Motion to Dismiss Certain Individual Defendants, dated September 23, 2011.

8 The Court notes that in his opposition papers, plaintiff mentions the actions of ADAs Fisher and Applebaum in connection with the request that Mr. Tabor sign the standard arraignment waiver, but there is no argument presented as to ADAs Espinal or Parsons. Claims brought under ⚑ Section 1983 require "a plaintiff to establish that a defendant had some personal involvement in the allegedly unlawful conduct." *Turner v. Silver,* No. 96 CV 2315, WL 658616, at *3 (2d Cir. Nov. 12, 1996). Other than a general allegation that all of the ADAs "failed to examine a patently false allegation" (Compl.¶ 111), the involvement of ADAs Espinal and Parsons is unclear. All that seems to be specifically alleged in the Complaint with respect to Mr. Espinal is that he allegedly informed counsel of the change in the date of the alleged rape. (Compl.¶ 136). ADA Parsons is alleged to have met with plaintiff and counsel to discuss the date change and offer a plea, and elicited testimony in the Grand Jury. (*Id.* ¶¶ 138, 139, 144). Other than these actions, it is unclear what conduct, investigatory or otherwise, is alleged to have been undertaken by these ADAs in violation of plaintiff's constitutional rights.

9 Citations to "Defs.' 8/25/11 Ltr." refer to defendants' letter to the undersigned, dated August 25, 2011 and filed that same day.

10 Citations to "Pl.'s 9/9/11 Ltr." refer to the September 9, 2011 letter submitted by plaintiff in opposition to defendants' letter motion of August 25, 2011.

11 As noted *supra* at 12–13, this Court finds no basis for holding the prosecutors to such a duty in this case.

---

**End of Document**        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2025 Thomson Reuters. No claim to original U.S. Government Works. 10

2025 WL 2605343

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Matthew VANDERSLOOT, individually and on
behalf of all others similarly situated, Plaintiff,

v.

CHARLES BARATTA LLC, doing
business as Prime Marketing, Defendant.

24-cv-07096 (JMW)

|

Signed September 9, 2025

**Attorneys and Law Firms**

Andrew Roman Perrong, Perrong Law LLC, 2657 Mt. Carmel
Ave, Glenside, PA 19038, Attorney for Plaintiff.

Laura Kogan, David Krueger, Benesch Friedlander Coplan
& Aronoff, 127 Public Square, Suite 4900, Cleveland, OH
44114, Attorneys for Defendant.

## ORDER

WICKS, Magistrate Judge:

**\*1** Matthew VanderSloot ("Plaintiff") commenced this
action on October 8, 2024, pursuant to the Telephone
Consumer Protection Act ("TCPA"), 🚩 47 U.S.C. § 227 *et
seq.*, asserting that Charles Baratta d/b/a Prime Marketing
Source ("Defendant" or "Prime") allegedly called Plaintiff's
residential phone number repeatedly despite Plaintiff's
registration on the National Do Not Call Registry. (*See
generally* ECF Nos. 1, 28.) Plaintiff contends that through
use of fictitiously named individuals who allegedly worked
for various non-existent companies and entities, Defendant
initiated calls to Plaintiff over one hundred times without
Plaintiff's consent in an attempt to solicit Plaintiff filing a
potential Camp Lejeune claim. (*See* ECF No. 28 at ¶¶ 22-23.)
The parties are before the Court on Defendant's motion to
bifurcate individual and class discovery effectively seeking
to limit the initial discovery to whether or not Defendant
placed the subject calls. (*See generally* ECF Nos. 40, 41.) For
the reasons that follow, Defendant's motion (ECF No. 40) is
**GRANTED**.

## FACTUAL BACKGROUND

Plaintiff commenced this lawsuit asserting a violation of the
TCPA on behalf of himself and the National Do-Not-Call
("DNC") Class. (*Id.* at ¶ 3.) Despite having registered his
phone number on the National Do Not Call Registry, Plaintiff
contends that "Defendant, or its affiliates, agents, or other
persons or entities acting on Defendant's behalf violated the
TCPA by causing multiple telephone solicitation calls or
text messages to Plaintiff ...." (*Id.* at ¶¶ 17, 64.) According
to Plaintiff, Defendant's entire business model is structured
around relying on "illegal telemarketing, including using
fictitious names to hide their identify" to generate "leads"
from potential individuals interesting in filing lawsuits, and
subsequently selling that information to law firms. (*See id.* at
¶¶ 19-21.)

Beginning on August 30, 2023, Plaintiff maintains that
he received "over approximately one hundred calls"
from supposedly fictitious individuals named "Tiffany,"
"DeAndre," and "Christopher," working for allegedly non-
existent companies, including "Legal Helpers" and "Medical
Health Department," seeking to solicit Plaintiff for legal
representation in a Camp Lejeune claim. (*Id.* at ¶ 22.) Plaintiff
avers that these calls were unwanted, nonconsensual, and
resulted in violations of Plaintiff's and the DNC Class's
privacy rights. (*See id.* at ¶¶ 49-53.) Notably, Plaintiff
maintains that all calls from these entities and individuals
were placed "directly by Defendant." [1] (*Id.* at ¶ 23; *see also
id.* at ¶ 25 (arguing that Legal Helpers is Defendant)).

On September 20, 2023, and September 27, 2023, Defendant
allegedly sent a text message from the (210) 405-8263
telephone number, a number that Plaintiff maintains "is
a direct telephone number owned and operated by the
Defendant in the Defendant's name," to Plaintiff identifying
itself as "DeAndre" with "Legal Helpers." (*Id.* at ¶¶
28-29.) The calls continued and on January 10, 2024,
Plaintiff allegedly received "at least seven calls" from
"Tiffany" from the "Medical Health Department" using
a (713) 405-3514 number. (*Id.* at ¶ 31.) During the
last of the calls, "Tiffany" allegedly asked Plaintiff if
he received calls from "[Tiffany's] law associate" from
a (954) 800-2991 number, and that Plaintiff should "just
search for that number." (*Id.* at ¶ 32.) Plaintiff called
this number and spoke with "Christopher Garcia" who
provided "cgarcia@primemarketingsource.com" as his email
address and a callback number of (954) 799-8058. (*Id.* at ¶

33.) "Christopher Garcia" followed this call with an email regarding a Camp Lejeune claim which "also originated from the Defendant's email." (*Id.*) As Plaintiff contends, the two "954" numbers "are direct telephone numbers owned and operated by the Defendant in the Defendant's name." (*Id.* at ¶ 34.)

**\*2** Following this call with "Christopher," Plaintiff received a text message on January 10, 2024 from the 210-405-8263 number that read "954-799-8058 Chris G calls only" and another message saying "*cgarcia@primemarketingsource.com*." (*Id.* at ¶¶ 36-37.) "Christopher" purportedly then sent Plaintiff a text message from the "210" number including a link to a website to upload Plaintiff's ID that, upon clicking the link, prompted an individual named "Matthew" to upload his ID. (*See id.* at ¶ 38.) Shortly thereafter, on January 17, 2024, Plaintiff received a call from "Christopher" using the same "210" number. (*Id.* at ¶ 39.) As Plaintiff avers, "Tiffany" followed this call with a text asking Plaintiff to fill out verification and registration forms "Christopher" provided to Plaintiff using the 210-405-8263 number. (*See id.*) The next day, Plaintiff received another message from the 210-405-8263 number stating it was "Christopher Gee from Legal Helpers" inquiring about a Camp Lejeune claim. (*Id.* at ¶ 40.) That message left a callback number as 954-799-8058, the same number Christopher mentioned on a prior call. (*See id.* at ¶¶ 40-41.) Under these circumstances, Plaintiff contends that " 'Tiffany' from 'Medical Health Department' and 'Chris' and 'DeAndre' calls from 'Legal Helpers' were in fact uncovered as originating from the Defendant ...." (*See id.* at ¶¶ 46-48.)

## PROCEDURAL BACKGROUND

Plaintiff filed its Amended Complaint on February 13, 2025. (ECF No. 28.) On April 3, 2025, the undersigned held a pre-motion conference on Defendant's anticipated motion to dismiss the Amended Complaint for failure to state a claim. (*See* ECF No. 31.) During this pre-motion conference, "Plaintiff stipulated on the record that on the current Amended Complaint *only claims of direct liability* under the Telephone Consumer Protection Act are sought and that it *does not encompass a claim of vicarious liability.*" (*Id.*) (emphasis added).

On July 9, 2025, the Court denied Defendant's motion to dismiss the Amended Complaint for failure to state a claim under the TCPA, finding that "[b]ecause Plaintiff

present[ed] sufficient allegations that raise[d] a plausible inference that Defendant initiated the calls and messages to Plaintiff, Plaintiff's direct liability claim ought to proceed to discovery." *Vandersloot v. Charles Baratta LLC*, No. 24-cv-07096 (JMW), 2025 WL 1898929, at \*9 (E.D.N.Y. July 9, 2025). Consequently, the undersigned directed the parties to submit a proposed scheduling order addressing the end date for fact discovery; dates for expert reports and disclosures in chief and rebuttal; and end date of expert discovery. *See id.*

On July 23, 2025, the parties submitted two competing discovery schedules. (*See* ECF No. 39.) In this submission, Defendant expressed its intention to "seek bifurcation on the issue of whether Defendant placed the at issue calls, which the Plaintiff opposes." (*Id.* at p. 1.) Accordingly, the Court directed the parties to submit briefing on the motion to bifurcate discovery. (*See* Electronic Orders dated July 24, 2025, August 13, 2025.) Defendant submitted its motion on August 4, 2025 (ECF Nos. 40-41), Plaintiff opposed on August 26, 2025 (ECF No. 45), and Defendant submitted its reply on September 3, 2025. (ECF No. 46.)

## THE LEGAL FRAMEWORK

Bifurcation "is properly understood as a stay of class discovery pending resolution of plaintiff's individual claim." *Chow v. SentosaCare, LLC*, No. 19-CV-2541 (FR), 2020 WL 559704, at \*1 (E.D.N.Y. Jan. 23, 2020). A district court has "considerable discretion to stay discovery" under Federal Rule of Procedure 26(c), with the moving party having the burden of establishing good cause. *See Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of N.Y.*, No. 18-CV-4476 (LJL) (SLC), 2020 WL 1166047, at \*5 (S.D.N.Y. Mar. 11, 2020); *Mohammed Thani A.T. Al Thani v. Hanke*, 20-CV-4765 (JPC), 2021 WL 23312, at \*1 (S.D.N.Y. Jan. 4, 2021) ("Upon a showing of good cause[,] a district court has considerable discretion to stay discovery pursuant to Rule 26(c)") (alteration in original) (quoting *Rep. of Turk. v. Christie's, Inc.*, 316 F. Supp. 3d 675, 677 (S.D.N.Y. 2018)). Good cause may exist "where the 'resolution of a single issue may resolve the case and render trial on the other issue[s] unnecessary,' " *Charvat v. Plymouth Rock Energy, LLC*, No. 15-CV-4106 (JMA) (SIL), 2016 WL 207677, at \*2 (E.D.N.Y. June 5, 2013) (quoting *Tabor v. N.Y. City*, No. 11-CV-0195, 2012 WL 603561, at \*10 (E.D.N.Y. Feb. 23, 2012)), or where "a narrow, potentially dispositive issue," being "totally distinct from class issues," has the

potential render Plaintiff's TCPA claim baseless. *Id.* (quoting *Physicians Healthsource, Inc. v. Janssen Pharms., Inc.*, No. 12-CV-2132, 2014 WL 413534, at *2 (D.N.J. Feb. 4, 2014)).

**\*3** The Federal Rules of Civil Procedure do not squarely address the bifurcation of discovery. *See Cunningham v. Big Think Cap. Inc.*, No. 21-CV-02162 (DRH) (JMW), 2021 WL 4407749, at *2 (E.D.N.Y. Sept. 27, 2021); *see also* Alexa Ashworth, et al., *Bifurcation of Discovery*, 10 Fed. Proc., L. Ed. § 26:88 (Mar. 2023) (noting that the court may bifurcate discovery, for example, "in class actions into sections related to the claims of the named plaintiffs and the class claims"). Rather, when confronted with the issue, courts turn to Rule 42(b), which sets forth the standard to be applied when considering consolidation and separation of cases for trial. *Cunningham*, 2021 WL 4407749, at *2 (citing Fed. R. Civ. P. 42(b)). Borrowing from Rule 42, courts contemplate bifurcating discovery "[f]or convenience, to avoid prejudice, or to expedite and economize" the proceedings. Fed. R. Civ. P. 42(b); *see Charvat*, 2016 WL 207677, at *1 ("The standards applicable to motions to bifurcate discovery appear to be the same as those addressed under Fed. R. Civ. P. 42(b).").

However, bifurcation should be considered an exception, not the rule. *Harris v. Shore Funding Solutions Inc.*, No. 23-cv-00789 (JMA) (JMW), 2023 WL 3440077, at *2 (E.D.N.Y. Apr. 21, 2023). Indeed, courts are likely to deny bifurcation "where discovery relating to class issues overlaps substantially with merits discovery" given that, in such circumstances, "bifurcation will result in duplication of efforts and needless line-drawing disputes." *Charvat*, 2016 WL 207677 at *1 (quoting *Hines v. Overstock.com, Inc.*, No. 09-CV-991, 2010 WL 2775921, at *1 (E.D.N.Y. July 13, 2020)). Moreover, courts will not bifurcate if bifurcation will simply delay class certification or obfuscate the issue of what discovery relates to the class as opposed to the named plaintiff. *Id.* (citing *True Health Chiropractic Inc. v. McKession Corp.*, No. 13-CV-2219 (JST), 2015 WL 273188, at *2–3 (N.D. Cal. Jan. 20, 2015)).

Mindful of these principles, the Court considers the instant application.

## DISCUSSION

Defendant seeks to bifurcate discovery and serve limited discovery upon Plaintiff targeted at whether Defendant placed the calls at issue or not. (ECF No. 41 at pp. 7-8.) Defendant specifically intends to serve upon Plaintiff discovery requests "that cut to the core issues that might decide the case" at this juncture:

- Whether Prime actually called Plaintiff at the (208) XXX-XXXX phone number;

- If so, whether Plaintiff independently owns the (208) XXX-XXXX phone number, for residential use;

- Whether Prime actually called Plaintiff on the following dates: August 30, 2023; September 4, 2023; September 18, 2023, September 20, 2024; September 27, 2023; November 16, 2023; January 10, 2024; January 17, 2024; January 18, 2024; and

- Whether Prime owns the phone numbers identified in the Complaint.

(*Id.* at p. 4.)

In *Harris*, this Court granted a motion to bifurcate discovery under strikingly similar circumstances. 2023 WL 3440077, at *1. There, defendant sought to bifurcate individual and class discovery under the TCPA to explore "the threshold issue of whether Plaintiff received a call from Defendant" at a certain phone number and "whether Plaintiff owns the phone to which the number is assigned." *Id.* at *2. This Court determined that "limiting discovery for a certain period as to whether Defendant in fact even called Plaintiff at that number would be efficient and avoids costly and potentially unnecessary class discovery in this matter." *Id.* at *3. Indeed, the discovery regarding whether defendant actually called plaintiff was "distinct from class issues" and would not overlap with it because the proposed bifurcated discovery would involve plaintiff's individual phone records, defendant's specific call records for a certain date, defendant's outgoing calls to plaintiff, and "other categories that do not specifically relate to the larger proposed class of individuals ...." *Id.* Moreover, "resolution of [the] narrow, potentially dispositive issue ha[d] the potential to render Plaintiff's TCPA claim baseless and may resolve the case" especially in light of the anticipated dispositive motion practice following limited discovery. *Id.* at *4. Further,

the Court emphasized that "limited discovery [ ] has the potential to save the parties from the costs resulting from class action discovery," especially where plaintiff's propounded demands sought four years of documents containing outbound telemarking information by defendant or its vendors. *Id.* Lastly, the case was in its "nascent stages," an initial conference was held, and initial discovery requests were served by plaintiff only. *Id.* at *1, *5.

**\*4** Here, much like in *Harris*, the issues regarding Plaintiff's individual claim are distinct from, and do not overlap with, class issues. Through limited discovery, Defendant seeks to "gather telephone logs evidencing the purported calls, confirm Plaintiff's ownership of the (208) XXX-XXXX telephone number, show alleged text messages and/or emails that were exchanged, any relevant phone recordings of the Subject Calls, and verify through carrier data the origin of said call." (ECF No. 41 at p. 9.) Moreover, Plaintiff's Amended Complaint discusses at length calls and messages from "DeAndre," "Tiffany," and "Chris G," from "Legal Helpers" and "Medical Health Department." (*See* ECF No. 28 at pp. 4-8.) These are issues "that do not specifically relate to the class" but rather are particular to Plaintiff and the communications *he* had with Defendant. *See Cameron v. CHW Group, Inc.*, No. 23-cv-00320-HCN-DBP, 2025 WL 2336513, at *3 (D. Utah Aug. 13, 2025) (finding "enough separation between class discovery and individual discovery to warrant bifurcation" including discovery concerning, *inter alia*, whether plaintiff received telephone solicitations within the TCPA by defendant).

Plaintiff's class allegations, on the other hand, make generalized assertions that Defendant knowingly violated the TCPA by "causing multiple telephone solicitation calls and/or text messages to be initiated to Plaintiff and members of the National DNC Class in a 12-month period" despite being registered on the National Do Not Call Registry. (ECF No. 28 at ¶¶ 63-65.) Plaintiff fails to offer anything more than conclusory statements to support its contention that overlap exists. (*See* ECF No. 45 at pp. 12-14.) As such, the proposed limited discovery will not substantially overlap with class discovery or result in duplication of efforts. *Compare Harris*, 2023 WL 3440077, at *4, *with Cunningham*, 2021 WL 4407749, at *3 (determining bifurcation was not appropriate where issues of consent "concern[ed] the same online application and consent agreement" that all class members and plaintiff received).

Moreover, determining whether Defendant initiated the calls to Plaintiff is the dispositive issue on a direct liability claim.

*Banks v. Pro Custom Solar*, 416 F. Supp. 3d 171, 173 (E.D.N.Y. 2018) (noting that to establish direct liability under the TCPA, a plaintiff must allege that a defendant initiated the unsolicited call). As noted *supra*, Plaintiff is *solely* pursuing a claim of direct liability. (*See* ECF No. 31.) It follows, therefore, that Plaintiff's direct liability claim may be rendered baseless following a limited discovery period into whether Defendant placed the calls and whether Defendant owns the numbers that called Plaintiff. *Compare Fania v. Kin Ins., Inc.*, No. 22-12354, 2024 WL 2607303, at *2 (E.D. Mich. May 24, 2024) (bifurcating discovery to address the "case-dispositive questions" of whether plaintiff received a pre-recorded call and whether defendant was legally responsible for such calls), *with Simmons v. Author Reputation Press LLC*, No. 24-12330-BEM, 2025 WL 863601, at *2 (D. Mass. Mar. 18, 2025) (denying motion to bifurcate where defendant provided "no specific basis on which to conclude" plaintiff's individual claim was "vulnerable to early defeasance").

Furthermore, limited discovery may save the parties, particularly Defendant, from the "hefty litigation expenses and an extensive use of judicial resources" common in TCPA class actions. *Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc.*, No. 12-2132 (FLW), 2014 WL 413534, at *4 (D.N.J. Feb. 4, 2014) ("It is also generally understood that the costs can be particularly 'enormous' for defendants.") (citation omitted). Indeed, a majority of Plaintiff's initial discovery demands are tailored around a theory of vicarious liability notwithstanding Plaintiff's stipulation to the contrary. For example, Plaintiff's first set of interrogatories seek, *inter alia*, "[a]ll communications with any third party concerning this litigation other than [Defendant's] attorney," "all documents containing ... information for each outbound telemarketing call sent by [Defendant] or [Defendant's] vendor, including those made to Plaintiff," "[a]ll internal communications at [Defendant's] company regarding any third party that provided you the Plaintiff's telephone number," and "all complaints concerning outbound calls made by [Defendant] or by any vendor of [Defendant's] for allowing or making allegedly unlawful or unauthorized outbound calls." (ECF No. 45-2 at pp. 19, 28, 31, 33.) This discovery stretches not only beyond the theory of direct liability, but seeks *any* and *all* information from these third parties, thereby increasing potential costs and expenses. *Compare Harris*, 2023 WL 3440077, at *4, *with Charvat*, 2016 WL 207677, at *2 (denying motion to bifurcate where

defendant submitted no information suggesting that the discovery requests would be voluminous, unduly burdensome to produce, or disproportionate to the needs of the case).

**\*5** This case is also in its nascent stages. Although a scheduling order was entered on January 6, 2025 (ECF Nos. 22, 23), discovery was stayed shortly thereafter on February 7, 2025 pending disposition of Defendant's motion to dismiss. Even following denial of the motion to dismiss on July 9, 2025, no discovery schedule was entered because of the current motion to bifurcate. (*See* ECF No. 39); *see Harris,* 2023 WL 3440077, at \*1 ("The case is in its infancy. At the initial conference, the Court entered a Scheduling Order and set a briefing schedule for Defendant's motion to bifurcate discovery as to Plaintiff's individual claim and the proposed class."). Though Plaintiff raises prejudice in the form of being deprived of information needed to develop his current *and alternative theories* of his case, any asserted prejudice is neutralized by the early stage of this case coupled with the burdens and costs associated with unnecessary class action discovery under the TCPA. *See Harris,* 2023 WL 344077, at \*5; *see also Pavelka v. Paul Moss Ins. Agency, LLC,* No. 1:22 CV 02226, 2023 WL 3728199, at \*2 (N.D. Ohio May 30, 2023) (granting bifurcation where the case "[was] still in its preliminary stages" before defendant suggested bifurcating discovery); *see also Newell v. Aliera Healthcare, Inc.,* No. 19-cv-01489-SCJ, 2020 WL 13568762, at \*3 (N.D. Ga. Apr. 6, 2020).

Under the circumstances presented, where limited discovery (i) does not substantially overlap with class discovery, (ii) would ensure the just, speedy, and inexpensive determination of this action, and (iii) would not prejudice Plaintiff based on the status of this litigation, Defendant has established good cause for limited discovery related to Plaintiff's individual claim of direct liability. Accordingly, bifurcation of discovery is warranted and appropriate here.

## CONCLUSION

For the foregoing reasons, Defendant's motion for bifurcation (ECF No. 40) is **GRANTED**. All discovery relevant to Plaintiff's individual direct liability claim under the TCPA shall conclude by **November 7, 2025**, and the parties are directed to file a joint status report, on or before **November 3, 2025**, advising the Court as to the progress of discovery. Class discovery is stayed until further order by the Court.

**SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 2605343

---

## Footnotes

1    Plaintiff alleges that each these "spoofed" calls, in addition to text messages sent by "DeAndre" and "Tiffany," were sent by various, supposedly fictitious numbers, including: (208) 900-6666, (208) 681-7762, (615) 653-4187, (210) 405-8263, (872) 760-0218, (872) 760-0759, (713) 357-5174. (ECF No. 28 at ¶¶ 26-27.)

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-01410-JKM    Document 23-4    Filed 11/21/25    Page 118 of 121

Wilson v. Quest Diagnostics, Incorporated, Not Reported in Fed. Supp. (2019)

KeyCite Yellow Flag
Distinguished by Holton v. Finley, M.D.Pa., April 14, 2022

2019 WL 7560932
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Judy WILSON, on behalf of herself and
all others similarly situated, Plaintiff,
v.
QUEST DIAGNOSTICS, INCORPORATED, Defendant.

Civil Action No. 18-11960 (WJM)
|
Signed 08/22/2019

**Attorneys and Law Firms**

Andrew Joseph Obergfell, Bursor & Fisher PA, New York, NY, for Plaintiff.

Michael T. Hensley, Jorkeell Echeverria, Bressler Amery & Ross, PC, Florham Park, NJ, for Defendant.

## ORDER

MARK FALK, Chief U.S. Magistrate Judge

*1 **THIS MATTER** having come before the Court by way of Defendant's motion to stay the case, or in the alternative, bifurcate discovery [ECF No. 23]; and the Court having considered the papers in support of and in opposition to the motion; and for the reasons stated below, Defendant's motion is **DENIED**.

**IT APPEARING THAT:**

1. On July 23, 2018, Plaintiff, Judy Wilson, filed a putative class action complaint alleging violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"). Plaintiff claims that Defendant called on her cellular telephone, using an automatic telephone dialing system ("ATDS"), about a debt. However, Plaintiff alleges that she does not owe a debt to Defendant, is not a customer of Defendant, and has never provided Defendant with consent to call her. Plaintiff's Complaint seeks to certify a nationwide class, alleging that Defendant has a pattern and practice of autodialing consumers who have not provided consent.

2. On August 14, 2018, Defendant filed a pre-answer motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6).

3. On August 31, 2018, Plaintiff filed an Amended Complaint. In response, Defendant filed a motion to dismiss the amended complaint on September 10, 2018. The crux of Defendant's motion was that Plaintiff's Amended Complaint failed to state a claim because Plaintiff had not sufficiently pleaded facts alleging that Quest called her cellphone using an ATDS.

4. On December 17, 2018, the Honorable William J. Martini, U.S.D.J., denied Defendant's motion to dismiss. Judge Martini expressly found that Plaintiff had sufficiently pleaded the use of an ATDS. (Opinion at 5; ECF No. 14.) Judge Martini also commented on the need for discovery to proceed in this case, noting that "[d]uring discovery, the parties can explore the actual configuration of the dialing equipment used to call Plaintiff," and that "[w]ith the benefit of discovery as to the type of equipment Quest used and the nature and extent of Quest's contacts with Plaintiff, the case will be well postured to assess Quest's conduct under the TCPA." Judge Martini concluded the Opinion stating "[t]he Court will thus unlock the doors of discovery." (*Id.*; quotations omitted).

5. On January 29, 2019, the Undersigned issued an Order scheduling an initial conference.

6. On February 8, 2019, Defendant filed a formal motion seeking to stay the case. As an alternative to a stay, Defendant seeks to bifurcate discovery and focus on the issue of Plaintiff's "consent." (ECF No. 23.) Defendant contends that the FCC is engaged in notice and comment rulemaking on the issue of whether certain equipment qualifies as an ATDS – equipment they claim is at issue in this case – and thus, could impact Plaintiff's ability to bring a claim. In the alternative, Defendant wants to bifurcate discovery to focus solely on the issue of Plaintiff's consent. Defendant contends that Plaintiff's husband provided the phone number that was called in this case, and that he is a "customary" user of the phone, which it claims equates to consent under the TCPA.

*2 7. Plaintiff opposes the motion to stay and/or bifurcate. She contends that the FCC process is lengthy and could drag on for months or years without resolution. Moreover, Plaintiff contends that, since there has been no discovery on the subject of what dialing equipment Defendant used, the equipment might constitute an ATDS regardless of the

FCC's interpretation. Finally, Plaintiff opposes bifurcation on the grounds that whether her husband used her cell phone or not, consent is not implied and she is the only person with the authority to consent, which she did not do. She also contends that bifurcation will delay the case, cause discovery inefficiency and disputes, and result in duplication, such as deposing Plaintiff twice.

**8.** On July 3, 2019, while the motion to stay and/or bifurcate was pending, Defendant filed a motion for reconsideration of Judge Martini's decision on the motion to dismiss. Plaintiff opposes reconsideration as both untimely and substantively deficient.

**9.** Defendant seeks a stay of the case pursuant to (1) the Court's inherent authority; and (2) the primary jurisdiction doctrine.

A stay pursuant to the Court's inherent authority is completely discretionary. *See, e.g.,* 🚩 *Bechtel Corp. v. Local 215 Laborers' Int'l Union of N.A.*, 544 F. 2d 1207, 1215 (3d Cir. 1976). Deciding whether to stay a case requires "an exercise in judgment, which must weigh competing interests and maintain an even balance." 🚩 *Landis v. North Am. Co.*, 299 U.S. 248, 255-56 (1936). Considerations generally include: the hardship to the moving party should the case proceed; the potential prejudice to the non-moving party; the length of the requested stay; the similarity of issues; and judicial economy. *See, e.g., Ford Motor Credit v. Chiorazzo*, 529 F. Supp. 2d 535, 542 (D.N.J. 2008).

With respect to the primary jurisdiction doctrine, courts in the Third Circuit consider the following factors when determining whether the doctrine applies: (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made. *See* 🚩 *Baykeeper v. NL Indus., Inc.*, 660 F.3d 686, 691 (3d Cir. 2011).

**10.** Requests to bifurcate discovery are controlled by Rule 42(b). *See, e.g., Cephalon, Inc. v. Sun Pharm., Indus., Ltd.*, 2013 WL 3417416, at *2 (D.N.J. Aug. 31, 2016). "Bifurcation is the exception and the moving party bears the burden of

demonstrating that bifurcation is needed." *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 2016 WL 4541870, at *2 (D.N.J. Aug. 31, 2016). "Whether the advantages of bifurcation outweigh the disadvantages is a factual inquiry assessed on a case by case basis." *Id.* As a practical matter, bifurcation of discovery in this District, which is in a serious judicial emergency, is extremely rare, since bifurcation often delays cases and leads to serial motion practice.

**11.** Defendant's motion to stay is **denied**. At the outset, the parties' briefs read like briefs on the merits of the case. However, Defendant already had an opportunity to make a pre-answer motion to dismiss and it did not prevail. Indeed, Judge Martini's decision expressly states that the Court is "unlock[ing] the doors of discovery." We are now at the discovery stage; disagreement with a pre-answer decision is no basis to seek to stay the case and hope that intervening events from the FCC change its course. Putting that aside, consideration of the traditional factors do not support a stay in this case.

**\*3  12.** There is no basis for a stay under the primary jurisdiction doctrine.

<u>First</u>, determining what constitutes an ATDS is something that courts routinely consider and decide, and is well within the "conventional" role of judges. Case law supporting this view is expansive. *See, e.g., Baum v. ADT, LLC*, 2018 WL 5255219, at *3 (W.D. Pa. Oct. 22, 2018);* 🚩 *Grogan v. Aaron's Inc.*, 2018 WL 6040195, at *7 (N.D. Ga. Oct. 26, 2018);* 🚩 *Pieterson v. Wells Fargo Bank, N.A.*, 2018 WL 3241069, at *3 (N.D. Cal. July 2, 2018); *Bieler v. GC Servs. L.P.*, 2014 WL 5531169, at *3 (M.D.N.C. Nov. 3, 2014). Thus, the first primary jurisdiction factor does not support a stay.

<u>Second</u>, while the parties agree that what constitutes an ATDS is within the FCC's discretion, that does not mean that this case is a ripe for a stay. As cited with respect to factor one, judges are routinely called upon to, and do, decide what constitutes an ATDS. *See, e.g.,* 🚩 *Grogan*, 2018 WL 6040195, at *7 ("While it is beyond cavil that the issues implicated in this case ... fall within the FCC's purview, that does not lead to the inexorable conclusion that they are beyond ... this Court to analyze and adjudicate, even in the absence of binding regulatory guidance from the FCC."). Nothing about this case suggests that is an exceptional case that warrants abstention on primary jurisdiction grounds.

Third, the risk of inconsistent rulings does not require a stay. The case is already more than a year old and no discovery has taken place. There is no certainty with respect to when the FCC will issue anything, and even if something was issued soon, it would still be subject to further appeals and proceedings. Thus, while some risk of inconsistent determinations is theoretically conceivable, it is not definite enough as to warrant halting TCPA litigation and waiting an undetermined period of time for the FCC to issue guidance and then for that guidance to be further challenged. *See, e.g.*, Grogan, 2018 WL 6040195, at *8 ("While the Court is mindful that a concrete pronouncement from the FCC would prove beneficial in navigating the turbulent waters that lie ahead, neither is the Court willing to stay this matter for what could end up being years."). Moreover, as Plaintiff notes, it's "wholly possible" that Defendant's system could constitute an ATDS regardless of any future FCC guidance.

Finally, Defendant has not itself made an application to the FCC, which the majority of Courts generally deem necessary for the final factor to weigh in favor of a stay. *See, e.g.*, Demmick v. Cellco Partnership, 2011 WL 1253733, at *6 (D.N.J. Mar. 29, 2011).

**13.** The Court also declines to stay this case pursuant to its inherent authority. First, Defendant has not established any prejudice that will result from proceeding with the case. Defendant had the benefit of a stay of discovery while its motion to dismiss was pending - and the case is now more than year old. Judge Martini denied the motion to dismiss and directed discovery to proceed. It is time to proceed with the case. To the extent Defendant claims that Plaintiff's discovery demands themselves are burdensome or disproportionate or expensive, that can be addressed pursuant to the discovery rules, *see* Fed. R. Civ. P. 26; it is not, however, a basis to avoid discovery altogether. Nor does engaging in balanced and appropriate discovery constitute any prejudice.

**\*4** Second, there is likely prejudice to the non-moving party. The case has been pending for a fairly lengthy period of time with no discovery. The longer the case sits dormant, the longer the wait for the case to be decided on the merits.

Third and Fourth, the length of the stay and judicial economy are addressed together – and neither supports a stay. The period of stay sought here could be lengthy. No one knows when the FCC may act. It could be many months, and with no certainty whatsoever that what the FCC does will affect this case. It certainly may not be binding. At the same time, Plaintiff will be precluded from discovery, and the case will potentially be years away from trial.

**14.** Bifurcation would be inefficient and contrary to judicial economy. Bifurcation of discovery is a discretionary matter that is considered on a case-by-case basis. Here, no special basis for bifurcation has been shown. Defendant contends that the issue of consent could be dispositive of the case and thus should proceed first. However, that position is untenable and unfair. The Court should not allow one side to pick one defense of its choosing, limit discovery to that issue, and then presumably try a summary judgment motion. Both sides have a right to discovery. Further, if the ensuing summary judgment motion was denied, the case would just be starting and there would likely be subsequent rounds of dispositive motion practice – a completely impractical approach. Also, Defendant's argument that considering its chosen issue first would dispose of the case could be (and often is) made in every case. However, allowing that approach to case management would not only be unfair to plaintiff, it would wreak havoc on the docket, extending resolution of cases for years. For example, following a motion on the consent issue, one would assume Defendant (and perhaps Plaintiff) would seek to make additional, merits-based summary judgment motions after the close of fact discovery. Generally, one round of summary judgment motions following the close of discovery is the Court's practice. And nothing in this case suggests that it is unique or different such that it should be permitted two different dispositive motions before any discovery is taken. For that reason, bifurcation will only delay the disposition of the entire case, and therefore, is contrary to judicial economy.

**FOR THE REASONS STATED ABOVE**,

**IT IS** on this 22 nd day of August 2019,

**ORDERED** that, Defendant's motion to stay, or in the alternative to bifurcate discovery [ECF No. 23] is **DENIED**. The parties are directed to confer and submit a joint discovery plan within 14 days.

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 7560932

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.